## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| STATE OF CONNECTICUT, by its Attorney General, William M. Tong,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>EXXON MOBIL CORPORATION,<br><br>　　　　　　　Defendant. | Case No.<br><br><br><br>October 14, 2020 |

## <u>NOTICE OF REMOVAL</u>

PLEASE TAKE NOTICE THAT Defendant Exxon Mobil Corporation ("ExxonMobil") hereby removes this action from the Connecticut Superior Court for the Judicial District of Hartford to the United States District Court for the District of Connecticut pursuant to 28 U.S.C. §§ 1331, 1332(a), 1441, 1442(a), and 1453(b), and 43 U.S.C. § 1349(b)(1).  To the extent any part of Attorney General's causes of action can be construed as non-federal, this Court has supplemental jurisdiction over them under 28 U.S.C. § 1367(a) because they form part of the same case or controversy as those causes of action over which the Court has original jurisdiction.[1]

While purportedly brought under state law and in the name of consumer protection, this lawsuit by the State of Connecticut, acting through its attorney general (the "Attorney General"), is the latest product of a multi-year plan developed by plaintiffs' attorneys, climate activists, and special interests designed to suppress political speech on matters of national public importance and to substitute, through litigation, the judgment of certain state attorneys general for that of the duly

---

[1] By filing this Notice of Removal, ExxonMobil does not waive any right, defense, affirmative defense, or objection, including without limitation any challenges to personal jurisdiction, insufficient process, and/or insufficient service of process.

elected political branches of the federal government.  While the Attorney General is entitled to disagree with particular statements about climate and energy policy, he is not entitled to use state power to suppress speech and deter free association as part of a coordinated campaign to change federal climate and energy policy.  In keeping with his intent to unduly influence the public debate over climate change and the appropriate responses to it, the Attorney General seeks to compel ExxonMobil to fund a "corrective education campaign" promoting the Attorney General's viewpoint on disputed questions of public concern.  Compl., Prayer for Relief ¶ 8.

This suit is not about consumer protection, and it is not properly brought under state law. The Attorney General purposefully wades into complex federal statutory, regulatory, and constitutional issues, and attempts to substitute one state's judgment for longstanding decisions by the federal government about national and international energy policy and environmental protection.  A suit of this nature should be heard by a federal court.

## TIMELINESS OF REMOVAL

1.     The Attorney General initiated this action on September 14, 2020, when the summons and Complaint were served on ExxonMobil.  The Attorney General filed the action that same day in the Connecticut Superior Court for the Judicial District of Hartford, as Civil Action No. X03-HHD-CV-20-6132568-S.

2.     This Notice of Removal is timely because it is filed within 30 days of service.  *See* 28 U.S.C. § 1446(b).

## NATURE OF THE ACTION

3.     The Attorney General brought this action to limit and ultimately end ExxonMobil's production of fossil fuels because of their purported connection to alleged climate change-based injuries.

2

4.     The origins of this lawsuit demonstrate the coordinated attempt to regulate worldwide greenhouse gas emissions—a task assigned exclusively to the federal government in our constitutional system.   In early 2016, a coalition of state attorneys general, including Connecticut's Attorney General, entered into a "Climate Change Coalition Common Interest Agreement" purportedly in furtherance of their shared interest in "limiting climate change" and "ensuring the dissemination of *accurate* information about climate change."  Ex.[2] 1 at 1 (emphasis added).   Those state and local government officials—approximately 20 in number—called themselves the "Green 20."[3]

5.     On March 29, 2016, the Green 20 held a press conference titled, "AGs United for Clean Power," with at least one representative of the Attorney General in attendance.  Ex. 2 at 1. Noting the perceived "gridlock in Washington," the New York Attorney General promoted "collective efforts to deal with the problem of climate change" and urged his colleagues to "step into this [legislative] breach" through the "creative[]" and "aggressive[]" use of their respective offices to target the fossil fuel industry.  *Id.* at 1-3.[4]

6.     The AGs United for Clean Power press conference was the product of a strategy that climate activists and plaintiffs' lawyers developed years earlier.  Its outlines emerged during a "Workshop on Climate Accountability, Public Opinion, and Legal Strategies" held in La Jolla,

---

[2] "Ex." refers to an Exhibit attached to this Notice of Removal.

[3] The parties to the Climate Change Coalition Common Interest Agreement included the attorneys general of California, Connecticut, Delaware, the District of Columbia, Iowa, Illinois, Maryland, Massachusetts, Maine, Minnesota, New Hampshire, New Mexico, New York, Oregon, Rhode Island, Virginia, Vermont, Washington, and the U.S. Virgin Islands.  *See* Ex. 1 at 3-20; Ex. 2 at 1.

[4] This press conference drew criticism from thirteen other state attorneys general, who viewed the intentions expressed by the Green 20 as an attempt to "[u]s[e] law enforcement authority to resolve a public policy debate."  Ex. 3 at 3.

California in June 2012.  Ex. 4 at 1.  The workshop attendees discussed using law enforcement powers and civil litigation to "maintain[] pressure on the [fossil fuel] industry that could eventually lead to its support for legislative and regulatory responses to global warming."  *Id.* at 27.  Some participants noted that "pressure from the courts offers the best current hope for gaining the energy industry's cooperation in converting to renewable energy."  *Id.* at 27-28.  The attendees concluded that "a single sympathetic state attorney general might have substantial success in bringing key internal documents to light" that could be used to coerce companies to change their positions on climate and energy policy.  *Id.* at 11.  They also saw civil litigation as a vehicle for accomplishing their goals, with one commentator observing: "Even if your ultimate goal might be to shut down a company, you still might be wise to start out by asking for compensation for injured parties."  *Id.* at 13.

7.      Prior to the AGs United for Clean Power press conference, the attorneys general met with climate activists who had participated in the La Jolla conference.[5]  One of those activists had recently attended a meeting at the Rockefeller Family Fund offices to discuss a so-called "Exxon campaign" to undermine ExxonMobil's ability to conduct business.  Ex. 6 at 1.  The campaign's goals included:

- "delegitimiz[ing] [ExxonMobil] as a political actor,"

- "establish[ing] in [the] public's mind that Exxon is a corrupt institution that has pushed humanity (and all creation) toward climate chaos and grave harm," and

- "driv[ing] divestment from Exxon."  *Id.*

---

[5] These presentations were not only closed to the public; the attorneys general also affirmatively and deceptively directed the participants to conceal their attendance.  *See* Ex. 5 at 1 ("My ask is if you speak to the reporter, to not confirm that you attended or otherwise discussed the event.").

8.      Over the next several years, the attorneys general associated with the Green 20 filed lawsuits against ExxonMobil and other energy companies, all with the goal of limiting—if not ceasing—ExxonMobil's production and sales of fossil fuels, including by stifling speech on political issues and questions.[6]  The first of these lawsuits, brought by the New York Attorney General, went to trial on October 22, 2019, and concluded with a complete vindication for ExxonMobil.  Justice Ostrager, who presided over the trial, found the State's allegations to be "without merit," and its complaint to be "hyperbolic" and the "result of an ill-conceived initiative of the Office of the Attorney General."  *People* v. *Exxon Mobil Corp.*, Civ. No. 18-45044, 2019 WL 6795771, at *1-2, *26 (N.Y. Sup. Ct. Dec. 10, 2019).

9.      Numerous municipalities, also intending to shape national and international energy policy, have joined in the effort to file lawsuits against energy companies.[7]  A trial court in Texas concluded that climate activists had mounted a "crusade" against ExxonMobil "aimed to chill and suppress ExxonMobil's speech through legal actions & related campaigns."  *City of San Francisco* v. *Exxon Mobil Corp.*, Civ. No. 18-106, 2020 WL 3969558, at *3, *8 (Tex. App. June 18, 2020)

---

[6] *See District of Columbia* v. *Exxon Mobil Corp.*, Civ. No. 20-2892 (D.C. Sup. Ct. June 25, 2020); *Commonwealth* v. *ExxonMobil Corp.*, Civ. No. 19-3333 (Mass. Super. Ct. Oct. 24, 2019); *People* v. *ExxonMobil Corp.*, Civ. No. 18-45044 (N.Y. Sup. Ct. Oct. 24, 2018); *State* v. *Chevron Corp.*, Civ. No. 18-4716 (R.I. Super. Ct. July 2, 2018).

[7] *See City of New York* v. *BP p.l.c.*, Civ. No. 18-182 (S.D.N.Y. Jan. 9, 2018); *City & County of Honolulu* v. *Sunoco LP*, Civ. No. 20-380 (Haw. Cir. Ct. Mar. 9, 2020); *Mayor & City Counsel of Baltimore* v. *BP p.l.c.*, Civ. No. 18-4219 (Md. Cir. Ct. July 20, 2018); *King County* v. *BP p.l.c.*, Civ. No. 18-11859 (Wash. Super. Ct. May 9, 2018); *Bd. of Cnty. Comm'rs of Boulder Cnty.* v. *Suncor Energy (U.S.A.), Inc.*, Civ. No. 18-30349 (Colo. Dist. Ct. Apr. 17, 2018); *City of Richmond* v. *Chevron Corp.*, Civ. No. 18-55 (Cal. Super. Ct. Jan. 22, 2018); *City of Santa Cruz* v. *Chevron Corp.*, Civ. No. 17-3243 (Cal. Super. Ct. Dec. 20, 2017); *County of Santa Cruz* v. *Chevron Corp.*, Civ. No. 17-3242 (Cal. Super. Ct. Dec. 20, 2017); *City of Oakland* v. *BP p.l.c.*, Civ. No. 17-87588 (Cal. Super. Ct. Sept. 19, 2017); *City of San Francisco* v. *BP p.l.c.*, Civ. No. 17-561370 (Cal. Super. Ct. Sept. 19, 2017); *City of Imperial Beach* v. *Chevron Corp.*, Civ. 17-1227 (Cal. Super. Ct. July 17, 2017); *County of Marin* v. *Chevron Corp.*, Civ. No. 17-2586 (Cal. Super. Ct. July 17, 2017); *County of San Mateo* v. *Chevron Corp.*, Civ. No. 17-3222 (Cal. Super. Ct. July 17, 2017).

(internal quotation marks omitted).  A Texas appellate court likewise expressed dismay about California municipalities' "[l]awfare," which it considered "an ugly tool by which to seek the environmental policy changes the California Parties desire, enlisting the judiciary to do the work that the other two branches of government cannot or will not do."  *Id.* at *20.

10.     More recently, Bloomberg Philanthropies funded the creation of a State Energy & Environmental Impact Center (the "Impact Center") to assist in litigation to shape national energy policy.[8]  The Impact Center urges state attorneys general to bring climate change lawsuits and provides them with resources on the condition that the participating attorneys general do so.  *See* Ex. 7 at 1-3.  Among its initiatives, the Impact Center embeds Bloomberg's Special Assistant Attorneys General ("SAAGs"), who are often experienced environmental plaintiffs' attorneys, within attorneys general offices that agree to "advanc[e] progressive clean energy, climate change, and environmental legal positions."  *Id.* at 3.

11.     The Impact Center exercises significant control over the SAAGs.  As an initial matter, the Impact Center selects the SAAGs and pays their salaries and benefits.  *See id.* at 2. Additionally, the Impact Center evaluates the SAAGs' work to determine whether to continue the program or allocate additional resources to a particular attorney general.  *Id.* at 2-3.

12.     When, in September 2020, the Attorney General filed his Complaint in this action, his allegations echoed the strategies announced at the AGs United for Clean Power press conference, the objectives of the Impact Center, and the assertions made in lawsuits brought by

---

[8]*See* Juliet Eilperin, *NYU Law Launches New Center to Help State AGs Fight Environmental Rollbacks*, Wash. Post (Aug. 16, 2017), https://www.washingtonpost.com/politics/nyu-law-launches-new-center-to-help-state-ags-fight-environmental-rollbacks/2017/08/16/e4df8494-82ac-11e7-902a-2a9f2d808496_story.html.

the attorneys general of New York, Massachusetts, Rhode Island, the District of Columbia, and Minnesota.[9]

13.     Indeed, the Complaint's signature block includes a SAAG selected, embedded, and compensated by the Impact Center.  Compl. at 47.  In his application to the Impact Center, the Attorney General wrote that a SAAG "would assist us in evaluating and pursuing climate change related matters," which included "potential actions to reduce emissions of greenhouse gases."  Ex. 8 at 2.  As demonstrated in the Complaint, reducing greenhouse gases was the Attorney General's top priority and ExxonMobil was the primary target.

14.     Thus, although brought in the name of the State of Connecticut, the Complaint is actually the product of special interest groups.  It has been filed to influence national energy policy and the United States' international position on climate change, and to seek discovery that will be weaponized and used for purposes outside the litigation.  The Complaint is a political act, not a legal one.

15.     The Complaint does little to mask the core purpose of the Attorney General's lawsuit—namely, to force reductions in fossil fuel production, sales, and use under the guise of state consumer protection laws.  For example, the Attorney General alleges that the "most significant way in which human activity has contributed to climate change is through the extraction, refinement, and combustion of fossil fuels."  Compl. ¶ 25.  The only solution, in the Attorney General's view, is to cease reliance on fossil fuel.  *Id*. ¶ 90 (alleging that "the only meaningful way to curtail climate change [i]s to curtail combustion of fossil fuels.").

---

[9] The majority of these suits were filed with the assistance of SAAGs selected and funded by the Impact Center.

16.     Those allegations make clear that the fundamental issue raised in the Complaint is not the accuracy of representations made in advertisements about the nature of the products being sold, but whether ExxonMobil's products should be sold *at all*.  *See also id.* ¶ 30 (taking issue with ExxonMobil's alleged "stated position [] that it will continue to explore for new fossil fuel reserves and that it does not anticipate a reduction in fossil fuel consumption for the next forty years."). This lawsuit is intended to force ExxonMobil to substantially eliminate, if not cease altogether, its fossil fuel activities, in a coordinated effort to curb global greenhouse gas emissions.  Through this lawsuit, the Attorney General seeks to impose Connecticut's views on climate change on every other state, the federal government, and indeed the rest of the world.

17.     The Complaint's allegations of harm further demonstrate the inextricable relationship between the Attorney General's claims and the production, sale, and use of fossil fuels. According to the Complaint, ExxonMobil's alleged deception was harmful because it caused consumers to use more fossil fuels, which in turn contributed to greenhouse gas emissions and climate change.  *See, e.g.*, Compl. ¶ 6 (alleging that ExxonMobil engaged in "a systematic campaign of deception" to undermine public acceptance of the fact that "anthropogenic (human-caused) climate change was real and dangerous to humanity"); ¶ 11 (asserting that ExxonMobil's "strategy to create uncertainty about climate science successfully kept consumers purchasing ExxonMobil products"); ¶¶ 42-43 (alleging that continued purchasing of fossil fuel products and delayed creation of alternative technologies have contributed to the devastating effects of climate change); ¶¶ 168-81 (listing the harms Connecticut has allegedly suffered due to climate change: rise in sea level, flooding, drought, increase in extreme temperatures and storms, contamination of drinking water, increase in illness, economic loss caused by decreased productivity and tourism, and adaptation costs).

18.     Those allegations suggest that the alleged injuries in this lawsuit are the effects of climate change, not the price per gallon Connecticut consumers paid for gasoline at the pump.  The allegations also demonstrate that this lawsuit's objective is to reduce fossil fuel use, and thereby effectively eliminate its production.  Indeed, the Complaint alleges that ExxonMobil's public relations campaign "kept consumers buying ExxonMobil fossil-fuel-based products, and prevented a transition to alternative sources of energy."  Compl. ¶ 58.

19.     Central to the Attorney General's claims is the notion that ExxonMobil produced, promoted, and sold oil and gas products to billions of consumers around the world, and thus has had a *global* impact.  Indeed, the Attorney General's claims depend on ExxonMobil's nationwide and global activities, as well as the activities of billions of fossil fuel consumers, including not only the U.S. government and military, but also hospitals, schools, manufacturing facilities, and individual households.  The production of a dependable, affordable energy supply by ExxonMobil and other oil and gas producers is the backbone of the American economy.  Fossil fuel products power our national defense and military; drive production and innovation; keep our homes, offices, hospitals, and other essential facilities illuminated, powered, heated, and ventilated; transport workers and tourists across the nation; and form the materials from which innumerable consumer, technological, and medical devices are fashioned.  The State of Connecticut itself is a prodigious consumer and user of fossil fuels.

20.     The Complaint seeks to hold ExxonMobil liable for the consequences of longstanding decisions by the federal government regarding, among other things, national security, national energy policy, environmental protection, the maintenance of a national strategic petroleum reserve program, development of the nation's resources on the Outer Continental Shelf, mineral extraction on federal lands (which have yielded billions of dollars for the federal

government), and the negotiation of international agreements bearing on the issue of climate change.  ExxonMobil has leases and contracts with the federal government to develop and extract minerals from federal lands, and has acted under the direction of federal officers to produce and sell fuel and associated products to the federal government for the nation's defense.

21.     The Complaint improperly attempts to apply state law to interstate and, indeed, international activity to which federal law and only federal law applies.  The policy decisions surrounding the use of fossil fuels and the threat of climate change "require consideration of competing social, political, and economic forces," as well as "economic [and] defense considerations."  *Juliana* v. *United States*, 947 F.3d 1159, 1172 (9th Cir. 2020) (internal quotation marks and citations omitted).  "[A]ny effective plan [to reduce fossil fuel emissions] would necessarily require a host of complex policy decisions entrusted . . . to the wisdom and discretion of the executive and legislative branches" of the federal government.  *Id.* at 1171 (citation omitted). This lawsuit thus implicates bedrock divisions of federal-state responsibility, and the claims fall squarely on the federal side.

22.     The domestic aspects of this case are governed by the Clean Air Act and Environmental Protection Agency ("EPA") regulations, while the international aspects of the case are governed by the Foreign Commerce Clause and the foreign affairs powers of the federal government.  The production and sale of fossil fuels is lawful throughout the world, and many countries encourage the production of oil and gas within their borders—often going to great lengths to do so.  As the United States has noted in a brief filed in a similar climate change action: "Where, as here, the Cities seek to project state law into the jurisdiction of other nations, the potential is particularly great . . . for interference with United States foreign policy."  Brief for the

United States, *City of Oakland* v. *BP p.l.c.*, 960 F.3d 570 (9th Cir. 2020) (No. 18-16663), 2019 WL 2250196, at *15.

23.     In sum, the Complaint intrudes on the federal political branches' exclusive authority to address important issues of national and international energy and environmental policy.  The balance between the use of fossil fuels and reduction of greenhouse gas emissions is an interstate and international issue, and the Attorney General's claims directly implicating this issue can be addressed only on a national level.  Accordingly, the Complaint should be heard in a federal forum.

## **GROUNDS FOR REMOVAL**

24.     A defendant may remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction."  28 U.S.C. § 1441(a).  This Court has original jurisdiction over this action on multiple grounds.[10]  *First*, these claims, which concern transboundary pollution, foreign relations, and the navigable waters of the United States, necessarily arise under federal common law.  *Second*, this case raises disputed and substantial federal questions arising under federal statutes, federal regulations, and international treaties dealing directly with the balance between the use of fossil fuels and the reduction of greenhouse gas emissions, warranting the exercise of federal jurisdiction under *Grable & Sons Metal Products,*

---

[10] Removal jurisdiction under 28 U.S.C. § 1441(a) is coextensive with original jurisdiction under 28 U.S.C. § 1331.  *See Wis. Dep't of Corr.* v. *Schacht*, 524 U.S. 381, 390 (1998) ("Since a federal court would have original jurisdiction to hear this case had [the plaintiff] originally filed it there, the defendants may remove the case from state to federal courts." (citing 28 U.S.C. § 1441(a))); *Shapiro* v. *Logistec USA, Inc.*, 412 F.3d 307, 309-10 (2d Cir. 2005) ("[D]efendant may remove to federal court 'any civil action brought in a State court of which the district courts of the United States have original jurisdiction.'" (citing 28 U.S.C. § 1441(a))); *see also* 14C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3722 (4th ed. Apr. 2020 Update) ("Generally, then, removal based on Section 1441(a) embraces the same class of cases as is covered by Section 1331, the original federal-question jurisdiction statute.").

*Inc.* v. *Darue Engineering & Manufacturing*, 545 U.S. 308, 312 (2005). *Third*, the Federal Officer Removal Statute, 28 U.S.C. § 1442, authorizes removal because many of the activities for which this action seeks to hold ExxonMobil liable were taken at federal direction. *Fourth*, this Court has original jurisdiction over this lawsuit and removal is proper pursuant to the Outer Continental Shelf Lands Act ("OCSLA") because this case "aris[es] out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b)(1). *Fifth*, the claims the Attorney General asserts arise out of federal enclaves. *See* U.S. Const., art. I, § 8, cl. 17. *Sixth*, the Attorney General brings this suit on behalf of Connecticut consumers, who are the real parties in interest, creating removal jurisdiction on the basis of diversity of citizenship. 28 U.S.C. § 1332(a).[11]

## I.     The Attorney General's Complaint Arises under Federal Common Law

25.     Section 1331 supplies this Court with jurisdiction over the Attorney General's suit because its causes of action can arise—if at all—only under federal common law. *See Nat'l Farmers Union Ins. Cos.* v. *Crow Tribe of Indians*, 471 U.S. 845, 850 (1985) (recognizing original federal jurisdiction over "claims founded upon federal common law"). While the Attorney General presents his claims as being brought under state law, courts have long recognized that claims may arise under federal common law regardless of whether they are styled as federal claims. *See, e.g.*, *United States* v. *Standard Oil Co.*, 332 U.S. 301, 307 (1947) (holding that certain claims asserted under state law must be governed by federal common law because they involved "matters essentially of federal character"); *Republic of Philippines* v. *Marcos*, 806 F.2d 344, 352 (2d Cir.

---

[11] If the Attorney General challenges this Court's jurisdiction, ExxonMobil reserves the right to further elaborate on these grounds beyond their specific articulations in this Notice. *Cf. Betzner* v. *Boeing Co.*, 910 F.3d 1010, 1014-16 (7th Cir. 2018).

1986) (finding that plaintiff's state law claims arose under federal common law, and that federal question jurisdiction thus existed); *Nordlicht* v. *New York Tel. Co.*, 799 F.2d 859, 862 (2d Cir. 1986) (holding that the plaintiff's claims concerning interstate telecommunications "ar[o]se under federal common law," even though the complaint "purport[ed] to rely solely on state law), *abrogated on other grounds by Marcus* v. *AT&T Corp.*, 138 F.3d 46 (2d Cir. 1998); *Sam L. Majors Jewelers* v. *ABX, Inc.*, 117 F.3d 922, 926-28 (5th Cir. 1997). The Attorney General's claims implicate three "uniquely federal interests" that demand the application of federal common law: (i) transboundary pollution, (ii) the navigable waters of the United States, and (iii) international affairs and commerce.

26.     Although "[t]here is no federal general common law," *Erie R. Co.* v. *Tompkins*, 304 U.S. 64, 78 (1938), there remain "some limited areas" in which the governing legal rules are supplied not by state law, but by "what has come to be known as 'federal common law,'" *Tex. Indus., Inc.* v. *Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (citing *Standard Oil*, 332 U.S. at 308). In particular, federal common law governs areas implicating "uniquely federal interests," *Boyle* v. *United Techs. Corp.*, 487 U.S. 500, 504 (1988), such as where the issue is, by nature, "within [the] national legislative power" and there is a "demonstrated need for a federal rule of decision" on that issue. *Am. Elec. Power Co.* v. *Connecticut* ("*AEP*"), 564 U.S. 410, 421-22 (2011). These interests are also present where "the interstate or international nature of the controversy makes it inappropriate for state law to control." *Tex. Indus.*, 451 U.S. at 641. Where federal common law must govern, there simply is no parallel state-law claim. "[I]f federal common law exists, it is because state law cannot be used." *City of Milwaukee* v. *Illinois* ("*Milwaukee II*"), 451 U.S. 304, 313 n.7 (1981).

### *Transboundary Pollution*

27.     The United States Supreme Court has long recognized that "[e]nvironmental protection is undoubtedly an area within national legislative power" for which "federal courts may . . . fashion federal [common] law." *AEP*, 564 U.S. at 421 (internal quotation marks and citation omitted); *see also Illinois* v. *City of Milwaukee* (*"Milwaukee I"*), 406 U.S. 91, 103 (1972) ("When we deal with air and water in their ambient or interstate aspects, there is federal common law."). Thus, federal common law is to be applied to "transboundary pollution suits." *Native Village of Kivalina* v. *ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012); *see, e.g.*, *Int'l Paper Co.* v. *Ouellette*, 479 U.S. 481, 487-88 (1987); *Missouri* v. *Illinois*, 200 U.S. 496, 576 (1906); *City of New York* v. *BP p.l.c.*, 325 F. Supp. 3d 466, 472 (S.D.N.Y. 2018), *appeal pending*, No. 18-2188 (2d Cir. argued Nov. 22, 2019) (citation omitted) ("the City's claims are ultimately based on the 'transboundary' emission of greenhouse gases, indicating that these claims arise under federal common law").

28.     This is because, as the Supreme Court has held for more than a century, "[e]ach state stands on the same level with all the rest," and no state "can impose its own legislation on . . . one of the others." *Kansas* v. *Colorado*, 206 U.S. 46, 97 (1907).  Because the State of Connecticut cannot impose its law on the production, sale, and use of fossil fuels in the 50 States, some of which may disagree with Connecticut's dim view of fossil fuels, this action must arise under federal common law.  *See* Brief for the United States, *Milwaukee II*, 451 U.S. 304 (1981) (No. 79-408), 1980 WL 339512, at *18 ("[A state cannot] generally enforce its own law beyond its borders.  Yet, its sovereign rights ought not be circumscribed by the law of its neighbor state, which may be inadequate.  Accordingly, federal law must perforce serve as a basis for resolving interstate pollution disputes." (internal quotation marks and citation omitted)).

29.     In *Milwaukee I*, a unanimous Court held that a suit for interstate water pollution arose under federal law and was within the jurisdiction of the federal district courts.  406 U.S. at 108.  In that case, the State of Illinois filed a motion for leave to pursue an original action in the Supreme Court.  *Id.* at 94.  The proposed action sought to abate a nuisance allegedly created by Milwaukee and its sewerage authorities by their discharges of inadequately treated sewerage into Lake Michigan.  *Id.* at 93.  The Court denied the motion to invoke its original jurisdiction, but held that Illinois could seek relief in federal district court under the federal common law of nuisance. *See id.* at 107-08.

30.     The Court characterized the issue before it as whether "pollution of interstate or navigable waters creates actions arising under the 'laws' of the United States within the meaning of [28 U.S.C. §] 1331(a)."  *Id.* at 99.  The Court answered that question in the affirmative, giving "laws" its "natural meaning" and holding that an action based on federal common law, as much as an action based on a federal statute, supports federal question jurisdiction.  *Id.* at 99-100.  The Court was explicit: "federal common law . . . is [an] ample basis for jurisdiction under 28 U.S.C. [§] 1331(a)."  *Id.* at 102 n.3.  The Supreme Court reaffirmed the jurisdictional holding of *Milwaukee I* in *AEP*.

31.     In *AEP*, plaintiffs sued several electric utilities, contending that the utilities' greenhouse gas emissions contributed to global climate change and created a "substantial and unreasonable interference with public rights, in violation of the federal common law of interstate nuisance, or, in the alternative, of state tort law."  564 U.S. at 418 (internal quotation marks and citation omitted).  In determining whether plaintiffs had properly stated a claim for relief, the Supreme Court determined that federal common law governs claims involving "air and water in their ambient or interstate aspects."  *Id.* at 421 (internal quotation marks and citation omitted).  The

Court rejected the notion that state law could govern public-nuisance claims related to global climate change, stating that "borrowing the law of a particular State would be inappropriate." *Id.* at 422.

32.     The Ninth Circuit's decision in *Kivalina* applies the same well-established logic. There, a municipality asserted a public-nuisance claim for damages to its property allegedly resulting from the defendant energy companies' "emissions of large quantities of greenhouse gases." *Kivalina*, 696 F.3d at 854.  The plaintiff contended that its claim arose under federal and (alternatively) state common law. *Native Village of Kivalina* v. *ExxonMobil Corp.*, 663 F. Supp. 2d 863, 869 (N.D. Cal. 2009).  The district court dismissed the federal claim and declined to exercise supplemental jurisdiction over any related state-law claims. *Id.* at 882-83.  On appeal, the Ninth Circuit held that federal common law governed the plaintiff's claims. *Kivalina*, 696 F.3d at 855.  Citing *AEP*, the Ninth Circuit began from the premise that "federal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Id.*  Given the interstate and transnational character of claims asserting damage from greenhouse gas emissions, the court concluded that the suit fell within that rule. *Id.*

33.     Most recently, in *City of New York* v. *BP p.l.c.*, the plaintiff sued energy companies for their "worldwide fossil fuel production and the use of their fossil fuel products, [which] continue[] to emit greenhouse gases and exacerbate global warming."  325 F. Supp. 3d 466, 471 (S.D.N.Y. 2018) (internal quotation marks and citation omitted), *appeal pending*, No. 18-2188 (2d Cir. argued Nov. 22, 2019).  Because the plaintiff's claims were "based on the 'transboundary' emission of greenhouse gases," the court held that they "ar[o]se under federal common law and require[d] a uniform standard of decision." *Id.* at 472.  Indeed, the court recognized that cases involving "widespread global dispersal" of greenhouse gas emissions are "exactly the type

16

of transboundary pollution suit[] to which federal common law should apply." *Id.* at 471 (internal quotation marks and citations omitted).

34.     Although the Attorney General frames his suit as derived from a state statute that concerns consumer protection, the gravamen of the Attorney General's claims and alleged damages is that ExxonMobil caused consumers in Connecticut and around the world to consume fossil fuel products, which in turn contributed to greenhouse gas emissions, which in turn contributed to global climate change, which in turn caused harm to Connecticut residents and consumers.  Indeed, the Complaint alleges at length the harms the State of Connecticut will experience as a result of climate change, including "sea-level rise on Connecticut's shoreline, wildlife degradation on Connecticut's lands, and property devaluation and damage for Connecticut's residents." Compl. ¶ 43; *see Michigan* v. *U.S. Army Corps of Eng'rs*, 667 F.3d 765, 771-72 (7th Cir. 2011).  These are plainly environmental harms, not the types of harms typically alleged in a consumer-protection action.

35.     Because this suit is inherently premised on interstate pollution that allegedly causes environmental harm in the form of climate change, it implicates uniquely federal interests and is governed by federal common law.  *See AEP*, 564 U.S. at 421; *Kivalina*, 696 F.3d at 855; *City of New York*, 325 F. Supp. 3d at 472.

### *Navigable Waters*

36.     Federal common law also governs claims arising out of the "interstate or navigable waters" of the United States.  *See Milwaukee I*, 406 U.S. at 92; *Michigan*, 667 F.3d at 771-72; *Netherlands Am. Steam Nav. Co.* v. *Gallagher*, 282 F. 171, 175 (2d Cir. 1922) ("navigable waters" for purposes of federal jurisdiction "extends to all public navigable waters where commerce is carried on between the states or with a foreign nation.").

37. Thus, as noted above, the Supreme Court in *Milwaukee I* held that federal common law governed, and original federal question jurisdiction existed over, the State of Illinois's nuisance abatement suit against four cities and two sewerage commissions in Wisconsin, which alleged that defendants were polluting Lake Michigan. 406 U.S. at 91-92. And in *Michigan*, the Seventh Circuit considered the application of federal common law to claims alleging that the operation of the Chicago Area Waterway System would allow invasive non-native species of carp to enter the Great Lakes. *See* 667 F.3d at 771. Because federal common law "extends to the harm caused by . . . environmental and economic destruction" by way of navigable waters, it necessarily applied to the claims at issue. *Id.*

38. Because the Attorney General alleges that Connecticut has suffered, and will suffer, "environmental and economic destruction" via the "navigable waters" of the United States, the application of federal common law is warranted. *See, e.g.*, Compl. ¶¶ 173-75 (alleging harms to Connecticut's waters, coastline, fish, and wildlife due to sea level rise, flooding, drought, and storms).

39. Connecticut's coastline borders the Long Island Sound, a tidal estuary of the Atlantic Ocean, which is designated as Navigable Waters of the United States. *See Dolan Bros. Shellfish Co.* v. *Boissoneault*, No. 3:05-CV-1385 (WWE), 2007 WL 963203, at \*2 (D. Conn. Mar. 29, 2007) (finding that the waters of the Long Island Sound are "navigable waters"). Additionally, the Connecticut River, the Housatonic River, and Mumford Cove—all waters of the State of Connecticut—are designated Navigable Waters of the United States. *See Navigable Waters of the United States in New England Subject to Section 10, Rivers and Harbors Act Jurisdiction*, U.S. Army Corps of Engineers, New England District (July 18, 2006), https://www.nae.usace.army.mil/Portals/74/docs/regulatory/JurisdictionalLimits/US_Navigable_

Waters.pdf (stating that the Connecticut River is considered "Navigable Waters" to the Massachusetts state line); *Connecticut Light & Power Co.* v. *Fed. Power Comm'n*, 557 F.2d 349, 357-58 (2d Cir. 1977) (finding that the Housatonic River, as it flows through the state of Connecticut, is considered navigable waters of United States); *Mumford Cove Ass'n*, *Inc.* v. *Town of Groton, Conn.*, 786 F.2d 530, 532 (2d Cir. 1986) (finding Mumford Cove, "a shallow estuarine tidal basin in Groton," to be a "navigable water of the United States").

40.    Accordingly, the Attorney General has tied the claims asserted in this action to the navigable waters of the United States, for which federal common law must govern.

### *International Affairs and Commerce*

41.    The international nature of the claims further shows that they cannot be state-law claims and that, if anything, they are federal common law claims that support original jurisdiction in federal court.  *See Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 425 (1964) (issues involving "our relationships with other members of the international community must be treated exclusively as an aspect of federal law"); *Marcos*, 806 F.2d at 353 (explaining that "there is federal question jurisdiction over actions having important foreign policy implications" under federal common law).

42.    The United States' international climate change policy has, for decades, sought to balance environmental policy with economic development.  In 1959, President Eisenhower invoked statutory authority to proclaim quotas on imports of petroleum and petroleum-based products into the United States "to avoid discouragement of and decrease in domestic oil production, exploration and development to the detriment of the national security." Adjusting Imports of Petroleum and Petroleum Products into the United States, Proclamation No. 3279, 24

Fed. Reg. 1781 (Mar. 12, 1929); *see* Act of July 1, 1954, 68 Stat. 360, ch. 445, § 2, as amended by Pub. L. No. 85-686, 72 Stat. 678, § 8(a) (Aug. 20, 1958).

43.     The import system was "mandatory" and "necessary" to "preserve to the greatest extent possible a vigorous, healthy petroleum industry in the United States" and to regulate "patterns of international trade."   Statement by the President Upon Signing Proclamation Governing Petroleum Products, 1 Pub. Papers 240-41 (Mar. 10, 1959).   President Eisenhower further explained United States foreign and domestic policy: "Petroleum, wherever it may be produced in the free world, is important to security, not only of ourselves, but also of the free people of the world everywhere." *Id.*

44.     After the 1973 oil embargo, the United States signed a treaty that requires member countries of the International Energy Agency to hold emergency oil stocks—through government stocks or industry-obligated stocks—equivalent to at least 90 days of net oil imports. *See* Agreement on an International Energy Program art. 2, Nov. 18, 1974, 27 U.S.T. 1685, 1040 U.N.T.S. 271.   The United States meets part of its obligation through government-owned stocks held in the U.S. Strategic Petroleum Reserve.  *See, e.g.*, 42 U.S.C. § 6231(b); Nat'l Energy Pol'y Dev.    Grp.,    National    Energy    Policy,    8-17    (May    2001), https://www.nrc.gov/docs/ML0428/ML042800056.pdf.

45.     In the 1990s, in response to President Clinton's signing of the Kyoto Protocol, an international commitment to reduce greenhouse gas emissions, the Senate resolved that the nation should not be a signatory to any protocol that "would result in serious harm to the economy" or fail to regulate the emissions of developing nations.  *See* S. Res. 98, 105th Cong., 1st Sess. (1997). And President Obama promoted shale oil and natural gas development as a means to improve greenhouse gas emissions and to encourage "greater energy independence."   Jude Clemente,

*President Obama's Support for America's Shale Oil and Natural Gas*, Forbes (Dec. 31, 2019), https://www.forbes.com/sites/judeclemente/2020/12/31/president-obamas-support-for-americas-shale-oil-and-natural-gas/#4bd1e46b1883.   During his presidency, domestic gas production increased 35%, and domestic crude oil production increased 80%. *Id.* President Obama also issued a series of directives in May 2011, "which included additional lease sales, certain offshore lease extensions, and steps to streamline permitting, all towards the President's goal of expanding safe and responsible domestic oil and gas production . . . as part of his long-term plan to reduce our reliance on foreign oil."[12]

46.     More recently, President Trump cited foreign-affairs implications in his decision to withdraw from the Paris Agreement, which was based, in large part, on the current Administration's conclusion that the treaty did not strike the right balance between environmental protection, on the one hand, and economic growth and national security, on the other.  *See* The White House, Statement by President Trump on the Paris Climate Accord (June 1, 2017), https://www.whitehouse.gov/briefings-statements/statement-president-trump-paris-climate-accord/.  A different presidential administration may of course take a different view.  Under the Attorney General's view, however, a Connecticut state court judge or jury would decide how to strike the balance among competing national policy imperatives.  The Attorney General's claims thus infringe on the federal government's environmental, trade, and energy policies, which require the United States to speak with one voice in coordinating with other nations.  *See United States* v. *Pink*, 315 U.S. 203, 233 (1942) ("Power over external affairs is not shared by the States; it is vested in the national government exclusively.").

---

[12] Press Release, Off. of the Press Sec'y, Obama Administration Holds Major Gulf of Mexico Oil and Gas Lease Sale (Dec. 13, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/12/13/obama-administration-holds-major-gulf-mexico-oil-and-gas-lease-sale.

47.     Indeed, U.S. District Judge Keenan recognized that New York City's claims, which are substantially similar to those alleged here, "implicate countless foreign governments and their laws and policies." *City of New York*, 325 F. Supp. 3d at 475.  Claims that seek to hold a defendant liable "for the emissions that result from their worldwide production, marketing, and sale of fossil fuels" inherently interfere with the decisions of "many other governmental entities around the United States and in other nations" and "international agreements," including "the Paris Climate Accords." *Id.*

48.     Because the Attorney General's claims involve foreign commerce and the foreign affairs of the United States, federal common law—not state law—must govern.  *See Tex. Indus.*, 451 U.S. at 641 ("[It is] the interstate or international nature of the controversy [that] makes it inappropriate for state law to control.").

49.     The Attorney General's suit implicates multiple "uniquely federal interests": transboundary pollution, injuries arising from the "navigable waters" of the United States, and international affairs and commerce.  Accordingly, these claims must be brought, if at all, under federal common law, and must be heard in federal court.

## II.     This Action Raises Disputed and Substantial Federal Issues

50.     This lawsuit also "arises under" federal law, warranting federal question jurisdiction, because the claims advanced (i) "necessarily raise" stated federal issues, (ii) that are "actually disputed" and (iii) "substantial," and (iv) that are "capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Gunn* v. *Minton*, 568 U.S. 251, 258 (2013) (citing *Grable*, 545 U.S. at 314 (2005)).  Where these requirements are met, federal jurisdiction is proper "because there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum.'"  *Id*.

51.     Determining whether federal jurisdiction is present "calls for a common-sense accommodation of judgment to [the] kaleidoscopic situations that present a federal issue" and thus "justif[ies] resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312-13 (internal quotation marks and citations omitted).

52.     The substantial and disputed federal issues necessarily raised in this action are readily apparent based on the context in which this suit has been brought, *see supra* ¶¶ 3-23, and the allegations the Attorney General has chosen to advance.  The Complaint is the product of an effort to seize control of the United States' national and international climate change policy and alter the balance the federal government has struck between economic and national security concerns and the reduction of greenhouse gas emissions.  The lawsuit seeks to accomplish this in part by infringing on ExxonMobil's free speech rights, free association rights, and right to petition the government.  The lawsuit fundamentally seeks to curtail global fossil fuel activities and emissions of greenhouse gases.

53.     But the federal government has already addressed—and is currently addressing—these issues through domestic regulations and international agreements.  This lawsuit, by seeking to undermine and supplant these preexisting federal efforts, raises several federal issues.

54.     *First*, Congress has struck a careful balance between energy production and environmental protection by enacting federal statutes such as the Clean Air Act, 42 U.S.C. § 7401(c), and by directing the EPA to regulate greenhouse gas emissions, *see AEP*, 564 U.S. at 426-27.  The EPA regulates both stationary and mobile sources of greenhouse gases on a national basis.  *See* 40 C.F.R. § 60.1 *et seq.* (standards of performance for new stationary sources); 40 C.F.R. § 85.501 *et seq.* (control of air pollution from mobile sources).  This lawsuit seeks to have

a judge or jury in Connecticut reweigh the factors considered by the EPA in arriving at these standards of performance for greenhouse gases.[13]

55.     The federal government "affirmatively promotes fossil fuel use in a host of ways, including beneficial tax provisions, permits for imports and exports, subsidies for domestic and overseas projects, and leases for fuel extraction on federal land." *Juliana*, 947 F.3d at 1167.  These federal statutes and regulations demonstrate that Congress has already weighed the costs and benefits of fossil fuels, and permitted their sale because, among other things, affordable energy is critical for economic stability and growth and national security.  *See, e.g.*, 42 U.S.C. § 15927(b) (declaring it the "policy of the United States that . . . oil shale, tar sands, and other unconventional fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports"); *City of New York*, 325 F. Supp. 3d at 473 ("Congress has expressly delegated to the EPA the determination as to what constitutes a reasonable amount of greenhouse gas emission under the Clean Air Act"); *City of Oakland* v. *BP p.l.c.*, 325 F. Supp. 3d 1017, 1023 (N.D. Cal. 2018) ("[O]ur industrial revolution and the development of our modern world has literally been fueled by oil and coal.  Without those fuels, virtually all of our monumental progress would have been impossible."), *vacated on other grounds*, 960 F.3d 570 (9th Cir. 2020).

---

[13] In fact, the EPA has pending rulemakings addressing the emission of greenhouse gases from numerous sources.  *See* The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program, 84 Fed. Reg. 51,310 (Sept. 27, 2019) (EPA proposed rule establishing national program for fuel economy and greenhouse gas regulation); Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources Review, 84 Fed. Reg. 50,244 (Sept. 24, 2019) (EPA proposed rule addressing methane emissions).  These lawsuits would allow state courts to balance exactly the same competing interests at issue in those rulemakings and come to potentially different results.

56.     The Attorney General's goal—that a state court substitute its judgment for that of Congress and the EPA on these issues, and impose significant penalties, damages, and injunctive relief based on the Attorney General's view that a different balance should be struck—constitutes a "collateral attack" on an "entire [federal] regulatory scheme . . . premised on the notion that [the scheme] provides inadequate protection." *Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E.* v. *Tenn. Gas Pipeline Co.*, 850 F.3d 714, 724 (5th Cir. 2017) (internal quotation marks omitted).  Removal is not only appropriate, but essential, in such circumstances.  *See, e.g.*, *Pet Quarters, Inc.* v. *Depository Tr. & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009); *Bryan* v. *BellSouth Commc'ns, Inc.*, 377 F.3d 424, 429-30 (4th Cir. 2004); *Hill* v. *BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1317 (11th Cir. 2004).  The balance struck by Congress, the EPA, and the President between the sometimes competing interests of economic and national security against reducing greenhouse gas emissions is a necessary part of the Attorney General's claims.  That issue— whether the federal response to climate change is adequate—cannot be decided by a state court.

57.     *Second*, the Attorney General's claims impede the foreign affairs power.  As noted above, *supra* ¶¶ 41-49, the United States' international climate change policy has, for decades, sought to balance environmental policy with economic development.

58.     The very existence and purpose of this lawsuit thus conflicts with the national position of the United States on international affairs.  The United States has consistently opposed the "establishment of sovereign liability and compensation schemes" to address climate change on the international level.  Brief for the United States, *City of Oakland*, 960 F.3d 570 (No. 18-16663) (citing Todd Stern, Special Envoy for Climate Change, Special Briefing (Oct. 28, 2015), https://2009-2017.state.gov/s/climate/releases/2015/248980.htm); *see also City of New York*, 325 F. Supp. 3d at 475.

59.     In reaction to this and similar lawsuits, foreign governments might adopt their own "liability and compensation" schemes for past use of fossil fuels, contrary to the foreign policy of the United States.  Thus, this lawsuit also collaterally attacks the foreign policy of the United States regarding the proper way to address the issue of climate change on the international stage.

60.     By asking a state court to weigh in on precisely those issues, this case would "implicate countless foreign governments and their laws and policies."  *City of New York*, 325 F. Supp. 3d at 475.   Accordingly, the exercise of federal jurisdiction is both appropriate and necessary.  *See Marcos*, 806 F.2d at 352 (exercising federal jurisdiction where "plaintiff's claims . . . will directly and significantly affect American foreign relations"); *see, e.g.*, *Am. Ins. Ass'n* v. *Garamendi*, 539 U.S. 396, 413 (2003) (holding that claims implicating the "exercise of state power that touches on foreign relations" in a significant way "must yield to the National Government's policy"); *Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, 381, 388 (2000) (striking down a Massachusetts law barring state entities from transacting with companies doing business in Myanmar because the law "undermine[d] the President's capacity . . . for effective diplomacy"); *In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 118 (2d Cir. 2010) (reasoning that state laws that prevent the President from "wield[ing] the full coercive power of the national economy as a tool of diplomacy in negotiating a process for settling claims … compromise[] the very capacity of the President to speak for the Nation with one voice in dealing with other governments." (internal quotation marks and citation omitted)).

61.     *Third*, the Attorney General alleges a causation theory that depends on proof that federal policymakers would have adopted different energy and climate policies absent ExxonMobil's alleged conduct.  According to the Complaint, ExxonMobil engaged in a "campaign of deception" that targeted "policymakers," "members of Congress, state officials, [and] industry

leadership." Compl. ¶¶ 114-17.  It is well settled that claims arising from the regulatory activities of a federal agency, like the EPA, arise under federal law.  *See Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law."); *Pet Quarters*, 559 F.3d at 779 (affirming federal question jurisdiction where claims implicated federal agency's acts implementing federal law); *Kemp* v. *Medtronic, Inc.*, 231 F.3d 216, 235 (6th Cir. 2000) ("[C]laims alleging fraud on federal agencies have never come within the 'historic police powers of the States.'" (quoting *Medtronic, Inc.* v. *Lohr*, 518 U.S. 470, 485 (1996))); *Bader Farms, Inc.* v. *Monsanto Co.*, Case No. 1:16-CV-299 SNLJ, 2017 WL 633815, at *3 (E.D. Mo. Feb. 16, 2017) ("Count VII [alleging misrepresentations] is in a way a collateral attack on the validity of [the Animal and Plant Health Inspection Service's] decision to deregulate the new seeds.").  Indeed, the "inevitable result of such suits," if successful, is that ExxonMobil "would have to change" its federally regulated "methods of doing business and controlling pollution to avoid the threat of ongoing liability." *Ouellette*, 479 U.S. at 495.

62.     *Fourth*, the Complaint's reliance on injuries allegedly suffered by way of navigable waters provides an additional basis for the exercise of federal jurisdiction under *Grable*.  *See* Compl. ¶¶ 173-77.  Congress has given the U.S. Army Corps of Engineers jurisdiction to regulate the navigable waters of the United States.  *See* 33 U.S.C. § 401 *et seq.*  To adjudicate the Attorney General's claims, a court would need to evaluate whether, even assuming that "[c]limate change has caused, is causing, and will cause sea level rise," such a phenomenon amounts to a cognizable injury that can be remedied consistent with federal law.  *See* Compl. ¶ 174; *see also* 33 U.S.C. §§ 426i, 403.  That, in turn, will require the court to interpret an extensive web of federal statutes

and regulations, *see, e.g.*, 33 C.F.R. § 320.4(a)(1)-(2), and to evaluate whether the Corps has exercised its authority over navigable waters reasonably over the past several decades, *see, e.g.*, U.S. Army Corps of Eng'rs, Eng'g Circular 1105-2-186, Planning Guidance on the Incorporation of Sea Level Rise Possibilities in Feasibility Studies (Apr. 21, 1989) (providing "guidance for incorporating the effects of possible changes in relative sea level in Corps of Engineers feasibility studies").  Today, the Army Corps has its own program for responding to rising navigable waters across the United States.  *See* U.S. Army Corps of Eng'rs, *Climate Preparedness and Resilience*, https://www.usace.army.mil/corpsclimate/.  This lawsuit would require a Connecticut state court to judge the efficacy of the program on interstate bodies of water like the Long Island Sound and the Connecticut and Housatonic Rivers.

63.     *Fifth*, as explained above, federal common law exclusively governs the Attorney General's claims because they implicate three areas which our constitutional design does not allow state or municipal law to control: transboundary pollution, navigable waters, and foreign relations. *See supra* ¶¶ 25-49.  But even if there were some viable state law component to these claims (which there is not), federal common law would still govern at least some aspects of them, and the aspects necessarily governed by federal common law would justify removal under *Grable*, since a claim "raise[s] substantial questions of federal law by implicating the federal common law." *Torres* v. *S. Peru Copper Corp.*, 113 F.3d 540, 542 (5th Cir. 1997) (upholding removal of claims raising foreign relations issues); *see also Battle* v. *Seibels Bruce Ins. Co.*, 288 F.3d 596, 607-08 (4th Cir. 2002) (a claim in an area where "federal common law *alone* governs" "necessarily depends on resolution of a substantial question of federal law" (internal quotation marks and citation omitted)); *Newton* v. *Cap. Assurance Co.*, 245 F.3d 1306, 1309 (11th Cir. 2001) (a claim that requires

applying "principles of federal common law . . . satisfies § 1331 by raising a substantial federal question").

64.     *Sixth*, this action raises important constitutional issues regarding the relationship among states and the constitutional division of authority between the federal government and the states.  It is a well-settled principle of constitutional law that one state cannot impose its law upon another.  Because "[e]ach state stands on the same level with all the rest," no state "can impose its own legislation on . . . one of the others."  *Kansas*, 206 U.S. at 97.  Similarly, a state may not supplant federal law with its own.  U.S. Const. art. VI., § 2; *Edgar* v. *MITE Corp.*, 457 U.S. 624, 632-33 (1982); *Milwaukee II*, 451 U.S. at 313 n.7 ("[I]f federal common law exists, it is because state law cannot be used.").

65.     Thus, the Complaint raises important issues of federalism under our constitutional structure that should be decided by a federal court.

66.     Similarly, the international issues raised by the Complaint have a constitutional component.  The foreign affairs power is exclusive to the federal government.  *Pink*, 315 U.S. at 233 ("Power over external affairs is not shared by the States; it is vested in the national government exclusively.").  And the Supreme Court has made clear that the actions of state courts cannot be allowed to interfere with the foreign policy of the United States.  *See Zschernig* v. *Miller*, 389 U.S. 429, 441 (1968) (invalidating Oregon law that "illustrate[d] the dangers which are involved if each State, speaking through its probate courts, is permitted to establish its own foreign policy").  Thus, this action raises the constitutional question whether there can be a state-law action for climate change at all.  *See, e.g.*, *Milwaukee II*, 451 U.S. at 313 n.7.

67.     To adjudicate the Attorney General's purported state-law claims, a court must answer the antecedent federal constitutional issue of whether such claims can exist under our

constitutional structure.  Of course, substantial constitutional issues embedded in a state-law claim justify removal under *Grable*.  Indeed, the *Grable* Court cited *Smith* v. *Kansas City Title & Trust Co*., 255 U.S. 180 (1921), as the "classic example" of substantial question removal.  *Grable*, 545 U.S. at 312.  The *Grable* Court noted that in *Smith*, "[a]lthough Missouri law provided the cause of action, the Court recognized federal-question jurisdiction because the principal issue in the case was the federal constitutionality of the bond issue."  *Id.*  Here, the issue of whether a state-law claim for worldwide greenhouse gas emissions and the global effects of climate change exists at all is a substantial federal question that must be decided by a federal court.

68.     The federal questions raised here are substantial.  This action sits at the intersection of federal energy and environmental regulations, which implicate foreign policy and national security considerations.  These issues implicate the proper constitutional relationship between the States and between the States and the federal government.  The substantiality inquiry is satisfied when the federal issues in a case concern even *one* of these subjects.  *See, e.g.*, *NASDAQ OMX Grp., Inc.* v. *UBS Sec., LLC*, 770 F.3d 1010, 1029 (2d Cir. 2014) (issues related to "fair and orderly market[s]"); *In re Nat'l Sec. Agency Telecomms. Recs. Litig.*, 483 F. Supp. 2d 934, 943 (N.D. Cal. 2007) (issues relating to the state secrets privilege); *Grynberg Prod. Corp.* v. *British Gas, p.l.c.*, 817 F. Supp. 1338, 1356 (E.D. Tex. 1993) (issues relating to allocation of international mineral resources).

69.     For the same reason, the exercise of federal jurisdiction is fully consistent with the principles of federalism—federal courts are the traditional and appropriate fora for litigation regarding the intersection of national energy and environmental law, and foreign policy.  *See Massachusetts* v. *EPA*, 549 U.S. 497, 519 (2007) (explaining that the "sovereign prerogatives" to force reductions in greenhouse gas emissions "are now lodged in the [f]ederal [g]overnment").

70.     This lawsuit, a thinly veiled effort to regulate fossil fuel production and greenhouse gas emissions, raises several substantial and disputed federal issues concerning domestic and international energy and environmental policy.  It belongs in federal court.

### III.     This Action Meets the Elements of the Federal Officer Removal Statute

71.     Removal is also proper under the Federal Officer Removal Statute, 28 U.S.C. § 1442, which allows for removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  Among other things, ExxonMobil has acted under federal government mandates, leases, and contracts, performed critical and necessary functions for the U.S. military, and engaged in activities on federal lands under federal direction, oversight, and control.  And "in the absence of [] contract[s] with [] private firm[s], the Government itself would have had to perform" these essential tasks itself.  *Watson* v. *Philip Morris Cos., Inc.*, 551 U.S. 142, 154 (2007).

72.     The Federal Officer Removal Statute is to be "liberally construed" in favor of removal.  *Isaacson* v. *Dow Chem. Co.*, 517 F.3d 129, 136 (2d Cir. 2008).  Removal under this statute is appropriate when defendants demonstrate that they: (1) "are 'persons' within the meaning of the statute who 'act[ed] under [a federal] officer'"; (2) "performed the actions for which they are being sued 'under color of [federal] office"; and (3) "raise a colorable federal defense."  *Id.* at 134 (alterations in original) (citation omitted).  All of these elements are satisfied here.

73.     *First*, ExxonMobil "acted under" federal officers because the government exerted subjection, guidance, or control over ExxonMobil's actions, and because ExxonMobil engaged in an effort to "*assist[]* or . . . help[] *carry out*, the duties or tasks of the federal superior."  *Id.* at 137

(quoting *Watson*, 551 U.S. at 152).[14]  The quintessential example of such a relationship is when a private contractor helps the government to produce an item that it needs, such as "a product that it used to help conduct a war"—a task "that, in the absence of a contract with a private firm, the Government itself would have had to perform."  *Id.* (citing *Watson*, 551 U.S. at 153-54).  The Supreme Court has emphasized that "the words 'acting under' are broad."  *Watson*, 551 U.S. at 147.

74.     To meet this prong, a defendant's conduct need only "relat[e] to any act under color" of a federal office.  28 U.S.C. § 1442(a)(1).  As the Ninth Circuit has explained, this is a "low bar."  *Goncalves By & Through Goncalves* v. *Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1245 (9th Cir. 2017); *see also id.* at 1244 (explaining that the "hurdle erected" by this requirement is "quite low").  And when Congress in the Removal Clarification Act of 2011 inserted the words "or relating to" into the statute, it "broaden[ed] the universe of acts that enable Federal officers to remove to Federal court," even further.  *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 467 (3d Cir. 2015), as amended (June 16, 2015) (quoting H.R. Rep. 112-17, at 6, 2011 U.S.C.C.A.N. 420, 425).  Congress thus "broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office."  *Latiolais* v. *Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc); *see also Baker* v. *Atl. Richfield Co.*, 962 F.3d 937, 943 (7th Cir. 2020).

---

[14] The Complaint improperly conflates the activities of ExxonMobil with the activities of its separately organized predecessors, subsidiaries, and affiliates.  Although ExxonMobil rejects the Attorney General's erroneous attempt to attribute the actions of predecessors, subsidiaries, and affiliates to the named defendant, for purposes of this Notice of Removal only, ExxonMobil describes the conduct of certain predecessors, subsidiaries, and affiliates to show that the Complaint, as pleaded, can and should be removed to federal court.

75.     Acting under federal officers, ExxonMobil developed and produced special fuels for the U.S. government, including unique fossil fuel products to meet national security requirements.  The U.S. government is one of the largest consumers of fossil fuel products in the world.  Indeed, the U.S. Department of Defense is the world's largest institutional user of petroleum fuels.  There is thus far more than an incidental relationship between the United States' fuel needs (that have driven the federal government to mandate exploration and production of fossil fuels) and the alleged impacts about which the Attorney General complains here.  The federal government relies heavily on ExxonMobil and other energy companies to meet these needs.  This reliance is particularly acute with respect to matters of national security and defense.  Starting at least as early as World War II, officers of the federal government were authorized to direct, and have directed, ExxonMobil to conduct its production, extraction, and development of fossil fuels and to advance the Nation's military, security, geopolitical, and economic development interests. *City of Oakland* v. *BP p.l.c.*, 325 F. Supp. 3d 1017, 1023 (N.D. Cal. 2018).

76.     At this stage, a defendant's allegations "in support of removal" only need to be "facially plausible," and the defendant receives the "benefit of all reasonable inferences from the facts alleged." *Baker*, 962 F.3d at 941, 945.  In *Defender Association of Philadelphia*, the Third Circuit made clear that in assessing a motion to remand a case removed to federal court, the Court must "construe the facts in the removal notice in the light most favorable to the" existence of federal jurisdiction, and the defendant's theory of the case is the basis for determining the propriety of removal.  790 F.3d at 466, 471  ("[W]e must accept the [defendant's] theory of the case at this juncture."); *see also Baker*, 962 F.3d at 947 ("Our role at this stage of the litigation is to credit only the [defendant's] theory.").  This conclusion is based on the Supreme Court's decision in *Jefferson Cnty.* v. *Acker*, in which the Court "credit[ed] the [Defendants'] theory of the case for

purposes of both elements of [the] jurisdictional inquiry and conclude[d] that the [Defendants] made an adequate threshold showing that the suit is 'for a[n] act under color of office.'" 527 U.S. 423, 432 (1999).  Accordingly, this Court must defer to ExxonMobil's reasonable theory for federal officer removal—that it acted under the direction and control of federal officers to carry out essential functions for the federal government and this conduct is related to and connected with the Attorney General's asserted claims and alleged injuries.

77.    The association between oil and national security began in the early 1900s, when the world's leading navies switched from coal to oil as the preferred energy source for ships. President Taft recognized the national interest in developing domestic oil sources in his address to Congress on December 6, 1910:  "As not only the largest owner of oil lands, but as a prospective large consumer of oil by reason of the increasing use of fuel oil by the Navy, the federal government is directly concerned both in encouraging rational development and at the same time inuring the longest possible life to the oil supply."  This national security concern led to the September 2, 1912 executive order creating the Naval Petroleum Reserve at Elk Hills, California.

78.    Following World War I, the United States continued to explore for and develop its own domestic resources, while other nations pursued policies to maintain access and to develop oil resources in the Middle East, Venezuela, and Mexico.  Although the United States produced a significant amount of the world's oil in the interwar years, it also began to push European powers to open Middle East oil reserves for American companies.

79.    World War II confirmed petroleum's role as a key American resource, and underscored the government's interest in maintaining and managing it.  The government created agencies to control the petroleum industry; it built refineries; it directed the production of certain petroleum products; and it managed scarce resources for the war effort.  Put simply, "[b]y

controlling the nation's crude oil supply, *the federal government controlled the nation's petroleum industry*." *Exxon Mobil* v. *United States*, No. CV H-10-2386, 2020 WL 5573048, at *11 (S.D. Tex. Sept. 16, 2020) (emphasis added).

80.     As just one example, during World War II, the federal government asserted substantial control over the development and production of high-octane aviation fuels ("avgas"). *Cf. Betzner* v. *Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018) (removal proper where defendant "acted under the military's detailed and ongoing control" by "contract[ing] to manufacture heavy bomber aircraft"); *Isaacson*, 517 F.3d at 140 (removal proper where defendant chemical company manufactured Agent Orange pursuant to government contract); *Contois* v. *Able Indus., Inc.*, 523 F. Supp. 2d 155, 160-64 (D. Conn. 2007) (removal proper in asbestos case where defendants manufactured the products to which plaintiffs were exposed under direction of the U.S. Navy).

81.     Avgas was "'the most critically needed refinery product' during World War II and was essential to the United States' war effort." *Shell Oil Co.* v. *United States*, 751 F.3d 1282, 1285 (Fed. Cir. 2014) (internal quotation marks and citations omitted).

> Because avgas was critical to the war effort, the United States government exercised significant control over the means of its production during World War II. In 1942, President Roosevelt established several agencies to oversee war-time production. Among those with authority over petroleum production were the War Production Board ("WPB") and the Petroleum Administration for War ("PAW"). The WPB established a nationwide priority ranking system to identify scarce goods, prioritize their use, and facilitate their production; it also limited the production of nonessential goods. The PAW centralized the government's petroleum-related activities. It made policy determinations regarding the construction of new facilities and allocation of raw materials, and had the authority to issue production orders to refineries.

> *United States* v. *Shell Oil Co.*, 294 F.3d 1045, 1049 (9th Cir. 2002).

82.     In short, the "PAW told the refiners what to make, how much of it to make, and what quality." *Shell Oil*, 751 F.3d at 1286 (internal citation omitted).

83.     In the days after the attack on Pearl Harbor, the federal government "recognized the need to quickly mobilize avgas production, with the [Office of the Petroleum Coordinator for National Defense] stating: 'It is *essential*, in the national interest that the supplies of all grades of aviation gasoline for military, defense, and essential civilian uses *be increased immediately to the maximum*.'" *Id.* (internal quotation marks and citation omitted).  The federal government issued directives requiring predecessors or affiliates of ExxonMobil to produce particular quantities of fossil fuel products meeting particular specifications.  Thus, at the direction of the federal government, oil companies, including ExxonMobil's predecessors and affiliates, increased avgas production over twelve-fold from approximately 40,000 barrels per day in December 1941 to 514,000 barrels per day in 1945, which was "crucial to Allied success in the war."  *Id.* at 1287; *see also Exxon Mobil Corp.* v. *United States*, 101 Fed. Cl. 576, 577 (Fed. Cl. 2011) (During World War II, "[t]he critical need for avgas prompted the Government to order oil refineries to maximize its production, which resulted in the Government contracting with [ExxonMobil's] Baytown and Baton Rouge refineries for the production and supply of avgas.").

84.     The controls placed on the production of petroleum during World War II extended through the Korean War.  During the war, the Defense Production Act of 1950, Pub. L. No. 81-774 ("DPA"), gave the federal government broad powers to issue production orders to private companies to prioritize military procurement requirements.  *See Exxon Mobil*, 2020 WL 5573048 at *27 (detailing the use of the DPA to maintain government control over the petroleum industry, including the continued operation of government-owned facilities).   On September 9, 1950, President Truman issued Executive Order 10161 establishing the Petroleum Administration for Defense ("PAD"), which had the authority to issue orders under the DPA requiring private companies to operate refineries to ensure sufficient petroleum production for the military.  The

PAD issued production orders to oil and gas companies, including to ensure adequate quantities of avgas for military use.  *See* Fourth Annual Report on the Activities of the Joint Committee on Defense Production, 84th Cong., 1st Sess., H. Rep. No. 1, at 122 (Jan. 5, 1955).  When supplying the federal government with fuels required to support the country's military, ExxonMobil again was "acting under" federal officers "to *assist*, or to help *carry out*, the duties or tasks of the federal superior" vital to national security.  *Watson*, 551 U.S. at 152.

85.    ExxonMobil continues to produce special military fuels to meet the United States' need to power planes, ships, and other vehicles, and to satisfy other national defense requirements. Historically, ExxonMobil (and its predecessors or affiliates) has been one of the top suppliers of fossil fuel products to the United States military, whose energy needs are coordinated through the Defense Energy Support Center ("DESC").  *See* Anthony Andrews, Cong. Rsch. Serv., R40459, Department of Defense Fuel Spending, Supply, Acquisition, and Policy 1 (2009).  DESC procures a range of military unique petroleum-based products from ExxonMobil, including JP-8 fuel (MIL-DTL-83133) for the U.S. Air Force and Army, and JP-5 fuel (MIL-DTL-5624 U) for the U.S. Navy, and a variety of other specialized fuels.  In fiscal year 2008, for example, the DESC purchased 134.9 million barrels of fuel products in compliance with military specifications, totaling $17.9 billion in procurement actions.  *See id.* at 2.  In fact, "[t]he U.S. military services and the North Atlantic Treaty Organization forces use an estimated 5 billion gallons of JP-8 [jet fuel] each year."  National Research Council (US) Subcommittee on Jet-Propulsion Fuel 8, Committee on Toxicology, National Research Council, Toxicologic Assessment of Jet-Propulsion Fuel 8 (2003), https://www.ncbi.nlm.nih.gov/books/NBK207616/.

86.    By developing and producing these special fuels for the federal government and military, ExxonMobil performed tasks under federal officers that, "in the absence of [] contract[s]

with a private firm, the Government itself would have had to perform." *Watson*, 551 U.S. at 154. In performing these tasks, ExxonMobil allegedly contributed to global climate change, which allegedly caused the local injuries asserted in the Complaint.

87. In addition, ExxonMobil has explored for, developed, and produced oil and gas on federal lands under federal government leases governed by OCLSA, 43 U.S.C. § 1331 *et seq.* and the Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq.* ("MLA").  The unique and controlling provisions of these statutes and leases demonstrate that when producing federal minerals, ExxonMobil was "acting under" a federal official within the meaning of Section 1442(a)(1).

88. In enacting OCSLA in 1953, "Congress was most concerned with establishing federal control over resources on the Outer Continental Shelf" ("OCS").  *Laredo Offshore Constructors, Inc.* v. *Hunt Oil Co.*, 754 F.2d 1223, 1227 (5th Cir. 1985).  Congress made clear that it intended the leasing program "to meet the urgent need for further exploration and development of" the oil and gas deposits of the OCS.  43 U.S.C. § 1337(i).  In 1978, following the Arab oil embargo of 1973, Congress directed the federal government to develop and use the resources of the OCS to reduce dependence on foreign oil and address "the Nation's long-range energy needs." *Id.* § 1801.  In aid of this objective, Congress established detailed "policies and procedures for managing the oil and gas resources" of the OCS, which were "intended to result in *expedited exploration and development* of the Outer Continental Shelf in order *to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources*, and maintain a favorable balance of payments." *California ex rel. Brown* v. *Watt*, 668 F.2d 1290, 1296 (D.C. Cir. 1981) (emphasis added).  In so doing, Congress confirmed OCSLA's objective: "the expeditious development of OCS resources," which the Department of Interior is called upon to implement. *Id.* at 1316.

89.     To fulfill its statutory obligations, the Department of Interior maintains and administers the OCS leasing program, under which lessees are obligated to "develop[] . . . the leased area" diligently, including carrying out exploration, development, and production activities for the express purpose of "maximiz[ing] the ultimate recovery of hydrocarbons from the leased area."  Ex. 9 § 10; *see* 30 C.F.R. § 250.1150.  The leasing program is reviewed every five years, and leases are permitted in the manner that the Secretary of Interior "determines will best meet national energy needs for the five-year period following its approval or reapproval."  43 U.S.C. § 1344(a).

90.     The federal government supervises and controls the oil and gas development and production activities of its lessees, like ExxonMobil, in myriad and extensive ways.  The OCS leases instruct that "[t]he Lessee *shall comply* with all regulations and orders relating to exploration, development, and production," and that "[a]fter due notice in writing, the Lessee *shall drill* such wells and produce at such rates *as the Lessor may require* in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles."  Ex. 10 § 10 (emphasis added).  All drilling takes place "in accordance with an approved exploration plan (EP), development and production plan (DPP) or development operation coordination document (DOCD)" as well as "approval conditions"—all of which must undergo extensive review and approval by federal authorities, and all of which must conform to "diligence" and "sound conservation practices."  Ex. 9 §§ 9, 10.

91.     Critically, the federal government retains the right to control a lessee's rate of production from its lease.  *See* 43 U.S.C. § 1334(g) (the lessee "shall produce any oil or gas, or both, . . . at rates consistent with any rule or order issued by the President in accordance with any provision of law.").  In particular, the Bureau of Safety and Environmental Enforcement within

the Department of Interior may set the Maximum Efficient Rate for production from a reservoir—

that is, a cap on the production rate from all of the wells producing from a reservoir.  30 C.F.R. §

250.1159.  This requirement has been in existence since 1974, *see* 39 Fed. Reg. 15,885 (May 6,

1974) (approving OCS Order No. 11), and the government adopted this "significant burden" to

control production from its leases for the purpose of responding to "a period of oil shortages and

energy crises," 75 Fed. Reg. 20,272 (Apr. 19, 2010), a public policy purpose distinct from the

conservation factors that typically motivate lessors regarding production rates.  For onshore

operations, the Interior Department's Bureau of Land Management leases similarly provide that

the United States "reserves [the] right to specify rates of development and production in the *public

interest*."  Ex. 11 § 4 (emphasis added).

92.     The federal government also maintains certain controls over the disposition of oil,

gas, and other minerals extracted from federally owned property.  For example, the federal

government conditions OCS leases with a right of first refusal to purchase all minerals "[i]n time

of war or when the President of the United States shall so prescribe."  Ex. 9 § 15(d); Ex. 10 §

15(d); *see* 43 U.S.C. § 1341(b).  The federal government also reserves the right to purchase up to

16 2/3% of lease production, less any royalty share taken in-kind.  43 U.S.C. § 1353(a)(2).  The

Secretary of Interior may direct a lessee to deliver any reserved production to the Department of

Defense (military operations), the Department of Energy (*e.g.*, Strategic Petroleum Reserve), or

the General Services Administration (government civilian operations).  *Id.* § 1353(a)(3).  For

onshore leases, the Secretary may take any royalty owed on oil and gas production in-kind and

"retain the same for the use of the United States."  30 U.S.C. § 192.  Bureau of Land Management

leases also provide that the "[l]essor reserves the right to ensure that production is sold at

reasonable prices and to prevent monopoly."  Ex. 11 § 10.  In addition, the Secretary may compel

a lessee to offer a percentage of lease production "to small or independent refiners" (*e.g.*, in shortage situations where independent refiners may not have access to production to the same extent as integrated producers/refiners). Ex. 9 § 15(c); Ex. 10 § 15(c); *see* 43 U.S.C. § 1337(b)(7) (OCS leases); 30 U.S.C. § 192 (onshore leases).

93.     The federal government also uniquely reserves the authority to determine the value of production for purposes of determining the royalty a lessee owes. Ex. 9 § 6(b) ("The value of production for purposes of computing royalty shall be the reasonable value of the production *as determined by the Lessor*.") (emphasis added). The standard Bureau of Land Management lease for onshore minerals has a similar provision. *See* Ex. 11 § 2 ("Lessor reserves the right . . . to establish reasonable minimum values on products."). A typical commercial private (*i.e.*, fee) lease would never reserve similar unilateral authority to one contracting party to control a material economic term of the lease contract; this would be akin to an apartment rental lease providing that the landlord has sole discretion to specify the rent owed.

94.     Through federal leases, the federal government balances economic development with environmental considerations. The Secretary may reduce or eliminate the United States' royalty share, and thus provide the lessee an additional economic incentive to produce oil and gas. 43 U.S.C. § 1337(a)(3) ("The Secretary may, in order to promote increased production on the lease area, through direct, secondary, or tertiary recovery means, reduce or eliminate any royalty or net profit share set forth in the lease for such area.") (OCS lease); 43 C.F.R. § 3103.4-1(a) ("[T]he Secretary . . . may waive, suspend or reduce the. . . royalty on an entire leasehold, or any portion thereof.") (MLA leases). The Secretary may also suspend production from an OCS lease "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine,

coastal, or human environment."  43 U.S.C. § 1334(a)(1); *see id.* § 1334(a)(2) (authority to cancel any lease for similar reasons); Ex. 9 § 13 (offshore lease provision governing suspension or cancellation).  For onshore federal leases, the Secretary may similarly direct or grant suspensions of operations. *See* 30 U.S.C. § 226(i); 43 C.F.R. § 3103.4-4. The standard Bureau of Land Management onshore lease also requires the lessee to cease any operations that would result in the destruction of threatened or endangered species or objects of historic or scientific interest.  Ex. 11 § 6.

95.     Through federal leases, the federal government retains supervision and control over the use of federal property.  The mineral leasing laws, including OCSLA and the MLA, are an exercise of Congress's power under the Property Clause of the Constitution.  U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.").  In 2019, oil production by private companies, including ExxonMobil, from federal offshore and onshore leases managed by the Interior Department was nearly one billion barrels.  Historically, annual oil and gas production from federal leases has accounted for as much as 36% of domestic oil production and 25% of domestic natural gas production.  *See* Cong. Rsch. Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas 1-2 (updated Oct. 23, 2018).  The federal government has reaped enormous financial benefits from the ongoing policy decision to contract for the production of oil and gas from federal lands in the form of royalty regimes that have resulted in billions of dollars of revenue to the federal government.

96.     The government issues onshore and offshore leases for a primary term of five to ten years, with a habendum clause under which the lessee retains the lease for so long after the primary term as the lease produces oil and gas in paying quantities.  30 U.S.C. § 226(e) (onshore);

43 U.S.C. § 1337(b)(2) (OCS); Ex. 9 § 3.  But when the lease terminates, the property interest reverts to the United States; the lessee cannot acquire fee title interest.  Nor may a federal lessee assign its lease to another person without express federal government approval.  30 U.S.C. § 187; 43 C.F.R. § 3106 (onshore leases); 30 C.F.R. §§ 556.701(a), 556.800 (OCS leases).

97.     The United States controls federal mineral lessees, like ExxonMobil, in other ways as well.  An OCS lessee does not have an absolute right to develop and produce; rather, it has only an exclusive right to seek approval from the United States to develop and produce under the lease.  *See Sec'y of the Interior* v. *California*, 464 U.S. 312, 337-39 (1984); *Village of False Pass* v. *Clark*, 733 F.2d 605, 614-16 (9th Cir. 1984).  The MLA limits the onshore federal oil and gas lease acreage that may be held by any one person, enforceable by an action in federal court.  30 U.S.C. § 184(d), (h).  The federal government has the right to obtain "prompt access" to facilities and records.  Ex. 9 § 12; Ex. 10 § 12; 30 U.S.C. § 1713. And the United States also reserves the right to all helium produced from federal leases, which the lessee produces solely for the government's benefit.  *See* 43 U.S.C. § 1341(f); Ex. 9 § 6(a); Ex. 10 § 6(a) (OCS leases); 30 U.S.C. § 181 (onshore leases).

98.     Thus, the OCS leases fit *Watson*'s description of that "special relationship" with the federal government that justifies federal officer removal.  *Watson*, 551 U.S. at 157.  As the above statutory and lease provisions demonstrate, a federal oil and gas lease is a contract to develop federal minerals on the government's behalf, and the government retains extensive supervision and control over the lessees for many purposes, including in some cases solely to further public policy or achieve purely governmental objectives.  In light of these restrictions, obligations, and directives, ExxonMobil was acting at the direction of a federal officer within the meaning of Section 1442 when it fulfilled its obligations with respect to oil and gas development and

production under the leases.  *See Contois*, 523 F. Supp. 2d at 160-64 (removal proper in asbestos case where defendants manufactured the products to which plaintiffs were exposed under direction of the Navy); *Betzner*, 910 F.3d at 1015 (removal proper where defendant "acted under the military's detailed and ongoing control" by "contract[ing] to manufacture heavy bomber aircraft"); *Greene* v. *Citigroup, Inc.*, Civ. No. 99-1030, 2000 WL 647190, at *2 (10th Cir. May 19, 2000) (removal proper where defendant chemical company conducted a radium clean-up pursuant to a "remedy selected by the EPA"); *see also Camacho* v. *Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486 (1st Cir. 1989) (removal proper when the defendants "were acting under express orders, control and directions of federal officers" (internal quotation marks omitted)).  These are activities that the federal government would itself need to undertake unless private actors did it for the government through the obligations of the federal leases on federal lands.  Under *Watson*, this is not run of the mill regulation; rather, it is the kind of "special relationship" that supports federal officer removal.  551 U.S. at 157.

99.     ExxonMobil also "acted under" federal officers in producing oil and operating infrastructure for the Strategic Petroleum Reserve.  Under 43 U.S.C. § 1353(a)(1), "all royalties . . . accruing to the United States under any oil and gas lease [under OCSLA] . . . shall, on demand of the Secretary [of the Interior], be paid in oil and gas."  For example, after the September 11 attacks, President George W. Bush ordered that the Strategic Petroleum Reserve, "an important element of our Nation's energy security," "will be filled . . . principally through royalty-in-kind transfers to be implemented by the Department of Energy and the Department of the Interior."  Statement on the Strategic Petroleum Reserve, 1 Pub. Papers 1406 (Nov. 13, 2001).  From 1999 to December 2009, the federal government's "primary means of acquiring oil for the [Strategic Petroleum Reserve]" was by taking its royalties from oil produced from federal offshore leases as

royalties "in kind" as part of the so-called "RIK" program.  U.S. Dep't of Energy, Filling the Strategic Petroleum Reserve, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/filling-strategic-petroleum-reserve (last visited Oct. 13, 2020).  During that time, "the Strategic Petroleum Reserve received 162 million barrels of crude oil through the RIK program" valued at over $6 billion.  U.S. Dep't of Energy, Strategic Petroleum Reserve Annual Report to Congress for Calendar Year 2010, at 18 (2011) ("SPR 2010 Report"); *see id.* at 39 (Table 13).

100.    The federal government required ExxonMobil (and/or its predecessors, subsidiaries, or affiliates), as lessees of federal offshore leases on the OCS, to pay royalties "in kind," which the government used for its strategic stockpile, a crucial element of U.S. energy security and treaty obligations.  *See, e.g.*, U.S. Dep't of Interior, Mins. Mgmt. Serv., Sample Dear Operator Letter (Dec. 14, 1999), https://onrr.gov/ReportPay/PDFDocs/991214.pdf (invoking OCSLA and royalty provisions in federal leases operated by ExxonMobil, and/or its predecessors, subsidiaries, or affiliates, "to use royalties in kind (RIK) to replenish the Strategic Petroleum Reserve (SPR)").  ExxonMobil thus "help[ed] the Government to produce an item that it needs." *Watson*, 551 U.S. at 153.

101.    In addition, ExxonMobil acted under federal officers within the meaning of 28 U.S.C. § 1442 as operator and lessee of Strategic Petroleum Reserve infrastructure.  For example, the Department of Energy has leased to an ExxonMobil affiliate the St. James Terminal in Louisiana and two government-owned pipelines that are also part of the Strategic Petroleum Reserve near Freeport, Texas.  *See* U.S. Dep't of Energy, Department of Energy Awards Strategic Petroleum Reserve Lease to ExxonMobil (Oct. 28, 2019), https://www.energy.gov/articles/department-energy-awards-strategic-petroleum-reserve-lease-

exxonmobil; SPR 2010 Report, at 34; U.S. Dep't of Energy, DOE Signs Major Agreement with Exxon Pipeline to Lease Idle Pipelines at Strategic Reserve (Jan. 14, 1999), https://fossil.energy.gov/techline/techlines/1999/tl_bmlse.html.

102.    The Department of Energy's leases enable ExxonMobil's affiliate to use the facilities for its commercial purposes, subject to the federal government's supervision and control in the event of the President's call for an emergency drawdown.  *See* 42 U.S.C. § 6241(d)(1) ("Drawdown and sale of petroleum products from the Strategic Petroleum Reserve may not be made unless the President has found drawdown and sale are required by a severe energy supply interruption or by obligations of the United States under the international energy program.").  The United States has exercised this control, including through the President's orders to draw down the reserve in response to Hurricane Katrina in 2005 and disruptions to the oil supply in Libya in 2011, emergency actions taken in coordination with the International Energy Agency.  *See* U.S. Dep't of Energy, History of SPR Releases, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/releasing-oil-spr (last visited Oct. 13, 2020).  Thus, the hundreds of millions of barrels of oil flowing through these facilities were subject to federal government control and supervision.

103.    These are but a few examples of the services ExxonMobil has provided the federal government, under the direction of federal officers.

104.    *Second*, assuming the truth of the Attorney General's allegations, there is a clear nexus between ExxonMobil's alleged improper conduct, which was undertaken in part at the direction of federal officials, and the Attorney General's causes of action.

105.    To meet this standard, a defendant's conduct need only "relat[e] to any act under color" of a federal office.  28 U.S.C. § 1442(a)(1).  Under this standard, a defendant need only

demonstrate that the relevant conduct "ha[s] some connection to, or association with, governmental actions." *Isaacson*, 517 F.3d at 137-38; *see also Latiolais*, 951 F.3d at 292.[15]  In addition, courts in the Second Circuit "credit Defendants' theory of the case when determining whether a causal connection exists." *Isaacson*, 517 F.3d at 137 (quoting *Acker*, 527 U.S. at 432 (1999)).  As noted above, ExxonMobil's fossil fuel activities, which the Attorney General challenges here, easily satisfy the low threshold of having "some connection to, or association with" actions directed by the federal government.

106.  *Third*, ExxonMobil has several meritorious federal defenses to the Attorney General's claims, including displacement or preemption under the Clean Air Act, Commerce Clause, Due Process Clause, First Amendment, Foreign Commerce Clause, and the foreign affairs doctrine.  Each of these defenses is more than sufficient to satisfy Section 1442.  *See Willingham* v. *Morgan*, 395 U.S. 402, 407 (1969) (a defendant invoking section 1442(a)(1) "need not win his case before he can have it removed"); *Isaacson*, 517 F.3d at 138 ("Courts have imposed few limitations on what qualifies as a colorable federal defense.  At its core, the defense prong requires that defendant raise a claim that is 'defensive' and 'based in federal law.'" (quoting *Mesa* v. *California*, 489 U.S. 121, 129-30 (1989))).

---

[15] Prior to 2011, Section 1442 conditioned removal on a defendant being "sued in an official or individual capacity *for* any act under color of such office."  28 U.S.C. § 1442(a) (2010) (emphasis added).  As part of the Removal Clarification Act of 2011, Congress "amended Section 1442(a) to add 'relating to'" to the statutory text, thereby "broaden[ing] federal officer removal to actions not just *causally* connected, but alternatively *connected or associated*, with acts under color of federal office."  *Latiolais*, 951 F.3d at 291-92; *accord Baker*, 962 F.3d at 943-44; *Sawyer* v. *Foster Wheeler, LLC*, 860 F.3d 249, 258 (4th Cir. 2017), *Caver* v. *Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1144 n.8 (11th Cir. 2017); *Def. Ass'n of Philadelphia*, 790 F.3d at 470-71; *see also K&D LLC* v. *Trump Old Post Office LLC*, 951 F.3d 503, 507 n.1 (D.C. Cir. 2020) (deeming it unnecessary to resolve the impact of the 2011 amendments on Section 1442's scope, but noting the views of its sister circuits).

107.   *Finally*, ExxonMobil is a "person[]" within the meaning of the statute.   *See Watson*, 551 U.S. at 153-54; *In re MTBE Prods. Liability Litig.*, 488 F.3d 112, 124 (2d Cir. 2007) ("[I]t is clear that corporations are 'persons' within the meaning of the statute.").

108.   Because ExxonMobil is being sued for activity taken at the direction of federal officers, has colorable federal defenses to the Attorney General's claims, and is a "person" within the meaning of the statute, removal under Section 1442 is proper.

## IV.   This Action Is Removable under the Outer Continental Shelf Lands Act

109.   This Court also has original jurisdiction pursuant to the OCSLA.   43 U.S.C. § 1349(b); *see Tenn. Gas Pipeline* v. *Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

110.   OCSLA grants federal courts original jurisdiction over all actions "arising out of, or in connection with . . .  any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil or seabed of the outer Continental Shelf, or which involves rights to such minerals."   43 U.S.C. § 1349(b); *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) (The "language" of § 1349(b)(1) is "straightforward and broad.").   The OCS includes all submerged lands that belong to the United States but are not part of any State.   43 U.S.C. §§ 1301, 1331.

111.   Congress passed OCSLA "to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources."   *EP Operating Ltd. P'ship* v. *Placid Oil Co.*, 26 F.3d 563, 566 (5th Cir. 1994).   "[T]he efficient exploitation of the minerals of the OCS . . . was . . . a primary reason for OCSLA."   *Amoco Prod. Co.* v. *Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988).   Indeed, OCSLA declares it "to be the policy of the United States that . . . the [OCS]. . . should be made available for expeditious and orderly development."   43 U.S.C. § 1332(3).   The statute further provides that "since exploration, development, and production of the minerals of the outer Continental Shelf

will have significant impacts on coastal and non-coastal areas of the coastal States . . . such States,

and through such States, affected local governments, are entitled to an opportunity to participate,

*to the extent consistent with the national interest*, in the policy and planning decisions made by the

Federal Government relating to exploration for, and development and production of, minerals of

the outer Continental Shelf." *Id.* § 1332(4) (emphasis added).

112.    Under OCSLA, the U.S. Department of the Interior administers an extensive federal

leasing program aiming to develop and exploit the oil and gas resources of the federal OCS. *Id.*

Under this authority, the Interior Department "administers more than 5,000 active oil and gas

leases on nearly 27 million OCS acres. In FY 2015, production from these leases generated $4.4

billion … in leasing revenue . . . [and] provided more than 550 million barrels of oil and 1.35

trillion cubic feet of natural gas, accounting for about sixteen percent of the Nation's oil production

and about five percent of domestic natural gas production." *The Impact of the President's FY 2017*

*Budget on the Energy and Min. Leasing and Production Missions of the Bureau of Ocean Energy*

*Management (BOEM), the Bureau of Safety and Environmental Enforcement (BSEE), and the*

*Bureau of Land Management (BLM): Hearing Before the Subcomm. on Energy and Min. Res. of*

*the H. Comm. on Nat. Res.*, 114th Cong. 3 (2016) (statement of Abigail Ross Hopper, Director,

Bureau of Ocean Energy Mgmt., Dep't of the Interior), https://www.boem.gov/FY2017-Budget-

Testimony-03-01-2016.[16] In 2019, OCS leases supplied more than 690 million barrels of oil, a

figure that has risen substantially in each of the last six years, together with 1.034 trillion cubic

feet of natural gas. Bureau of Safety & Env't. Enf't, Outer Continental Shelf Oil and Gas

---

[16] The Court may look beyond the facts alleged in the Complaint to determine that OCSLA jurisdiction exists. *See, e.g.*, *Plains Gas Sols., LLC* v. *Tenn. Gas Pipeline Co., LLC*, 46 F. Supp. 3d 701, 703 (S.D. Tex. 2014); *St. Joe Co.* v. *Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 608 (D. Del. 2011) (citing *Amoco Prod. Co.*, 844 F.2d at 1205).

Production, https://www.data.bsee.gov/Production/ OCSProduction/Default.aspx (last visited Oct. 13, 2020).

113.    As noted above, ExxonMobil (or its predecessors, subsidiaries, or affiliates) participates significantly in the federal OCS leasing program and conducts oil and gas operations on the federal OCS. *See* Bureau of Ocean Energy Management, Lease Owner Information (last updated Oct. 13, 2020), https://www.data.boem.gov/Leasing/LeaseOwner/Default.aspx.

114.    Moreover, OCSLA makes clear that oil and gas activities on the OCS can only be governed by federal law.  As the Supreme Court recently confirmed, "OCSLA defines the body of law that governs the OCS."  *Parker Drilling Mgmt. Servs., Ltd.* v. *Newton*, 139 S. Ct. 1881, 1887 (2019).  In particular, OCSLA extends "[t]he Constitution and laws and civil and political jurisdiction of the United States" to the OCS.  43 U.S.C. § 1333(a)(1).  Federal law applies "to the same extent as if the [OCS] were an area of exclusive Federal jurisdiction located within a State." *Id.*  Disputes under OCSLA may borrow from the law of adjacent states, but such claims remain creatures of federal law.  "[T]he civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the [OCS]."  *Id.* § 1333(a)(2)(A).

115.    OCSLA jurisdiction exists even if the Complaint pleads no substantive OCSLA claims.  *See, e.g.*, *In re Deepwater Horizon*, 745 F.3d at 163.  Consistent with Congress's intent, courts have repeatedly found OCSLA jurisdiction where the claims involved conduct that occurred on the OCS or resolution of the dispute foreseeably could affect the efficient exploitation of minerals from the OCS.  *See, e.g.*, *EP Operating Ltd. P'ship.*, 26 F.3d at 569-70; *United Offshore* v. *S. Deepwater Pipeline Co.*, 899 F.2d 405, 407 (5th Cir. 1990).

116.    A substantial part of the Attorney General's claims "arise[] out of, or in connection with," ExxonMobil's "operation[s] conducted on the outer Continental Shelf" that involve "the exploration and production of minerals." *In re Deepwater Horizon*, 745 F.3d at 163 (internal quotation marks and citation omitted). The Attorney General, in fact, challenges advertising relating to ExxonMobil's products, regardless of where they were extracted and produced. And a substantial quantum of those products are extracted and produced from OCS operations. Therefore, the Attorney General's claims necessarily encompass all of ExxonMobil's exploration, production, extraction, and development on the OCS and fall within the "broad . . . jurisdictional grant of section 1349." *EP Operating Ltd. P'ship*, 26 F.3d at 569.

117.    Thus, as *Parker Drilling* explains, the choice-of-law "question under the OCSLA" is not one of "ordinary" preemption. 139 S. Ct. at 1893. "OCSLA makes apparent that federal law is exclusive in its regulation of [the OCS], and that state law is adopted only as surrogate federal law." *Id.* at 1889 (internal quotation marks omitted, alteration in original). Thus, the courts have affirmed removal jurisdiction where plaintiff's claims, "though ostensibly premised on [state] law, arise under the 'law of the United States' under" 43 U.S.C. § 1333(a)(2) such that "[a] federal question . . . appears on the face of [plaintiff's] well-pleaded complaint." *Ten Taxpayer Citizens Grp.* v. *Cape Wind Assocs., LLC*, 373 F.3d 183, 193 (1st Cir. 2004). Accordingly, this lawsuit is removable under OCSLA.

## V.    This Action Arises Out of Federal Enclaves

118.    This Court also has original jurisdiction under the federal enclave doctrine. The Constitution's "Enclave Clause" authorizes Congress to "exercise exclusive Legislation in all Cases whatsoever" over all places purchased with the consent of a state "for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." U.S. Const., art. I, § 8, cl. 17. "A suit based on events occurring in a federal enclave . . . must necessarily arise under federal law

and implicates federal question jurisdiction under § 1331." *Jones* v. *John Crane-Houdaille, Inc.*, No. 11-2374, 2012 WL 1197391, at *1 (D. Md. Apr. 6, 2012).

119.    The "key factor" in determining whether federal enclave jurisdiction exists "is the location of the plaintiff's injury or where the specific cause of action arose." *Sparling* v. *Doyle*, Civ. No. 13-0323, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014).  The "[f]ailure to indicate the federal enclave status and the location of the exposure will not shield plaintiffs from the consequences" of "federal enclave status." *Fung* v. *Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992).  Federal jurisdiction is available if some of the events or damages alleged in the complaint occurred on a federal enclave.  *See Durham* v. *Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) (finding defendant was permitted "to remove to federal court" because "some of [plaintiff's] claims arose on federal enclaves").

120.    *First*, in targeting ExxonMobil's oil and gas operations, the Attorney General necessarily sweeps in those activities that occur on military bases and other federal enclaves.  *See, e.g.*, *Humble Pipe Line Co.* v. *Waggonner*, 376 U.S. 369, 372-74 (1964) (noting that the United States exercises exclusive jurisdiction over certain oil and gas rights within Barksdale Air Force Base in Louisiana); *see also Miss. River Fuel Corp.* v. *Cocreham*, 390 F.2d 34, 35 (5th Cir. 1968) (on Barksdale Air Force Base, "the reduction of fugitive oil and gas to possession and ownership[] takes place within the exclusive jurisdiction of the United States").  Indeed, as of 2000, approximately 14% of the National Wildlife Refuge System "had oil or gas activities on their land," and these activities were spread across 22 different states.  U.S. Gov't Accountability Off., GAO-02-64R, U.S. Fish & Wildlife Service: Information on Oil and Gas Activities in the National Wildlife Refuge System 1 (Oct. 31, 2001), http://www.gao.gov/new.items/d0264r.pdf.

121.    *Second*, the Complaint alleges that climate change injuries will be suffered in federal enclaves within Connecticut.  The Attorney General alleges that, on account of climate change, Connecticut will experience "increasingly serious, life-threatening, and financially burdensome impacts on . . . the lands, waters, coastline, species, natural resources, critical ecosystems, infrastructure and other assets owned by the State and its political subdivisions." Compl. ¶ 23; *see id.* ¶¶ 168-81.  Necessarily impacted are federal enclaves in Connecticut, including the Naval Submarine Base New London, the Stewart B. McKinney National Wildlife Refuge, the Federal Correctional Institution in Danbury, the West Haven and Newington VA Hospital Campuses, and the Milford Laboratory.

## VI.    This Court Has Diversity Jurisdiction Because the Real Party in Interest Has Diverse Citizenship from ExxonMobil

122.    ExxonMobil is also authorized to remove this action under 28 U.S.C. § 1441, based on diversity jurisdiction.  This Court has original diversity of citizenship jurisdiction under 28 U.S.C. § 1332(a), because the real parties in interest are citizens of different states, and the amount in controversy exceeds the value of $75,000.

123.    Federal district courts have "original," diversity jurisdiction over civil actions for which (1) there is "complete diversity," meaning that no plaintiff is a citizen of the same State as any defendant; and (2) the amount in controversy "exceeds the sum or value of $75,000."  *Id.* § 1332(a); *Lincoln Property Co.* v. *Roche*, 546 U.S. 81, 89 (2005).

124.    "[C]omplete diversity" is present because the consumers and residents of Connecticut and ExxonMobil are citizens of different states.  28 U.S.C. § 1332(a)(1).

125.     For purposes of diversity jurisdiction, a corporation is a citizen of the state in which it is incorporated, and the state in which it has its principal place of business.[17] 28 U.S.C. § 1332(c)(1).

126.     Exxon Mobil Corporation is incorporated in New Jersey and has its primary place of business in Texas.  *See* Compl. ¶ 47.

127.     Plaintiff, State of Connecticut, is not a citizen of any state for purposes of diversity jurisdiction; however, it is a nominal plaintiff here.  The real parties in interest are consumers in Connecticut.

128.     Diversity jurisdiction is determined by the real parties in interest, not merely the names on the face of a complaint.  *Connecticut Comm'r of Labor* v. *AT&T Corp.*, No. CIV 306CV01257 AWT, 2006 WL 3332982, at *3 (D. Conn. 2006).

129.     A "real party in interest" is the "person who, according to the governing substantive law, is entitled to enforce the right."  *Oscar Gruss & Son, Inc.* v. *Hollander*, 337 F.3d 186, 193 (2d Cir. 2003) (quoting 6A Charles Alan Wright, et al., *Federal Practice & Procedure* § 1543, at 334 (2d ed. 1990)).  To determine the "real party in interest," courts look to the actual nature of the claims, not how the State attempts to characterize them.  *See Philip Morris, Inc.* v. *Blumenthal*, 123 F.3d 103, 105-107 (2d Cir. 1997) (holding that "on its face, the state action does not appear to differ greatly from a private action under CUTPA, and the mere fact that the state is involved as a party does not transform the action into a 'sovereign enforcement' proceeding").

130.     Here, the State has brought this suit on behalf of Connecticut's consumers.  The Attorney General seeks, *inter alia*, injunctive and equitable relief on behalf of those consumers, as

---

[17] The "in-state defendant rule" does not bar removal of this case because no Defendant is a citizen of Connecticut, "the State in which [this] action is brought."  28 U.S.C. § 1441(b)(2).

well as an order that ExxonMobil "fund a corrective education campaign" to "remedy the harm inflicted" upon those consumers by "decades of disinformation." Compl. at 44, ¶¶ 1-8. When the State seeks relief on behalf of its consumers, those consumers are the real parties in interest. *See, e.g., Connecticut* v. *Levi Strauss & Co.*, 471 F. Supp. 363, 371 (D. Conn. 1979) (the state "satisfies the citizenship requirement for diversity jurisdiction" when "Connecticut presents claims of individuals."); *see also AT&T Corp.*, 2006 WL at *2 (holding that the citizen status of the individuals represented, "rather than the sovereign status of the state, control[led] for diversity purposes.").

131.    Because the Complaint asks for ExxonMobil to pay $5,000 for each of the many alleged violations of the Connecticut Unfair Trade Practices Act, Compl. at 44, ¶ 4, the amount in controversy far "exceeds the sum or value of $75,000." *Id.* § 1332(a)(1); *Dart Cherokee Basin Operating Co., LLC* v. *Owens*, 574 U.S. 81, 89 (2014) (concluding that a defendant's notice of removal need include only a plausible allegation that the amount in controversy satisfies the jurisdictional threshold). In addition, the Complaint alleges that ExxonMobil is liable for a sweeping "campaign of deception" in countless communications to consumers over decades, and requests restitution and disgorgement of profits, pursuant to Connecticut Statutes section 42-110. Compl. at 44, ¶ 4.

132.    The amount in controversy also incorporates injunctive relief. *DiTolla* v. *Doral Dental IPA of New York*, 469 F.3d 271, 276 (2d Cir. 2006) ("[I]n actions for declaratory or injunctive relief . . . the amount in controversy is measured by the value of the object of the litigation." (citing *Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977)).) Here, the Complaint seeks comprehensive injunctive relief, which would independently satisfy the jurisdictional threshold. *See, e.g.*, Compl. at 44-45, ¶¶ 2, 7, 8. The Attorney General alleges that

"ExxonMobil has engaged in national advertising campaigns that have deliberately targeted consumers throughout the United States, including Connecticut, in order to increase its sales and enhance its reputation"  Compl. ¶ 61.  Accordingly, the Complaint seeks to compel ExxonMobil to fund a "corrective education" program to remedy the harms inflicted by its alleged disinformation campaign.  Compl. at 45, ¶ 8.  Based on this allegation, it is plausible that the cost of a public education campaign to correct the alleged misrepresentations similarly would cost millions of dollars.

133.    The Attorney General also seeks the cost of its suit and attorney's fees, which are likely to be substantial.  *See id.* ¶ 9.

134.    In sum, because the parties are "completely diverse," and the amount in controversy exceeds $75,000, this Court has subject matter jurisdiction under 28 U.S.C. § 1332(a).

## **COMPLIANCE WITH OTHER REMOVAL REQUIREMENTS**

135.    Based on the foregoing, this Court has original jurisdiction of this action under 28 U.S.C. §§ 1331, 1332(a), 1367, 1441, 1442, 1453(b), and 43 U.S.C. § 1349(b)(1).

136.    The United States District Court for the District of Connecticut is the appropriate venue for removal under 28 U.S.C. § 1441(a) because it is the federal judicial district encompassing the Connecticut Superior Court for the Judicial District of Hartford, where this suit was originally filed.

137.    Copies of all process, pleadings, and orders from the state-court action being removed to this Court that ExxonMobil has obtained from the State of Connecticut Superior Court of the Judicial District of Hartford and which are in the possession of ExxonMobil are attached

hereto as Exhibit 12.  Pursuant to 28 U.S.C. § 1446(a), this constitutes "a copy of all process, pleadings, and orders" received by ExxonMobil in the action.

138.     Pursuant to 28 U.S.C. § 1446(d), ExxonMobil will promptly file a copy of this Notice of Removal, as well as a Notice of Filing of this Notice of Removal,  with the Clerk of the State of Connecticut Superior Court of the Judicial District of Hartford, and serve a copy of the same on the Attorney General.  A copy of this filing (without exhibits) is attached as Exhibit 13. This Notice of Removal is signed pursuant to Fed. R. Civ. P. 11, as required by 28 U.S.C. § 1446(a).

139.     ExxonMobil reserves the right to amend or supplement this Notice of Removal. ExxonMobil also reserves all defenses and objections available under applicable law, and the filing of this Notice of Removal is subject to, and without waiver of, any such defenses or objections.

WHEREFORE, ExxonMobil respectfully gives notice that this action is hereby removed from the State of Connecticut Superior Court of the Judicial District of Hartford to the United States District Court for the District of Connecticut.


DATE:  October 14, 2020

Respectfully submitted,

EXXON MOBIL CORPORATION,

By its attorneys,

Patrick J. Conlon*
patrick.j.conlon@exxonmobil.com
22777 Springwoods Village Parkway
Spring, TX 77389
Tel:  (832) 624-6336

WIGGIN & DANA LLP

*/s/ Kevin M. Smith*
Kevin M. Smith
Tadhg Dooley
ksmith@wiggin.com
tdooley@wiggin.com
One Century Tower
265 Church Street
New Haven, CT 06510-7001
Tel: (203) 498-4400
Fax: (203) 782-2889

Robert M. Langer
rlanger@wiggin.com
20 Church Street
Hartford, CT 06103-1250
Tel: (860) 297-3700
Fax: (860) 297-3799

29633\1\4850-5729-4798.v1

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

Theodore V. Wells, Jr.*
Daniel J. Toal*
twells@paulweiss.com
dtoal@paulweiss.com
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:  (212) 373-3000
Fax:  (212) 757-3990

Justin Anderson*
janderson@paulweiss.com
2001 K Street, NW
Washington, DC 20006-1047
Tel:  (202) 223-7300
Fax:  (202) 223-7420

*Pro hac vice* forthcoming