# Exhibit 1

## CLIMATE CHANGE COALITION COMMON INTEREST AGREEMENT

This Common Interest Agreement ("Agreement") is entered into by the undersigned Attorneys General of the States, Commonwealths, and Territories (the "Parties") who are interested in advancing their common legal interests in limiting climate change and ensuring the dissemination of accurate information about climate change. The Parties mutually agree:

1.    Common Legal Interests. The Parties share common legal interests with respect to the following topics: (i) potentially taking legal actions to compel or defend federal measures to limit greenhouse gas emissions, (ii) potentially conducting investigations of representations made by companies to investors, consumers and the public regarding fossil fuels, renewable energy and climate change, (iii) potentially conducting investigations of possible illegal conduct to limit or delay the implementation and deployment of renewable energy technology, (iv) potentially taking legal action to obtain compliance with federal and state laws governing the construction and operation of fossil fuel and renewable energy infrastructure, or (v) contemplating undertaking one or more of these legal actions, including litigation ("Matters of Common Interest").

2.    Shared Information. It is in the Parties' individual and common interests to share documents, mental impressions, strategies, and other information regarding the Matters of Common Interest and any related investigations and litigation ("Shared Information"). Shared Information shall include (1) information shared in organizing a meeting of the Parties on March 29, 2016, (2) information shared at and after the March 29 meeting, pursuant to an oral common interest agreement into which the Parties entered at the meeting and renewed on April 12, 2016, and (3) information shared after the execution of this Agreement.

3.    Legends on Documents. To avoid misunderstandings or inadvertent disclosure, all documents exchanged pursuant to this Agreement should bear the legend "Confidential – Protected by Common Interest Privilege" or words to that effect. However, the inadvertent failure to include such a legend shall not waive any privilege or protection available under this Agreement or otherwise. In addition, any Party may, where appropriate, also label documents exchanged pursuant to this Agreement with other appropriate legends, such as, for example, "Attorney-Client Privileged" or "Attorney Work Product." Oral communications among the Parties shall be deemed confidential and protected under this Agreement when discussing Matters of Common Interest.

4.    Non-Waiver of Privileges. The exchange of Shared Information among Parties including among Parties' staff and outside advisors  does not diminish in any way the privileged and confidential nature of such information. The Parties retain all applicable privileges and claims to confidentiality, including the attorney client privilege, work product privilege, common interest privilege, law enforcement privilege, deliberative process privilege and exemptions from disclosure under any public records laws that may be asserted to protect against disclosure of Shared Information to non-Parties (hereinafter collectively referred to as "Privileges").

1

5. Nondisclosure. Shared Information shall only be disclosed to: (i) Parties; (ii) employees or agents of the Parties, including experts or expert witnesses; (iii) government officials involved with the enforcement of antitrust, environmental, consumer protection, or securities laws who have agreed in writing to abide by the confidentiality restrictions of this Agreement; (iv) criminal enforcement authorities; (v) other persons, provided that all Parties consent in advance; and (vi) other persons as provided in paragraph 6. A Party who provides Shared Information may also impose additional conditions on the disclosure of that Shared Information. Nothing in this Agreement prevents a Party from using the Shared Information for law enforcement purposes, criminal or civil, including presentation at pre-trial and trial-related proceedings, to the extent that such presentation does not (i) conflict with other agreements that the Party has entered into, (ii) interfere with the preservation of the Privileges, or (iii) conflict with court orders and applicable law.

6. Notice of Potential Disclosure. The Parties agree and acknowledge that each Party is subject to applicable freedom of information or public records laws, and nothing in this Agreement is intended to alter or limit the disclosure requirements of such laws. If any Shared Information is demanded under a freedom of information or public records law or is subject to any form of compulsory process in any proceeding ("Request"), the Party receiving the Request shall: (i) immediately notify all other Parties (or their designees) in writing; (ii) cooperate with any Party in the course of responding to the Request; and (iii) refuse to disclose any Shared Information unless required by law.

7. Inadvertent Disclosure. If a Party discloses Shared Information to a person not entitled to receive such information under this Agreement, the disclosure shall be deemed to be inadvertent and unintentional and shall not be construed as a waiver of any Party's right under law or this Agreement. Any Party may seek additional relief as may be authorized by law.

8. Independently Obtained Information. Provided that no disclosure is made of Shared Information obtained pursuant to this Agreement, nothing in this Agreement shall preclude a Party from (a) pursuing independently any subject matter, including subjects reflected in Shared Information obtained by or subject to this Agreement or (b) using or disclosing any information, documents, investigations, or any other materials independently obtained or developed by such Party.

9. Related Litigation. The Parties continue to be bound by this Agreement in any litigation or other proceeding that arises out of the Matters of Common Interest.

10. Parties to the Agreement. This Agreement may be executed in counterparts. All potential Parties must sign for their participation to become effective.

11. Withdrawal. A Party may withdraw from this Agreement upon thirty days written notice to all other Parties. Withdrawal shall not terminate, or relieve the withdrawing Party of any obligation under this Agreement regarding Shared Information received by the withdrawing Party before the effective date of the withdrawal.

12. Modification. This writing is the complete Agreement between the Parties, and any modifications must be approved in writing by all Parties.

OAG000185

Dated:   *May 18*   , 2016

Michele Van Gelderen
Supervising Deputy Attorney General
Consumer Law Section
Office of Attorney General Kamala D. Harris
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Tel. (213) 897-2000

OAG000186

Matthew I. Levine
Assistant Attorney General
Office of the Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06106

OAG000187

Elizabeth Wilkins
Senior Counsel to the Attorney General*
Office of the Attorney General for the District of
Columbia
441 4th Street N.W. Suite 1100S
Washington, D.C. 20001
(202) 724-5568
elizabeth.wilkins@dc.gov

*Admitted to practice only in Maryland.  Practicing in the
District of Columbia under the direct supervision of Natalie O.
Ludaway, a member of the D.C. Bar pursuant to D.C. Court of
Appeals Rule 49(c).

5

OAG000188

Dated:  *May* 2     , 2016

James P. Gignac
Environmental and Energy Counsel
Illinois Attorney General's Office
69 W. Washington St., 18th Floor
Chicago, IL  60602
(312) 814-0660
jgignac@atg.state.il.us

6

OAG000189

Dated: April 29, 2016

CHRISTOPHE COURCHESNE
Assistant Attorney General
Chief, Environmental Protection Division
One Ashburton Place
Boston, MA 02108
christophe.courchesne@state.ma.us

7

OAG000190

Dated: _____ , 2016

Joshua N. Auerbach
Assistant Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6311
jauerbach@oag.state.md.us

8

Dated:    May  5      , 2016

Gerald D. Reid
Assistant Attorney General
Chief, Natural Resources Division
Maine Office of the Attorney General
(207) 626-8545
jerry.reid@maine.gov

9

OAG000192

Signature: _____ Date: 5/16/16

Karen D. Olson
Deputy Attorney General
Minnesota Attorney General's Office
445 Minnesota Street, Suite 900
St. Paul, MN 55101
(651) 757-1370
karen.olson@ag.state.mn.us

10

Dated: _April 21_ , 2016

JOSEPH A. FOSTER, ATTORNEY GENERAL
K. Allen Brooks, Senior Assistant Attorney General
33 Capitol Street
Concord, NH 03301
(603) 271-3679
allen.brooks@doj.nh.gov

11

Dated: _____, 2016

Tania Maestas
Deputy Attorney General Civil Affairs
Office of the New Mexico Attorney General
PO Drawer 1508
Santa Fe, NM 87504

OAG000195

Dated. *May 2* 2016

*Monica Wagner*

Monica Wagner
Deputy Chief
Environmental Protection Bureau
Office of the Attorney General of New York
120 Broadway, 26th floor
New York, NY 10271
212-416-6351

OAG000196

Dated: April 29 , 2016

$$l L 0 9 - z - /$$

Paul Garrahan
Attorney-in-Charge | Natural Resources Section |
General Counsel Division
Oregon Department of Justice
1162 Court St. NE, Salem, OR 97301-4096
971.673.1943 (Tue, Thu, Fri) (Portland)
503.947.4593 (Mon, Wed) (Salem)
503.929.7553 (Mobile)

14

OAG000197

Dated: April 28, 2016

Gregory S. Schultz
Special Assistant Attorney General
Rhode Island Department of Attorney General
150 South Main Street Providence, RI 02903
Tel.: (401) 274-4400, Ext. 2400

15

OAG000198

Dated: May 9, 2016

*Rhodes B. Ritenour*  5/9/16

Rhodes B. Ritenour
Deputy Attorney General
Civil Litigation Division
Office of the Attorney General
900 East Main Street
Richmond, VA 23219
Office: (804) 786-6731
E-mail: RRitenour@oag.state.va.us

*John W. Daniel* 5/5/16

John W. Daniel
Deputy Attorney General
Commerce, Environmental, and Technology
Division
Office of the Attorney General
900 East Main Street
Richmond, VA 23219
Office: (804) 786-6053
E-mail: JDaniel@oag.state.va.us

16

OAG000199

Dated: May _10th_, 2016

Renee A. Gumbs, Esq.
Deputy Attorney General
Department of Justice
34-38 Kronprindsens Gade
GERS Complex, 2nd flr.
St. Thomas, VI 00802
(340) 774-5666, ext. 101
(340) 776-3494 (Fax)
Renee.gumbs@doj.vi.gov

17

OAG000200

Dated: April 29, 2016

Nicholas F. Persampieri
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802)-828-6902
nick.persampieri@vermont.gov

18

OAG000201

Dated: _____ , 2016

_____
Laura J. Watson
Senior Assistant Attorney General
Washington State Office of the Attorney General
(360)-586-6743
Laura.watson@atg.wa.gov

OAG000202

# Exhibit 2

# AGs United For Clean Power Press Conference
## March 29, 2016: 11:35 am – 12:32 pm

**AG Schneiderman:**  Thank you, good morning.  I'm New York's Attorney General, Eric Schneiderman.  I thank you for joining us here today for what we believe and hope will mark a significant milestone in our collective efforts to deal with the problem of climate change and put our heads together and put our offices together to try and take the most coordinated approach yet undertaken by states to deal with this most pressing issue of our time.  I want to thank my co-convener of the conference, Vermont Attorney General, William Sorrell, who has been helping in joining us here and been instrumental in making today's events possible, and my fellow attorneys general for making the trip to New York for this announcement.  Many of them had been working for years on different aspects of this problem to try and preserve our planet and reduce the carbon emissions that threaten all of the people we represent.  And I'm very proud to be here today with Attorney General George Jepsen of Connecticut, Attorney General Brian Frosh of Maryland, Attorney General Maura Healey of Massachusetts, Attorney General Mark Herring of Virginia, and Attorney General Claude Walker of the U.S. Virgin Islands.

We also have staff representing other attorneys general from across the country, including: Attorney General Kamala Harris of California, Matt Denn of Delaware, Karl Racine of the District of Columbia, Lisa Madigan of Illinois, Tom Miller of Iowa, Janet Mills of Maine, Lori Swanson of Minnesota, Hector Balderas of New Mexico, Ellen Rosenblum of Oregon, Peter Kilmartin of Rhode Island and Bob Ferguson of Washington.

And finally, I want to extend my severe thanks to Vice President Al Gore for joining us.  It has been almost ten years since he galvanized the world's attention on climate change with his documentary *An Inconvenient Truth*.

And, I think it's fair to say that no one in American public life either during or beyond their time in elective office has done more to elevate the debate about climate change or to expand global awareness about the urgency of the need for collective action on

---

\*      The following transcript of the AGs United For Clean Power Press Conference, held on March 29, 2016, was prepared by counsel based on a video recording of the event, which is available at http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalitionattorneys-general-across.

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

climate change than Vice President Gore.  So it's truly an honor to have you here with us today.

So we've gathered here today for a conference – the first of its kind conference of attorneys general dedicated to coming up with creative ways to enforce laws being flouted by the fossil fuel industry and their allies in their short-sighted efforts to put profits above the interests of the American people and the integrity of our financial markets.  This conference reflects our commitment to work together in what is really an unprecedented multi-state effort in the area of climate change.  Now, we have worked together on many matters before and I am pleased to announce that many of the folks represented here were on the Amicus Brief we submitted to the United States Supreme Court in the *Friedrichs* v. *California Teachers Association* case.  We just got the ruling that there was a four-four split so that the American labor movement survives to fight another day.  And thanks, thanks to all for that effort and collaboration.  It shows what we can do if we work together.  And today we are here spending a day to ensure that this most important issue facing all of us, the future of our planet, is addressed by a collective of states working as creatively, collaboratively and aggressively as possible.

The group here was really formed when some of us came together to defend the EPA's Clean Power Plan, the new rules on greenhouse gases.  And today also marks the day that our coalition is filing our brief in the Court of Appeals for the District of Columbia.  In that important matter we were defending the EPA's rules.  There is a coalition of other states on the other side trying to strike down the rules, but the group that started out in that matter together was 18 states and the District of Columbia.  We call ourselves The Green 19, but now that Attorney General Walker of the Virgin Islands has joined us our rhyme scheme is blown.  We can't be called The Green 19, so now we're The Green 20.  We'll come up with a better name at some point.

But, ladies and gentlemen, we are here for a very simple reason.  We have heard the scientists.  We know what's happening to the planet.  There is no dispute but there is confusion, and confusion sowed by those with an interest in profiting from the confusion and creating misperceptions in the eyes of the American public that really need to be cleared up.  The U.S. Defense Department, no radical agency, recently called climate change an urgent and

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

growing threat to our national security.  We know that last month, February, was the furthest above normal for any month in history since 1880 when they started keeping meteorological records.  The facts are evident.  This is not a problem ten years or twenty years in the future.  [There are] people in New York who saw what happened with the additional storm surge with Super Storm Sandy.  We know the water level in New York Harbor is almost a foot higher than it was.   The New York State Department of Environmental Conservation, not some radical agency, predicts that if we continue at this pace, we'll have another 1.5 feet of water in New York Harbor.  It'll go up by that much in 2050.  So today, in the face of the gridlock in Washington, we are assembling a group of state actors to send the message that we are prepared to step into this breach.  And one thing we hope all reasonable people can agree on is that every fossil fuel company has a responsibility to be honest with its investors and with the public about the financial and market risks posed by climate change.  These are cornerstones of our securities and consumer protection laws.

My office reached a settlement last year based on the enforcement of New York securities laws with Peabody Energy.  And they agreed to rewrite their financials because they had been misleading investors and the public about the threat to their own business plan and about the fact that they had very detailed analysis telling them how the price of coal would be going down in the face of actions taken by governments around the world.  But they were hiding it from their investors.  So they agreed to revise all of their filings with the SEC.   And the same week we announced that, we announced that we had served a subpoena on ExxonMobil pursuing that and other theories relating to consumer and securities fraud.  So we know, because of what's already out there in the public, that there are companies using the best climate science.  They are using the best climate models so that when they spend shareholder dollars to raise their oil rigs, which they are doing, they know how fast the sea level is rising.  Then they are drilling in places in the Arctic where they couldn't drill 20 years ago because of the ice sheets.  They know how fast the ice sheets are receding.  And yet they have told the public for years that there were no "competent models," was the specific term used by an Exxon executive not so long ago, no competent models to project climate patterns, including those in the Arctic.  And we know that they paid millions of dollars to support organizations that put out propaganda denying that we can predict or measure the effects of

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

fossil fuel on our climate, or even denying that climate change was happening.

There have been those who have raised the question:  aren't you interfering with people's First Amendment rights?   The First Amendment, ladies and gentlemen, does not give you the right to commit fraud.   And we are law enforcement officers, all of us do work, every attorney general does work on fraud cases.   And we are pursuing this as we would any other fraud matter.   You have to tell the truth.   You can't make misrepresentations of the kinds we've seen here.

And the scope of the problem we're facing, the size of the corporate entities and their alliances and trade associations and other groups is massive and it requires a multi-state effort.  So I am very honored that my colleagues are here today assembling with us.  We know that in Washington there are good people who want to do the right thing on climate change but everyone from President Obama on down is under a relentless assault from well-funded, highly aggressive and morally vacant forces that are trying to block every step by the federal government to take meaningful action.  So today, we're sending a message that, at least some of us – actually a lot of us – in state government are prepared to step into this battle with an unprecedented level of commitment and coordination.

And I now want to turn it over to my great colleague, the co-convener of this conference, Vermont Attorney General William Sorrell.

**AG Sorrell:**       I am pleased that the small state of Vermont joins with the big state of New York and are working together to make this gathering today a reality.  Truth is that states, large and small, have critical roles to play in addressing environmental quality issues.  General Schneiderman has mentioned our filing today in the D.C. Circuit on the Clean Power Plan case.  Going back some time, many of the states represented here joined with the federal government suing American Electric Power Company, the company operating several coal-fired electric plants in the Midwest and largely responsible for our acid rain and other air quality issues in the eastern part of the United States, ultimately resulting in what I believe to date is the largest settlement in an environmental case in our country's history.  With help from a number of these states, we successfully litigated Vermont's adoption of the so-called California standard

**AGs United For Clean Power Press Conference**
March 29, 2016: 11:35 am – 12:32 pm

for auto emissions in federal court in Vermont, now the standard in the country. And right down to the present day, virtually all of the states represented today are involved in looking at the alleged actions by Volkswagen and the issues relating to emissions from tens of thousands of their diesel automobiles.

But today we're talking about climate change which I don't think there's any doubt, at least in our ranks, is the environmental issue of our times. And in order for us to effectively address this issue, it's going to take literally millions of decisions and actions by countries, by states, by communities and by individuals. And, just very briefly, Vermont is stepping up and doing its part. Our legislature has set goals of 75% reduction – looking from a 1990 base line – a 75% reduction in greenhouse gas emissions by 2050. Similarly, our electric utilities have a goal of 75% use of renewable energy sources by 2032. So, we've been doing our part. Our presence here today is to pledge to continue to do our part. I'm mindful of the fact that I'm between you and the real rock star on this issue, and so I'm going to turn it back to General Schneiderman to introduce the next speaker.

**AG Schneiderman**: Thank you. Thank you. I'm not really a rock star.

[Laughter]

Thank you Bill. It's always a pleasure to have someone here from a state whose U.S. senator is from Brooklyn.

[Laughter]

And doing pretty well for himself. So, Vice President Gore has a very busy schedule. He has been traveling internationally, raising the alarm but also training climate change activists. He rearranged his schedule so he could be here with us to day to meet with my colleagues and I. And there is no one who has done more for this cause, and it is a great pleasure to have him standing shoulder to shoulder with us as we embark on this new round in what we hope will be the beginning of the end of our addiction to fossil fuel and our degradation of the planet. Vice President Al Gore.

**VP Gore**: Thank you very much, Eric. Thank you. Thank you very much.

[Applause]

5

# AGs United For Clean Power Press Conference
## March 29, 2016: 11:35 am – 12:32 pm

Thank you very much, Attorney General Schneiderman.  It really and truly is an honor for me to join you and your colleagues here, Bill Sorrell of Vermont, Maura Healey of Massachusetts, Brian Frosh of Maryland, Mark Herring of Virginia, George Jepsen of [Connecticut] and Claude Walker from the U.S. Virgin Islands, and the ten (let's see 1, 2, 3, 4, 5) how many other – ten other states . . . eleven other state attorneys general offices that were represented in the meetings that took place earlier, prior to this press conference.

I really believe that years from now this convening by Attorney General Eric Schneiderman and his colleagues here today may well be looked back upon as a real turning point in the effort to hold to account those commercial interests that have been – according to the best available evidence – deceiving the American people, communicating in a fraudulent way, both about the reality of the climate crisis and the dangers it poses to all of us.  And committing fraud in their communications about the viability of renewable energy and efficiency and energy storage that together are posing this great competitive challenge to the long reliance on carbon-based fuels.  So, I congratulate you, Attorney General, and all of you, and to those attorneys general who were so impressively represented in the meetings here.  This is really, really important.

I am a fan of what President Obama has been doing, particularly in his second term on the climate crisis.  But it's important to recognize that in the federal system, the Congress has been sharply constraining the ability of the executive branch to fully perform its obligations under the Constitution to protect the American people against the kind of fraud that the evidence suggests is being committed by several of the fossil fuel companies, electric utilities, burning coal, and the like.  So what these attorneys general are doing is exceptionally important.  I remember very well – and I'm not going to dwell on this analogy – but I remember very well from my days in the House and Senate and the White House the long struggle against the fraudulent activities of the tobacco companies trying to keep Americans addicted to the deadly habit of smoking cigarettes and committing fraud to try to constantly hook each new generation of children to replenish their stock of customers who were dying off from smoking-related diseases.  And it was a combined effort of the executive branch, and I'm proud that the Clinton-Gore administration played a role in that, but it was a combined effort in which the state attorneys general

**AGs United For Clean Power Press Conference**
March 29, 2016: 11:35 am – 12:32 pm

played the crucial role in securing an historic victory for public health.  From the time the tobacco companies were first found out, as evidenced by the historic attorney generals' report of 1964, it took 40 years for them to be held to account under the law.  We do not have 40 years to continue suffering the consequences of the fraud allegedly being committed by the fossil fuel companies where climate change is concerned.

In brief, there are only three questions left to be answered about the climate crisis.  The first one is: Must we change, do we really have to change?  We rely on fossil fuels for more than 80% of all the energy our world uses.  In burning it we've reduced poverty and raised standards of living and built this elaborate global civilization, and it looks like it'll be hard to change.  So naturally, people wonder:  Do we really have to change?  The scientific community has been all but unanimous for a long time now.  But now mother nature and the laws of physics – harder to ignore than scientists – are making it abundantly clear that we have to change.  We're putting 110 million tons of man-made heat trapping global warming pollution into the thin shell of atmosphere surrounding our planet every day, as if it's an open sewer.  And the cumulative amount of that man-made global warming pollution now traps as much extra heat energy in the earth's system as would be released by 400,000 Hiroshima-class atomic bombs exploding every 24 hours on the surface of our planet.

It's a big planet, but that's a lot of energy.  And it is <u>the</u> reason why temperatures are breaking records almost every year now. 2015 was the hottest year measured since instruments had been used to measure temperature.  2014 was the second hottest.  <u>14</u> of the 15 hottest have been in the last 15 years.  As the Attorney General mentioned, February continues the trend by breaking all previous records – the hottest in 1,632 months ever measured. Last December 29th, the same unnatural global warming fuel storm system that created record floods in the Midwest went on up to the Arctic and on December 29th, smack in the middle of the polar winter night at the North Pole, temperatures were driven up <u>50 degrees</u> above the freezing point.  So the North Pole started thawing in the middle of the winter night.  Yesterday the announcement came that it's the smallest winter extent of ice ever measured in the Arctic.

# AGs United For Clean Power Press Conference
## March 29, 2016: 11:35 am – 12:32 pm

Ninety-three percent of the extra heat goes into the oceans of the world, and that has consequences.  When Super Storm Sandy headed across the Atlantic toward this city, it crossed areas of the Atlantic that were nine degrees Fahrenheit warmer than normal and that's what made that storm so devastating.  The sea level had already come up because of the ice melting, principally off Greenland and Antarctica.  And as the Attorney General mentioned, that's a process now accelerating.  But these ocean-based storms are breaking records now.  I just came from the Philippines where Super Typhoon Haiyon created 4 million homeless people when it crossed much warmer waters of the Pacific.  By the way, it was a long plane flight to get here and I happened to get, just before we took off, the 200-page brief that you all filed in support of the Clean Power Plan.  Really excellent work.  Footnotes took up a lot of those 200 pages so I'm not claiming to [have] read all 200 of them.

The same extra heat in the oceans is disrupting the water cycle.  We all learned in school that the water vapor comes off the oceans and falls as rain or snow over the land and then rushes back to the ocean.  That natural life-giving process is being massively disrupted because the warmer oceans put a lot more water vapor up there.  And when storm conditions present themselves they, these storms will reach out thousands of kilometers to funnel all that extra humidity and water vapor into these massive record-breaking downpours.  And occasionally it creates a snowpocalypse or snowmaggedon but most often, record-breaking floods.  We've had seven once-in-a-thousand-year floods in the last ten years in the U.S.  Just last week in Louisiana and Arkansas, two feet of rain in four days coming again with what they call the Maya Express off the oceans.  And the same extra heat that's creating these record-breaking floods also pull the soil moisture out of the land and create these longer and deeper droughts all around the world on every continent.

Every night on the news now it's like a nature hike through the Book of Revelation.  And we're seeing tropical diseases moving to higher latitudes – the Zika virus.  Of course the transportation revolution has a lot to do with the spread of Zika and Dengue Fever and Chikungunya and diseases I've never heard of when I was growing up and maybe, probably most of you never did either.  But now, they're moving and taking root in the United States.  Puerto Rico is part of the United States, by the way – not a state,

**AGs United For Clean Power Press Conference**
March 29, 2016: 11:35 am – 12:32 pm

but part of our nation.  Fifty percent of the people in Puerto Rico are estimated to get the Zika virus this year.  By next year, eighty percent.  When people who are part of the U.S. territory, when women are advised not to get pregnant, that's something new that ought to capture our attention.  And in large areas of Central America and South America, women are advised now not to get pregnant for two years until they try to get this brand new viral disease under control.

The list of the consequences continues, and I'm not going to go through it all, but the answer to that first question:  "Do we have to change?" is clearly now to any reasonable thinking person:  "yes, we have to change."  Now the second question is:  "Can we change?"  And for quite a few years, I will confess to you that, when I answered that question yes, it was based on the projections of scientists and technologists who said, just wait.  We're seeing these exponential curves just begin, solar is going to win, wind power is going to get way cheaper, batteries are going to have their day, we're going to see much better efficiency.  Well now we're seeing these exponential curves really shoot up dramatically.  Almost 75% of all the new investment in the U.S. in new generating capacity last year was in solar and wind – more than half worldwide.  We're seeing coal companies go bankrupt on a regular basis now.  Australia is the biggest coal exporter in the world.  They've just, just the analysis there, they're not going to build any more coal plants because solar and wind are so cheap.  And we're seeing this happen all around the world.  But, there is an effort in the U.S. to slow this down and to bring it to a halt because part of the group that, again according to the best available evidence, has been committing fraud in trying to convince people that the climate crisis is not real, are now trying to convince people that renewable energy is not a viable option.  And, worse than that, they're using their combined political and lobbying efforts to put taxes on solar panels and jigger with the laws to require that installers have to know the serial number of every single part that they're using to put on a rooftop of somebody's house, and a whole series of other phony requirements, unneeded requirements, that are simply for the purpose of trying to slow down this renewable revolution.  In the opinion of many who have looked at this pattern of misbehavior and what certainly looks like fraud, they are violating the law.  If the Congress would actually work – our democracy's been hacked, and that's another story, not the subject of this press conference – but if the Congress really would

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

allow the executive branch of the federal government to work, then maybe this would be taken care of at the federal level. But these brave men and women, who are the attorneys general of the states represented in this historic coalition, are doing their job and – just as many of them did in the tobacco example – they are now giving us real hope that the answer to that third question: "Will we change?" is going to be "yes." Because those who are using unfair and illegal means to try to prevent the change are likely now, finally, at long last, to be held to account. And that will remove the last barriers to allow the American people to move forward and to redeem the promise of our president and our country in the historic meeting in Paris last December where the United States led the global coalition to form the first global agreement that is truly comprehensive. If the United States were to falter and stop leading the way, then there would be no other leader for the global effort to solve this crisis. By taking the action these attorneys general are taking today, it is the best, most hopeful step I can remember in a long time – that we will make the changes that are necessary.

So, I'll conclude my part in this by, once again, saying congratulations to these public servants for the historic step they are taking today. And on behalf of many people, who I think would say it's alright for me to speak for them, I'd like to say thank you.

**AG Schneiderman**: Thank you very much, and now my other colleagues are going to say a few words. For whatever reason, I've gotten into the habit, since we always seem to do this, we do this in alphabetical order by state, which I learned when I first became an AG but I guess we'll stick with it. Connecticut Attorney General George Jepsen who was our partner in the *Friedrichs* case and stood with me when we announced that we were filing in that case. We've done a lot of good work together. Attorney General Jepsen.

**AG Jepsen:** I'd like to thank Eric and Bill for their leadership on this important issue and in convening this conference and to recognize the man who has done more to make global warming an international issue than anybody on the entire planet – Vice President Al Gore. In the backdrop, in the backdrop of a very dysfunctional Congress, state attorneys general, frequently on a bipartisan, basis have shown that we can stand up and take action where others have not. The Vice President referenced the tobacco litigation, which was before my time but hugely important in setting the tone and the structures by

10

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

which we do work together.  Since becoming attorney general in 2011, we've taken on the big banks and their mortgage servicing issues, a $25 billion settlement.  We've taken on Wall Street's Standard & Poor's for mislabeling mortgage-backed securities – as a 20-state coalition – mislabeling mortgage-backed securities as AAA when in fact they were junk.  Working together on data privacy issues, and now it's time that we stand up once again and take on what is the most important issue of our generation.  We owe it to our children, our children's children, to step up and do the right thing, to work together and I'm committed to it.  Thank you.

**AG Schneiderman**:   Thank you.  And now a relatively new colleague but someone who has brought incredible energy to this fight and who we look forward to working with on this and other matters for a long time to come.  Maryland Attorney General Brian Frosh.

**AG Frosh**:   Well, first thank you again to General Schneiderman and General Sorrell for putting together this group and it's an honor to be with you, Mr. Vice President.  Thank you so much for your leadership.  I'm afraid we may have reached that point in the press conference where everything that needs to be said has been said, but everyone who needs to say it hasn't said it yet.

[Laughter]

So, I will try to be brief.  Climate change is an existential threat to everybody on the planet.  Maryland is exceptionally vulnerable to it.  The Chesapeake Bay bisects our state.  It defines us geographically, culturally, historically.  We have as much tidal shoreline as states as large as California.  We have islands in the Chesapeake Bay that are disappearing.  We have our capital, Annapolis, which is also the nuisance flood capital of the United States.  It's under water way, way, way too often.  It's extraordinarily important that we address the problem of climate change.  I'm grateful to General Sorrell and General Schneiderman for putting together this coalition of the willing.  I'm proud to be a part of it in addressing and supporting the President's Clean Power Plan.  What we want from ExxonMobil and Peabody and ALEC is very simple.  We want them to tell the truth.  We want them to tell the truth so that we can get down to the business of stopping climate change and of healing the world.  I think that as attorneys general, as the Vice President said, we have a unique ability to help bring that about and I'm very glad to be part of it.

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

**AG Schneiderman**: Thank you.   And, another great colleague, who has done extraordinary work before and since becoming attorney general working with our office on incredibly important civil rights issues, financial fraud issues, Massachusetts Attorney General Maura Healey.

**AG Healey**: Thank you very much General Schneiderman. Thank you General Schneiderman and General Sorrell for your leadership on this issue.  It's an honor for me to be able to stand here today with you, with our colleagues and certainly with the Vice President who, today, I think, put most eloquently just how important this is, this commitment that we make.  Thank you for your leadership.  Thank you for your continuing education.  Thank you for your inspiration and your affirmation.

You know, as attorneys general, we have a lot on our plates: addressing the epidemics of opiate abuse, gun violence, protecting the economic security and well-being of families across this country; all of these issues are so important.  But make no mistake about it, in my view, there's nothing we need to worry about more than climate change.  It's incredibly serious when you think about the human and the economic consequences and indeed the fact that this threatens the very existence of our planet.  Nothing is more important.  Not only must we act, we have a moral obligation to act.  That is why we are here today.

The science – we do believe in science; we're lawyers, we believe in facts, we believe in information, and as was said, this is about facts and information and transparency.   We know from the science and we know from experience the very real consequences of our failure to address this issue.  Climate change is and has been for many years a matter of extreme urgency, but, unfortunately, it is only recently that this problem has begun to be met with equally urgent action.   Part of the problem has been one of public perception, and it appears, certainly, that certain companies, certain industries, may not have told the whole story, leading many to doubt whether climate change is real and to misunderstand and misapprehend the catastrophic nature of its impacts.  Fossil fuel companies that deceived investors and consumers about the dangers of climate change should be, must be, held accountable.  That's why I, too, have joined in investigating the practices of ExxonMobil.   We can all see today the troubling disconnect between what Exxon knew, what industry folks knew, and what

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

the company and industry chose to share with investors and with the American public.

We are here before you, all committed to combating climate change and to holding accountable those who have misled the public.  The states represented here today have long been working hard to sound the alarm, to put smart policies in place, to speed our transition to a clean energy future, and to stop power plants from emitting millions of tons of dangerous global warming pollution into our air.  I will tell you, in Massachusetts that's been a very good thing.  Our economy has grown while we've reduced greenhouse gas emissions and boosted clean power and efficiency. We're home to a state with an $11 billion clean energy industry that employs nearly 100,000 people.  Last year clean energy accounted for 15% of New England's power production.  Our energy efficiency programs have delivered $12.5 billion in benefits since 2008 and are expected to provide another $8 billion over the next three years.  For the past five years, Massachusetts has also been ranked number one in the country for energy efficiency.  So we know what's possible.  We know what progress looks like.  But none of us can do it alone.  That's why we're here today.  We have much work to do, but when we act and we act together, we know we can accomplish much.  By quick, aggressive action, educating the public, holding accountable those who have needed to be held accountable for far too long, I know we will do what we need to do to address climate change and to work for a better future.  So, I thank AG Schneiderman for gathering us here today and for my fellow attorneys general in their continued effort in this important fight.  Thank you.

**AG Schneiderman**:   Thank you.   And now another great colleague who speaks as eloquently as anyone I've heard about what's happening to his state, and a true hero of standing up in a place where maybe it's not quite as politically easy as it is to do it in Manhattan but someone who is a true aggressive progressive and a great attorney general, Mark Herring from Virginia.

**AG Herring**:   Thank you, Eric.  Good afternoon.  In Virginia, climate change isn't some theoretical issue.  It's real and we are already dealing with its consequences.  Hampton Roads, which is a coastal region in Virginia, is our second most populated region, our second biggest economy and the country's second most vulnerable area as sea levels rise.  The area has the tenth most valuable assets in the

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

world threatened by sea level rise.  In the last 85 years the relative sea level in Hampton Roads has risen 14 inches – that's well over a foot – in just the last century.

Some projections say that we can expect an additional two to five feet of relative sea level rise by the end of this century – and that would literally change the face of our state.  It would cripple our economy and it could threaten our national security as Norfolk Naval, the world's largest naval base, is impacted.  Nuisance flooding that has increased in frequency will become the norm.  They call it blue sky flooding.  Storm surges from tropical systems will threaten more homes, businesses and residents.  And even away from the coast, Virginians are expected to feel the impact of climate change as severe weather becomes more dangerous and frequent.  Just a few weeks ago, we had a highly unusual February outbreak of tornadoes in the Commonwealth that was very damaging and unfortunately deadly.

Farming and forestry is our number one industry in Virginia.  It's a $70 billion industry in Virginia that supports around 400,000 jobs and it's going to get more difficult and expensive.  And, the Commonwealth of Virginia local governments and the navy are already spending millions to build more resilient infrastructure, with millions and millions more on the horizon.  To replace just one pier at Norfolk Naval is about $35 to $40 million, and there are 14 piers, so that would be around a half billion right there.

As a Commonwealth and a nation, we can't put our heads in the sand.  We must act and that is what today is about.  I am proud to have Virginia included in this first of its kind coalition which recognizes the reality and the pressing threat of man-made climate change and sea level rise.  This group is already standing together to defend the Clean Power Plan – an ambitious and achievable plan – to enjoy the health, economic and environmental benefits of cleaner air and cleaner energy.   But there may be other opportunities and that's why I have come all the way from Virginia.   I am looking forward to exploring ideas and opportunities, to partner and collaborate, if there are enforcement actions we need to be taking, if there are legal cases we need to be involved in, if there are statutory or regulatory barriers to growing our clean energy sectors and, ultimately, I want to work together with my colleagues here and back in Virginia to help combat climate change and to shape a more sustainable future.

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

And for any folks who would say the climate change is some sort of made-up global conspiracy, that we're wasting our time, then come to Hampton Roads.  Come to Norfolk and take a look for yourselves.  Mayor Fraim would love to have you.

**AG Schneiderman**:  Thank you.   And our closer, another great colleague who has traveled far but comes with tremendous energy to this cause and is an inspiration to us all, U.S. Virgin Islands Attorney General Claude Walker.

**AG Walker**:  Thank you.   Thank you, General Schneiderman, Vice President Gore.  One of my heroes, I must say.  Thank you.  I've come far to New York to be a part of this because in the Virgin Islands and Puerto Rico, we experience the effects of global warming.  We see an increase in coral bleaching, we have seaweeds, proliferation of seaweeds in the water, all due to global warming.   We have tourism as our main industry, and one of the concerns that we have is that tourists will begin to see this as an issue and not visit our shores.   But also, residents of the Virgin Islands are starting to make decisions about whether to live in the Virgin Islands – people who have lived there for generations, their families have lived there for generations.   We have a hurricane season that starts in June and it goes until November.  And it's incredibly destructive to have to go through hurricanes, tropical storms annually.  So people make a decision:  Do I want to put up with this, with the power lines coming down, buildings being toppled, having to rebuild annually?   The strengths of the storms have increased over the years.   Tropical storms now transform into hurricanes.   When initially they were viewed as tropical storms but as they get close to the land, the strength increases.  So we're starting to see people make decisions about whether to stay in a particular place, whether to move to higher ground – which is what some have said – as you experience flooding, as you experience these strong storms.  So we have a strong stake in this, in making sure that we address this issue.

We have launched an investigation into a company that we believe must provide us with information about what they knew about climate change and when they knew it.   And we'll make our decision about what action to take.   But, to us, it's not an environmental issue as much as it is about survival, as Vice President Gore has stated.  We try as attorneys general to build a community, a safe community for all.  But what good is that if

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

annually everything is destroyed and people begin to say:  Why am I living here?

So we're here today to support this cause and we'll continue.  It could be David and Goliath, the Virgin Islands against a huge corporation, but we will not stop until we get to the bottom of this and make it clear to our residents as well as the American people that we have to do something transformational.  We cannot continue to rely on fossil fuel.  Vice President Gore has made that clear.  We have to look at renewable energy.  That's the only solution.  And it's troubling that as the polar caps melt, you have companies that are looking at that as an opportunity to go and drill, to go and get more oil.  Why?  How selfish can you be?  Your product is destroying this earth and your strategy is, let's get to the polar caps first so we can get more oil to do what?  To destroy the planet further?  And we have documents showing that.  So this is very troubling to us and we will continue our fight. Thank you.

**AG Schneiderman**:   Thank you and Eric.  And I do want to note, scripture reports David was not alone in fact, Brother Walker.  Eric and Matt will take on-topic questions.

**Moderator**:   Please just say your name and publication.

**Press Person**:   John [inaudible] with *The New York Times*.  I count two people who have actually said that they're launching new investigations.  I'm wondering if we could go through the list and see who's actually in and who is not in yet.

**AG Schneiderman**:   Well, I know that prior to today, it was, and not every investigation gets announced at the outset as you know, but it had already been announced that New York and California had begun investigations with those stories.  I think Maura just indicated a Massachusetts investigation and the Virgin Islands has, and we're meeting with our colleagues to go over a variety of things.  And the meeting goes on into the afternoon.  So, I am not sure exactly where everyone is.  Different states have – it's very important to understand – different states have different statutes, different jurisdictions.  Some can proceed under consumer protection law, some securities fraud laws, there are other issues related to defending taxpayers and pension funds.  So there are a variety of theories that we're talking about and collaborating and to the degree to which we can cooperate, we share a common interest, and we will.  But, one problem for journalists with investigations

16

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

is, part of doing an investigation is you usually don't talk a lot about what you're doing after you start it or even as you're preparing to start it.

**Press Person**: Shawn McCoy with *Inside Sources*. A *Bloomberg Review* editorial noted that the Exxon investigation is preposterous and a dangerous affirmation of power. *The New York Times* has pointed out that Exxon has published research that lines up with mainstream climatology and therefore there's not a comparison to Big Tobacco. So is this a publicity stunt? Is the investigation a publicity stunt?

**AG Schneiderman**: No. It's certainly not a publicity stunt. I think the charges that have been thrown around – look, we know for many decades that there has been an effort to influence reporting in the media and public perception about this. It should come as no surprise to anyone that that effort will only accelerate and become more aggressive as public opinion shifts further in the direction of people understanding the imminent threat of climate change and other government actors, like the folks represented here step up to the challenge. The specific reaction to our particular subpoena was that the public reports that had come out, Exxon said were cherry picked documents and took things out of context. We believe they should welcome our investigation because, unlike journalists, we will get every document and we will be able to put them in context. So I'm sure that they'll be pleased that we're going to get everything out there and see what they knew, when they knew it, what they said and what they might have said.

**Press Person**: David [inaudible] with *The Nation*. Question for General Schneiderman. What do you hope to accomplish with your Exxon investigation? I'm thinking with reference to Peabody where really there was some disclosure requirements but it didn't do a great deal of [inaudible]. Is there a higher bar for Exxon? What are the milestones that you hope to achieve after that investigation?

**AG Schneiderman**: It's too early to say. We started the investigation. We received a lot of documents already. We're reviewing them. We're not pre-judging anything, but the situation with oil companies and coal companies is somewhat different because the coal companies right now are, the market is already judging the coal industry very harshly. Coal companies, including Peabody, are teetering on the brink. The evidence that we advanced and what was specifically disclosed about Peabody were pretty clear cut examples of

17

**AGs United For Clean Power Press Conference**
March 29, 2016: 11:35 am – 12:32 pm

misrepresentations made in violation with the Securities and Exchange Commission, made to investors.  It's too early to say what we're going to find with Exxon but we intend to work as aggressively as possible, but also as carefully as possible.  We're very aware of the fact that everything we do here is going to be subject to attack by folks who have a huge financial interest in discrediting us.  So we're going to be aggressive and creative but we are also going to be as careful and meticulous and deliberate as we can.

VP Gore:  Could I respond to the last couple of questions just briefly.  And in doing so, I'd like to give credit to the journalistic community and single out the Pulitzer Prize winning team at *InsideClimate News*, also the *Los Angeles Times* and the student-led project at Columbia School of Journalism under Steve Coll.  And the facts that were publicly presented during, in those series of articles that I have mentioned, are extremely troubling, and where Exxon Mobil in particular is concerned.  The evidence appears to indicate that, going back decades, the company had information that it used for the charting of its plan to explore and drill in the Arctic, used for other business purposes information that largely was consistent with what the mainstream scientific community had collected and analyzed.  And yes, for a brief period of time, it did publish some of the science it collected, but then a change came, according to these investigations.  And they began to make public statements that were directly contrary to what their own scientists were telling them.  Secondly, where the analogy to the tobacco industry is concerned, they began giving grants – according to the evidence collected – to groups that specialize in climate denial, groups that put out information purposely designed to confuse the public into believing that the climate crisis was not real.  And according to what I've heard from the preliminary inquiries that some of these attorneys general have made, the same may be true of information that they have put out concerning the viability of competitors in the renewable energy space.  So, I do think the analogy may well hold up rather precisely to the tobacco industry.  Indeed, the evidence indicates that, that I've seen and that these journalists have collected, including the distinguished historian of science at Harvard, Naomi Oreskes wrote the book *The Merchants of Doubt* with her co-author, that they hired several of the very same public relations agents that had perfected this fraudulent and deceitful craft working for the tobacco companies.  And so as someone who

18

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

has followed the legislative, the journalistic work very carefully, I think the analogy does hold up.

**Press Person**: [inaudible] with *InsideClimate News*.  Along the lines of talking about that analogy:  from a legal framework, can you talk about a comparison, similarities and differences between this potential case and that of Big Tobacco?

**AG Schneiderman**: Well, again, we're at the early stages of the case.  We are not pre-judging the evidence.  We've seen some things that have been published by you and others, but it is our obligation to take a look at the underlying documentation and to get at all the evidence, and we do that in the context of an investigation where we will not be talking about every document we uncover.  It's going to take some time, but that's another reason why working together collectively is so important.  And we are here today because we are all committed to pursuing what you might call an all-levers approach.  Every state has different laws, different statutes, different ways of going about this.  The bottom line is simple.  Climate change is real, it is a threat to all the people we represent.  If there are companies, whether they are utilities or they are fossil fuel companies, committing fraud in an effort to maximize their short-term profits at the expense of the people we represent, we want to find out about it.  We want to expose it, and we want to pursue them to the fullest extent of the law.

**Moderator**: Last one.

**Press Person**: Storms, floods will arise they are all going to continue to destroy property and the taxpayers . . .

**Moderator**: What's your name and . . .

**Press Person**: Oh, sorry.  Matthew Horowitz from *Vice*.  Taxpayers are going to have to pay for these damages from our national flood insurance claims.  So if fossil fuel companies are proven to have committed fraud, will they be held financially responsible for any sorts of damages?

**AG Schneiderman**: Again, it's early to say but certainly financial damages are one important aspect of this but, and it is tremendously important and taxpayers – it's been discussed by my colleagues – we're already paying billions and billions of dollars to deal with the consequences of climate change and that will be one aspect of –

## AGs United For Clean Power Press Conference
### March 29, 2016: 11:35 am – 12:32 pm

early foreseeing, it's far too early to say.  But, this is not a situation where financial damages alone can deal with the problem.  We have to change conduct, and as the Vice President indicated, other places in the world are moving more rapidly towards renewables.  There is an effort to slow that process down in the United States.  We have to get back on that path if we're going to save the planet and that's ultimately what we're here for.

**Moderator**:          We're out of time, unfortunately.  Thank you all for coming.

**AG Schneiderman**:  Thank you.

20

# Exhibit 3

**ATTORNEY GENERAL STRANGE LEADS DEAR COLLEAGUE LETTER TO FELLOW ATTORNEYS GENERAL OPPOSING USE OF SUBPOENAS TO ENFORCE THEIR CLIMATE AGENDA VIEWS**

(MONTGOMERY) – Alabama Attorney General Luther Strange led a 13-state Dear Colleague letter urging the nation's Attorneys General to resist using their subpoena powers to target energy industries for their views in the heated climate change debate.

"State Attorneys General should not abuse subpoena power to silence speech or side with one industry against a competitor under investigation," said Attorney General Strange.  "Yet we have seen this very approach used by a group of Attorneys General in an apparent effort to advance a climate change agenda.  This is a chilling abuse of power that must be stopped."

"Several state Attorneys General recently held a press conference under the banner of 'AGs United for Clean Power,'" the multi-state Dear Colleague letter said.  "The media event highlighted an investigation into 'whether fossil fuel companies misled investors and the public on the impact of climate change on their businesses.' We think this effort by our colleagues to police the global warming debate through the power of the subpoena is a grave mistake."

"We are concerned that our colleagues' investigation undermines the trust the people have invested in Attorneys General to investigate fraud.  Investigatory subpoenas were issued to at least one company and one non-profit believed to have made statements minimizing the risks of climate change.  At the press conference, one of our colleagues noted that '[w]e are pursuing this as we would any other fraud matter.'  We routinely investigate fraud and have done so with many of the states present at the press conference.  But this investigation is far from routine.  We are unaware of any fraud case combining the following three characteristics: 1) the investigation targets a particular type of market participant; 2) the Attorneys General identify themselves with the competitors of their investigative targets; and 3) the investigation implicates an ongoing policy debate."

The letter also questioned how one company's minimizing climate change risk is fraud and yet another company's exaggeration of climate change impact is not.

"First, this fraud investigation targets only 'fossil fuel companies' and only statements minimizing climate change risks.  If it is possible to minimize the risks of climate change, then the same goes for exaggeration.  If minimization is fraud, exaggeration is fraud."

Attorney General Strange was joined by fellow Attorneys General from Alaska, Arizona, Arkansas, Louisiana, Michigan, Nebraska, Nevada, Oklahoma, South Carolina, Texas, Utah and Wisconsin in the Dear Colleague letter.

*A copy of the Dear Colleague letter is attached*

--30--

June 15, 2016


Dear Fellow Attorneys General:

Several state Attorneys General recently held a press conference under the banner of "AGs United for Clean Power." The media event highlighted an investigation into "whether fossil fuel companies misled investors and the public on the impact of climate change on their businesses."[1] We think this effort by our colleagues to police the global warming debate through the power of the subpoena is a grave mistake.

We all understand the need for a healthy environment, but we represent a wide range of viewpoints regarding the extent to which man contributes to climate change and the costs and benefits of any proposed fix. Nevertheless, we agree on at least one thing—this is not a question for the courts. Using law enforcement authority to resolve a public policy debate undermines the trust invested in our offices and threatens free speech.

We are concerned that our colleagues' investigation undermines the trust the people have invested in Attorneys General to investigate fraud. Investigatory subpoenas were issued to at least one company and one non-profit believed to have made statements minimizing the risks of climate change.[2] At the press conference, one of our colleagues noted that "[w]e are pursuing this as we would any other fraud matter."[3] We routinely investigate fraud, and have done so with many of the states present at the press conference. But this investigation is far from routine. We are unaware of any fraud case *combining* the following three characteristics: 1) the investigation targets a particular type of market participant; 2) the Attorneys General identify themselves with the competitors of their investigative targets; and 3) the investigation implicates an ongoing public policy debate.

---

[1] Press Release, New York State Attorney General, *A.G. Schneiderman, Former Vice President Al Gore And A Coalition Of Attorneys General From Across The Country Announce Historic State-Based Effort To Combat Climate Change* (March 29, 2016) (available at http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across).

[2] *See, e.g.*, Attorney General Schneiderman, Press Conference, AGs United For Clean Power (March 29, 2016) (confirming subpoena to ExxonMobil) (video available at http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across); Subpoena to Competitive Enterprise Institute, *United States Virgin Islands, Office of the Attorney General v. ExxonMobil Oil Corp.*, Case No. 16-002469, Superior Court of the District of Columbia (April 4, 2016).

[3] Attorney General Schneiderman, Press Conference, AGs United For Clean Power, *supra* note 2.

First, this fraud investigation targets only "fossil fuel companies" and only statements minimizing climate change risks.[4]  If it is possible to minimize the risks of climate change, then the same goes for exaggeration.  If minimization is fraud, exaggeration is fraud.  Some have indicated that Exxon Mobil's securities disclosures regarding climate change may be inadequate.[5]  We do not know the accuracy of these charges.  We do know that Exxon Mobil discloses climate change and its possible implications as a business risk.  *See* Exxon Mobil Corporation SEC Form 10-k, FY 2014 (listing "Climate change and greenhouse gas restrictions" as an item 1A risk factor).  If Exxon's disclosure is deficient, what of the failure of renewable energy companies to list climate change as a risk?  *See, e.g.*, SolarCity Corporation SEC Form 10-k, FY 2014 (omitting from item 1A risk factors any mention of climate change or global warming).  If climate change is perceived to be slowing or becoming less of a risk, many "clean energy" companies may become less valuable and some may be altogether worthless.  Therefore, any fraud theory requiring more disclosure of Exxon would surely require more disclosure by "clean energy" companies.

Similarly, it has been asserted that "fossil fuel companies" may have funded non-profits who minimized the risks of climate change.[6]  Does anyone doubt that "clean energy" companies have funded non-profits who exaggerated the risks of climate change?  Under the stated theory for fraud, consumers and investors could suffer harm from misstatements by all energy-market participants and the non-profits they support.  Yet only companies and non-profits allegedly espousing a particular viewpoint have been chosen for investigation.

Second, the Attorneys General have taken the unusual step of aligning themselves with the competitors of their investigative targets.  The press conference was titled, "AGs United for Clean Power," apparently to contrast with the power generated by the investigative targets.[7]  One of our colleagues emphasized that she looked forward to working with those at the press conference to "advocate for a comprehensive portfolio of renewable energy sources."[8]  Furthermore, the media event featured a senior partner of a venture capital firm that invests in renewable energy companies.[9]  If the focus is fraud,

---

[4] *See generally* Press Release, New York State Attorney General, *supra* note 1; Press Conference, AGs United For Clean Power, *supra* note 2.

[5] *See, e.g.*, Attorney General Healey, Press Conference, AGs United For Clean Power, *supra* note 2.

[6] *See, e.g.*, Attorney General Schneiderman, Press Conference, AGs United For Clean Power, *supra* note 2.

[7] *See generally* Press Release, New York State Attorney General, *supra* note 1; Press Conference, AGs United For Clean Power, *supra* note 2.

[8] Press Release, New York State Attorney General, *supra* note 1 (quoting Attorney General Madigan).

[9] *See* Press Release, New York State Attorney General, *supra* note 1 (noting presence of Vice President Gore); Press Conference, AGs United For Clean Power, *supra* note 2 (including remarks by Vice President Gore); Press Release, Kleiner Perkins Caufield & Byers, *Al Gore Joins KPCB as Partner and John Doerr Joins Generation's Advisory Board* (November 12, 2007) (available at

such alignment by law enforcement sends the dangerous signal that companies in certain segments of the energy market need not worry about their misrepresentations. For example, though some of us may have investigated diesel emissions, we have not launched our investigations with other auto companies present or identified ourselves as "AGs United for Diesel Alternatives." Implying a safe harbor for the "Clean Power" energy segment, which some estimate at $200 billion, or approximately the size of the pharmaceutical industry, is a dangerous practice.[10]

Third, this investigation inescapably implicates a public policy debate and raises substantial First Amendment concerns. As our colleagues must know, a vigorous debate exists in this country regarding the risks of climate change and the appropriate response to those risks. Both sides are well-funded and sophisticated public policy participants. Whatever our country's response, it will affect people, communities, and businesses that all have a right to participate in this debate. Actions indicating that one side of the climate change debate should fear prosecution chills speech in violation of a formerly bi-partisan First Amendment consensus. As expressed by Justice Brandeis, it has been a foundational principle that when faced with "danger flowing from speech … the remedy to be applied is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring). Here, the remedy chosen is silence through threat of subpoena. This threat distorts the debate and impoverishes consumers and the general public who may wish to better educate themselves by hearing and evaluating both sides.

Once the government begins policing viewpoints, two solutions exist. The first solution is to police all viewpoints equally. Another group of Attorneys General could use the precedent established by the "AGs United for Clean Power" to investigate fraudulent statements associated with competing interests. The subpoenas currently directed at some market participants could be met with a barrage of subpoenas directed at other market participants. No doubt a reasonable suspicion exists regarding a number of statements relating to the risks of climate change. Even in the press conference, a senior partner at Kleiner Perkins Caufield & Byers ("Kleiner Perkins") identified "man-made global warming pollution" as "the reason" for 2015 temperatures, the spread of Zika, flooding in Louisiana and Arkansas, Super Storm Sandy, and Super Typhoon Haiyan.[11] Some evidence may support these statements. Other evidence may refute them. Do these statements increase the value of clean energy investments offered for sale by Kleiner Perkins? Should these statements justify an investigation into all contributions to environmental non-profits by Kleiner Perkins's partners? Should these questions be

---

https://www.generationim.com/media/pdf-generation-kpcb-12-11-07.pdf); Kleiner Perkins Caufield & Byers public website, available at http://www.kpcb.com/partner/al-gore (confirming Vice President Gore's present status as a "senior partner").

[10] *See, e.g.*, Informational Report, Environmental Defense Fund, *Climate* (2015), at 2 (noting "U.S. clean energy market grew … to $200 billion," in 2014) (available at https://www.edf.org/sites/default/files/AR2015/EDF_AR2015_climate.pdf).

[11] Vice President Gore, Press Conference, AGs United For Clean Power, *supra* note 2.

settled by our state courts under penalty of RICO charges?  May it never be.  As Justice Jackson noted, our "forefathers did not trust any government to separate the true from the false for us."  *Thomas v. Collins*, 323 U.S. 516, 545 (1945).  We write to urge our colleagues to choose the second, and far superior, solution.  Stop policing viewpoints.

Sincerely,

Luther Strange
Attorney General
State of Alabama

Bill Schuette
Attorney General
State of Michigan

Ken Paxton
Attorney General
State of Texas

Craig Richards
Attorney General
State of Alaska

Doug Peterson
Attorney General
State of Nebraska

Sean Reyes
Attorney General
State of Utah

Mark Brnovich
Attorney General
State of Arizona

Adam Laxalt
Attorney General
State of Nevada

Brad Schimel
Attorney General
State of Wisconsin

Leslie Rutledge
Attorney General
State of Arkansas

Scott Pruitt
Attorney General
State of Oklahoma

Jeff Landry
Attorney General
State of Louisiana

Alan Wilson
Attorney General
State of South Carolina

# Exhibit 4



# Establishing Accountability for Climate Change Damages:

## *Lessons from Tobacco Control*

Summary of the Workshop on Climate Accountability,
Public Opinion, and Legal Strategies

Martin Johnson House
Scripps Institution of Oceanography
La Jolla, CA, June 14–15, 2012





©October 2012
Union of Concerned Scientists and Climate
Accountability Institute. All rights reserved.

**Report Author**
This workshop summary was written by Seth
Shulman, senior staff writer at the Union of
Concerned Scientists.

**Workshop Organizers**
The workshop was conceived by Naomi Oreskes
of the University of California–San Diego, Peter
C. Frumhoff and Angela Ledford Anderson of the
Union of Concerned Scientists, Richard Heede of
the Climate Accountability Institute, and Lewis
M. Branscomb of the John F. Kennedy School of
Government at Harvard University and the Scripps
Institution of Oceanography. Alison Kruger of
the Union of Concerned Scientists coordinated
workshop logistics.

*Organizational affiliations are for identification
purposes only. The opinions expressed in this report
are the sole responsibility of the participants quoted.*

**Acknowledgments**
This workshop was made possible by the V.
Kann Rasmussen Foundation, the Mertz Gilmore
Foundation, The Grantham Foundation for the
Protection of the Environment, and the Martin
Johnson House at the Scripps Institution of
Oceanography. Without their generous support,
this workshop would not have been possible.

**The Union of Concerned Scientists** is the leading
science-based nonprofit working for a healthy
environment and a safer world. More information
about UCS is available on the UCS website at
*www.ucsusa.org.*

**The Climate Accountability Institute** engages
in research and education on anthropogenic
climate change, dangerous interference with the
climate system, and the contribution of fossil fuel
producers' carbon production to atmospheric
carbon dioxide content. This encompasses the
science of climate change, the civil and human
rights associated with a stable climate regime not
threatened by climate-destabilizing emissions of
greenhouse gases, and the risks, liabilities, and
disclosure requirements regarding past and future
emissions of greenhouse gases attributable to
primary carbon producers.

## Contents

Preface ...................................................   3

1. Introduction ....................................   5

2. Lessons from Tobacco Control:
   Legal and Public Strategies ........................   7

3. Climate Legal Strategies:
   Options and Prospects ...............................  11

4. Attribution of Impacts and Damages:
   Scientific and Legal Aspects .....................  15

5. Public Opinion and
   Climate Accountability ...............................  21

6. Conclusion ......................................................  27

Endnotes ...........................................................  30

## Appendices

A. Workshop Agenda .......................................  31

B. Participants ...................................................  34

# Preface

**The workshop sought to compare the evolution of public attitudes and legal strategies related to tobacco control with those related to anthropogenic climate change.**

For many years after scientists first concluded that smoking causes cancer, the tobacco companies continued to win court cases by arguing, among other things, that smokers assumed the risk of smoking and that no specific cancer deaths could be attributed to smoking. At some point, however, the tobacco companies began to lose legal cases against them even though the science had not substantively changed. Juries began to find the industry liable because tobacco companies had known their products were harmful while they publicly denied the evidence, targeted youth, and manipulated nicotine levels.

To explore how this transformation happened, and to assess its implications for people working to address climate change, the Union of Concerned Scientists and the Climate Accountability Institute brought together about two dozen leading scientists, lawyers and legal scholars, historians, social scientists, and public opinion experts for a June 14–15, 2012, workshop at the Scripps Institution of Oceanography in La Jolla, CA.

Specifically, the workshop sought to compare the evolution of public attitudes and legal strategies related to tobacco control with those related to anthropogenic climate change, fostering an exploratory, open-ended dialogue about whether we might use the lessons from tobacco-related education, laws, and litigation to address climate change. The workshop explored which changes now being observed (e.g., increasing extreme heat, sea level rise) can be most compellingly attributed to human-caused climate change, both scientifically and in the public mind. Participants also considered options for communicating this scientific attribution of climate impacts in ways that would maximize public understanding and produce the most effective mitigation and adaptation strategies.

The workshop explored the degree to which the prospects for climate mitigation might improve with public acceptance (including judges and juries) of the causal relationships between fossil fuel production, carbon emissions, and climate change. Participants

debated the viability of diverse strategies, including the legal merits of targeting carbon producers (as opposed to carbon emitters) for U.S.-focused climate mitigation. And finally, the group sought to identify the most promising and mutually reinforcing intellectual, legal, and/or public strategies for moving forward. We are pleased to share the outcome of these preliminary workshop discussions. Among the many points captured in this report, we want to highlight the following:

- A key breakthrough in the public and legal case for tobacco control came when internal documents came to light showing the tobacco industry had knowingly misled the public. Similar documents may well exist in the vaults of the fossil fuel industry and their trade associations and front groups, and there are many possible approaches to unearthing them.

- Drawing upon the forthcoming "carbon majors" analysis by Richard Heede, it may be feasible and highly valuable to publicly attribute important changes in climate, such as sea level rise, to specific carbon producers. Public health advocates were effective in attributing the health impacts of smoking to major tobacco companies.

- While we currently lack a compelling public narrative about climate change in the United States, we may be close to coalescing around one. Furthermore, climate

**Climate change may loom larger today in the public mind than tobacco did when public health advocates began winning policy victories.**

change may loom larger today in the public mind than tobacco did when public health advocates began winning policy victories. Progress toward a stronger public narrative might be aided by use of a "dialogic approach" in which climate advocates work in partnership with the public. Such a narrative must be both scientifically robust and emotionally resonant to cut through the fossil fuel industry's successful efforts to sow uncertainty and confusion.

Naomi Oreskes
*University of California–San Diego*

Peter C. Frumhoff
*Union of Concerned Scientists*

Richard Heede
*Climate Accountability Institute*

Lewis M. Branscomb
*Scripps Institution of Oceanography*

Angela Ledford Anderson
*Union of Concerned Scientists*

**Climate Accountability, Public Opinion, and Legal Strategies Workshop**

*Martin Johnson House, Scripps Institution of Oceanography, La Jolla, CA, June 14–15, 2012*

# 1. Introduction

**Tobacco companies realized they did not need to prove their products were safe. Rather, they had only to implement a calculated strategy to foster doubt about the science.**

For decades after U.S. tobacco firms first became aware of strong scientific evidence linking smoking to cancer in the mid-1950s, the industry adopted a public relations strategy that knowingly sought to confuse people about the safety of its products. As we now know, tobacco industry lawyers long advised their clients that if they admitted to selling a hazardous product they would be vulnerable to potentially crippling liability claims. So, despite the scientific evidence, the industry developed and implemented a sophisticated disinformation campaign designed to deceive the public about the hazards of smoking and forestall governmental controls on tobacco consumption.

As time went on, a scientific consensus emerged about a multitude of serious dangers from smoking. On January 11, 1964, for instance, the U.S. government released the first report by the Surgeon General's Advisory Committee on Smoking and Health, which specifically warned the public about the link between smoking and lung cancer.[1] Nonetheless, the tobacco industry's disinformation campaign continued. As internal documents have long since revealed, the tobacco companies quickly realized they did not need to prove their products were safe. Rather, they had only to implement a calculated strategy to foster doubt about the science in the minds of the public. As one infamous internal memo from the Brown & Williamson company put it: "Doubt is our product, since it is the best means of competing with the 'body of fact' that exists in the minds of the general public."[2] The industry also managed to convince juries that smoking was a voluntary act, that the public was well informed of "potential risks," and that smokers therefore only had themselves to blame for whatever harm may have occurred.

It has become increasingly clear during the past decade or more that the fossil fuel industry has adopted much the same strategy:

attempting to manufacture uncertainty about global warming even in the face of overwhelming scientific evidence that it is accelerating at an alarming rate and poses a myriad of public health and environmental dangers. Not only has the fossil fuel industry taken a page from the tobacco industry's playbook in its efforts to defeat action on climate change, it also shares with the tobacco industry a number of key players and a remarkably similar network of public relations firms and nonprofit "front groups" that have been actively sowing disinformation about global warming for years.[3]

At this pivotal moment for climate change, with international agreement all but stymied and governmental action in the United States largely stalled, the Union of Concerned Scientists and the Climate Accountability Institute sought to build a clearer understanding of the drivers of change that eventually proved effective against the tobacco industry. To be sure, lawyers played a huge role; scientific evidence played an important role as well. But notably, neither science nor legal strategies alone drove the changes in public understanding of the health dangers posed by smoking. Workshop participants were therefore asked to share their perspectives on a key question: given the power and resources of the tobacco industry, how *were* tobacco control efforts able to finally gain traction?

By gathering a distinguished and complementary group of experts, the Climate Accountability Workshop created the conditions for a well-informed discussion about the history of tobacco prevention as an example for those working on climate change: exploring how science in combination with the law, public advocacy, and possibly new technology can spur a seminal shift in public understanding and engagement on an issue of vital importance to the global community.

What follows is a summary of the workshop designed to highlight some of the major themes that emerged over the course of two days of structured dialogue. Because the discussion was often animated and wide-ranging, this report does not attempt to portray a comprehensive account of all the ideas presented, but rather the key findings that emerged.

When I talk to my students I always say, tobacco causes lung cancer, esophageal cancer, mouth cancer. . . . My question is: What is the "cancer" of climate change that we need to focus on?

—*Naomi Oreskes*

# 2. Lessons from Tobacco Control: Legal and Public Strategies

**Both the tobacco industry and the fossil fuel industry have adopted a strategy of disseminating disinformation to manufacture uncertainty and forestall government action, and in so doing, have placed corporate interests above the public interest.**

Workshop participants reviewed the history of tobacco control in the United States to identify lessons that might be applicable to action on global warming. The first important insight was that the history of tobacco control efforts stretches back much further than most people realize. The American Tobacco Company was broken up as a result of the Sherman Anti-Trust Act of 1890, and several U.S. states banned tobacco entirely between 1890 and 1920 in response to concerns that the powerful tobacco industry was paying off legislators. Those bans were all overturned after successful lobbying efforts by the industry, but a landmark 1900 legal case (*Austin v. Tennessee*) set an important precedent by upholding the legal right of states to ban tobacco.[4]

A second important insight was that the battle for tobacco control continues today, despite substantial gains over the past several decades. In a point made forcefully by Robert Proctor, a science historian who frequently serves as an expert witness in tobacco litigation, "Tobacco is not over." While the number of cigarettes smoked worldwide may no longer be growing, an estimated 6 trillion were still sold and smoked in 2012. More than 45 million Americans continue to smoke, some 8 million live with a serious illness caused by their smoking, and more than 400,000 die prematurely each year.[5]

A few principles emerged from the long fight for tobacco control. First, any legal strategies involving court cases require plaintiffs, a venue, and law firms willing to litigate—all of which present significant hurdles to overcome. Robert Proctor generalized about the history of tobacco-related litigation by noting that tobacco opponents typically won with simplicity but lost in the face of complexity. As he noted, it is worth remembering that, "The industry can win by making plaintiffs have to pass a thousand hurdles, any one of which can derail the whole effort." Second, public victories can occur even when the formal point is lost. In one effort that sought to stop tobacco research at Stanford University, for instance, no formal ban was enacted but the public outcry led the Philip Morris company to stop its external research programs anyway.[6]

## The Importance of Documents in Tobacco Litigation

One of the most important lessons to emerge from the history of tobacco litigation is the

value of bringing internal industry documents to light. Roberta Walburn, a key litigator in the pathbreaking 1994 case *State of Minnesota and Blue Cross and Blue Shield of Minnesota v. Philip Morris et al. [C1-94-8565]*, explained that her legal team, with strong backing from Minnesota Attorney General Hubert "Skip" Humphrey, made it a goal from the start of the lawsuit to use the process of legal discovery to gain access to Philip Morris's internal documents and make them part of the public domain. Walburn noted that Humphrey was mocked and scorned by many of his colleagues for this emphasis, but it proved critical to achieving the landmark settlement.

For the previous four decades, the tobacco industry had not lost a single legal case nor been forced to release most of its internal documents. But attorneys began to see the tremendous value of the industry's memos in an individual New Jersey smoker's case in the 1980s, and when a paralegal leaked some internal documents in the early 1990s. By making such documents a key part of the Minnesota litigation, the legal discovery process ultimately brought some 35 million pages of industry documents to light.[7]

Of course, the release of so many documents also presented immense challenges, requiring the legal team to pore over them one page at a time. The industry also went to great lengths to hide documents throughout the discovery process, listing them under different corporate entities, "laundering" scientific documents by passing them through attorneys in order to claim attorney-client privilege, and playing word games in order to claim they didn't have any documents on the topics sought by the plaintiffs. During pre-trial discovery in the Minnesota litigation, Walburn noted, Philip Morris was spending some $1.2 million dollars every week in legal defense.

In the end, however, the documents proved crucial in helping to shift the focus of litigation away from a battle of the experts over the science of disease causation and toward an investigation of the industry's conduct. As Roberta Walburn explained, their legal team was able to say to the judge and jury, "You don't have to believe us or our experts; just look at the companies' own words." The strategy of prying documents from the industry also proved effective because once a lawsuit begins, litigants are required by law to retain evidence. The very first order issued by the judge in the Minnesota case was a document preservation order, which meant that the company could be held in contempt of court if it failed to comply. Companies are also required to preserve any documents they think might be pertinent to possible future litigation.

Today, the documents that have emerged from tobacco litigation have been collected in a single searchable, online repository: the so-called Legacy Tobacco Document Library (available at *legacy.library.ucsf.edu*) currently contains a collection of some 80 million pages. Stanton Glantz, a professor of cardiology at the University of California–San Francisco who directs the project, noted the importance of the decision to create an integrated collection accessible to all. One advantage of such a collection, he said, is that it becomes a magnet for more documents from disparate sources.

Because the Legacy Collection's software and infrastructure is already in place, Glantz suggested it could be a possible home for a parallel collection of documents from the fossil fuel industry pertaining to climate change. He stressed the need to think carefully about which companies and which trade groups might have documents that could be especially useful. And he underscored the point that bringing documents to light must be

established as an objective independent of the litigation, or else the most valuable documents are not likely be made public.

## Documents Helped Establish a Conspiracy

The release of documents from the tobacco industry became front-page news in the 1990s. The headlines did not tout the fact that tobacco causes lung cancer, which had already been widely reported; instead, they focused on the tobacco industry's lies to the public, its efforts to target children in its marketing campaigns, and its manipulation of the amount of nicotine in cigarettes to exploit their addictive properties.[8] Many of these facts had not come to the public's attention until the industry's internal documents came to light.

Most importantly, the release of these documents meant that charges of conspiracy or racketeering could become a crucial component of tobacco litigation. Formerly secret documents revealed that the heads of tobacco companies had colluded on a disinformation strategy as early as 1953.[9]

Sharon Eubanks noted the importance of documents in a racketeering case against the tobacco industry she prosecuted during the Clinton administration. That case, *U.S.A v. Philip Morris, Inc.*, was filed after President Clinton directed his attorney general to attempt to recover from the tobacco industry the costs of treating smokers under Medicare. The Justice Department brought the case under the Racketeer Influenced and Corrupt Organizations (RICO) statute that was originally enacted to combat organized crime.

The U.S. District Court for the District of Columbia found Philip Morris and other tobacco companies charged in the case guilty of violating RICO by fraudulently covering up the health risks associated with smoking and by marketing their products to children. The court imposed most of the requested remedies, and rejected the defendants' argument that their statements were protected by the First Amendment, holding that the amendment does not protect "knowingly fraudulent" statements. The tobacco companies appealed the ruling but a three-judge panel of the U.S. Court of Appeals for the District of Columbia unanimously upheld the decision in 2009.

## Lessons for the Climate Community

One theme to emerge from this review of tobacco litigation was the similarity between the tobacco industry's disinformation campaign and the fossil fuel industry's current efforts to sow confusion about climate change. As one participant put it, "The tobacco fight is now the climate fight." Both industries have adopted a strategy of disseminating disinformation to manufacture uncertainty and forestall governmental action, and in so doing, have placed corporate interests above the public interest. Several workshop participants presented detailed evidence of the close ties between the two industries in terms of personnel, nonprofit "front groups," and funders.

Given these close connections, many participants suggested that incriminating documents may exist that demonstrate collusion among the major fossil fuel companies, trade associations, and other industry-sponsored groups. Such documents could demonstrate companies' knowledge, for instance, that the use of their products damages human health and well-being by contributing to "dangerous anthropogenic interference with the climate system."[10]

Finally, participants agreed that most questions regarding how the courts might rule on climate change cases remain unanswered. Most participants also agreed that pursuing a

legal strategy against the fossil fuel industry would present a number of different obstacles and opportunities compared with those faced by litigants in the tobacco cases. As Roberta Walburn noted, however, both efforts do share an important public interest imperative: "People have been harmed and there should be justice," she said. "If you want to right a wrong you have to be bold."

# 3. Climate Legal Strategies: Options and Prospects

*Tobacco started with a small box of documents. We used that to wedge open a large pattern of discovery. . . . It looks like where you are with climate is as good as it was with tobacco—probably even better. I think this is a very exciting possibility.*

—*Stanton Glantz*

A wide variety of potential legal strategies were discussed at the workshop. Participants agreed that a variety of different approaches could prove successful in spurring action and engaging the public on global warming, with suggestions ranging from lawsuits brought under public nuisance laws (the grounds for almost all current environmental statutes) to libel claims against firms and front groups that malign the reputations of climate scientists.

Several participants warned of the potential polarizing effect of lawsuits. While it is never an easy decision to bring a lawsuit, they noted, litigants must understand that if they pursue such a course they should expect a protracted and expensive fight that requires careful planning. Among the issues discussed were the importance of seeking documents in the discovery process as well as the need to choose plaintiffs, defendants, and legal remedies wisely. Another issue of concern was the potential for a polarizing lawsuit to slow the broad cultural shift in public perception (see section 5).

## Strategies to Win Access to Internal Documents

Having attested to the importance of seeking internal documents in the legal discovery phase of tobacco cases, lawyers at the workshop emphasized that there are many effective avenues for gaining access to such documents.

First, lawsuits are not the only way to win the release of documents. As one participant noted, congressional hearings can yield documents. In the case of tobacco, for instance, the infamous "Doubt is our product" document came out after being subpoenaed by Congress.[11] State attorneys general can also subpoena documents, raising the possibility that a single sympathetic state attorney general might have substantial success in bringing key internal documents to light. In addition, lawyers at the workshop noted that even grand juries convened by a district attorney could result in significant document discovery.

Jasper Teulings, general counsel for Greenpeace International, emphasized that the release of incriminating internal documents

from the fossil fuel industry would not only be relevant to American policy but could have widespread international implications.

## Importance of Choosing Plaintiffs, Defendants, and Legal Remedies

Matt Pawa, a leading litigator on climate-related issues, discussed his current case, *Kivalina v. ExxonMobil Corporation, et al.*, now pending on appeal. The lawsuit, brought under public nuisance law, seeks monetary damages from the energy industry for the destruction of the native village of Kivalina, AK, by coastal flooding due to anthropogenic climate change. Damages have been estimated by the U.S. Army Corps of Engineers and the U.S. Government Accountability Office between $95 million and $400 million.

The suit was dismissed by a U.S. district court in 2009 on the grounds that regulating global warming emissions is a political rather than a legal issue that needs to be resolved by Congress and the executive branch rather than the courts. An appeal was filed with the Ninth Circuit Court of Appeals in November 2009, but was rejected in September 2012. The plaintiffs have yet to determine whether to take further legal action, either by calling for an *en banc* review of the appeal verdict or by re-filing the case in state court.

Pawa noted that in representing Kivalina, he chose a plaintiff whose stake in the case is patently evident, as is the harm that has come to the village. Because those facts remain largely beyond dispute, it puts the focus of the case squarely on attributing the damage to the defendants. Pawa has used the principle of "joint and several" liability, which (in his words) holds that, "If two guys are outside a bar and the plaintiff gets beaten up and only one technically does it but both of them collude in the activity, they can both be held responsible." Because Exxon and the other corporate defendants in the Kivalina case are indisputably large emitters of heat-trapping gases, Pawa said he will argue that they "are basically like the two guys outside that bar." To help with his argument of causation, Pawa will also argue that Exxon and the other defendants distorted the truth. He said that litigation not only allows him to pursue a remedy for some of those most vulnerable to the effects of climate change, but also serves as "a potentially powerful means to change corporate behavior."

Jasper Teulings recounted the unusual and controversial case in which Greenpeace International helped representatives from Micronesia—an island nation threatened by rising sea levels—request a transboundary environmental impact assessment (TEIA) in the Czech Republic, hoping to prevent the Czech government from granting a 30-year permit extension for a coal-fired power plant. That action, he said, led to a national debate about global warming in a country led by a climate skeptic, and the Czech environment minister ultimately resigned as a result. The case also drew the attention of the international media, including the *Wall Street Journal*, *Economist*, and *Financial Times*.[12]

Participants weighed the merits of legal strategies that target major carbon *emitters*, such as utilities, versus those that target carbon *producers*, such as coal, oil, and natural gas companies. In some cases, several lawyers at the workshop noted, emitters are better targets for litigation because it is easy to establish their responsibility for adding substantial amounts of carbon to the atmosphere. In other cases, however, plaintiffs might succeed in cases against the producers who unearthed the carbon in the first place.

In lawsuits targeting carbon producers, lawyers at the workshop agreed, plaintiffs need

to make evidence of a conspiracy a prominent part of their case. Richard Ayres, an experienced environmental attorney, suggested that the RICO Act, which had been used effectively against the tobacco industry, could similarly be used to bring a lawsuit against carbon producers. As Ayres noted, the RICO statute requires that a claimant establish the existence of a "criminal enterprise," and at least two acts of racketeering (with at least one having occurred within the past four years). It is not even clear, he added, whether plaintiffs need to show they were actually harmed by the defendant's actions. As Ayres put it, "RICO is not easy. It is certainly not a sure win. But such an action would effectively change the subject to the campaign of deception practiced by the coal, gas, and oil companies."

The issue of requesting an appropriate legal remedy was also discussed. As one of the workshop's lawyers said, "As we think about litigation, we need to consider: what does our carbon system look like with climate stabilization? It has to be something positive. Only then can we figure out what strategies we need to pursue." As important as this broad vision of a legal remedy is, this participant also emphasized the advantage of asking courts to do things they are already comfortable doing, noting that, "Even if your ultimate goal might be to shut down a company, you still might be wise to start out by asking for compensation for injured parties."

## Other Potential Legal Strategies

### False advertising claims

Naomi Oreskes, a historian of science at the University of California–San Diego, brought up the example of the Western Fuels Association, an industry-sponsored front group that has run ads containing demonstrably false information. Oreskes noted that she has some of the

public relations memos from the group and asked whether a false advertising claim could be brought in such a case. Lawyers at the workshop said that public relations documents could probably be used as evidence in such a case but they cautioned that courts view claims designed to influence consumer behavior differently than they do those designed to influence legislative policy.

Some lawyers at the workshop did note that historical false advertising claims could be deemed relevant, especially if plaintiffs can show that the conduct has continued. In tobacco litigation, for example, plaintiffs have successfully gone back as far as four decades for evidence by establishing the existence of a continuing pattern by the tobacco industry.

Joe Mendelson, director of climate policy at the National Wildlife Federation, suggested that such a strategy might be employed to take on the coal industry's advertising campaign, which has targeted swing states whose attorneys general are unlikely to call out the ads' distortions. Such a legal case, Mendelson explained, might achieve a victory in terms of public education and engagement.

### Libel suits

Lawyers at the workshop noted that libel lawsuits can be an effective response to the fossil fuel industry's attempts to discredit or silence atmospheric scientists. Pennsylvania State University's Michael Mann, for instance, has worked with a lawyer to threaten libel lawsuits for some of the things written about him in the media, and has already won one such case in Canada. Matt Pawa explained that libel cases merely require the claimant to establish falsity, recklessness, and harm. "What could be more harmful than impugning the integrity of a scientist's reputation?" Pawa asked. Roberta Walburn noted that libel suits can also serve

to obtain documents that might shed light on industry tactics.

### Atmospheric trust litigation

Mary Christina Wood, professor of law at the University of Oregon, discussed her involvement with so-called atmospheric trust litigation, a legal strategy she pioneered that is now unfolding in all 50 states. The goal of the litigation—to force massive reforestation and soil carbon sequestration that would return the planet to a sustainable level of atmospheric carbon dioxide (350 parts per million)—is grounded in the internationally recognized principle known as the Public Trust Doctrine, first enunciated by the Roman Emperor Justinian.

Under this doctrine, a state or third-party corporation can be held liable for stealing from or damaging a resource—in this case, the atmosphere—that is held as a public trust. The beneficiaries in the case are citizens—both current and future—who claim that the defendants (the state or federal government or third-party corporations) have a duty to protect and not damage that resource, which they oversee or for which they bear some responsibility.

Wood noted that this legal action has several promising features: it is being brought by children, can highlight local impacts of climate change because it is being brought in every state, and is flexible enough to be brought against states, tribes, the federal government, or corporations. Wood said that while the atmospheric trust lawsuits are just starting, some 22 amicus briefs (in which law professors from around the country argue that the approach is legally viable) have already been filed.

## Disagreement about the Risks of Litigation

Despite widespread endorsement by workshop participants of the potential value in pursuing legal strategies against the fossil fuel industry, some of the lawyers present expressed concern about the risks entailed should these cases be lost. As one participant put it, "We have very powerful laws and we need to think strategically about them so they won't be diminished by the establishment of a legal precedent or by drawing the attention of hostile legislators who might seek to undermine them."

Others, such as Sharon Eubanks, took issue with this perspective. "If you have a statute, you should use it," she said. "We had the case where people said, 'What if you screw up RICO?' But no matter what the outcome, litigation can offer an opportunity to inform the public." Stanton Glantz concurred with this assessment. As he put it, "I can't think of any tobacco litigation that backfired; I can't think of a single case where litigation resulted in bad law being made."

# 4. Attribution of Impacts and Damages: Scientific and Legal Aspects

*Why should taxpayers pay for adaptation to climate change? That is a sound bite that I don't hear used. Why should taxpayers bear the risk? Perhaps that question alone can help shift public perception.*

*—Myles Allen*

Several sessions at the workshop addressed a variety of vexing issues concerning the extent to which localized environmental impacts can be accurately attributed to global warming and how, in turn, global warming impacts might be attributed to specific carbon emitters or producers. Many challenges are involved in these kinds of linkages, from getting the science right to communicating it effectively.

Myles Allen, a climate scientist at Oxford University, suggested that while it is laudable to single out the 400 Kivalina villagers, all 7 billion inhabitants of the planet are victims of climate change. He noted, for instance, that while the United Nations Framework Convention on Climate Change makes an inventory of global warming emissions, it does not issue an inventory of who is being affected. As he put it, "Why should taxpayers pay for adaptation to climate change? That is a sound bite that I don't hear used. Why should taxpayers bear the risk? Perhaps that question alone can help shift public perception."

Allen also noted that the scientific community has frequently been guilty of talking about the climate of the twenty-second century rather than what's happening now. As a result, he said, people too often tend to perceive climate change as a problem for our grandchildren.

## Challenges of Attributing Environmental Effects to Anthropogenic Climate Change

Several of the climate scientists at the meeting addressed the scientific challenges involved in attributing specific environmental effects to anthropogenic climate change. For example, global warming, natural variability, population exposure, and population vulnerability are all factors in the disasters that make headlines. Myles Allen noted that while scientists can accurately speak about increases in average global temperature, such large-scale temperature measurements are difficult to link to specific individuals.

Claudia Tebaldi, a climate scientist at Climate Central, emphasized the problem of confounding factors: "If you want to have statistically significant results about what has already happened [on the health impacts of climate change]," she said, "we are far from being able to say anything definitive because the signal is so often overwhelmed by noise."

Given that nearly all consequences have multiple causes, Tebaldi reviewed the difficulties entailed in efforts at so-called *single-step attribution* (in which a single variable is added or removed from a model), *multi-step attribution* (in which two or more attribution linkages are drawn), and *associative patterns of attribution* (in which linkages are mapped over time in order to detect possible patterns). She noted that the authors of the 2007 Intergovernmental Panel on Climate Change report were relatively comfortable attributing certain environmental phenomena to climate change: changes in snow/ice/frozen ground; increased runoff and anticipated snowmelt in spring; warmer water temperatures and changes in salinity, oxygen levels, and ocean acidification. But she added that it is still hard to say anything statistically significant about some key areas of concern.

Climate scientist Mike MacCracken expressed more optimism about the ability of scientists to identify patterns of changes. The traditional view, he explained, is that one cannot attribute a single weather event to human-induced climate change, but climate change reflects a difference in the frequency and intensity of weather events from the past—that is how the term is defined. So, as the distribution of weather events changes, we are seeing an increasing likelihood of what were once very rare events, but are likely to become much more frequent.

Myles Allen agreed that scientists could be far more confident about a group of events rather than a single event, but noted, "Then you are talking again about climate [as opposed to weather]. We can say with confidence how the risks are changing. Absolutely. And some harms can be caused by change in risk. But we are still talking about probabilities." As an example, Allen cited work

> **Absolutely crucial is real progress on regional and local consequences of climate change. We have general notions that the Southwest will be drier. But once the science is able to say with confidence what will happen in the states of Colorado and Arizona, then the people who live there will want to pressure their representatives to fix their problem. Then political people will be much more responsive to the issue. That will be real progress in the next few years.**
>
> —*Lew Branscomb*

by Stefan Rahmstorf and Dim Coumou, who found an 80 percent probability that the July 2010 heat record would not have occurred without global warming.[13]

Others agreed that many different types of aggregate findings can be useful. Paul Slovic, for instance, cited the example of the book *At War with the Weather* by Howard Kunreuther. In studying economic losses from natural disasters, Kunreuther found an exponential increase in losses incurred over the last 10 or 20 years.[14] Again, multiple factors need to be teased apart, such as the growth in population exposed to natural disasters, increased infrastructure replacement costs, natural variability, and the influence of climate change.[15]

Mike MacCracken suggested that issues related to the science itself are distinct from how findings should be communicated to the public. "The challenge," he said, "is finding an effective lexicon that scientists are comfortable with." Along these lines, one participant suggested that it could be helpful to communicate findings framed as a discussion. For example, a farmer could ask a question

saying, "I'm concerned because I'm seeing *this* [particular local weather]." The scientist can comfortably respond: "You're right to be concerned because we are seeing *this*, *this*, and *this* [aggregate effect or strong probability of anthropogenic warming]."

Lew Branscomb, a physicist, governmental policy expert, and one of the meeting's organizers, suggested that the evolution of climate science is an important issue. As he put it, "Absolutely crucial is real progress on regional and local consequences of climate change. We have general notions that the Southwest will be drier. But once the science is able to say with confidence what will happen in the states of Colorado and Arizona, then the people who live there will want to pressure their representatives to fix their problem. Then political people will be much more responsive to the issue. That will be real progress in the next few years."

## Determining Appropriate Standards of Evidence

A discussion arose at the workshop about the appropriate standard of evidence required when attributing specific environmental phenomena to global warming and establishing the culpability of carbon emitters and producers. Naomi Oreskes noted the important differences among standards of evidence in science, in law, and in public perception.

As she explained, "When we take these things to the public, I think we often make a category error. We take a standard of evidence applied internally to science and use it externally. That's part of why it is so hard to communicate to the public." Oreskes pointed out that the "95 percent proof rule" widely accepted among scientists might not be appropriate in this application. That standard of proof, she said, "is not the Eleventh Commandment. There is nothing in nature that taught us that

95 percent is needed. That is a social convention. Statistics are often used when we don't understand the mechanisms of causation. But what if we do know what the mechanisms are? For instance, if we know how a bullet kills a human, we don't need statistics to prove that bullets can kill."

Oreskes went on to note that scientific knowledge in the field of climate science is very robust—more robust than in many other fields such as plate tectonics or relativity. This observation led her to wonder why climate scientists have been so reticent about communicating their results, and to postulate that in accepting such a high standard of proof, "The scientific community has been influenced by push-back from industry."

Stanton Glantz drew a comparison to his work with the Centers for Disease Control establishing a link between smoking and breast cancer. "I fought CDC on the links between smoking and breast cancer," he recalled. "There were 17 studies. How could you make a statement that there was no link? The epidemiologists focus on statistics but we already knew about the biology of breast cancer and damage to DNA and links to tobacco. My argument was that you needed to look at a whole body of evidence. . . . We compared the breast cancer evidence, which is stronger than the original lung cancer evidence, and that got accepted and became the default position. But the fact is, not everyone who smokes gets cancer."

For climate change, Glantz said, all the pieces fit together and they represent a consistent body of evidence. He added that criminal trials use the standard of "beyond a reasonable doubt." But as he put it, "Scientists have been making the 'reasonable doubt' standard higher and higher."

Some of the scientists at the workshop, however, took issue with the idea that they

ought to apply different standards of proof to their work. Claudia Tebaldi, for instance, responded, "As a scientist I need to have two different standards? I don't see that. I am not convinced that I should lower my standards of skepticism when I talk to the public. As a scientist I give you the probability. It is not my job to change my paper if the consequences are so bad. That is the job of a policy maker working with my results."

Mary Christina Wood reminded the group that the medical profession is adept at juggling two very different standards: the standard of proof and the standard of care, and suggested that climate scientists might be able to do something similar. Dick Ayres agreed, emphasizing that, "Too high a standard of proof increases the burden on those who seek to protect public health."

Myles Allen noted that a key problem always comes back to the issue of doubt. "If you grab a scientist off the street and ask whether we *could* have had this weather event without global warming, they will likely say yes, it could have been possible. So the reality is that there will always be a scientist available to fill that role in the court of law." The vexing thing, Allen said, is "trying to make clear to the public that there are two uncertainties. We can be very certain about what is happening and yet very uncertain about what is going to happen tomorrow or next year."

## Attributing Environmental Damage to Carbon Producers

Richard Heede, co-founder and director of the Climate Accountability Institute, presented a preview of a research project several years in the making, in which he has been quantifying the annual and cumulative global warming emissions attributable to each of the world's major carbon producers. By closely reviewing annual reports and other public sources of information from the energy sector, Heede is working to derive the proportion of the planet's atmospheric carbon load that is traceable to the fossil fuels produced and marketed by each of these companies annually from 1864 to 2010. The work deducts for carbon sequestered in non-energy products such as petrochemicals, lubricants, and road oil, and quantifies annual and cumulative emissions to the atmosphere attributable to each company. The research is still awaiting peer review before it can be finalized and publicized.

Most of the workshop's participants responded positively to Heede's research. Matt Pawa thought the information could prove quite useful in helping to establish joint and several liability in tort cases, but he cautioned that, in practice, a judge would likely hesitate to exert joint and several liability against a carbon-producing company if the lion's share of carbon dioxide in the atmosphere could *not* be attributed to that company specifically. Nevertheless, he said this kind of accounting would no doubt inspire more litigation that could have a powerful effect in beginning to change corporate behavior.

Other participants reacted positively to other aspects of Heede's research. Angela Anderson, director of the climate and energy program at the Union of Concerned Scientists, noted for instance that it could potentially be useful as part of a coordinated campaign to identify key climate "wrongdoers." Mary Christina Wood agreed, saying the preliminary data resonated strongly with her, making her feel like "Polluters did this and they need to clean this up." Other participants noted that it could be helpful in the international realm by changing the narrative that currently holds nations solely responsible for the carbon emitted by parties within their own borders. Finding

the specific companies responsible for emissions, they said, cuts a notably different way.

One concern raised was that some in the "American middle" might perceive it as unfair to go after a company that didn't know carbon dioxide was harmful for much of the extended period Heede reviewed. To get a sense of this, some suggested reaching out to someone like public opinion specialist Tony Leiserowitz who could undertake polling to see how such research might be received by different segments of the public.

Robert Proctor suggested that the most effective public communication about the research would use the simplest formulation possible. One effective strategy in the fight against tobacco, he observed, was equating a year's production of cigarettes in a particular factory to a number of deaths. Anti-tobacco activists determined that there was one smoking-related death for every one million cigarettes produced. As Proctor explained, given that the industry made roughly one cent in profit per cigarette, that meant a company such as Philip Morris made $10,000 in profit for every death its products caused. Proctor suggested a similar strategy could be adapted to link the largest corporate carbon producers to specific climate impacts. If numbers could be generated for how many deaths per year were caused by each degree rise in global temperature, for instance, a similar case could be made against a particular company that produced or emitted a known percentage of the carbon load contributing to global warming.

Picking up on this notion, Naomi Oreskes suggested that some portion of sea level rise could be attributed to the emissions caused by a single carbon-producing company. In essence, she suggested, "You might be able to say, 'Here's Exxon's contribution to what's happening to Key West or Venice.'" Myles Allen

agreed in principle but said the calculations required, while not complicated, were easy to get wrong.

Whether or not the attribution would hold up in court, Stanton Glantz expressed some enthusiasm about such a strategy, based on his experience with tobacco litigation. As he put it, "I would be surprised if the industry chose to attack the calculation that one foot of flooding in Key West could be attributed to ExxonMobil. They will not want to argue that you are wrong and they are really only responsible for one half-foot. That is not an argument they want to have." For similar reasons, he said, tobacco companies have never challenged death estimates, noting, "Their PR people tell them not to do that, focusing instead on more general denial and other tactics."

## Evidence of Collusion and Prospects for Constructive Engagement

Participants at the workshop also discussed one other aspect of attribution: the close connections among climate change deniers, the fossil fuel industry, and even the tobacco companies. John Mashey, a computer scientist and entrepreneur who has meticulously analyzed climate change deniers, presented a brief overview of some of his research, which traces funding, personnel, and messaging connections between roughly 600 individuals and 100 organizations in the climate change denial camp.[16] Mashey noted that looking closely at the relationships between these parties—via documents, meetings, e-mails, and other sources—can help clarify the extent of collusion involved in sowing confusion on the issue. Mashey cited, for instance, memos that have surfaced from a 1998 "climate denial" plan involving most of the major oil companies (under the auspices of the American Petroleum Institute) that set the

stage for much of the disinformation of the past 10 years.[17]

A number of participants ultimately agreed that the various linkages and attribution data could help build a broad public narrative along the following lines:

- We have a serious problem (as shown by the science)

- We know the people responsible are the same ones responsible for a campaign of confusion

- There are solutions, but we can't get to them because of the confusion these companies have funded

Finally, there was some fundamental disagreement over the potential for engagement with the fossil fuel industry. Richard Heede expressed optimism, saying, "I would love to envision constructive engagement with industry. That would mean convincing them to participate in a plan that 'could make life worth living for future generations.'"

Some veterans of the tobacco control campaign voiced skepticism, however. Stanton Glantz recalled two instances in which activists sought engagement with the industry. In one, the National Cancer Institute met with tobacco companies to try to persuade them to make less dangerous cigarettes. "The tobacco companies used it as an opportunity to undertake intelligence gathering about health groups and it was a disaster," he recalled. Glantz did note a fundamental difference between tobacco and climate change, however: while tobacco companies offer no useful product, he explained, "The fact is we do need some form of energy. Unless other alternative energy firms replace the current carbon producers, which seems unlikely, at some point there will likely have to be some kind of positive engagement. Less clear, however, is how best to create a political environment for that engagement to work."

# 5. Public Opinion and Climate Accountability

*The watershed moment was the congressional hearing when the tobacco companies lied and the public knew it. If that had occurred earlier, the public might not have so clearly recognized that the executives were lying. My question is: What do we know about how public opinion changed over time?*

*—Peter Frumhoff*

Throughout several sessions, workshop participants discussed and debated the role of public opinion in both tobacco and climate accountability. It was widely agreed that, in the case of tobacco control, a turning point in public perception came at the 1994 "Waxman hearings" on the regulation of tobacco products.[18] On this highly publicized occasion, a broad swath of the populace became aware that the heads of the major tobacco companies had lied to Congress and the American public. Naomi Oreskes said tobacco litigation helped make this public narrative possible.

Participants grappled with the question of how climate advocates might create a similar narrative for global warming. While there was a good deal of debate about exactly what such a narrative should be, there was widespread agreement that the public is unlikely to be spurred into action to combat global warming on the basis of scientific evidence alone. Furthermore, climate change science is so complex that skeptics within the scientific community can create doubts in the public mind without any assistance from the fossil fuel industry or other climate change deniers.

## The Importance of Creating a Public Narrative

Jim Hoggan, a public relations expert and co-founder of DeSmogBlog.com, explained the problem this way: "The public debate about climate change is choked with a smog of misinformation. Denial and bitter adversarial rhetoric are turning the public away from the issue. Communicating into such high levels of public mistrust and disinterest is tricky. We need to do some research into a new narrative." Hoggan emphasized the importance of linking the industry's "unjust misinformation" back to an overall narrative about sustainability, rather than getting mired in issues of whose fault climate change is and who should do what to ameliorate the situation. Noting the fact that there is broad and deep support for clean energy, Hoggan suggested the following narrative: "Coal, oil, and gas companies are engaging in a fraudulent attempt to stop the development of clean energy."

Many participants agreed about the importance of framing a compelling public narrative. Dick Ayres added that the simple act of naming an issue or campaign can be important as well. After acid rain legislation passed in 1990, he recalled, an industry lobbyist told him, "You won this fight 10 years ago when you chose to use the words 'acid rain.'"

Paul Slovic, a psychologist and expert on risk perception, cited his colleague Daniel Kahneman's book *Thinking, Fast and Slow*, which has shown that people often tend to make snap judgments rather than stopping to analyze.[19] Though a degree of slow thinking is necessary to comprehend climate change, he said, people instead tend to go with their quick first impressions.

Having reviewed two boxes of documents obtained from tobacco marketers by the Justice Department for its RICO case against the tobacco companies, Slovic became convinced that the industry was decades ahead of academic psychologists in understanding the interplay of emotion and reason in decision making. The sophistication of the cigarette makers' approach showed, he said, in the effectiveness with which they used images of beautiful people doing exciting things, or words like "natural" and "light" that conveyed health (in response to mounting evidence of smoking's link to lung cancer).

Slovic emphasized that there are huge differences between tobacco and climate risks. "Every hazard is unique, with its own personality, so to speak," he said. "Does it pose a risk to future generations? Does it evoke feelings of dread? Those differences can make an impact on strategy." The feeling of dread, specifically, was an important feature in people's perception of tobacco risks, since they equated smoking with lung cancer.

> Here is one possibility for a public narrative: "Coal, oil, and gas companies are engaging in a fraudulent attempt to stop the development of clean energy."
>
> —*Jim Hoggan*

This differs from "doom-and-gloom" discussions about climate change, which can tend to turn people off rather than instilling dread. The difference is that climate change risks seem diffuse—distant in both time and location. The situation is even more complicated, Slovic added, by the fact that when people receive a benefit from an activity, they are more inclined to think the risk that activity carries is low. If they receive little benefit, they tend to think the risk is higher. As he explained, "The activities that contribute to climate change are highly beneficial to us. We love them; we are addicted to them." That, he said, makes the problem of communicating the dangers of climate change all the more difficult.

## Reaching People "Where They Live"

Several participants emphasized the phenomenon of cultural cognition, including work on the subject by Dan Kahan at Yale Law School.[20] Cultural cognition research suggests that we all carry around with us a vision of a just social order for the world in which we live. Kahan's work identifies a major division between those who tend toward a worldview based on structure and hierarchy, and those who tend toward a worldview based on egalitarianism. Another axis is individualism versus communitarianism (i.e., whether a higher value is placed on the welfare of the individual or the group). In Kahan's conception, all of us have a blend of such attributes.

Attitudes on climate change are highly correlated with these views. As a result, it is difficult to change people's views on the issue because, when they receive information, they tend to spin it to reflect their favored worldview. In light of this research, several participants expressed concern that a revelation about documents from oil companies might not work to change many minds, given the power of such pre-existing worldviews.

Brenda Ekwurzel, a climate scientist at the Union of Concerned Scientists (UCS), recounted her organization's experience with this variable, explaining that UCS, as a science-based organization, contends with an "information fire hose" when it comes to climate change. As she put it, "We love data. We scientists tend to focus on the frontal lobe and we need communications folks to remind us that there are other parts of our brain too." She said she always wants to begin a discussion by saying, "Let's talk about climate change." But that, it turns out, is not necessarily the best starting point—she has learned that it's better to start with: "Let's talk about what you care about most." The answer is likely to be family, friends, livelihood, health, and recreation.

Ekwurzel highlighted polling data that have shown some 77 percent of people in Kahan's egalitarian/communitarian sector believe experts agree about climate change,

while 80 percent of those in the hierarchical/individualist camp believe experts disagree about climate change. To overcome that barrier, UCS staff responsible for communicating about climate change began experimenting, in one case addressing an issue of great concern to a very specific constituency: the correlation between August high school football practices in Texas and an increase in heat stroke among the student athletes.

This effort, launched to coincide with the first week of football practice in Texas and Oklahoma, proved remarkably successful, Ekwurzel said, drawing local media attention in a region the organization rarely reached. It also encouraged commentary from a different set of voices than those who normally talk about global-warming-related issues, such as medical professionals. It may have been a coincidence, Ekwurzel admitted, but within six weeks of this campaign the state of Texas decided to scale back high school football practices in the summer—and the message about the consequences of warmer summers in the region reached a largely untapped audience for UCS.[21]

## Identifying Wrongdoers

Participants at the workshop also discussed the benefits and risks associated with identifying wrongdoers as part of a public narrative. Some participants, such as Paul Slovic, argued that this could prove an effective strategy. Slovic cited research by Roy Baumeister and Brad Bushman suggesting that, when it comes to messages, "bad is stronger than good"—a finding that helps explain the tendency toward negative advertising in political campaigning.[22] Claudia Tebaldi said she believed "there is a big difference between convincing people there is a problem and mobilizing them. To mobilize, people often need to be outraged."

> Every hazard is unique, with its own personality, so to speak. Does it pose a risk to future generations? Does it evoke feelings of dread? Those differences can make an impact on strategy.
>
> —*Paul Slovic*

On the other hand, several of the public opinion experts cautioned that "argument tends to trigger counter-argument." By contrast, they pointed out, emotional messages don't tend to trigger counter-emotions. "Abuse breeds abuse," explained Dan Yankelovich, cofounder of Public Agenda, a nonpartisan group devoted to public opinion research and citizen education. "In this case, you have industry being abusive. But you do not want to demonize the industry. The objective ought to be to have the public take this issue so seriously that people change their behavior and pressure industry to alter their current practices. In the end, we want industry to be more receptive to this pressure, not less."

For this reason and others, several participants expressed reservations about implementing an overly litigious strategy at this political moment. Perhaps the strongest proponent of this view was Yankelovich, who explained, "I am concerned about so much emphasis on legal strategies. The point of departure is a confused, conflicted, inattentive public. Are legal strategies the most effective strategies? I believe they are important after the public agrees how to feel about an issue. Then you can sew it up legally." In the face of a confused, conflicted, and inattentive public, legal strategies can be a double-edged sword, he continued: "The more adversarial the discourse, the more minds are going to be closed." In response to a comment by Richard Ayres, however, Yankelovich agreed that a legal strategy focused on the industry's disinformation campaign could help advance public opinion on global warming, as it did in the case of tobacco.

Jim Hoggan advised, "It's like that old adage that says, 'Never get into a fight with a pig in public. The pig likes it. You both get dirty. And, after a while, people can't tell the difference.'"

> I am concerned about so much emphasis on legal strategies. The point of departure is a confused, conflicted, inattentive public. Are legal strategies the most effective strategies? I believe they are important after the public agrees how to feel about an issue. Then you can sew it up legally. Legal strategies themselves are a double-edged sword. The more adversarial the discourse, the more minds are going to be closed.
>
> —Daniel Yankelovich

Dan Yankelovich also described his theory of the "public learning curve," which holds that public opinion moves through three recognizable phases on issues like smoking or climate change. The first is the "consciousness-raising" phase, during which the media can help dramatically draw attention to an issue. This is followed by the "working-through" phase, during which things bog down as the public struggles over how to adapt to painful, difficult change. Yankelovich noted a paucity of institutions that can help the public work through this phase, which is frequently marked by the kind of denial and wishful thinking recognizable today in public opinion about climate change. He argued that only when the public begins to move into the third phase of "thoughtful public judgment" can legal strategies prove most effective and ultimately produce laws and regulations.

As he explained, "My sense is we are not there yet on climate change. The media has not been a help. The opposition has been successful in throwing sand in the works. People are just beginning to enter the open-minded stage. We are not decades away but I don't have enough empirical data. My sense is that it may take about three to five more years."

## The Prospects for a "Dialogic" Approach and Positive Vision

Given the fact that the climate advocacy community has not yet coalesced around a compelling public narrative, Dan Yankelovich suggested that the topic could be a good candidate for engaging in a relatively new public opinion technique known as the "dialogic method," in which representative groups holding different views on a subject meet over the course of a day or more to develop a narrative in an iterative fashion. The benefit of this method, he said, is that climate advocates could essentially work in partnership with the public "by having them help shape a narrative that is compelling."

Yankelovich argued that the narrative must convey deep emotion to cut through the apathy and uncertainty prevalent in public opinion on the issue today, which has made it easier for the fossil fuel industry to sow confusion. In considering these emotional components of the narrative, he noted that anger is likely to be one of the major candidates but there may be others as well, adding that, "The notion of a custodial responsibility and concern also has deep resonance." Finding the right public narrative, Yankelovich suggested, could help accelerate public opinion through the second phase of the curve within the next five years.

In one interesting example of mobilizing public opinion on an issue, Mary Christina Wood drew the group's attention to the "victory speakers" campaign in World War II. When the U.S. government was contemplating entering the war, the threat of Nazi Germany seemed too far away to many Americans, who were reluctant to change their lives to mobilize for war. In response, the government orchestrated a campaign in which some 100,000 speakers, including Wood's mother and grandmother, made five speeches each day about the need for U.S. involvement.[23] Wood suggested that the campaign helped mobilize the American people remarkably quickly.

Finally, several participants voiced strong support for the need to create a positive vision as part of the public narrative about climate change. As Naomi Oreskes put it, citing Ted Nordhaus and Michael Schellenberger's article "The Death of Environmentalism,"[24] "Martin Luther King did not say, 'I have a nightmare'! King looked at a nightmare but he painted a positive vision. Abolitionists did not say, 'We have to collapse the economy of the South,' even if that is what happened. No one wants to hear you are a bad person or that the way you live is bad." Lew Branscomb concurred, noting that, "There has got to be a future people think is worth struggling for."

# 6. Conclusion

**There was widespread agreement among workshop participants that multiple, complementary strategies will be needed moving forward.**

Workshop participants unanimously agreed that the sessions yielded a productive and well-timed interdisciplinary dialogue. Participants from the scientific and legal communities seemed especially appreciative for the opportunity to engage so intensively with experts outside their usual professional circles. The only potential gaps identified by attendees were a lack of participants from the insurance industry and a lack of emphasis on the biotic effects of climate change.

Participants made commitments to continue the discussion and collaborate on a number of the efforts discussed at the meeting. In particular, several participants agreed to work together on some of the attribution work already under way, including efforts to help publicize attribution findings in a way that will be easy for the general public to understand, and build an advocacy component around those findings. Others proposed an informal subgroup to pursue Dan Yankelovich's suggestion of using the dialogic method in conjunction with public relations specialists to help develop an effective public narrative.

Participants also made commitments to try to coordinate future efforts, continue discussing strategies for gaining access to internal documents from the fossil fuel industry and its affiliated climate denial network, and to help build an accessible repository for those documents that are obtained.

## Points of Agreement

There was widespread agreement among workshop participants that multiple, complementary strategies will be needed moving forward. For instance, in terms of what the "cancer" analog for global warming might be, participants generally accepted the proposition put forth by Angela Anderson that the answer might differ by region, with sea level rise instilling the most concern on the coasts, and extreme heat proving most compelling in the Midwest. Participants also agreed that it is better to focus on consequences of climate change happening now rather than on those projected for the distant future. Brenda Ekwurzel's anecdote about the public's engagement on the issue of high school football was offered as an example of the power that highlighting such immediate consequences can have.

Equally important was the nearly unanimous agreement on the importance of legal actions, both in wresting potentially useful internal documents from the fossil fuel industry and, more broadly, in maintaining pressure on the industry that could eventually lead to its support for legislative and regulatory responses to global warming. Some participants stated that pressure from the courts offers the best

current hope for gaining the energy industry's cooperation in converting to renewable energy.

Dan Yankelovich expressed a widely held sentiment when he noted what he called "a process of convergence" over the course of the workshop, in which participants with different expertise gradually incorporated broader perspectives on the problem at hand. "I know I found the tobacco example and the range of possible legal strategies very instructive," he said.

## Unresolved Issues

Perhaps the largest unresolved issues from the workshop were some disagreement over how adversarial in tone efforts targeting the fossil fuel industry should be, and the extent to which outrage can mobilize the public.

On the latter point, one participant noted, "Outrage is hugely important to generate. Language that holds carbon producers accountable should be an important part of the narrative we create." But a number of participants expressed reservations about any plans that "demonized" the fossil fuel industry.

Myles Allen, for instance, worried that too adversarial a tone "could hand a victory to the 'merchants of doubt.'" He explained that because the fossil fuel industry's disinformation has effectively muted a large portion of the electorate, "Our focus ought to be to bring as many of these people back to the table and motivate them to act. We need to somehow promote a debate among different parts of the legislature to get this happening."

Lew Branscomb agreed that efforts should not seek to demonize the fossil fuel industry, noting that, "There are a lot of companies in the oil and auto business, and some of the companies will come forward on the good side. We all need their cooperation. My notion is to try to find people in the industry producing

**It is possible to see glimmers of an emerging consensus on a strategy that incorporates legal action with a narrative that creates public outrage.**

carbon who will come around." To accomplish this, he suggested a strategy that emphasizes facts and doesn't impugn motives.

Brenda Ekwurzel lent some historical support to such a view by citing Adam Hochschild's book *Bury the Chains*, about the long campaign to end slavery. Hochschild noted, she said, that one of the most influential pamphlets published in the abolitionists' fight offered a dispassionate accounting of facts and details about the slave trade gathered from witnesses who had participated in it. This publication had no trace of the moral finger-wagging that had marked virtually all prior pamphlets. Instead, the facts—especially a famous diagram of a slave ship—carried the day and became widely accepted. Women in the United Kingdom, for instance, soon started serving tea using only sugar that had been certified as not having come from the slave trade.[25] "Maybe," Ekwurzel suggested, "we need an analogous effort to offer certified energy sources from suppliers who do not spread disinformation."

Mike MacCracken supported the need to "win the middle." As he noted, "We have had an international consensus of scientists agreeing to key facts since 1990."

Angela Anderson said she hoped UCS could contribute meaningfully to the public's "working-through" stage of the process outlined by Dan Yankelovich. She noted that local climate adaptation stories offer a way to sidestep the controversy, but acknowledged that it is still an open question whether this

strategy helps people work through the issue and ultimately accept climate science as fact. "This is our theory," she said, "But we don't have the research yet to prove this." Anderson added that many people expect UCS, as a science-based organization, to correct misinformation about climate science. "I don't want to abdicate that responsibility," she said, "and I wrestle with this, wondering what is the most effective order in which to do things and the right tone?"

While many questions like these remain unresolved, the workshop made an important contribution to the quest for answers. And it is possible to see glimmers of an emerging consensus on a strategy that incorporates legal action (for document procurement and accountability) with a narrative that creates public outrage—not to demonize industry, but to illuminate the collusion and fraudulent activities that prevent us from building the sustainable future we need and our children deserve.

# Endnotes

1 Terry, L., et al. 1964. *Smoking and health: Report of the Advisory Committee to the Surgeon General of the United States.* Public Health Service publication no. 1103. Department of Health, Education, and Welfare. Online at *http://profiles.nlm.nih.gov/ps/retrieve/ResourceMetadata/ NNBBMQ.*

2 Brown and Williamson. 1969. Internal memo. Online at *http://legacy.library.ucsf.edu/tid/tgy93f00.*

3 See, for instance: Oreskes, N., and E.M. Conway. 2010. *Merchants of doubt: How a handful of scientists obscured the truth on issues from tobacco smoke to global warming.* New York: Bloomsbury Press. Also: Hoggan, J., and R. Littlemore. 2009. *The climate cover-up: The crusade to deny global warming.* Vancouver, Canada: Greystone Books.

4 *Austin v. State of Tennessee.* 179 U.S. 343 (1900). Online at *http://caselaw.lp.findlaw.com/scripts/getcase. pl?court=us&vol=179&invol=343.*

5 U.S. Department of Health and Human Services. 2010. Medicare national coverage determinations. Online at *http://www.cms.gov/Regulations-and-Guidance/Guidance/ Transmittals/downloads/R126NCD.pdf.* Also: U.S. Centers for Disease Control and Prevention. 2011. Targeting the nation's leading killer. Online at *http://www.cdc.gov/chronicdisease/ resources/publications/aag/osh.htm.*

6 Proctor, R. 2012. *Golden holocaust: Origins of the cigarette catastrophe and the case for abolition.* University of California Press.

7 *State of Minnesota and Blue Cross Blue Shield v. Philip Morris et al.* 1998. Summary judgment. Online at *http:// publichealthlawcenter.org/topics/tobacco-control/tobacco- control-litigation/minnesota-litigation-and-settlement.*

8 See, for instance: Brandt, A.M. 2007. *The cigarette century: The rise, fall, and deadly persistence of the product that defined America.* New York: Basic Books.

9 Ibid.

10 United Nations Framework Convention on Climate Change. 1992. Article 2. Online at *http://unfccc.int/essential_ background/convention/background/items/1353.php.*

11 Michaels, D. 2008. *Doubt is their product: How industry's assault on science threatens your health.* Oxford University Press. Also: Proctor 2012.

12 United Nations, General Assembly, Human Rights Council. 2010. Report of the United Nations High Commissioner for Human Rights on the outcome of the seminar address- ing the adverse impacts of climate change on the full enjoyment of human rights. Twentieth session, agenda items 2 and 3. Online at *http://www.ohchr.org/Documents/ HRBodies/HRCouncil/RegularSession/Session20/ A-HRC-20-7_en.pdf.*

13 Rahmstorf, S., and D. Coumou. 2011. Increase of extreme events in a warming world. *PNAS.* October 24. Also: Coumou, D., and S. Rahmstorf. 2012. A decade of weather extremes. *Nature Climate Change.* March 25.

14 Kunreuther, H., and E. Michel-Kerjan. 2009. *At war with the weather: Managing large-scale risks in a new era of catastrophes.* Cambridge, MA: MIT Press.

15 Field, C.B., V. Barros, T.F. Stocker, D. Qin, D.J. Dokken, K.L. Ebi, M.D. Mastrandrea, K.J. Mach, G.-K. Plattner, S.K. Allen, M. Tignor, and P.M. Midgley (eds.). 2012. *Managing the risks of extreme events and disasters to advance climate change adaptation: A special report of Working Groups I and II of the Intergovernmental Panel on Climate Change.* Cambridge, UK: Cambridge University Press.

16 See, for instance: Mashey, J.R. Crescendo to Climategate cacophony: Behind the 2006 Wegman report and two decades of climate anti-science. Online at *http://www. desmogblog.com/crescendo-climategate-cacophony.*

17 See: American Petroleum Institute. 1998. Global climate science communication plan. April. Online at *http://www. euronet.nl/users/e_wesker/ew@shell/API-prop.html.*

18 Hearing of the U.S. House Energy and Commerce Committee, Subcommittee on Health and the Environment, April 14, 1994.

19 Kahneman, D. 2011. *Thinking, fast and slow.* New York: Farrar, Straus and Giroux.

20 See, for example: Kahan, D.M., et al. 2012. The polarizing impact of science literacy and numeracy on perceived climate change risks. *Nature Climate Change.* doi:10.1038/ nclimate1547. Online at *http://www.nature.com/nclimate/ journal/vaop/ncurrent/full/nclimate1547.html.*

21 Union of Concerned Scientists. 2012. States work to protect high school football players from extreme heat risk, the leading cause of death and disability among high school athletes. Press release. Online at *http://www.ucsusa.org/ news/media_alerts/states-work-to-protect-high-school- football-1374.html.*

22 Baumeister, R.F., and B.J. Bushman. 2013. *Social psychology and human nature.* Wadsworth Publishing Co.

23 See, for example: U.S. Office of War Information. 1942. Victory speaker: An arsenal of information for speakers. Online at *http://arcweb.sos.state.or.us/pages/exhibits/ww2/ life/pdf/speak1.pdf.*

24 Nordhaus, T., and M. Schellenberger. The death of environ- mentalism: Global warming politics in a post-environmental world. 2004. Online at *http://grist.org/article/doe-reprint.*

25 Hochschild, A. 2006. *Bury the chains.* New York: Houghton Mifflin Company.

# Appendix A: Workshop Agenda

## Climate Accountability, Public Opinion, and Legal Strategies

*Martin Johnson House, Scripps Institution of Oceanography, La Jolla, CA*
*June 14–15, 2012*

### Workshop Goals

• Compare the evolution of public attitudes and legal strategies for tobacco control and anthropogenic climate change. Can we use the lessons from tobacco education, laws, and litigation to address climate change?

• Explore which impacts can be most compellingly attributed to climate change, both scientifically and in the public mind, and consider options for communicating the scientific understanding of attribution in ways most useful to inform both public understanding and mitigation strategies.

• Explore the degree to which public (including judge and jury) acceptance of the causal relationships of climate impacts to fossil fuel production and/or emissions would increase the prospects for an effective strategy for U.S.-focused climate mitigation.

• Consider the viability of diverse strategies, including the legal merits of targeting carbon producers—as opposed to carbon emitters—for U.S.-focused climate mitigation.

• Identify promising legal and other options and scope out the development of mutually reinforcing intellectual, legal, and/or public strategies to further them.

## June 14, 2012

| | |
|---|---|
| **7:45 a.m.** | Meet in La Jolla Shores Hotel lobby for shuttle to workshop venue |
| **8:00 a.m.** | Coffee, light breakfast |
| **8:30 a.m.** | Welcome and charge to participants |
| **9:00 a.m.** | **Session 1. The Lay of the Land: Key Issues and Concepts** |

*Five presentations @ five minutes each, with limit of one image/visual aid; followed by moderated discussion*

**Proctor:** A brief history of the tobacco wars: epidemiology, "doubt is our product," litigation and other strategies

**Allen:** Climate science and attribution

**Heede:** Attribution of emissions to carbon producers

**Pawa:** The legal landscape: fundamentals of law, climate change, damages, plaintiffs, and defendants

**Slovic:** Public opinion and risk perception on tobacco and climate

| | |
|---|---|
| **10:30 a.m.** | Break |
| **11:00 a.m.** | **Session 2. Lessons From Tobacco Control: Legal and Public Strategies** |

*Three presentations @ seven minutes each, with limit of one image/visual aid; followed by moderated discussion*

**Sharon Eubanks, Stanton Glantz, Robert Proctor, Roberta Walburn:** Litigation, media strategies, coordination with grassroots efforts, etc.

**Key issue:** What lessons can we draw from the history of public and legal strategies for controlling tobacco that might be applicable to address climate change?

| | |
|---|---|
| **12:30 p.m.** | Lunch |
| **1:30 p.m.** | **Session 3. Attribution of Impacts and Associated Damages to Carbon and Climate Change: State of the Science and Expert Judgment** |

*Two presentations @ less than 10 minutes each; followed by moderated discussion*

**On science:** Myles Allen and Claudia Tebaldi

**Lead discussant:** Mike MacCracken

**Key issue:** What impacts can be most compellingly attributed to carbon and climate change?

| | |
|---|---|
| **3:00 p.m.** | Break |
| **3:15 p.m.** | **Session 4. Climate Legal Strategies: Options and Prospects** |

*Three presentations @ seven minutes each; followed by moderated discussion*

**Presenters:** Matt Pawa, Mims Wood, Richard Ayres

**Key issues:** What potential options for U.S.-focused climate litigation appear most promising? To what extent would greater public (including judge and jury) acceptance of the causal relationships of climate impacts to fossil fuel production and/or emissions enhance the prospects for success?

| | |
|---|---|
| **5:00 p.m.** | Wrap up |
| | Shuttle service will be provided for the return trip to the hotel |
| **6:30 p.m.** | Drinks and dinner at the home of Lew and Connie Branscomb |
| | Shuttle will be provided from La Jolla Shores Hotel |

## June 15, 2012

| | |
|---|---|
| **7:45 a.m.** | Meet in La Jolla Shores Hotel lobby for shuttle to workshop venue |
| **8:00 a.m.** | Coffee, light breakfast |
| **8:30 a.m.** | **Session 5. Attribution of Emissions to Carbon Producers** |
| | *Presentation @ 10 minutes; followed by moderated discussion* |
| | **Heede:** Carbon majors analysis |
| | **Lead discussant:** Matt Pawa |
| | **Key issue:** Can new analyses increase the prospect for holding major carbon producers legally and publicly accountable? |
| **9:30 a.m.** | **Session 6. Innovative Strategies for Climate Accountability** |
| | *One to two presentations @ seven minutes each; followed by moderated discussion* |
| | Jim Hoggan, John Mashey |
| | **Key issues:** What potential options for U.S.-focused climate litigation appear most promising? To what extent would greater public (including judge and jury) acceptance of the causal relationships of climate impacts to fossil fuel production and/or emissions enhance the prospects for success? What types of non-litigation public pressure might enhance their prospects for success? |
| **11:00 a.m.** | Break |
| **11:15 a.m.** | **Session 7. Public Opinion and Climate Accountability** |
| | *Moderated discussion drawing from key perspectives in public opinion* |
| | **Speakers:** Dan Yankelovich, Paul Slovic, Brenda Ekwurzel |
| | **Key issues:** What is the role of public opinion in climate accountability? |
| **12:45 p.m.** | Lunch |
| **2:00 p.m.** | **Session 8. Discussion, outcomes, next steps** |
| **4:00 p.m.** | Wrap up |
| | Shuttle service will be provided for the return trip to the hotel |
| **7:30 p.m.** | Drinks and dinner at La Jolla Shores Hotel restaurant |

# Appendix B: Participants

## Climate Accountability, Public Opinion, and Legal Strategies Workshop

*June 14–15, 2012*

### Workshop Organizers

Naomi Oreskes
*Professor of History and Science Studies, University of California–San Diego Adjunct Professor of Geosciences, Scripps Institution of Oceanography*

Peter C. Frumhoff
*Director of Science and Policy, Union of Concerned Scientists Cambridge, MA*

Richard (Rick) Heede
*Principal, Climate Mitigation Services Co-Founder and Director, Climate Accountability Institute Snowmass, CO*

Lewis M. Branscomb
*Aetna Professor of Public Policy and Corporate Management (emeritus), John F. Kennedy School of Government, Harvard University*

Angela Ledford Anderson
*Director, Climate and Energy Program, Union of Concerned Scientists Washington, DC*

### Workshop Participants

Myles Allen
*Professor of Geosystem Science, School of Geography & the Environment, University of Oxford Environmental Change Institute, Oxford University Centre for the Environment*

Richard (Dick) E. Ayres
*Attorney, The Ayres Law Group Washington, DC*

Brenda Ekwurzel
*Climate Scientist and Assistant Director of Climate Research and Analysis, Union of Concerned Scientists Washington, DC*

Sharon Y. Eubanks
*Advocates for Justice, Chartered PC Senior Counsel, Sanford Wittels & Heisler, LLP Washington, DC*

Stanton A. Glantz
*Professor of Medicine, University of California–San Francisco University of California Center for Tobacco Control Research & Education*

**James (Jim) Hoggan**
*President, Hoggan & Associates*
*Vancouver, BC*

**Michael (Mike) MacCracken**
*Chief Scientist for Climate Change*
*Programs, Climate Institute*
*Washington, DC*

**John Mashey**
*Techviser*
*Portola Valley, CA*

**Joseph (Joe) Mendelson III**
*Director of Policy, Climate and Energy*
*Program, National Wildlife Federation*
*Washington, DC*

**Matt Pawa**
*President, Pawa Law Group, PC*
*Founder, The Global Warming Legal*
*Action Project*
*Newton Centre, MA*

**Robert N. Proctor**
*Professor of the History of Science,*
*Stanford University*

**Paul Slovic**
*Founder and President, Decision Research*
*Eugene, OR*

**Claudia Tebaldi**
*Research Scientist, Climate Central*
*Boulder, CO*

**Jasper Teulings**
*General Counsel/Advocaat, Greenpeace*
*International*
*Amsterdam*

**Roberta Walburn**
*Attorney*
*Minneapolis, MN*

**Mary Christina Wood**
*Philip H. Knight Professor and Faculty*
*Director, Environmental and Natural*
*Resources Law Program, University of*
*Oregon School of Law*

**Daniel (Dan) Yankelovich**
*Chair and Co-Founder, Public Agenda*
*San Diego, CA*

### Rapporteur

**Seth Shulman**
*Senior Staff Writer, Union of*
*Concerned Scientists*
*Cambridge, MA*



*Pictured (L to R): Stanton Glantz, Richard Heede, Roberta Walburn (obscured), James Hoggan, Sharon Eubanks, Peter Frumhoff, Richard Ayres (obscured), Angela Anderson, Mary Christina Wood, Lewis Branscomb, Claudia Tebaldi, Brenda Ekwurzel, Naomi Oreskes, Robert Proctor (obscured), Joseph Mendelson, Seth Shulman, John Mashey (obscured), Myles Allen, Alison Kruger, Michael MacCracken. Not pictured: Matt Pawa, Paul Slovic, Jasper Teulings, Daniel Yankelovich.*

© Brenda Ekwurzel



Two Brattle Square
Cambridge, MA 02138-3780
(617) 547-5552

Website: www.ucsusa.org

1626 Gateway Road
Snowmass, CO 81654-9214
(970) 927-9511

Website: www.climateaccountability.org

©October 2012
Union of Concerned Scientists and
Climate Accountability Institute

# Exhibit 5

## Kline, Scot

| | |
|---|---|
| **From:** | Lemuel Srolovic <Lemuel.Srolovic@ag.ny.gov> |
| **Sent:** | Wednesday, March 30, 2016 9:01 PM |
| **To:** | Matt Pawa |
| **Cc:** | Kline, Scot |
| **Subject:** | Re: Wall st journal |

My ask is if you speak to the reporter, to not confirm that you attended or otherwise discuss the event.

Sent from my iPhone

> On Mar 30, 2016, at 6:31 PM, Matt Pawa <mp@pawalaw.com> wrote:
>
> Lem and Scot - a WSJ reporter wants to talk to me. I may not even talk to her at all but if I do I obviously will have no comment on anything discussed at the meeting. What should I say if she asks if I attended? No comment? Let me know.
>
> MP
>
> Matt Pawa
> Pawa Law Group, P.C.
> 1280 Centre Street, Suite 230
> Newton Centre, MA 02459
> (617) 641-9550
> (617) 641-9551 facsimile
> www.pawalaw.com

IMPORTANT NOTICE: This e-mail, including any attachments, may be confidential, privileged or otherwise legally protected. It is intended only for the addressee. If you received this e-mail in error or from someone who was not authorized to send it to you, do not disseminate, copy or otherwise use this e-mail or its attachments. Please notify the sender immediately by reply e-mail and delete the e-mail from your system.

# Exhibit 6

From: Kenny Bruno <kenny.bruno@verizon.net>
Date: Tue, Jan 5, 2016 at 4:42 PM
Subject: Exxon meeting DRAFT Agenda and logistics
To: Lee Wasserman <lwasserman@rffund.org>, Bill McKibben <bill.mckibben@gmail.com>, Jamie
Henn <jamie@350.org>, Rob Weissman <rweissman@citizen.org>, Bill Lipton
<blipton@workingfamilies.org>, Dan Cantor <dcantor@workingfamilies.org>, John Passacantando
<j.passacantando@gmail.com>, Kert Davies <kertmail@gmail.com>, won@ef.org,
SEubanks@bordaslaw.com, lkrarup@vkrf.org, mp@pawalaw.com, bcampbell@clf.org, Stephen
Kretzmann <steve@priceofoil.org>, Carroll Muffett <cmuffett@ciel.org>, Naomi Ages
<naomi.ages@greenpeace.org>


Dear All,
If you are receiving this message then we believe you are attending the meeting
this coming Friday Jan 8 regarding Exxon.
The meeting will take place at:
Rockefeller Family Fund
475 Riverside Dr entrance on Claremont @ 120th St. in Upper Manhattan, 1
Train to 116th St. from Penn Station
Please confirm whether you are attending in person (preferred, of course!) or
remotely. If remotely see instructions below.
Here is a DRAFT Agenda, your suggestions are welcome.


DRAFT Agenda
Exxon: Revelations & Opportunities
Friday January 8  11 AM – 3 PM
475 Riverside Dr @ 120th ST Manhattan
10:45: Arrival and Coffee
11:00 – 11:15 Introductions and purpose of the meeting (Lee)
**11:15-12:00 – Goals of an Exxon campaign**
What are our common goals? Examples include:

- To establish in public's mind that Exxon is a corrupt institution that has
  pushed humanity (and all creation) toward climate chaos and grave harm.
- To delegitimize them as a political actor
- To force officials to disassociate themselves from Exxon, their money, and
  their historic opposition to climate progress, for example by refusing
  campaign donations, refusing to take meetings, calling for a price on
  carbon, etc.
- To call into question climate advantages of fracking, compared to coal.
- To drive divestment from Exxon.
- To drive Exxon & climate into center of 2016 election cycle.

# Exhibit 7

**Siegel, Kim (DOJ)**

| | |
|---|---|
| **From:** | David J. Hayes <david.hayes@nyu.edu> |
| **Sent:** | Friday, August 25, 2017 12:51 PM |
| **To:** | Eleanor.Blume@doj.ca.gov; PerryZR@ct.gov; Roberts, LaKresha S (DOJ); Natalie.Ludaway@dc.gov; Joshua.A.Wisch@hawaii.gov; ASpillane@atg.state.il.us; Eric.Tabor@iowa.gov; Latasha.Buckner@ky.gov; Linda.Pistner@maine.gov; Brian Mahanna; Mike.Firestone@state.ma.us; MMCCL@ago.state.ms.us; MBaca@nmag.gov; SDearmin@ncdoj.gov; BThomas@ncdoj.gov; Kamala.H.Shugar@doj.state.or.us; JRadosevich@attorneygeneral.gov; DWade@attorneygeneral.gov; MFischer@attorneygeneral.gov; MLenz@riag.ri.gov; Natalie.Silver@vermont.gov; KOHolleran@oag.state.va.us; KateK@atg.wa.gov |
| **Cc:** | David J. Hayes; Elizabeth Klein |
| **Subject:** | State Energy & Environmental Impact Center |
| **Attachments:** | State Impact Center Staff Attorney Position Description.docx |



To:     State OAG Leaders [list kindly provided by Brian Mahanna][please share this email with your Attorney General]

From:  David J. Hayes

Re:     State Energy & Environmental Impact Center at the NYU School of Law

I hope that you received word about the formation of the State Energy & Environmental Impact Center (State Impact Center) at the NYU School of Law. NYU issued a press release on the formation of the Center, and it also was referenced in recent articles in the Washington Post and in Greenwire.

I am writing to give you and your Attorney General more information about the new State Impact Center.

The goal of the State Energy & Environmental Impact Center is to enhance the resources that your office has to champion your citizens' interests in clean energy, climate change and environmental matters.  We admirer the

vitally important work that you have been doing in this area and are dedicated to giving more support to you, and other Attorneys General – regardless of party affiliation -- who pursue clean energy, climate change and environmental issues.

As explained on our NYU web site, the State Impact Center looks forward to providing assistance to interested AGs in a number of ways.

First, our Center will have three full time attorneys who will be available to provide direct legal assistance to interested AGs on specific administrative, judicial or legislative matters involving clean energy, climate change, and environmental interests of regional and national significance. We look forward to developing a working relationship with your offices and serving as a source of ideas, materials, and contacts on these matters. In that regard, we will maintain a set of on-going relationships with advocates working in the area, and we also are identifying pro bono services that may be available to your offices on individual matters. We are engaged with ethics experts and individuals in some of your offices to ensure confidentiality and work product privilege for matters that State Impact Center attorneys work with you on.

Second, our Center will have a full time communications expert experienced in the clean energy, climate and environmental field to work with, and help leverage, the communications resources in your offices. It is a primary goal of the State Impact Center to draw regional and national attention to the important clean energy, climate and environmental initiatives that your offices are pursing.

Third, we have funding to recruit and hire 10 NYU fellows who will serve as Special Assistant AGs, working as part of the state OAG's staff. It's in everyone's interest that we work with the relevant AGs and hire these lawyers as soon as practicable.

I have inserted below language from our website which lays out the process for placing NYU fellows as SAAGs. **Please note the September 15 application date.** This deadline is coming up quickly. We set a short deadline at the request of several AGs who are anxious to get the process for placing NYU Fellows into AG offices as soon as possible.

### How to Hire an NYU Fellow

The State Impact Center is announcing an opportunity for state attorneys general to recruit and hire a limited number of NYU Fellows with five to 10 years of experience in clean energy, climate change, and environmental issues as special assistant attorneys general (SAAGs). These SAAGs would be available for a two-year period to provide a supplemental, in-house resource to attorneys general and their senior staffs on clean energy, climate change and environmental matters of regional and national importance.

State attorneys general who are selected for this program will work cooperatively with the State Impact Center to recruit and hire NYU Fellows as SAAGs. NYU Law will pay the salaries of the SAAGs, and the State Impact Center will provide ongoing support to the SAAGs and their offices. Once hired, however, the SAAGs' duty of loyalty shall be to the attorney general who hired them.

**Basic Eligibility Requirements and Application Process**

The opportunity to potentially hire an NYU Fellow is open to all state attorneys general who demonstrate a need and commitment to defending environmental values and advancing progressive clean energy, climate change, and environmental legal positions. Initial funding will support a limited number of NYU Fellows in state attorneys general offices for a two-year term, with the possibility of adding additional NYU Fellows in year two of the program.

Candidates who are approved by the attorneys general and the State Impact Center will receive offers to serve as SAAGs (or the equivalent appropriate title within the office) from the attorneys general, based on an understanding that they will devote their time to clean energy, climate change and environmental matters.

**Interested state attorneys general should prepare an application as detailed below and return it to stateimpactcenter@nyu.edu no later than Friday, September 15, 2017.**

The State Impact Center will review all applications received for completeness and will contact attorneys general if additional information is needed. State Impact Center staff are available for questions regarding this program.

**Application Requirements**

To be considered for the NYU Fellows/SAAG program, an application must contain the following:

1. Program Eligibility and Narrative

State attorneys general should describe the particular scope of needs within their offices related to the advancement and defense of progressive clean energy, climate change, and environmental matters. Relevant details include the extent to which funding or other capacity constraints have limited the ability to work on these issues or how additional dedicated support could help advance the work of the state attorney general on behalf of his or her constituents.

Priority consideration will be given to state attorneys general who demonstrate a commitment to and acute need for additional support on clean energy, climate change, and environmental issues of regional

or national importance, such as those matters that cross jurisdictional boundaries or raise legal questions or conflicts that have nationwide applicability.

2. Program Structure

Applications should include specific details about the scope of expertise the state attorney general needs in a SAAG to advance his or her priorities. Details should also be provided about how the SAAG would be incorporated into the Office of the Attorney General, including the relevant internal reporting structure.

3. Budget Proposal and Confirmation of Authority

To be considered complete, applications must identify a proposed salary (or range) for a SAAG, with an explanation of how it would conform with the existing salary structure in the state AG office.

Applications also should identify any state-specific limitations or requirements governing the appointment of an employee paid by an outside funding source, and include a written confirmation that the attorney general has the authority to hire an NYU Fellow as a SAAG (or equivalent title).

**Application Review**

Complete applications will be reviewed on an expedited basis, with decisions on proposed placements of NYU Fellows made as soon as practicable thereafter. Proposed placement decisions will be made by the executive director of the State Impact Center, in consultation with the advisory council. Approximately 10 NYU Fellow slots for five to seven states are expected to be available for the first year of the program. Additional slots may be available in subsequent years.

Once agreements are finalized, the State Impact Center will coordinate directly and immediately with state attorneys general to identify, recruit, and extend SAAG offers to appropriate candidates, with a goal to have SAAG hires in place by the end of 2017.

The State Impact Center will provide ongoing support to the SAAGs. The State Impact Center's support will not be limited, however, to those AG offices that include NYU Fellows. Where appropriate and upon request, and consistent with available resources, the State Impact Center will work with all attorneys general who are pursuing clean energy, climate change, and environmental initiatives.

Finally, please note that the State Energy & Environmental Impact Center's attorneys and communications staff will be located in Washington, D.C.  Our offices are at 1616 P Street NW, near DuPont Circle.  (The 10 Special Assistant AGs, of course, will be located in the host AG's offices.)

I am heading up the Center, and Liz Klein is the Deputy Director.  You can reach us at David.Hayes@nyu.edu and Elizabeth.Kline@nyu.edu. We are in the process of hiring an additional attorney and our full-time communications staff.  I am attaching a job descriptions for the attorney position in case you have any recommendations.

Our Center will guided by a distinguished Advisory Council, chaired by Richard (Ricky) Revesz, the Dean Emeritus of the NYU School of Law.  The Advisory Council also includes two former State Attorneys General, Anne Milgram (New Jersey) and Bruce Babbitt (Arizona), as well as Dan Firger, environmental program officer for Bloomberg Philanthropies.

If you have any questions, please do not hesitate to contact Liz Klein or me via email or by phone.

Thanks.

--
**David J. Hayes**
Executive Director
State Energy & Environmental Impact Center
NYU School of Law
c/o Resources for the Future
1616 P Street, NW
Washington, DC 20036
Cell: 202-258-3909
Personal email:  davidjhayes01@gmail.com
Twitter: @djhayes01

--
**David J. Hayes**
Executive Director
State Energy & Environmental Impact Center
NYU School of Law
c/o Resources for the Future
1616 P Street, NW
Washington, DC 20036
Personal email:  davidjhayes01@gmail.com
Twitter: @djhayes01