# Exhibit 8

WILLIAM TONG
ATTORNEY GENERAL



55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120

### Office of the Attorney General
# State of Connecticut

*Tel: (860) 808-5210*

March 13, 2019

*Via email only* stateimpactcenter@nyu.edu
David J. Hayes, Executive Director
New York University School of Law
40 Washington Sq. South
New York, NY 10012

RE:   NYU Law Fellow Application

Dear Mr. Hayes:

We write to apply for an NYU Law Fellow to assist our office in the development, prosecution and advancement of critical environmental protection litigation and initiatives. The addition of a fellow to our staff will have a meaningful positive impact on our statewide and national environmental protection efforts.

The Attorney General is the chief legal officer of the state, holding general supervision over all civil legal matters in which the state is an interested party. Conn. Gen. Stat. § 3-125. The Attorney General represents all state agencies in both offensive and defensive litigation and establishes the State's legal policy in regard to issues of significance to Connecticut and the nation. Our office, through our Environment Department, has a history of strong and effective action to advance critical environmental protection initiatives. For example, in recent years, we have played an active role in attacking the causes of climate change. In 2006, Connecticut took a leading role in *Massachusetts v. EPA*, 549 U.S. 497 (2007), in which twelve states brought the successful landmark lawsuit against EPA to force the agency to regulate carbon dioxide and other greenhouse gases. While *Massachusetts v. EPA* was winding its way through the court system. Connecticut lead a coalition of states that sued the five largest power producing emitters of $CO_2$ (*Connecticut v. AEP*, 564 U.S. 41 (2009)) under the federal common law of public nuisance. We won in the 2nd Circuit, but the U.S. Supreme Court reversed, holding that federal common law was displaced by EPA's statutory authority, as determined in *Mass. v. EPA*, to regulate greenhouse gas emissions.

Connecticut continues to act with our partner states, both through litigation and comments on proposed regulatory matters, to ensure that the regulations intended to control greenhouse gas emissions are implemented and that attempts to roll back progress are not successful. For example, in the last two years alone, we have joined a number of litigations with a coalition of states in defense of the Clean Power Plan to ensure that it is implemented. We have also joined regulatory comments opposing the Affordable Clean Energy rule intended to replace the Clean Power Plan and roll back progress toward controlling $CO_2$ emissions from power plants. Additionally, we are participating in two lawsuits in support of California's ability

*An Affirmative Action/Equal Opportunity Employer*

NYU Law Fellow Application
March 13, 2019
Page 2

to set its own motor vehicle emissions standards. Connecticut has adopted these same standards under section 177 of the Clean Air Act. These emissions controls are critical for the health and welfare of the citizens of Connecticut. We are also involved in cases intended to control a number of air pollutants, including methane and mercury.

While we are justifiably proud of our accomplishments, the staff of our Environment Department is small. We have only 9 full and 2 part-time attorneys to handle both all of our national work and our work on in-state enforcement matters involving all media and all forms of pollution throughout our state. With an additional skilled and experienced staff attorney reporting directly to the head of the Environment Department, we could be involved as leaders in more important issues, and provide more support in progressive multi-state efforts to protect the future of the planet. For example, a Special Assistant Attorney General (SAAG) would assist us in evaluating and pursuing climate change related matters including potential actions to reduce emissions of greenhouse gases. A SAAG would also allow us to be a leader in assessing and challenging the aggressive changes at the federal level that will have a negative impact not only on Connecticut but on the environment nationally. For further details about the work of the Environment Department, please see the attached annual report covering FY 17-18.

A candidate for NYU Law fellow should be admitted to the Connecticut bar. Other bar admissions, including the 2nd Circuit and the D.C. Court of Appeals, would be helpful.

The office of the Connecticut Attorney General has the authority to hire an NYU fellow as a SAAG, paid entirely by NYU funds. We are not aware of any constraints on this authority. An attorney with 5-10 years of experience would be classified as an Assistant Attorney General II, and the salary range for that position is **$93,896 – $128,027** annually with a comprehensive health insurance plan.

We are prepared and eager to fully utilize an NYU Fellow to strengthen and advance our committed efforts to combat climate change and continue to reduce all dangerous forms of pollution. While the exact assignments of the fellow will depend on the skills and experience of the fellow and the status of various matters as they arise, we can promise the Fellow an opportunity to be a meaningful force for progress and change in protecting the environment, and we can promise NYU that the Fellow will be in a position to help make a meaningful difference. We ask for your favorable consideration of this application.

Very truly yours,

Margaret Q. Chapple
Deputy Attorney General

Enc.

# Exhibit 9



# United States Department of the Interior
## BUREAU OF OCEAN ENERGY MANAGEMENT
### Gulf of Mexico OCS Region
1201 Elmwood Park Boulevard
New Orleans, LA  70123-2394

**RECEIVED**

JUN **1 6** 2016

**LAND**

OCS-G 35896

| | | |
|---|---|---|
| | Offering Date<br>03/23/2016 | Map Area and Block Number<br>NG15-06 - Walker Ridge - 274 |
| **DECISION** | Rental<br>$63,360.00 | Balance of Bonus<br>$1,920,096.00 |
| | Total Amount Due | $1,983,456.00 |

**Exxon Mobil Corporation**
**Post Office Box 4778**
**Houston, Texas 77210-4778**

## LEASE FORMS TRANSMITTED FOR EXECUTION

Pursuant to Section 8 of the Outer Continental Shelf Lands Act (67 Stat. 462; 43 U.S.C. 1337) as amended (92 Stat. 629), and the regulations pertaining thereto (30 CFR 556), your bid for the block described above is accepted. Accordingly, in order to perfect your rights hereunder, the following actions must be taken:

1.  A signatory, authorized pursuant to the qualification records on file with the Bureau of Ocean Energy Management (BOEM), Gulf of Mexico Region (GOMR), Adjudication Section, must execute on behalf of the Lessee, each of the three lease forms attached hereto; and return same to the BOEM GOMR Office of Leasing and Plans, Adjudication Section.

2.  You must pay, by Electronic Funds Transfer, the balance of the bonus and the first year's rental indicated above, by following the detailed instructions contained on the BOEM website for the specific lease sale this Decision Letter pertains to or on the Payment Information Webpage found on the Office of Natural Resources and Revenue (ONRR) website. Payment must be received by the Federal Reserve Bank of New York no later than noon, eastern standard time, on the 11th business day after receipt of this decision (30 CFR 556.47).  That day is **July 1, 2016.**

You must comply with the two requirements enumerated above not later than the 11th business day after receipt of this decision.  Failure to comply with the above requirements will result in forfeiture of the 1/5 bonus deposit and your rights to acquire the lease.

Additionally, you must comply with bonding requirements according to 30 CFR 556, Subpart I, and with the regulations at 30 CFR 550.143, addressing designations of operator.

IMPORTANT: *The lease form requires the attachment of the* CORPORATE SEAL *to all leases executed by corporations.*

Regional Director

June 15, 2016

Attachments                                    Date

Lease # 6007760

<table>
<tr><td colspan="2">UNITED STATES<br>DEPARTMENT OF THE INTERIOR<br>BUREAU OF OCEAN ENERGY MANAGEMENT<br><strong>OIL AND GAS LEASE OF SUBMERGED LANDS<br>UNDER THE OUTER CONTINENTAL SHELF LANDS ACT</strong></td><td>Office<br><strong>New Orleans, LA</strong></td><td>Serial number<br><strong>OCS-G 35896</strong></td></tr>
</table>

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT
**OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT**

**Paperwork Reduction Act of 1995 statement:** *This form does not constitute an information collection as defined by 44 U.S.C. 3501 et seq., and therefore does not require approval by the Office of Management and Budget.*

| | |
|---|---|
| Office<br>**New Orleans, LA** | Serial number<br>**OCS-G 35896** |
| Cash bonus<br>**$2,400,120.00** | Rental rate per acre, hectare<br>or fraction thereof<br>**See Addendum** |
| Minimum royalty rate per<br>acre, hectare or fraction<br>thereof<br>**$11.00 per acre** | Royalty rate<br>**18 3/4 percent**<br><br>Profit share rate |

This lease is effective as of **JUL 0 1 2016** (hereinafter called the "Effective Date") and shall continue for an initial period of **ten** years (hereinafter called the "Initial Period") by and between the United States of America (hereinafter called the "Lessor"), by the **Regional Director, Gulf of Mexico OCS Region**, Bureau of Ocean Energy Management (BOEM), its authorized officer, and

**Exxon Mobil Corporation**                                    **100%**



R E C E I V E D
JUN 2 2 2016
ADJUDICATION SECTION

(hereinafter called the "Lessee"). In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered **8** attached hereto, the Lessee and Lessor agree as follows:

**Sec. 1. <u>Statutes and Regulations</u>.** This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953; 43 U.S.C.1331 *et seq.*, as amended, (hereinafter called "the Act"). This lease is subject to the Act, regulations promulgated pursuant thereto, and other statutes and regulations in existence upon the Effective Date of the lease, and those statutes enacted (including amendments to the Act or other statutes) and regulations promulgated thereafter, except to the extent they explicitly conflict with an express provision of this lease. It is expressly understood that amendments to existing statutes and regulations, including but not limited to the Act, as well as the enactment of new statutes and promulgation of new regulations, which do not explicitly conflict with an express provision of this lease may be made and that the Lessee bears the risk that such may increase or decrease the Lessee's obligations under the lease.

In accordance with the regulations at 2 CFR, parts 180 and 1400, the Lessee must comply with the U.S. Department of the Interior's debarment and suspension (nonprocurement) requirements and must communicate this requirement to comply with these regulations to all persons with whom the Lessee does business as it relates to this lease by including this term as a condition when entering into contracts and transactions with others.

**Sec. 2. <u>Rights of Lessee</u>.** The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf containing approximately **5,760.000000** acres or hectares (hereinafter referred to as the "leased area"), described as follows:

**All of Block 274, Walker Ridge, OCS Official Protraction Diagram, NG 15-06.**

**This lease is amended by addendum pursuant to the Final Notice of Sale for Outer Continental Shelf (OCS) Oil and Gas Lease Sale 241. The addendum shall become a part of the lease and supersede any inconsistent provisions of the lease form.**

**BOEM** Form BOEM-2005 (October 2011)                                    **Page 1**

Document ID:   312129491
Label:   312129491
Library: DefaultIMS:FB_PROD:FileNet
Page:   1

Note: 1
Verified lease and updated obligations and provisions in QLS. No further action necessary. 11/2/16 CSC.

These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Secretary of the Interior or the Secretary's delegate (hereinafter called the "Secretary"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

**Sec. 3.  Term.**  This lease shall continue from the Effective Date of the lease for the Initial Period and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon, or as otherwise provided by regulation.

**Sec. 4.  Rentals.**  The Lessee shall pay the Lessor on or before the first day of each lease year before the discovery of oil or gas on the lease, then on or before the last day of each full lease year in which royalties on production are not due, a rental as shown on the face hereof.

**Sec. 5.  Minimum Royalty.**  The Lessee shall pay the Lessor on or before the last day of each lease year beginning with the year in which royalty-bearing production commences, and notwithstanding any royalty suspension that may apply, a minimum royalty as shown on the face hereof, with credit applied for actual royalty paid during the lease year. If actual royalty paid exceeds the minimum royalty requirement, then no minimum royalty payment is due.

**Sec. 6.  Royalty on Production.**
(a) The Lessee shall pay a royalty as shown on the face hereof in amount or value of production saved, removed, or sold from the leased area. Gas (except helium) and oil of all kinds are subject to royalty.  All helium produced shall remain the property of the United States. The Lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order, or citation issued under the Federal Oil and Gas Royalty Management Act of 1982 or the Act.  The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty shall be the reasonable value of the production as determined by the Lessor. The value upon which royalty will be paid is established under 30 CFR Chapter XII or applicable successor regulations.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee.  Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty production to such delivery point.

**Sec. 7.  Payments.**  The Lessee shall make all payments (rentals, royalties and any other payments required by this lease) to the Lessor by electronic transfer of funds unless otherwise provided by regulations or by direction of the Lessor.  Rentals, royalties, and any other payments required by this lease shall be made payable to the Office of Natural Resources Revenue and tendered to the Lessor.  Determinations made by the Lessor as to the amount of payment due shall be presumed to be correct and payable as due.

**Sec. 8.  Bonds.**  The Lessee shall at all times maintain the bond(s) required by regulation prior to the issuance of the lease.  The Lessee shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor determines additional security is necessary to ensure compliance with Lessee's obligations under this lease and the regulations.

**Sec. 9.  Plans.**  The Lessee shall conduct all operations on the lease or unit in accordance with an approved exploration plan (EP), development and production plan (DPP) or development operations coordination document (DOCD), approval conditions, and any other applicable requirements provided by law or regulation.  The Lessee may depart from an approved plan only as provided by applicable regulations.

**Sec. 10.  Diligence and Prevention of Waste.**
(a) The Lessee must exercise diligence in the development of the leased area and in the production of wells located thereon and must prevent unnecessary damage to, loss of, or waste of leased resources.
(b) The Lessee shall comply with all applicable laws, regulations and orders related to diligence, sound conservation practices and prevention of waste.  EPs, DPPs and DOCDs, are to conform to sound conservation practices to preserve, protect, and develop minerals resources and maximize the ultimate recovery of hydrocarbons from the leased area.

**Sec. 11.  Directional Drilling.**  A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area.  Drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease.  Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

**Sec. 12.  Safety and Inspection Requirements.**  The Lessee shall:
(a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the lease area;
(b) maintain all operations within the leased area in compliance with regulations or orders intended to protect persons, property and the environment on the Outer Continental Shelf; and
(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and provide any documents and records that are pertinent to occupational or public health, safety, or environmental protection as may be requested.

**Sale 241 Lease Addendum – R23**
**Leases in Water Depths Greater Than or Equal To 1,600 Meters**

*This lease is amended by addendum pursuant to the Final Notice of Sale for OCS Oil and Gas Lease Sale 241. The addendum shall become a part of the lease and supersede any inconsistent provisions of the lease form.*

**Sec. 4.  <u>Rentals</u>.**

Notwithstanding the language in Sec. 4 of the lease instrument, annual rental rates are as follows:

| Rental Rates per Acre or Fraction Thereof | |
| --- | --- |
| Years 1-5 | Years 6, 7, & 8+ |
| $11.00 | $16.00 |

**Stipulation No. 8 – Protected Species**

A.  The Endangered Species Act (16 U.S.C. 1531 *et seq.*) and the Marine Mammal Protection Act (MMPA) (16 U.S.C. 1361 *et seq.*) are designed to protect threatened and endangered species and marine mammals and apply to activities on the Outer Continental Shelf (OCS).  The OCS Lands Act (43 U.S.C. 1331 *et seq.*) provides that the OCS should be made available for expeditious and orderly development subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs (see 43 U.S.C. 1332). The Bureau of Ocean Energy Management (BOEM) and the Bureau of Safety and Environmental Enforcement (BSEE) comply with these laws on the OCS.

B.  The lessee and its operators must:

    1)  Collect and remove flotsam resulting from activities related to exploration, development, and production of this lease;

    2)  Post signs in prominent places on all vessels and platforms used as a result of activities related to exploration, development, and production of this lease detailing the reasons (legal and ecological) why release of debris must be eliminated;

    3)  Observe for marine mammals and sea turtles while on vessels, reduce vessel speed to 10 knots or less when assemblages of cetaceans are observed, and maintain a distance of 91 meters or greater from whales and a distance of 45 meters or greater from small cetaceans and sea turtles;

    4)  Employ mitigation measures prescribed by BOEM/BSEE or the National Marine Fisheries Service (NMFS) for all seismic surveys, including the use of an "exclusion zone" based upon the appropriate water depth, ramp-up and shutdown procedures, visual monitoring, and reporting;

    5)  Identify important habitats, including designated critical habitat, used by listed species (e.g., sea turtle nesting beaches, piping plover critical habitat), in oil spill contingency planning and require the strategic placement of spill cleanup equipment to be used only by personnel trained in less-intrusive cleanup techniques on beaches and bay shores; and

    6)  Immediately report all sightings and locations of injured or dead protected species (e.g., marine mammals and sea turtles) to the appropriate stranding network.  If oil and gas industry activity is responsible for the injured or dead animal (e.g., because of a vessel strike), the responsible parties should remain available to assist the stranding network.  If the injury or death was caused by a collision with the lessee's vessel, the lessee must notify BSEE within 24 hours of the strike.

C.  BOEM and BSEE issue Notices to Lessees and Operators (NTLs), which more fully describe measures implemented in support of the above-mentioned implementing statutes and regulations, as well as measures identified by the U.S. Fish and Wildlife Service and NMFS arising from, among others, conservation recommendations, rulemakings pursuant to the MMPA, or

consultation.  The lessee and its operators, personnel, and subcontractors, while undertaking activities authorized under this lease, must implement and comply with the specific mitigation measures outlined in NTL No. 2012-JOINT-G01 (Vessel Strike Avoidance and Injured/Dead Protected Species Reporting), NTL No. 2012-JOINT-G02 (Implementation of Seismic Survey Mitigation Measures and Protected Species Observer Program), and NTL No. 2015-BSEE-G03 (Marine Trash and Debris Awareness and Elimination).  At the lessee's option, the lessee, its operators, personnel, and contractors may comply with the most current measures to protect species in place at the time an activity is undertaken under this lease, including, but not limited to, new or updated versions of the NTLs identified in this paragraph.  The lessee and its operators, personnel, and subcontractors will be required to comply with the mitigation measures, identified in the above referenced NTLs, and any additional measures in the conditions of approvals for their plans or permits.

**Sec. 13.  Suspension or Cancellation.**
(a) The Lessor may suspend or cancel this lease pursuant to section 5 of the Act, and compensation shall be paid when provided by the Act.
(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

**Sec. 14.  Indemnification.**  The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:
(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal Agency whether or not the discretion involved is abused; or
(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

**Sec. 15.  Disposition of Production.**
(a) As provided in section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16 2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price or, if no regulated price applies, at the fair market value at the wellhead of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.
(b) Pursuant to section 27(b) and (c) of the Act, the Lessor may offer and sell certain oil and gas obtained or purchased pursuant to a lease. As provided in section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal Agency pursuant to section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price or, if no regulated price applies, the fair market value of the oil or gas so obtained.
(c) As provided in section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.
(d) In time of war or when the President of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the Act.

**Sec. 16.  Unitization, Pooling, and Drilling Agreements.**  Within such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary.  Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

**Sec. 17.  Equal Opportunity Clause.**  During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations, which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin.  Paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Sec. 18.  Certification of Nonsegregated Facilities.**  By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained.  As used in this certification, the term "facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees.  Segregated facilities include those that are segregated by explicit directive or those that are in fact segregated on the basis of race, color, religion, sex, or national origin, because of habit, local custom, or otherwise; provided, that separate or single-user restrooms and necessary dressing or sleeping areas shall be provided to assure privacy as appropriate.  The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to awarding contracts or subcontracts unless they are exempt under 41 CFR 60-1.5.

**Sec. 19.  Reservations to Lessor.**  All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor.  Without limiting the generality of the foregoing, reserved rights included:
(a) the right to authorize geological and geophysical exploration in the leased area that does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;
(b) the right to grant leases for any minerals other than oil and gas, and to issue leases or grants for renewable energy or alternative uses within the leased area, except that operations under such leases or grants shall not unreasonably interfere with or endanger operations under this lease; and
(c) the right, as provided in section 12(d) of the Act, to restrict operations in the leased area or any part thereof, which may be designated by the Secretary of Defense, with approval of the President, as being within an area needed for national defense and, so long as such designation remains in effect, no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense.  If operations or production under this lease within any designated area are suspended pursuant to this paragraph, any payments of rentals and royalty prescribed by this lease likewise shall be suspended.  During such period of suspension of operations and production, the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

**Sec. 20.  Assignment of Lease.**  The Lessee shall file for approval with the appropriate regional BOEM OCS office any instrument of assignment or other transfer of any rights or ownership interest in this lease in accordance with applicable regulations.

**Sec. 21.  Relinquishment of Lease.**  The Lessee may relinquish this lease or any officially designated subdivision thereof by filing with the appropriate regional BOEM OCS office a written relinquishment, in triplicate, that shall be effective on the date it is filed.  No relinquishment of this lease or of any portion of the leased area shall relieve the Lessee of the continuing obligation to pay all accrued rentals, royalties, and other financial obligations or to plug all wells and remove

**BOEM**  Form BOEM-2005  (October 2011)                                                        **Page 3**

all platforms and other facilities on the area to be relinquished in accordance with applicable regulations.

### Sec. 22. Decommissioning.

(a) When wells, platforms, pipelines or other facilities are no longer useful for operations, the Lessee shall permanently plug such wells, remove such platforms and other facilities, decommission such pipelines, and clear the seafloor of all associated obstructions created by the lease operations.

(b) The Secretary may determine that a well, platform, pipeline or other facility is no longer useful and require its immediate decommissioning.

(c) All platforms and other facilities shall be removed within 1 year after the lease terminates unless the Lessor grants approval to conduct other activities.

(d) All decommissioning operations shall be conducted in accordance with applicable laws and regulations and in a manner that is safe, does not unreasonably interfere with other uses of the OCS, and does not cause undue or serious harm or damage to the human, marine, or coastal environment.

### Sec. 23. Remedies in Case of Default.

(a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of section 5(c) and (d) of the Act and the Lessor may

exercise any other remedies that the Lessor may have, including, but not limited to the penalty provisions of section 24 of the Act. Furthermore, pursuant to section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

### Sec. 24. Unlawful Interest.

No member of, or delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified and during their continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 20, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom, except to the extent that such benefit is obtained by the general public as well. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431-433, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease insofar as they may be applicable.

***

| Exxon Mobil Corporation | THE UNITED STATES OF AMERICA, Lessor |
|---|---|
| (Lessee) | |
| (Signature of Authorized Officer) | (Signature of Authorized Officer) |
| Paul W. Watson | Michael A. Celata |
| (Name of Signatory) | (Name of Signatory) |
| Attorney-in-Fact | Regional Director |
| (Title) | (Title) |
| June 20, 2016 | JUN 3 0 2016 |
| (Date) | (Date) |

Post Office Box 4778
Houston, Texas 77210-4778

(Address of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal*

# Exhibit 10

Form 3300—1
(September 1978)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

**OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT**

| Office | Serial number |
|---|---|
| Los Angeles, CA | OCS-P 0329 |
| Cash bonus | Rental rate |
| $17,115,000.00 | $3.00 per acre |
| Minimum royalty rate | Royalty rate Fixed |
| $3.00 per acre | Sliding Scale |
| Work commitment | Profit share rate |

This lease is effective as of **SEP  1 1979** (hereinafter called the "Effective Date") by and between the United States of America (hereinafter called the "Lessor"), by the Manager, Pacific OCS Office, Bureau of Land Management, its authorized officer, and

Exxon Corporation                    100%

(hereinafter called the "Lessee"). In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered 1–A, 2, 3, 4, 5, 6 and 8             attached hereto, the Lessee and Lessor agree as follows:

**Sec. 1. Statutes and Regulations.** This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462 as amended; 43 U.S.C. 1331 et. seq. (hereinafter called the "Act"). The lease is issued subject to the Act; Sections 302 and 303 of the Department of Energy Organization Act, 91 Stat. 578, 42 U.S.C. 7152 and 7153; all regulations issued pursuant to such statutes and in existence upon the effective date of this lease; all regulations issued pursuant to such statutes in the future which provide for the prevention of waste and the conservation of the natural resources of the Outer Continental Shelf, and the protection of correlative rights therein; and all other applicable statutes and regulations.

**Sec. 2. Rights of Lessee.** The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf described as follows:

All Block 52N 76W, OCS Leasing Map, Channel Islands Area, CAL-Map No. 6A

*(Continued on reverse)*

containing approximately   5760.00   acres or                     hectares (hereinafter referred to as the "leased area").
These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the United States Geological Survey or the Director's delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

Sec. 3. Term. This lease shall continue for an initial period of  five  years from the Effective Date of the lease and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon.

Sec. 4. Rentals. The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental of $3.00   per acre ( per hectare) or fraction thereof.

Sec. 5. Minimum Royalty. The Lessee shall pay the Lessor at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty of $3.00  per acre (             per hectare) or fraction thereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

Sec. 6. Royalty on Production. (a) ~~The Lessee shall pay a fixed royalty of ____ percent in amount or value of production saved, removed, or sold from the leased area~~ Gas of all kinds (except helium) is subject to royalty. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated, will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty paid in amount in excess of tankage required when royalty is paid in value. When royalties are paid in amount, the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

Sec. 7. Payments. The Lessee shall make all payments to the Lessor by check, bank draft, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the United States Geological Survey and tendered to the Director, except that filing charges, bonuses, first year's rental, and other payments made upon lease issuance, shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

Sec. 8. Bonds. The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary.

Sec. 9. Plans. The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans, and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

Sec. 10. Performance. The Lessee shall comply with all regulations and orders relating to exploration, development, and production. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

Sec. 11. Directional Drilling. A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

Sec. 12. Safety Requirements. The Lessee shall (a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the leased area;

(b) maintain all operations within the leased area in compliance with regulations intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

Sec. 13. Suspension and Cancellation. (a) The Lessor may suspend or cancel this lease during the initial lease term or thereafter pursuant to Section 5 of the Act and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in Section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

Sec. 14. Indemnification. The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

Sec. 15. Disposition of Production. (a) As provided in Section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16-2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price, or if no regulated price applies, at the fair market value at the well head of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) As provided in Section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal agency pursuant to Section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price, or if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in Section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war, or when the President of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

Sec. 16. Unitization, Pooling, and Drilling Agreements. At such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

Sec. 17. Equal Opportunity Clause. During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60–1.4(a)), and the implementing regulations, which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

Sec. 18. Certification of Nonsegregated Facilities. By entering into this lease, the Lessee certifies, as specified in 41 CFR 60–1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 60–1.5.

Sec. 19. Reservations to Lessor. All rights in the leased area not expressly granted to the Lessee by the Act, this regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights include:

(a) the right to authorize geological and geophysical exploration in the leased area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;

(b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;

(c) the right, as provided in Section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being with an area needed for national defense, and so long as such designation remains in effect no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within, any desig-

nated area are suspended pursuant to this paragraph, any payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 20. Transfer of Lease. The Lessee shall file for approval with the appropriate field office of the Bureau of Land Management any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

Sec. 21. Surrender of Lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Bureau of Land Management a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surrendered in a manner satisfactory to the Director.

Sec. 22. Removal of Property on Termination of Lease. Within a period of one year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

Sec. 23. Remedies in Case of Default. (a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of Section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of Section 24 of the Act. Furthermore, pursuant to Section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

Sec. 24. Unlawful Interest. No member of, or Delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified, and during this continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 7, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431–433, relating to contracts made or entered into, or accepted by or on behalf of the United States, from a part of this lease insofar as they may be applicable.

* For amendment to Sec. 6.(a) "Royalty on Production" see rider attached.

| EXXON CORPORATION | THE UNITED STATES OF AMERICA, Lessor |
|---|---|
| (Lessee) | |
| *W. M. Selvidge* | *William E. Grant* |
| (Signature of Authorized Officer) | (Signature of Authorized Officer) |
| W. M. SELVIDGE | Manager, Pacific OCS Office |
| | Bureau of Land Management |
| (Name of Signatory) | (Name of Signatory) |
| ATTORNEY-IN-FACT | WILLIAM E. GRANT |
| (Title) | (Title) |
| AUGUST 14, 1979 | AUG 2 8 1979 |
| (Date) | (Date) |

SEAL

P. O. Box 2180
Houston, Texas 77001

(Address of Lessee)

(Continued on reverse)

_____   _____
(Signature of Lessee)

_____   _____
(Signature of Lessee)

_____   _____
(Signature of Lessee)

_____   _____
(Signature of Lessee)

_____   _____
(Signature of Lessee)

_____   _____
(Signature of Lessee)

_____   _____
(Signature of Lessee)

_____   _____
(Signature of Lessee)

_____   _____
(Signature of Lessee)

_____   _____
(Signature of Lessee)

_____   _____
(Signature of Lessee)

_____   _____
(Signature of Lessee)

_____   _____
(Signature of Lessee)

*If this lease is executed by a corporation it must bear the corporate seal.*

GPO 848 – 137

Rider for Amendment to Sec. 6.(a) of Lease Form 3300-1 (September 1978)

Sec. 6. Royalty on Production. (a)  The Lessee agrees to pay the lessor a royalty of that percent in amount or value of production saved, removed or sold from the leased area as determined by the sliding scale royalty formula as follows.  When the quarterly value of production, adjusted for inflation, is less than or equal to $13.236229 million, a royalty of 16.66667 percent in amount or value of production saved, removed or sold will be due on the unadjusted value or amount of production.  When the adjusted quarterly value of production is equal to or greater than $13.236230 million, but less than or equal to $1662.854082 million, the royalty percent due on the unadjusted value or amount of production is given by

$$R_j = b[Ln (V_j/S)]$$

where

$R_j$ =  the percent royalty that is due and payable on the unadjusted amount or value of all production saved, removed or sold in quarter j

b =  10.0

Ln =  natural logarithm

$V_j$ =  the value of production in quarter j, adjusted for inflation, in millions of dollars

S =  2.5

When the adjusted quarterly value of production is equal to or greater than $1662.854083 million, a royalty of 65.00000 percent in amount or value of production saved, removed or sold will be due on the unadjusted quarterly value of production.  Thus, in no instance will the quarterly royalty due exceed 65.00000 percent in amount or value of quarterly production saved, removed or sold.

In determining the quarterly percent royalty due, $R_j$, the calculation will be rounded to five decimal places (for example, 18.17612 percent).  This calculation will incorporate the adjusted quarterly value of production, $V_j$, in millions of dollars, rounded to the sixth digit, i.e., to the nearest dollar (for example, 15.392847 millions of dollars).

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026      BLOCK NO. 52N 76W      MAP NO. CAL 6A      OCS-P 0329,

The area described in Section 2 of this instrument is subject to the following
stipulation:

Stipulation No. 1-A

(a)  The lessee agrees that prior to operating or causing to be operated on its behalf
boat or aircraft traffic into individual, designated warning areas, the lessee shall
coordinate and comply with instructions from the Commander, Space and Missile Test
Center (SAMTEC) and the Commander, Pacific Missile Test Center (PMTC), or other
appropriate military agency.  Such coordination and instruction will provide for
positive control of boats and aircraft operating into the warning areas at all times.

(b)  The lessee, recognizing that mineral exploration and exploitation and recovery
operations on the leased areas of submerged lands can impede tactical military
operations, hereby recognizes and agrees that the United States reserves and has the
right to temporarily suspend operations of the lessee under this lease in the
interests of national security requirements.  Such temporary suspension of operations,
including the evacuation of personnel, and appropriate sheltering of personnel not
evacuated (an appropriate shelter shall mean the protection of all lessee personnel
for the entire duration of any Department of Defense activity from flying or falling
objects or substances), will come into effect upon the order of the Supervisor, after
consultation with the Commander, Space and Missile Test Center (SAMTEC) and the
Commander, Pacific Missile Test Center (PMTC), or other appropriate military agency,
or higher authority, when national security interests necessitate such action.  It is
understood that any temporary suspension of operations for national security may not
exceed seventy-two hours; however, any such suspension may be extended by order of the
Supervisor.  During such periods equipment may remain in place.

(c)  The lessee agrees to control his own electromagnetic emissions and those of his
agents, employees, invitees, independent contractors or subcontractors emanating from
individual, designated defense warning areas in accordance with requirements specified
by the Commander, Space and Missile Test Center (SAMTEC) and the Commander, Pacific
Missile Test Center (PMTC), or other appropriate military agency, to the degree
necessary to prevent damage to, or unacceptable interference with, Department of
Defense flight, testing or operational activities conducted within individual,
designated warning areas.  Necessary monitoring, control, and coordination with the
lessee, his agents, employees, invitees, independent contractors or subcontractors,
will be effected by the Commander of the appropriate onshore military installation
conducting operations in the particular warning area:  Provided, however, that control
of such electromagnetic emissions shall permit at least one continuous channel of
communication between a lessee, its agents, employees, invitees, independent
contractors or subcontractors and onshore facilities.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026     BLOCK NO. 52N 76W     MAP NO. CAL 6A     OCS-P 0329

The area described in Section 2 of this instrument is subject to the following stipulation:

## Stipulation No. 2

Whether or not compensation for such damage or injury might be due under a theory of strict or absolute liability or otherwise, the lessee assumes all risks of damage or injury to persons or property, which occurs in, on, or above the Outer Continental Shelf, to any person or persons or to any property of any person or persons who are agents, employees or invitees of the lessee, its agents, independent contractors or subcontractors doing business with the lessee in connection with any activities being performed by the lessee in, on, or above the Outer Continental Shelf, if such injury or damage to such person or property occurs by reason of the activities of any agency of the U.S. Government, its contractors, or subcontractors, or any of their officers, agents or employees, being conducted as a part of, or in connection with, the programs and activities of the Space and Missile Test Center (SAMTEC), the Pacific Missile Test Center (PMTC), or other appropriate military agency.

Not withstanding any limitations of the lessee's liability in section 14 of the lease, the lessee assumes the risk whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States, its contractors or subcontractors, or any of their officers, agents, or employees. The lessee further agrees to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the lessee, and to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the agents, employees, or invitees of the lessee, its agents or any independent contractors or subcontractors doing business with the lessee in connection with the programs and activities of the aforementioned military installations and agencies, whether the same be caused in whole or in part by the negligence or fault of the United States, its contractors, or subcontractors, or any of their officers, agents, or employees and whether such claims might be sustained under theories of strict or absolute liability or otherwise.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026    BLOCK NO. 52N 76W    MAP NO. CAL 6A    OCS-P 0329

The area described in Section 2 of this instrument is subject to the following
stipulation:

Stipulation No. 3

If the Supervisor, having reason to believe that a site, structure or object of
historical or archaeological significance, hereinafter referred to as a "cultural
resource," may exist in the lease area, gives the lessee written notice that the
lessor is invoking the provisions of this stipulation, the lessee shall upon receipt
of such notice comply with the following requirements:

Prior to any drilling activity or the construction or placement of any structure for
exploration or development on the lease, including but not limited to, well drilling
and pipeline and platform placement, hereinafter in this stipulation referred to as
"operation," the lessee shall conduct remote sensing surveys to determine the
potential existence of any cultural resource that may be affected by such operations.
All data produced by such remote sensing surveys as well as other pertinent natural
and cultural environmental data shall be examined by a qualified marine survey
archaeologist to determine if indications are present suggesting the existence of a
cultural resource that may be adversely affected by any lease operation.  A report of
this survey and assessment prepared by the marine survey archaeologist shall be
submitted by the lessee to the Supervisor and the Manager, Bureau of Land Management
(BLM), Outer Continental Shelf (OCS) Office for review.

If such cultural resource indicators are present the lessee shall (1) locate the site
of such operation so as not to adversely affect the identified location; or (2)
establish, to the satisfaction of the Supervisor, on the basis of further
archaeological investigation conducted by a qualified marine survey archaeologist or
underwater archaeologist using such survey equipment and techniques as deemed
necessary by the Supervisor, either that such operation shall not adversely affect the
location identified or that the potential cultural resource suggested by the
occurrence of the indicators does not exist.

A report of this investigation prepared by the marine survey archaeologist or
underwater archaeologist shall be submitted to the Supervisor and the Manager, BLM OCS
Office for their review.  Should the Supervisor determine that the existence of a
cultural resource which may be adversely affected by such operation is sufficiently
established to warrant protection, the lessee shall take no action that may result in
an adverse effect on such cultural resource until the Supervisor has given directions
as to its preservation.

The lessee agrees that if any site, structure, or object of historical or archae-
ological significance should be discovered during the conduct of any operations on the
leased area, he shall report immediately such findings to the Supervisor and make
every reasonable effort to preserve and protect the cultural resource from damage
until the Supervisor has given directions as to its preservation.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026     BLOCK NO. 52N 76W     MAP NO. CAL 6A     OCS-P 0329

The area described in Section 2 of this instrument is subject to the following stipulation:

Stipulation No. 4

(a) Wells:  Subsea well-heads and temporary abandonments, or suspended operations that leave protrusions above the sea floor, shall be protected, if feasible, by a shroud which will allow commercial trawl gear to pass over the structure without snagging or otherwise damaging the structure or the fishing gear.  Latitude and longitude coordinates of these structures along with water depths, shall be submitted to the Supervisor.  The coordinates of such structures will be determined by the lessee utilizing state-of-the-art navigation systems with accuracy of at least $\pm$ 50 feet (15.25 meters) at 200 miles (322 kilometers).

(b) Pipelines:  All pipelines, unless buried, including gathering lines, shall have a smooth-surface design.  In the event that an irregular pipe surface is unavoidable due to the need for valves, anodes or other structures, they shall be protected by shrouds which will allow trawl gear to pass over the object without snagging or otherwise damaging the structure or the fishing gear.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026    BLOCK NO. 52N 76W    MAP NO. CAL 6A    OCS-P 0329

The area described in Section 2 of this instrument is subject to the following
stipulation:

Stipulation No. 5

(a)  If the Supervisor has reason to believe that areas of special biological interest
in the lease area contain biological communities or species of such extraordinary or
unusual value (even though unquantifiable) that no threat of damage, injury, or other
harm to the community or species would be acceptable, he shall give the lessee written
notice that the lessor is invoking the provisions of this stipulation and the lessee
shall comply with the following requirements:  Prior to any drilling activity or the
construction or placement of any structure for exploration or development on lease
areas including, but not limited to, well drilling and pipeline and platform
placement, hereinafter referred to as "operation," the lessee shall conduct site
specific surveys as approved by the Supervisor and in accordance with prescribed
biological survey requirements to determine the existence of any special biological
resource including, but not limited to:

    (1)  Very unusual, rare, or uncommon ecosystems or ecotones.

    (2)  A species of limited regional distribution that may be adversely affected by
         any lease operations

If the results of such surveys suggest the existence of a special biological resource
that may be adversely affected by any lease operation, the lessee shall:  (1) relocate
the site of such operation so as not to adversely affect the resources identified; (2)
establish to the satisfaction of the Supervisor, on the basis of the site-specific
survey, either that such operation will not have a significant adverse effect upon the
resource identified or that a special biological resource does not exist.  The
Supervisor will review all data submitted and determine, in writing, whether a special
biological resource exists or may be significantly affected by lessee's operations.
The lessee may take no action until the Supervisor has given the lessee written
directions on how to proceed.

(b)  The lessee agrees that if any area of biological significance should be
discovered during the conduct of any operations on the leased area, he shall report
immediately such findings to the Supervisor, and make every reasonable effort to
preserve and protect the biological resource from damage until the Supervisor has
given the lessee directions with respect to its protection.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026     BLOCK NO. 52N 76W     MAP NO. CAL 6A        OCS-P 0329

The area described in Section 2 of this instrument is subject to the following
stipulation:

Stipulation No. 6

(a)  Pipelines will be required, (1) if pipeline rights-of-way can be determined and
obtained, (2) if laying of such pipelines is technologically feasible and
environmentally preferable, and (3) if, in the opinion of the lessor, pipelines can be
laid without net social loss, taking into account any incremental costs of pipelines
over alternative methods of transportation and any incremental benefits in the form of
increased environmental protection or reduced multiple use conflicts.  The lessor
specifically reserves the right to require that any pipeline used for transporting
production to shore be placed in certain designated management areas.  In selecting
the means of transportation, consideration will be given to any recommendation of the
intergovernmental planning program for leasing and management of transportation of
Outer Continental Shelf oil and gas with the participation of Federal, State, and
local government and the industry.  Where feasible, and environmentally preferable,
all pipelines, including both flow lines and gathering lines for oil and gas, shall be
buried to a depth suitable for adequate protection from water currents, sand waves,
storm scouring, fisheries' trawling gear, and other uses as determined on a
case-by-case basis.

(b)  Following the completion of pipeline installation, no crude oil production will
be transported by surface vessel from offshore production sites, except in the case of
emergency.  Determinations as to emergency conditions and appropriate responses to
these conditions will be made by the Supervisor.  Where the three criteria set forth
in the first sentence of this stipulation are not met and surface transporation must
be employed, all vessels used for carrying hydrocarbons to shore from the leased area
will conform with all standards established for such vessels, pursuant to the Ports
and Waterways Safety Act of 1972 (46 U.S.C., 391a), as amended.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #48
Outer Continental Shelf
Southern California

TRACT NO. 48-026      BLOCK NO. 52N 76W      MAP NO.   CAL 6A      OCS-P 0329

The area described in Section 2 of this instrument is subject to the following
stipulation:

Stipulation No. 8

(a)  The royalty rate on production saved, removed or sold from this lease is subject
to consideration for reduction under the same authority that applies to all other oil
and gas leases on the Outer Continental Shelf (30 CFR 250.12 (e)).  The Director,
Geological Survey, may grant a reduction for only one year at a time.  Reduction of
royalty rates will not be approved unless production has been underway for one year or
more.

(b)  Although the royalty rate specified in Sec. 6 (a) of this lease or as
subsequently modified in accordance with applicable regulations and stipulations is
applicable to all production under this lease, not more than 16 2/3 percent of the
production saved, removed or sold from the lease area may be taken as royalty in
amount, except as provided in Sec. 15 (d) of this lease:  the royalty on any portion
of the production saved, removed or sold from the lease in excess of 16 2/3 percent
may only be taken in value of the production saved, removed or sold from the lease
area.

# Exhibit 11

Form 3100-11
(October 2008)

**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**

Serial Number

**OFFER TO LEASE AND LEASE FOR OIL AND GAS**

The undersigned (page 2) offers to lease all or any of the lands in Item 2 that are available for lease pursuant to the Mineral Lands Leasing Act of 1920, as amended and supplemented (30 U.S.C. 181 et seq.), the Mineral Leasing Act for Acquired Lands of 1947, as amended (30 U.S.C. 351-359), or _____ (other).

### READ INSTRUCTIONS BEFORE COMPLETING

1. Name

   Street

   City, State, Zip Code

2. This application/offer/lease is for: *(Check Only One)* ☐ PUBLIC DOMAIN LANDS   ☐ ACQUIRED LANDS (percent U.S. interest _____ )

   Surface managing agency if other than Bureau of Land Management (BLM): _____ Unit/Project _____

   Legal description of land requested:  *Parcel No.: _____   *Sale Date (mm/dd/yyyy): _____

   **\*See Item 2 in Instructions below prior to completing Parcel Number and Sale Date.**

| T. | R. | Meridian | State | County |
|----|----|----------|-------|--------|
|    |    |          |       |        |

Total acres applied for _____

Amount remitted: Filing fee $ _____   Rental fee $ _____   Total $ _____

### DO NOT WRITE BELOW THIS LINE

3. Land included in lease:

| T. | R. | Meridian | State | County |
|----|----|----------|-------|--------|
|    |    |          |       |        |

Total acres in lease _____

Rental retained $ _____

This lease is issued granting the exclusive right to drill for, mine, extract, remove and dispose of all the oil and gas (except helium) in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority.  Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to regulations and formal orders hereafter promulgated when not inconsistent with lease rights granted or specific provisions of this lease.

**NOTE: This lease is issued to the high bidder pursuant to his/her duly executed bid form submitted under 43 CFR 3120 and is subject to the provisions of that bid and those specified on this form.**

Type and primary term:

☐ Noncompetitive lease (ten years)

☐ Competitive lease (ten years)

☐ Other _____

THE UNITED STATES OF AMERICA

by _____
      (BLM)

_____
   (Title)                    (Date)

EFFECTIVE DATE OF LEASE _____

(Continued on page 2)

4. (a) Undersigned certifies that (1) offeror is a citizen of the United States; an association of such citizens; a municipality; or a corporation organized under the laws of the United States or of any State or Territory thereof, (2) all parties holding an interest in the offer are in compliance with 43 CFR 3100 and the leasing authorities; (3) offeror's chargeable interests, direct and indirect, in each public domain and acquired lands separately in the same State, do not exceed 246,080 acres in oil and gas leases (of which up to 200,000 acres may be in oil and gas options or 300,000 acres in leases in each leasing District in Alaska of which up to 200,000 acres may be in options, (4) offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located; (5) offeror is in compliance with qualifications concerning Federal coal lease holdings provided in sec. 2(a)2(A) of the Mineral Leasing Act; (6) offeror is in compliance with reclamation requirements for all Federal oil and gas lease holdings as required by sec. 17(g) of the Mineral Leasing Act; and (7) offeror is not in violation of sec. 41 of the Act. (b) Undersigned agrees that signature to this offer constitutes acceptance of this lease, including all terms conditions, and stipulations of which offeror has been given notice, and any amendment or separate lease that may include any land described in this offer open to leasing at the time this offer was filed but omitted for any reason from this lease. The offeror further agrees that this offer cannot be withdrawn, either in whole or in part unless the withdrawal is received by the proper BLM State Office before this lease, an amendment to this lease, or a separate lease, whichever covers the land described in the withdrawal, has been signed on behalf of the United States.

**This offer will be rejected and will afford offeror no priority if it is not properly completed and executed in accordance with the regulations, or if it is not accompanied by the required payments.**

Duly executed this _____ day of _____ , 20 _____   _____

(Signature of Lessee or Attorney-in-fact)

Title 18 U.S.C. Section 1001 and Title 43 U.S.C. Section 1212 make it a crime for any person knowingly and willfully to make to any department or Agency of the United States any false, fictitious, or fraudulent statements or representations as to any matter within its jurisdiction.

## LEASE TERMS

Sec. 1. Rentals--Rentals must be paid to proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are:

(a) Noncompetitive lease, $1.50 for the first 5 years; thereafter $2.00;

(b) Competitive lease, $1.50; for the first 5 years; thereafter $2.00;

(c) Other, see attachment, or

as specified in regulations at the time this lease is issued.

If this lease or a portion thereof is committed to an approved cooperative or unit plan which includes a well capable of producing leased resources, and the plan contains a provision for allocation of production, royalties must be paid on the production allocated to this lease. However, annual rentals must continue to be due at the rate specified in (a), (b), or (c) rentals for those lands not within a participating area.

Failure to pay annual rental, if due, on or before the anniversary date of this lease (or next official working day if office is closed) must automatically terminate this lease by operation of law. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

Sec. 2. Royalties--Royalties must be paid to proper office of lessor. Royalties must be computed in accordance with regulations on production removed or sold.  Royalty rates are:

(a) Noncompetitive lease, 12 1/2%;

(b) Competitive lease, 12 1/2 %;

(c) Other, see attachment; or

as specified in regulations at the time this lease is issued.

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the  right to  establish reasonable minimum values on products after giving lessee notice and  an opportunity to be heard. When  paid in value, royalties must be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production must be delivered, unless otherwise agreed to by lessor,  in merchantable condition on the premises where produced without cost to lessor.  Lessee must not  be required to hold such production in storage beyond the last day of  the  month  following  the month in which production occurred, nor must lessee be held liable for loss or destruction of royalty oil  or other products in storage from causes beyond the reasonable control of lessee.

Minimum royalty  in  lieu  of  rental  of  not less than the rental which otherwise  would be required for that lease year must be payable at the end  of  each lease year beginning on  or  after a discovery in paying quantities.  This minimum royalty  may  be  waived,  suspended,  or reduced, and the above royalty rates may be reduced, for all or portions of this lease if the Secretary determines that such action is necessary to encourage  the greatest ultimate recovery of the leased resources, or is otherwise justified.

An  interest  charge  will  be  assessed  on  late  royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) (30 U.S.C. 1701). Lessee must be  liable  for  royalty payments on oil and gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rule, regulation, order, or citation issued under FOGRMA or the leasing authority.

Sec. 3.   Bonds - A bond must be filed and maintained for lease operations as required under regulations.

Sec. 4.   Diligence, rate of development, unitization, and drainage - Lessee must exercise reasonable diligence in developing and producing, and must prevent unnecessary damage to, loss of, or waste of leased resources. Lessor reserves right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if deemed necessary for proper development and operation of area, field, or pool embracing these leased lands. Lessee must drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in amount determined by lessor.

Sec. 5.   Documents, evidence, and inspection - Lessee must file with proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production. At such times and in such form as lessor may prescribe, lessee must furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest, expenditures, and depreciation costs. In the form prescribed by lessor, lessee must keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required. Lessee must keep open at all reasonable times for inspection by any representative of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee must maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that supports costs claimed as manufacturing, preparation, and/or transportation costs. All such records must be maintained in lessee's accounting offices for future audit by lessor. Lessee must maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor.

During existence of this lease, information obtained under this section will be closed to inspection by the public in accordance with the Freedom of Information Act (5 U.S.C. 552).

Sec. 6.   Conduct of operations - Lessee must conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users.  Lessee must take reasonable measures deemed necessary by lessor to accomplish the intent of this section. To the extent consistent with lease rights granted, such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the approval of easements or rights-of-way. Such uses must be conditioned so as to prevent unnecessary or unreasonable interference with rights of lessee.

Prior to disturbing the surface of the leased lands, lessee must contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources. Lessee may be required to complete minor inventories or short term special studies under guidelines provided by lessor. If in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee must immediately contact lessor. Lessee must cease any operations that would result in the destruction of such species or objects.

Sec. 7.   Mining operations - To the extent that impacts from mining operations would be substantially different or greater than those associated with normal drilling operations, lessor reserves the right to deny approval of such operations.

Sec. 8.   Extraction of helium - Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas. Lessee must include in any contract of sale of gas the provisions of this section.

Sec. 9.   Damages to property - Lessee must pay lessor for damage to lessor's improvements, and must save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec. 10.   Protection of diverse interests and equal opportunity - Lessee must pay, when due, all taxes legally assessed and levied under laws of the State or the United States; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the United States; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee must comply with section 28 of the Mineral Leasing Act of 1920.

Lessee must comply with Executive Order No. 11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto. Neither lessee nor lessee's subcontractors must maintain segregated facilities.

Sec. 11.   Transfer of lease interests and relinquishment of lease - As required by regulations, lessee must file with lessor any assignment or other transfer of an interest in this lease. Lessee may relinquish this lease or any legal subdivision by filing in the proper office a written relinquishment, which will be effective as of the date of filing, subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties.

Sec. 12.   Delivery of premises - At such time as all or portions of this lease are returned to lessor, lessee must place affected wells in condition for suspension or abandonment, reclaim the land as specified by lessor and, within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells.

Sec. 13.   Proceedings in case of default - If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease will be subject to cancellation unless or until the leasehold contains a well capable of production of oil or gas in paying quantities, or the lease is committed to an approved cooperative or unit plan or communitization agreement which contains a well capable of production of unitized substances in paying quantities. This provision will not be construed to prevent the exercise by lessor of any other legal and equitable remedy, including waiver of the default. Any such remedy or waiver will not prevent later cancellation for the same default occurring at any other time. Lessee will be subject to applicable provisions and penalties of  FOGRMA (30 U.S.C. 1701).

Sec. 14.   Heirs and successors-in-interest - Each obligation of this lease will extend to and be binding upon, and every benefit hereof will inure to the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto.

(Continued on page 4)                                                     (Form 3100-11, page 3)

A. General:

1. Page 1 of this form is to be completed only by parties filing for a noncompetitive lease. The BLM will complete page 1 of the form for all other types of leases.

2. Entries must be typed or printed plainly in ink. Offeror must sign Item 4 in ink.

3. An original and two copies of this offer must be prepared and filed in the proper BLM State Office. See regulations at 43 CFR 1821.2-1 for office locations.

4. If more space is needed, additional sheets must be attached to each copy of the form submitted.

B. Special:

Item 1 - Enter offeror's name and billing address.

Item 2 - Identify the mineral status and, if acquired lands, percentage of Federal ownership of applied for minerals. Indicate the agency controlling the surface of the land and the name of the unit or project which the land is a part. The same offer may not include both Public Domain and Acquired lands. Offeror also may provide other information that will assist in establishing title for minerals. The description of land must conform to 43 CFR 3110. A single parcel number and Sale Date will be the only acceptable description during the period from the first day following the end of a competitive process until the end of that same month, using the parcel number on the List of Lands Available for Competitive Nominations or the Notice of Competitive Lease Sale, whichever is appropriate.

Payments: The amount remitted must include the filing fee and the first year's rental at the rate of $1.50 per acre or fraction thereof. The full rental based on the total acreage applied for must accompany an offer even if the mineral interest of the United States is less than 100 percent. The filing fee will be retained as a service charge even if the offer is completely rejected or withdrawn. To protect priority, it is important that the rental submitted be sufficient to cover all the land requested. If the land requested includes lots or irregular quarter-quarter sections, the exact area of which is not known to the offeror, rental should be submitted on the basis of each such lot or quarter-quarter section containing 40 acres. If the offer is withdrawn or rejected in whole or in part before a lease issues, the rental remitted for the parts withdrawn or rejected will be returned.

Item 3 - This space will be completed by the United States.

## NOTICES

The Privacy Act of 1974 and the regulations in 43 CFR 2.48(d) provide that you be furnished with the following information in connection with information required by this oil and gas lease offer.

AUTHORITY:  30 U.S.C. 181 et seq.; 30 U.S.C 351-359.

PRINCIPAL PURPOSE:  The information is to be used to process oil and gas offers and leases.

ROUTINE USES:  (1) The adjudication of the lessee's rights to the land or resources. (2) Documentation for public information in support of notations made on land status records for the management, disposal, and use of public lands and resources. (3) Transfer to appropriate Federal agencies when consent or concurrence is required prior to granting a right in public lands or resources. (4)(5) Information from the record and/or the record will be transferred to appropriate Federal, State, local or foreign agencies, when relevant to civil, criminal or regulatory investigations or prosecutions.

EFFECT OF NOT PROVIDING INFORMATION:  If all the information is not provided, the offer may be rejected.  See regulations at 43 CFR 3100.

# EXHIBIT 12

**SUMMONS - CIVIL**
JD-CV-1  Rev. 2-20
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a, 52-48, 52-259;
P.B. §§ 3-1 through 3-21, 8-1, 10-13

| For information on ADA accommodations, contact a court clerk or go to: *www.jud.ct.gov/ADA*. |
| --- |

STATE OF CONNECTICUT
**SUPERIOR COURT**
*www.jud.ct.gov*



**Instructions are on page 2.**

☐ Select if amount, legal interest, or property in demand, not including interest and costs, is LESS than $2,500.

☒ Select if amount, legal interest, or property in demand, not including interest and costs, is $2,500 or MORE.

☒ Select if claiming other relief in addition to, or in place of, money or damages.

**TO: Any proper officer**

By authority of the State of Connecticut, you are hereby commanded to make due and legal service of this summons and attached complaint.

| Address of court clerk *(Number, street, town and zip code)* | Telephone number of clerk | Return Date *(Must be a Tuesday)* |
| --- | --- | --- |
| 95 Washington Street, Hartford 06106 | ( 860 ) 548 – 2700 | 10/13/2020 |

| ☒ Judicial District    G.A. | At *(City/Town)* | Case type code *(See list on page 2)* | |
| --- | --- | --- | --- |
| ☐ Housing Session   ☐ Number: ___ | Hartford | Major: **M** | Minor: **90** |

**For the plaintiff(s) enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)* | Juris number *(if attorney or law firm)* |
| --- | --- |
| William M. Tong, AG, Office of the Attorney General, 165 Capitol Avenue, Hartford, CT 06106 | 440323 |

| Telephone number | Signature of plaintiff *(if self-represented)* |
| --- | --- |
| ( 860 ) 808 – 5280 | |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case under Section 10-13 of the Connecticut Practice Book. ☒ Yes ☐ No | E-mail address for delivery of papers under Section 10-13 of the Connecticut Practice Book *(if agreed)*  Benjamin.Cheney@ct.gov |
| --- | --- |

| Parties | Name *(Last, First, Middle Initial)* and address of each party *(Number; street; P.O. Box; town; state; zip; country, if not USA)* | |
| --- | --- | --- |
| **First plaintiff** | Name: **State of Connecticut**  Address: Office of the Attorney General, 165 Capitol Avenue, Hartford, CT 06106 | P-01 |
| **Additional plaintiff** | Name:  Address: | P-02 |
| **First defendant** | Name: **Exxon Mobil Corporation**  Address: Agent for Service: Corporation Service Company, 100 Pearl Street, 17th Floor, Hartford, CT 06103 | D-01 |
| **Additional defendant** | Name:  Address: | D-02 |
| **Additional defendant** | Name:  Address: | D-03 |
| **Additional defendant** | Name:  Address: | D-04 |

| Total number of plaintiffs: 1 | Total number of defendants: 1 | ☐ Form JD-CV-2 attached for additional parties |
| --- | --- | --- |

## Notice to each defendant

1. **You are being sued.** This is a summons in a lawsuit. The complaint attached states the claims the plaintiff is making against you.
2. To receive further notices, you or your attorney must file an *Appearance* (form JD-CL-12) with the clerk at the address above. Generally, it must be filed on or before the second day after the Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to appear.
3. If you or your attorney do not file an *Appearance* on time, a default judgment may be entered against you. You can get an *Appearance* form at the court address above, or on-line at https://jud.ct.gov/webforms/.
4. If you believe that you have insurance that may cover the claim being made against you in this lawsuit, you should immediately contact your insurance representative. Other actions you may take are described in the Connecticut Practice Book, which may be found in a superior court law library or on-line at https://www.jud.ct.gov/pb.htm.
5. If you have questions about the summons and complaint, you should talk to an attorney.
   **The court staff is not allowed to give advice on legal matters.**

| Date  09/14/2020 | Signed *(Sign and select proper box)* | ☒ Commissioner of Superior Court  ☐         Clerk | Name of person signing  William M. Tong |
| --- | --- | --- | --- |

| If this summons is signed by a Clerk: | | For Court Use Only |
| --- | --- | --- |
| a. The signing has been done so that the plaintiff(s) will not be denied access to the courts.  b. It is the responsibility of the plaintiff(s) to ensure that service is made in the manner provided by law.  c. The court staff is not permitted to give any legal advice in connection with any lawsuit.  d. The Clerk signing this summons at the request of the plaintiff(s) is not responsible in any way for any errors or omissions in the summons, any allegations contained in the complaint, or the service of the summons or complaint. | | File Date |

| I certify I have read and understand the above: | Signed *(Self-represented plaintiff)* | Date | Docket Number |
| --- | --- | --- | --- |

DOCKET NO:                                    RETURN DATE: October 13, 2020

STATE OF CONNECTICUT              :       SUPERIOR COURT
                                                     :
V.                                                   :       J.D. OF HARTFORD
                                                     :       AT HARTFORD
EXXON MOBIL CORPORATION      :
                                                     :       SEPTEMBER 14, 2020

## COMPLAINT

### I.   INTRODUCTION

1.    Climate change poses an existential threat to humanity.

2.    For several decades the Exxon Mobil Corporation ("ExxonMobil" or "Defendant") has misled and deceived Connecticut consumers about the negative effects of its business practices on the climate.

3.    As far back as the 1950s, ExxonMobil's corporate executives, scientists, and other representatives and agents knew that fossil fuel combustion contributed to global warming.

4.    In the 1970s and 1980s, ExxonMobil conducted research confirming that atmospheric carbon dioxide released in fossil fuel exploration, refinement, and combustion contributed to climate change.

5.    In the late 1980s, when climate change gained increased public attention, ExxonMobil had the opportunity to responsibly contribute to public understanding of climate change and its potentially catastrophic consequences.

6.    ExxonMobil instead began a systematic campaign of deception to undermine public acceptance of the scientific facts and methods relied upon by climate scientists who knew that anthropogenic (human-caused) climate change was real and dangerous to humanity.

7.     ExxonMobil executed this unfair and deceptive campaign in order to maximize profits by selling more oil and gasoline than consumers would have purchased had the reality of climate change been disclosed.

8.     The campaign of deception ExxonMobil implemented was similar to the infamous disinformation campaign used by tobacco companies to conceal their products' deadly effects.

9.     ExxonMobil's campaign of deception was wide-ranging, including targeting consumers to spread and reinforce doubt about established climate science.

10.     Over the last several decades dozens of ExxonMobil advertorials (paid advertisements appearing similar to editorial content) published in newspapers, including but not limited to *The New York Times*, contained misleading and deceptive statements about the relationship between ExxonMobil's business practices and climate change.

11.     ExxonMobil's strategy to create uncertainty about climate science successfully kept consumers purchasing ExxonMobil products by deceiving consumers about the serious harm caused by ExxonMobil's industry and business practices.

12.     ExxonMobil continues its campaign of deception to this day in greenwashed advertising (advertising falsely claiming or implying that Exxon's corporate actions are beneficial to the environment).

13.     ExxonMobil's greenwashed advertising deceives consumers by downplaying ExxonMobil's contributions to climate change and falsely portraying ExxonMobil as a corporation committed to seriously combatting climate change.

14.     ExxonMobil, however, continues to be a major contributor to climate change.

15.     ExxonMobil's decades-long campaign of deceiving Connecticut consumers includes numerous violations of the Connecticut Unfair Trade Practices Act.

16.     ExxonMobil's campaign of deception has allowed it to continue to inflict decades of avoidable harm on Connecticut's natural environment, including but not limited to its lands, waters, coastlines, infrastructure, fish and wildlife, natural resources and critical ecosystems.

17.     ExxonMobil's campaign of deception has contributed to myriad negative consequences in Connecticut, including but not limited to sea level rise, flooding, drought, increases in extreme temperatures and severe storms, decreases in air quality, contamination of drinking water, increases in the spread of diseases, and severe economic consequences.

18.     Despite ExxonMobil finally admitting publicly that combustion of fossil fuels contributes to climate change, its decades-long campaign of deception has been so successful that many consumers still do not believe the scientific facts that climate change is real, is caused primarily by fossil fuel combustion, and is having and will have devastating consequences for Connecticut and all of humanity.

19.     The success of ExxonMobil's campaign of deception has helped to ensure that the people of the State of Connecticut will continue to experience the catastrophic consequences of climate change for the foreseeable future.

20.     ExxonMobil must be held accountable for its campaign of deception.

## II.     OVERVIEW

21.     This lawsuit seeks appropriate redress for the unfair, deceptive, unethical, oppressive, immoral, and/or unscrupulous practices by ExxonMobil of systematically, knowingly, and routinely misrepresenting the extent of the harmful climatic effects of its fossil fuel products and its industry as a whole, research conducted about the relationship between climate change and fossil fuels, conclusions reached regarding the climatic effects of its fossil fuel products, and actions taken to address the negative climatic effects of its fossil fuel products.

3

22.     Climate change is a change in global or regional climate patterns. As used herein, the term climate change refers to the shift in worldwide weather patterns associated with an increase in average global temperature. This phenomenon is also sometimes referred to as global warming.

23.     The negative effects of climate change have already been felt by the residents of Connecticut, and climate change will continue to have increasingly serious, life-threatening, and financially burdensome impacts on the people of Connecticut and the lands, waters, coastline, species, natural resources, critical ecosystems, infrastructure and other assets owned by the State and its political subdivisions.

24.     Human activity has contributed, and continues to contribute, to climate change.

25.     The most significant way in which human activity has contributed to climate change is through the extraction, refinement, and combustion of fossil fuels.

26.     ExxonMobil is a corporation whose primary trade and commercial interest is the extraction, refinement, and sale of fossil fuels, and it is one of the largest and most profitable corporations in the world as a result of its trade.

27.     ExxonMobil has contributed to climate change by causing the sale of fossil fuel and petroleum products, in Connecticut and elsewhere, that emit large quantities of greenhouse gases responsible for trapping atmospheric heat that causes global warming.

28.     ExxonMobil knew decades ago that the release of greenhouse gases, including carbon dioxide ("$CO_2$"), when fossil fuels are combusted, was a substantial factor in causing global warming.

29.     ExxonMobil used and continues to use its knowledge about the reality and effects of climate change to make business decisions, including but not limited to exploration strategies.

4

30.     ExxonMobil's stated position is that it will continue to explore for new fossil fuel reserves and that it does not anticipate a reduction in fossil fuel consumption for the next forty years.

31.     In the 1950s and 1960s, ExxonMobil was aware of research—some of it by its own employees—correlating the combustion of fossil fuels and climate change. In the late 1970s, scientists in its employ drafted internal memoranda confirming the general scientific consensus that humans were impacting the climate by burning fossil fuels.

32.     In the early 1980s, ExxonMobil scientists accurately predicted the concentration of carbon dioxide in the atmosphere and the corresponding temperature increase for the year 2020. The Defendant was able to accurately predict the severity of climate change because, beginning in the late 1970s, it had invested significant resources aimed at understanding the science of climate change.

33.     Notwithstanding ExxonMobil's knowledge of the risks posed by continuing to find, extract, refine, and sell its fossil fuel products, the Defendant continuously advertised and sold those products at multiple locations in Connecticut to the consumers of Connecticut throughout the 1970s, 1980s, 1990s, 2000s, and up to and including the present day.

34.     Rather than adjust its business practices to account for the knowledge it had about its industry contributing to climate change, ExxonMobil instead began to engage in a campaign of deception intended to mislead consumers.

35.     Beginning in the late 1980s, ExxonMobil began a campaign to deceive the consumers of Connecticut about the harmful climatic effects of its fossil fuel products by misrepresenting and omitting material facts about how the use of its fossil fuel products

significantly increased $CO_2$ and other heat-trapping emissions that ExxonMobil knew contributed to climate change.

36.     Each time Connecticut consumers purchased—and continue to purchase—ExxonMobil's fossil fuel products at service stations and elsewhere, ExxonMobil knowingly deceived and deceives the consumers of Connecticut by failing to disclose highly material information concerning the harmful climatic effects of its products. This deception has occurred in millions of transactions in Connecticut over the last four decades.

37.     In advertisements, public speeches, articles, media statements and published writings during the last five decades, ExxonMobil has knowingly deceived consumers by systematically and routinely misrepresenting and/or omitting information about its products' effects on the climate, its knowledge about the effect of its products on the climate, and scientific consensus about the effects of ExxonMobil's products on the climate.

38.     ExxonMobil also deceived consumers by funding and/or collaborating with third party groups, including but not limited to the American Petroleum Institute, the Global Climate Coalition, and others, to assist in spreading disinformation about the effects of its products on the climate.

39.     ExxonMobil's strategy to profit from its business that it knew caused harmful climatic impacts was based on a comprehensive campaign of deception that used several tactics, including, as set forth in a 1988 memorandum authored by Exxon spokesperson Joseph M. Carlson, "emphasiz[ing] uncertainty in scientific conclusions regarding the potential enhanced greenhouse effect." The Defendant emphasized uncertainty through serial misrepresentations and omissions regarding facts that would have been important to reasonable purchasers making their purchasing decisions.

40.     ExxonMobil has also engaged in a corporate promotion and branding campaign—referred to herein as "greenwashing"—that misrepresents its business' environmental impacts and deceives consumers.

41.     ExxonMobil's campaign of deception was and is unfair, deceptive, unethical, oppressive, immoral, and/or unscrupulous. The Defendant's affirmative misrepresentations, omissions of material fact, and half-truths had and have a tendency to mislead Connecticut consumers regarding their purchase of ExxonMobil's fossil-fuel-based products.

42.     ExxonMobil's campaign of deception has enabled it to substantially increase its profits by simultaneously deceiving Connecticut consumers about the causal link between climate change and every purchase of an ExxonMobil fossil-fuel-based product and by helping to slow—for decades—a transition to energy sources that do not cause an existential threat to humanity. Its campaign of deception has undermined and delayed the creation of alternative technologies, driven by informed consumer choice, which could have avoided the most devastating effects of climate change, and it has stifled an open marketplace for renewable energy, thereby leaving consumers unable to reasonably avoid the detrimental consequences of fossil fuel combustion.

43.     ExxonMobil's campaign of deception has contributed and continues to contribute significantly to harmful climate change in Connecticut. The Defendant's unfair, deceptive, unethical, oppressive, immoral, and/or unscrupulous conduct has been a substantial factor in causing the avoidable release of billions of tons of greenhouse gases that now sit in the Earth's atmosphere and cause, *inter alia*, sea-level rise on Connecticut's shoreline, wildlife degradation on Connecticut's lands, and property devaluation and damage for Connecticut's residents.

44.     By intentionally and knowingly misrepresenting and/or omitting material facts

about the extent of the harmful climatic effects of its fossil-fuel-based products, the research it conducted, the conclusions it reached regarding the climatic effects of its fossil fuel products, and the nature of its business's impacts on the environment and climate, ExxonMobil offered and continues to offer a materially deceptive representation of its business practices to consumers with the goal of maximizing profits.

45.     ExxonMobil's conduct as described herein constitutes deceptive, unfair and illegal business practices in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). Pursuant to Conn. Gen. Stat. § 42-110m, the Connecticut Attorney General, in the name of the State of Connecticut, seeks restitution, disgorgement, and civil penalties, as well as other injunctive and equitable relief to remediate all past and future damage caused by these unfair, deceptive, and illegal business practices.

## III.    PARTIES

46.     Plaintiff State of Connecticut, represented by William Tong, Attorney General of the State of Connecticut, brings this action in its sovereign enforcement capacity pursuant to Conn. Gen. Stat. § 42-110m and at the request of Michelle H. Seagull, Commissioner of the Department of Consumer Protection for the State of Connecticut.

47.     Defendant Exxon Mobil Corporation is a multinational energy and chemicals company incorporated in the State of New Jersey and has its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas. It is registered to do business in Connecticut as a foreign corporation and maintains a registered agent for service of process, Corporation Service Company, 100 Pearl Street, Hartford, Connecticut.

48.     Exxon Mobil Corporation is the parent company of numerous wholly owned subsidiaries, including but not limited to ExxonMobil Oil Corporation, and is liable for the unlawful actions of those subsidiaries.

49.     Exxon Mobil Corporation controls and has controlled companywide decisions related to all aspects of all allegations contained herein, including but not limited to decisions regarding advertising, public communications, and climate change research.

50.     Exxon Mobil Corporation was formed on November 30, 1999, by the merger of Exxon Corporation ("Exxon") and Mobil Oil Corporation ("Mobil"). Exxon Mobil Corporation is liable for its own conduct as well as the conduct of any prior corporate entities that eventually became, or became owned by, Exxon Mobil Corporation (including but not limited to Exxon, Mobil, Exxon Research and Engineering Company, Standard Oil of New Jersey, Standard Oil of New York, Vacuum Oil, Socony-Vacuum Oil Company, and Humble Oil & Refining Company) as well as activities conducted while operating under any alternative trade names (including but not limited to Exxon, Mobil, ExxonMobil Research and Engineering Company, Enco and Esso).

51.     As used in this Complaint, "ExxonMobil" refers collectively to Exxon Mobil Corporation and its predecessors, subsidiaries, affiliates, and divisions.

52.      Whenever reference is made in this complaint to any act or practice of ExxonMobil, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, or representatives of ExxonMobil did, or authorized, such act or practice on behalf of ExxonMobil while actively engaged in the scope of their duties.

53.     ExxonMobil is a vertically integrated oil and gas company that locates, extracts, refines, transports, markets and sells fossil-fuel-based products.

54.     According to its public filings with the Securities and Exchange Commission, ExxonMobil's "principal business is energy, involving exploration for, and production of, crude oil and natural gas, manufacture of petroleum products and transportation and sale of crude oil, natural gas and petroleum products. ExxonMobil is a major manufacturer and marketer of commodity petrochemicals, including olefins, aromatics, polyethylene and polypropylene plastics and a wide variety of specialty products. Affiliates of ExxonMobil conduct extensive research programs in support of these businesses."

55.     According to ExxonMobil's website, it is committed to being the world's premier petroleum and chemical manufacturing company.

56.     ExxonMobil claims a commitment to enhancing the long-term value of the investment dollars entrusted to it by its shareholders. ExxonMobil is committed to running its business profitably and expects superior returns for its shareholders.

57.     ExxonMobil is one of the largest and most profitable corporations in the world. The Forbes Global 200 list of the world's largest public companies ranked ExxonMobil 11th, with a market value of over $340 billion, in 2019. That year, ExxonMobil reported $14.3 billion in earnings. In 2018, ExxonMobil earned over $20 billion in profits from $290 billion in revenues. ExxonMobil has remained highly profitable for the last five decades concentrating its business on global oil and gas production, refining, distribution, and wholesale and retail sales.

58.     A significant portion of ExxonMobil's profits over the past several decades was derived from its campaign of deception, which has deceived the public, kept consumers buying ExxonMobil fossil-fuel-based products, and prevented a transition to alternative sources of energy.

59.     For decades, ExxonMobil has regularly transacted business in the State of Connecticut and derived substantial revenue from its business within the State of Connecticut. ExxonMobil's products have been sold within the State of Connecticut by company-owned gas stations and Branded Wholesalers, and ExxonMobil's deceptive advertisements at issue in this complaint have been repeatedly viewed and relied upon by Connecticut consumers.

60.     ExxonMobil has extensive contacts with the State of Connecticut, including but not limited to the following. Upon information and belief, from 1973 until 2007, ExxonMobil maintained a chemical plant at 495 Lordship Boulevard, Stratford, Connecticut. ExxonMobil also maintains a branding agreement with Alliance Energy, LLC, to maintain the Mobil brand name for 88 petroleum-products retail stations located in Connecticut. Upon information and belief, ExxonMobil operated numerous additional petroleum-products retail stations located in Connecticut through 1999, when ExxonMobil divested of those stations as a result of a settlement with the Federal Trade Commission. Exxon continues to maintain branded franchises throughout the State of Connecticut.

61.     ExxonMobil has engaged in national advertising campaigns that have deliberately targeted consumers throughout the United States, including Connecticut, in order to increase its sales and enhance its reputation. ExxonMobil has purposely availed itself of Connecticut's marketplace through nationwide advertising that it knew would reach the consumers of Connecticut.

## IV.   EXXONMOBIL KNEW ITS PRODUCTS CAUSED CLIMATE CHANGE

62.     The scientific consensus that climate change is a real phenomenon, caused in part by human activity, has been growing for decades.

63.     The following paragraphs are a partial compilation of events and/or documents that demonstrate the alignment of the Defendant's internal research and knowledge about climate change with the scientific consensus that climate change was and is a serious threat to humanity and our environment.

64.     In 1957, H.R. Brannon of Humble Oil (now ExxonMobil) published research correlating increased fossil fuel combustion with increased atmospheric $CO_2$.

65.     In 1959, renowned physicist Edward Teller delivered the earliest known warning of the dangers of global warming to the petroleum industry, speaking before the American Petroleum Institute ("API"). The following year he formally published his warnings about the dangers of global climate change.

66.     In 1965, President Lyndon B. Johnson's Science Advisory Committee predicted that fossil fuel combustion could cause significant climatic changes by the end of the 20th Century.

67.     In 1965, Frank Ikard, President of API, delivered a presentation at API's Annual Meeting, informing API's membership of the findings of the Presidential Science Advisory Committee. Representatives from ExxonMobil were in attendance at that meeting.

68.     In the 1970s, ExxonMobil invested millions of dollars and hired scientists and other personnel to design projects specifically to further its understanding of climate science. ExxonMobil's 1970s-era research was later championed by then-CEO Lee Raymond, who stated in 2000 that "[f]or more than two decades, Exxon Mobil Corporation has carefully studied and worked to increase understanding of the issue of global climate change, often referred to as global warming."

69.     In 1978, Exxon scientist Henry Shaw sent a letter to Exxon leadership describing two proposed scientific initiatives, including a project to monitor atmospheric and oceanic $CO_2$ levels ("the tanker project"), to address Exxon's "need to assess the possible impact of the greenhouse effect on Exxon's business" based on researchers attributing the increase in atmospheric $CO_2$ to fossil fuel burning. During this time ExxonMobil also invested significant resources in researching climate modeling.

70.     In 1978, senior Exxon scientist James F. Black warned the Exxon Corporation Management Committee in writing of the "Greenhouse Effect" caused by $CO_2$ in the Earth's atmosphere. His memorandum stated that $CO_2$ concentration was increasing in the Earth's atmosphere, $CO_2$ emissions were attributable to fossil fuels, and $CO_2$ emissions would cause climate variations including a mean temperature increase. The memorandum stated: "Present thinking holds that man has a time window of five to ten years before the need for hard decisions regarding changes in energy strategies might become critical."

71.     In 1979, scientists from Exxon gave a presentation to the National Oceanic and Atmospheric Association stating that Exxon's rationale for researching "the greenhouse effect" was "to assess the possible impact of the greenhouse effect on Exxon business" and assemble a "responsible team that can credibly carry bad news, if any, to the corporation."

72.     In 1979, an internal Exxon memorandum stated that the most widely held theory about climate change was that the "increase [in $CO_2$ concentration] is due to fossil fuel combustion," "[i]ncreasing $CO_2$ concentration will cause a warming of the earth's surface," and the "present trend of fossil fuel consumption will cause dramatic environmental effects before the year 2050." With a doubling of $CO_2$ concentration (using 1860 as a baseline), the study

predicted that "ocean levels would rise four feet" and the "Arctic Ocean would be ice free for at least six months each year, causing major shifts in weather patterns in the northern hemisphere."

73.    In 1979, Exxon scientist Henry Shaw advocated for research on the greenhouse effect in order to combat potential environmental controls that could negatively impact Exxon's business. He opined that this "aggressive defensive program" be initiated before the government made "the public aware of pollution problems."

74.    In 1979, an internal Exxon memorandum recommended that a study on atmospheric $CO_2$ not receive priority as an emerging issue because society will be able to cope with "whatever problems ensue such as some increase in ocean level, due to polar ice cap melting, [and] the main concern that crop-growing regions would shift northward to Siberia and Canada, leaving central regions too warm for food production."

75.    In a 1980 draft statement to the National Commission on Air Quality $CO_2$ Workshop, Exxon opined that the consequences of climate change would be "adverse to the stability of human and natural communities" and that action delayed until the increase in atmospheric $CO_2$ is discernible would likely occur "too late to be effective."

76.    In 1980, an Exxon report stated that the observable growth in atmospheric $CO_2$ had been coincident with the start of the Industrial Revolution and that a doubling of $CO_2$ in the atmosphere could occur sometime between 2035 and 2065. The report predicted that the rise in temperature associated with the increase in atmospheric $CO_2$ would cause a "dramatic impact on soil moisture, and in turn, on agriculture." It also predicted that one effect of climate change—the melting of the Antarctic ice sheet—could raise sea level by 5 meters.

77.     In 1980, a subsidiary of Exxon prepared an internal memorandum, which stated: "There is no doubt that increases in fossil fuel usage and decreases in forest cover are aggravating the potential problem of increased $CO_2$ in the atmosphere."

78.     In 1980, Dr. John Laurman, a consultant and recognized expert in the field of $CO_2$ and climate, presented to the API Task Force on Climate Change on "The $CO_2$ Problem." He identified the "scientific consensus on the potential for large future climatic response to increased $CO_2$ levels" as a reason for concern, stated that there was "strong empirical evidence" that climate change was caused by fossil fuel combustion, and warned that the "likely impacts" of climate change were "major economic consequences" by 2038 and "globally catastrophic effects" by 2067. Henry Shaw, a member of the Task Force, represented Exxon at the meeting.

79.     In 1981, Exxon scientist Henry Shaw wrote that a doubling of $CO_2$ would result in a 3°C increase in average global temperature and a 10°C increase at the poles, causing major shifts in rainfall and agriculture and melting of polar ice.

80.     In 1981, Roger Cohen, director of Exxon's Theoretical and Mathematical Sciences Laboratory, critiqued a draft memorandum from a colleague that stated that the effects of climate change in 2030 would be "well short of catastrophic." This characterization, Cohen wrote, "may be too reassuring."

81.     In 1981, an internal Exxon memorandum revealed that the Defendant considered implementation of a comprehensive high-impact program studying atmospheric $CO_2$. However, Exxon decided not to pursue that program after concluding that "energy conservation or shifting to renewable energy sources" were "the only options that make sense" to combat increases in atmospheric $CO_2$.

82.     In 1982, Exxon began to scale back its research on $CO_2$ and climate change. It canceled the tanker project, and several years later it stopped researching climate modeling. Meanwhile, however, Exxon continued to learn about the potentially devastating consequences of its products.

83.     In 1982, Roger Cohen summarized the findings of Exxon's research in climate modeling, stating that "over the past several years a clear scientific consensus has emerged regarding the expected climatic effects of increased atmospheric $CO_2$." Cohen acknowledged that Exxon shared the views of the mainstream scientific community, stating that there is "unanimous agreement in the scientific community that a temperature increase of this magnitude would bring about significant changes in the earth's climate," and that Exxon's findings were "consistent with the published predictions of more complex climate models" and "in accord with the scientific consensus on the effect of increased atmospheric $CO_2$ on climate."

84.     In 1982, an API report, which was largely critical of the accuracy of climate modeling, conceded that "all climate model studies indicate that a doubling of $CO_2$ will produce a significant increase in the global and annual mean temperature of the Earth." The report noted that the warming predicted by the scientific consensus "can have serious consequences for man's comfort and survival since patterns of aridity and rainfall can change, the height of the sea level can increase considerably and the world food supply can be affected."

85.     In 1982, a corporate primer given "wide circulation to Exxon management" concluded that "there is time for further study and monitoring before specific action need be taken," but it noted that "once the effects [of climate change] are measurable, they might not be reversible." The report stated that the effects are "potentially catastrophic" and included famine, migration, "stress on renewable resource production," and sea level rise that would cause

"flooding on much of the U.S. East Coast." The report predicted a doubling of $CO_2$ concentrations (above pre-industrial levels) by 2060 and increased temperatures of 2-4°C (above 1982 levels) by the end of the 21st century. According to the report, "[m]itigation of the 'greenhouse effect' would require major reductions in fossil fuel consumption."

86.     In 1982 remarks, the President of Exxon's Research and Engineering Company acknowledged that "fossil fuels, and liquid chemical fuels, are really the heart of the energy and $CO_2$ problem" and emphasized the need to adopt conservation technologies to address the "profound issues posed by the $CO_2$ buildup" in the atmosphere.

87.     At all times mentioned herein before the two companies merged, Mobil and Exxon had similar knowledge about climate change as it related to their products. In addition to having access to publicly available information and information shared between corporations in the petroleum industry—including, but not limited to, information shared though API—Mobil conducted its own research on climate change that aligned with scientific consensus.

88.     For example, in 1983, a Mobil Status Report on Environmental and Toxicology Issues summarized the scientific consensus on the greenhouse effect and the possibility that a temperature rise of 3°F to 6 °F may occur and cause drought and fifteen to twenty feet of sea level rise, "inundating many of the world's coastal cities."

89.     In 1984, Exxon scientist Henry Shaw gave a presentation that highlighted the disparities in some climate modeling, but nonetheless concluded that humankind "can either adapt our civilization to a warmer planet or avoid the problem by sharply curtailing the use of fossil fuels." He listed some of the effects of global warming as: sea-level rise, redistribution of rainfall, changes in agricultural productivity, accelerated growth of pests and weeds, detrimental health effects, and population migration.

17

90.     By the mid-1980s, the Defendant knew that anthropogenic climate change was real, scientific consensus was that continued expulsion of $CO_2$ into the atmosphere would cause catastrophic consequences for humanity, and that the only meaningful way to curtail climate change was to curtail combustion of fossil fuels.

91.     In 1988, National Aeronautics and Space Administration ("NASA") scientist Dr. James Hansen testified before Congress that global warming is ascribable to the greenhouse effect, and that global warming was—at that time—"begin[ning] to effect the probability of occurrence of extreme events such as summer heat waves."

92.     Less than six weeks after Dr. Hansen's testimony, Exxon spokesperson Joseph M. Carlson circulated an internal draft memorandum acknowledging the scientific consensus that atmospheric $CO_2$ concentrations were increasing and could double in 100 years, that the combustion of fossil fuels was emitting five billion tons of $CO_2$ per year, and that the "principal greenhouse gases are by-products of fossil fuel combustion." He advised that the "[g]reenhouse effect may be one of the most significant environmental issues for the 1990s."

93.     The 1988 Carlson memorandum stated that Exxon "has not modified its energy outlook or forecasts to account for possible changes in fossil fuel demand or utilization due to the Greenhouse effect."

94.     In 1990, the First Assessment Report of the Intergovernmental Panel on Climate Change ("IPCC") was completed. It concluded that human activity caused the release of greenhouse gases—including $CO_2$ and methane—which enhanced the greenhouse effect and caused additional warming to the Earth's surface.

95.     In 1995, the IPCC issued its Second Assessment Report, which concluded that "the balance of evidence, from changes in global mean surface air temperature and from changes

18

in geographical, seasonal and vertical patterns of atmospheric temperature, suggests a discernible human influence on global climate." Consistent with previous reports, scientific consensus was that climate change was occurring, the combustion of fossil fuels was a significant contributor to climate change, and climate change could have devastating impacts on humanity and the environment. The IPCC has since published three more assessment reports, in 2001, 2007, and 2014. These reports detail continued scientific consensus on the causes and effects of global climate change, and predict worsening damage compared to the conclusions in the Second Assessment Report.

## V.     EXXONMOBIL DECEIVED CONSUMERS

96.     Despite public scientific consensus and years of internal scientific research concluding that climate change resulted from burning fossil fuels and would have devastating consequences, the Defendant engaged in a campaign to deceive the public about these conclusions.

97.     Exxon's 1988 Carlson memorandum, which was drafted weeks after Dr. Hansen's Congressional testimony, stated that the Defendant's public position would be to "[e]mphasize the uncertainty in scientific conclusions regarding the potential enhanced Greenhouse effect" and "resist overstatement and sensationalization of potential Greenhouse effect which could lead to noneconomic development of nonfossil fuel resources."

98.     Emphasizing claimed uncertainty about climate change has been a common tactic in Defendant's campaign of deception.

99.     The Defendant executed the strategy of deceiving the public with the intent of increasing its product sales.

100.     ExxonMobil's campaign of deception spread disinformation in several ways, including but not limited to investment brochures, research papers, books, speeches, presentations, and interviews.

101.     In addition to spreading disinformation directly, the Defendant also provided funding to—and continues to provide funding to—many individuals and organizations for the purpose of disseminating disinformation to foster doubt about climate change. Some of the funding of this disinformation campaign came from the ExxonMobil Foundation, which was provided significant funding by, and operated under the control of, Exxon Mobil Corporation.

102.     Much like ExxonMobil's disinformation, ExxonMobil's deceptive advertisements have evolved over time.

103.     As described in more detail below, ExxonMobil's deceptive advertising took the form of advertorials containing false, misleading, and/or deceptive information for decades. More recently—and currently—ExxonMobil's deception in advertising is often in the form of "greenwashing."

104.     Greenwashing is a practice in which a company uses imagery and language in advertising and promotional materials to suggest to consumers that the company is environmentally responsible and consumers should buy its products.

105.     The Defendant's campaign of deception about the risks associated with burning fossil fuels and climate change has delayed the needed transition to clean energy in Connecticut, the United States, and around the world.

106.     The Defendant's practices and a resultant delay in shifting to alternative sources of energy have had and will have a significant negative financial impact on the people of the State of Connecticut.

107.    The Defendant engaged in a campaign of deception in order to facilitate its continuing sales of fossil fuels and to continue to profit from those sales.

108.    Each manner in which the Defendant executed its campaign of deception was within its primary line of business and in furtherance of its objective to sell product in Connecticut's marketplace.

### A.    ExxonMobil Systematically and Routinely Used Disinformation as Part of its Campaign of Deception.

109.    The Defendant disseminated disinformation both directly and through other organizations, including but not limited to the specific instances in the following paragraphs.

110.    The Defendant was a longstanding and continuous Board Member of API, and API received funding and direction from the Defendant.

111.    In 1996, API published a book titled "Reinventing Energy: Making the Right Choices," which falsely stated that "there is no persuasive basis for forcing Americans to dramatically change their lifestyles to use less oil." The book falsely denied the human connection to climate change, stating that "no conclusive—or even strongly suggestive—scientific evidence exists that human activities are significantly affecting sea levels, rainfall, surface temperatures or the intensity and frequency of storms."

112.    In or around 1996, the Defendant joined with API and other parties to create the Global Climate Science Communications Team ("GCSCT"), a small group of prominent representatives of fossil fuel companies, public relations firms, and industry front groups with the mission of undermining the global scientific consensus that climate change was real and human caused.

113.    An agent of the Defendant was a member of the GCSCT. Through its membership, the Defendant directed and participated in the activities of the GCSCT. The

21

Defendant had the authority to control the activities of the GCSCT and knowledge of material representations made by the GCSCT.

114.    In 1998, the GCSCT developed a plan to launch a multi-million-dollar, multi-year "national media relations program to inform the media about uncertainties in climate science; to generate national, regional and local media on the scientific uncertainties, and thereby educate and inform the public, stimulating them to raise questions with policymakers."

115.    In 1998, the GCSCT prepared a memorandum outlining "strategies and tactics" to affect public opinion about climate change. The memorandum stated that "Victory will be achieved when average citizens 'understand' (recognize) uncertainties in climate science" and the "recognition of uncertainties becomes part of the 'conventional wisdom.'"

116.    The 1998 GCSCT memorandum advocated implementing: (1) a "National Media Relations Program" to "inform the media about uncertainties in climate science;" (2) a "Global Climate Science Information Source" with the goal of "undercutting the 'prevailing scientific wisdom'"; and (3) a "National Direct Outreach and Education" effort "to inform and educate members of Congress, state officials, industry leadership, and school teachers/students about uncertainties in climate science."

117.    In addition to planning and executing a disinformation campaign with API and other API members, the Defendant was a member of other organizations that disseminated disinformation as part of its campaign of deception.

118.    For example, Exxon and Mobil were members of the Global Climate Coalition ("GCC"), which defined itself as "an organization of business trade associations and private companies . . . to coordinate business participation in the scientific and policy debate on the global climate change issue."

119.     In 1995, Mobil drafted a paper for the GCC critiquing the IPCC's conclusion that human activity had impacted global climate. The paper acknowledged that "[t]he potential for a human impact on climate is based on well-established scientific fact and should not be denied" and that "contrarian theories raise interesting questions about our total understanding of climate process, but they do not offer convincing arguments against the conventional model of greenhouse gas emission-induced climate change." Nevertheless, the paper falsely concluded that "[c]laims that human activities have already impacted climate are currently unjustified." The paper also provided a list of talking-point counterarguments to the positions of scientific consensus.

120.     Contrary to GCC's purported mission of "contribut[ing] to a balanced debate on global climate change," the organization took a hardline stance against scientific consensus, as evidenced by its 1996 statement that "the scientific community has not yet met the 'burden of proof' that greenhouse gas emissions are likely to cause serious climatic impacts."

121.     In addition to working with and through other organizations, the Defendant disseminated disinformation directly to the public.

122.     In 1996, Exxon's then-CEO, Lee Raymond, authored several articles stating that fossil fuels' effect on the Earth's climate was an "unproven theory" and that "scientific evidence remains inconclusive as to whether human activities affect global climate." An accompanying piece authored by Exxon went on to assert that "[t]here is still a tremendous amount of uncertainty about how the climate will change in the 21st century" and whether global warming was good or bad.

123.     In 1996, Lee Raymond gave remarks to the Economic Club of Detroit and stated: "Currently, the scientific evidence is inconclusive as to whether human activities are having a

significant effect on the global climate." Similarly, he stated in remarks on a European trip later that year that "evidence remains inconclusive as to whether human activities, including the burning of fossil fuels, are affecting global climate." These remarks, as well as urging opposition to efforts to reduce fossil fuel use, were reiterated in a speech to API later in 1996.

124.     The purpose of Lee Raymond's remarks at the Economic Club of Detroit was to improve the reputation of the petroleum industry and advertise industry products for the listeners. Comments included promotion of oil's non-energy related uses, a discussion about contemporaneous global supply levels, and a comparison between oil products and alternative sources of energy. Similarly, the European trip remarks were aimed at advertising and burnishing the Defendant's business and products. Comments included a discussion of the Defendant's finances, its global operations, and planned future activities, as well as its anticipated future revenue.

125.     In 1997, Lee Raymond gave a speech at the World Petroleum Conference in which he criticized climate modelling as "notoriously inaccurate," questioned whether global warming was occurring, and stated that "[i]t is highly unlikely that the temperature in the middle of next century will be significantly affected whether policies are enacted now or 20 years from now." He also falsely stated that "the earth is cooler today than it was 20 years ago."

126.     In 1997, Mobil published an "educational" booklet in which it falsely stated that "[s]cientists cannot tell us with certainty how much and where temperatures will increase—or if they will increase at all. Neither can they tell us what impact such increases would have or what positive impact the proposed remedies will have."

127.     The booklet encouraged readers to discuss the statements contained within with their friends, family and lawmakers. The booklet was promulgated for the purpose of influencing

24

public opinion regarding Mobil and its impact on climate change, and it contained deceptive misrepresentations about the scientific consensus about climate change as well as statements and imagery designed to create the impression that Mobil was operating in an environmentally-friendly manner.

128.    In 1998, the Defendant published a brochure for the public titled "Global Climate Change: everyone's debate" in which the Defendant falsely claimed that based on "our analysis . . . the current state of climate science is too uncertain to provide clear answers to many key questions about global climate change," including whether it is "a threat" and whether "the tiny portion of greenhouse gases caused by burning fossil fuels have a measurable effect on worldwide climate."

129.    In 2000, ExxonMobil published a brochure titled "A Better Path Forward" stating: "We agree that the potential for climate change caused by increases in carbon dioxide and other greenhouse gases may pose a legitimate long-term risk. However, we do not now have a sufficient scientific understanding of climate change to make reasonable predictions and/or justify drastic measures."

130.    These brochures, upon information and belief, promulgated for the purpose of influencing public opinion regarding ExxonMobil and its impact on climate change, contained deceptive misrepresentations about the scientific consensus about climate change as well as statements and imagery designed to create the impression that ExxonMobil was operating in an environmentally-friendly manner.

131.    In a 2001 article in *Fortune* magazine, ExxonMobil's then-CEO, Lee Raymond, stated that "[ExxonMobil's] geologists show you how over the last 100,000 years, the temperatures had huge swings that didn't have anything to do with man-made burning of fossil

fuels, because no one was burning them . . . . So how do you distinguish that phenomenon, which we don't understand, from what's going on now?" He also dismissed the idea of renewable energy alternatives, stating that "[e]ven if there were significant changes in technology that none of us see now, by the time you get [alternative energy sources] developed on a commercial scale and get it implemented, it's ten, 15, 20 years." The *Fortune* article noted that other oil and gas companies, such as BP Amoco, "at least acknowledge that temperatures may in fact be rising in the long term."

132.   ExxonMobil published a number of materials—both annually and on a one-time basis—as part of its campaign of deception, including but not limited to Corporate Citizen Reports, Sustainability Reports, and Outlooks for Energy. Many of these reports were misleading to the public given what the Defendant knew at the time.

133.   In response to a 2005 Corporate Citizenship Brochure, the Royal Society—an independent scientific academy in the United Kingdom—wrote a letter to ExxonMobil to express "disappointment at the inaccurate and misleading view of the science of climate change" expressed in the widely distributed materials.

134.   Each aforementioned example of disinformation was disseminated after the 1995 IPCC report concluded that climate change was real, human-caused and attributable to the combustion of fossil fuels and the Defendant's own aforementioned internal research revealed the same.

135.   All of ExxonMobil's disinformation was tied to trade or commerce intimately associated with Connecticut, specifically ExxonMobil's business of selling oil and gas to Connecticut consumers. ExxonMobil's disinformation impacted and injured Connecticut consumers.

**B.      ExxonMobil Systematically and Routinely Used Deceptive Advertisements as Part of its Campaign of Deception.**

136.     The Defendant purchased advertising—in the form of "advertorials"—to influence consumers about climate change with the goal of selling more of its product.

137.     The Defendant purchased advertorials in *The New York Times* starting in or about 1970 and continued to purchase advertorials until at least 2007. Between 1972 and 2001, the advertorials were published nearly every Thursday.

138.     *The New York Times* is a national newspaper that has historically and continues to specifically target the tri-state (Connecticut, New York, New Jersey) area; notably, it has and continues to publish specific sections (e.g., Metro) tailored only to the tri-state area.

139.     During the time when the advertorials were published in *The New York Times*, *The New York Times* had a circulation of tens of thousands of readers in Connecticut.

140.     The Defendant published advertorials in other publications—including but not limited to *The Washington Post*, *National Journal*, *USA Today*, and *The Financial Times*—that were read by Connecticut consumers.

141.     By placing advertisements in national publications, the Defendant knowingly availed itself of Connecticut's marketplace.

142.     In speeches in the 1970s, Mobil's then-Chairperson Rawleigh Warner, Jr. called the advertorials "quarter-page advertisement[s]" and "advocacy advertising." A Mobil document detailing its public affairs programs during the 1970s and early 1980s referred to the advertorials as a "useful new ad format."

143.     Paying money to newspapers to print advertorials was an act and practice in the conduct of the Defendant's primary line of business—selling oil, gas, and petroleum products.

144.    Some of the advertorials, including but not limited to those described herein,

deceptively discussed climate change as part of the Defendant's campaign of deception. The

following advertorials are representative of a larger number of advertorials that were deceptive to

consumers in many ways, including but not limited to unjustifiably emphasizing claimed

uncertainty of climate science, omitting and/or misrepresenting known facts and/or scientific

consensus on climate change, and reflecting only the doubt—as opposed to the confidence—of

ExxonMobil's mixed internal dialogue on climate change:

a.      In 1984, a Mobil advertorial in the *New York Times* titled "Lies they tell
our children" stated that "a greenhouse effect" that could "melt the polar
ice caps and devastate U.S. coastal cities" was a "lie" and a "myth of the
1960s and 1970s."

b.      In 1993, a Mobil advertorial in the *New York Times* titled "Apocalypse no"
asserted that the "dire predictions of global warming catastrophes" and
"media hype proclaiming that the sky was falling did not properly portray
the consensus of the scientific community." It cited the "lack of scientific
data" as justification to delay action to address climate change.

c.      In 1996, a Mobil advertorial in the *New York Times* titled "With climate
change, what we don't know can hurt us" warned that acting quickly to
curb emissions would "create an unwarranted sense of crisis" and urged
instead a "gradual approach."

d.      In 1996, a Mobil advertorial in the *New York Times* titled "Less heat, more
light on climate change" stated that "a number of the scientists believe we
have the time and resources to avert a crisis."

e.      In 1997, a Mobil advertorial in the *New York Times* titled "Reset the
alarm" stated: "Let's face it: The science of climate change is too uncertain
to mandate a plan of action that could plunge economies into turmoil. . . .
Scientists cannot predict with certainty if temperatures will increase, by
how much and where changes will occur. We still don't know what role
man-made greenhouse gases might play in warming the planet."

f.      In 1997, a Mobil advertorial in the *New York Times* titled "Climate
Change: a prudent approach" stated: "We don't know enough about the
factors that affect global warming and the degree to which—if any—that
man-made emissions (namely carbon dioxide) contribute to increases in
the Earth's temperature." However, the advertorial then described the

28

"precautionary [and] voluntary" ways in which Mobil is "reducing emissions at the source and removing carbon dioxide from the atmosphere [by] supporting research and technology efforts, curtailing our own greenhouse gas emissions and helping customers scale back their emissions of carbon dioxide."

g.    In 1997, a Mobil advertorial in the *New York Times* titled "Climate change: where we come out" stated that "after two decades of progress, climatologists are still uncertain how—or even if—the buildup of man-made greenhouse gases is linked to global warming. It could be at least a decade before climate models will be able to link greenhouse warming unambiguously to human actions."

h.    In 1997, a Mobil advertorial in the *New York Times* titled "Stop, look and listen before we leap" cautioned consumers that the international efforts to combat climate change were borne out of "speculation," not in line with the "underlying science . . . [that] continue[s] to signal caution," and could "wreak havoc" on "U.S. prosperity."

i.    In 2000, an ExxonMobil advertorial in the *New York Times* titled "Unsettled Science" displayed a chart with the Sargasso Sea temperature lowering over time, and it stated that "climate and greenhouse gas levels experience significant natural variability for reasons having nothing to do with human activity" and "little if any warming" had occurred in the last 20 years, characterized the impacts of climate change as "positive or negative," and warned that the position that "the science debate is settled [was] empty rhetoric." The scientist whose research formed the basis of the chart in the advertorial subsequently wrote a letter to ExxonMobil stating that "ExxonMobil has been misleading in its use of the Sargasso Sea data."

j.    In 2002, an ExxonMobil advertorial in the *New York Times* titled "Do No Harm" warned of the damage to the United States' economy and way of life if policies were enacted to address climate change. The advertorial characterized the climate change "debate" as balanced, proposed that climate change may be "trivial" and the future impacts "beneficial," and juxtaposed climate science with unpredictable local weather.

k.    In 2002, an ExxonMobil advertorial in the *New York Times* titled "A responsible path forward on climate" announced that ExxonMobil was funding the Global Climate and Energy Project at Stanford University to conduct "research on ways to address climate and energy issues." The advertorial championing this initiative also stated that "many of today's suggested alternative energy approaches are not as . . . environmentally beneficial . . . as competing fossil fuels."

l.    In 2004, an ExxonMobil advertorial in the *New York Times* titled "Weather and climate" explained that unordinary weather events were unrelated to climate change and that "scientific uncertainties continue to limit our ability to make objective, qualitative determinations regarding the human role in recent climate change or the degree and consequences of future change."

145.    Professor Martin Hoffert, a former New York University physicist who researched climate change as an Exxon consultant in the 1980s, stated the following in sworn testimony before Congress: "I was greatly distressed by the climate science denial program campaign that Exxon's front office launched around the time I stopped working as a consultant—but not collaborator—for Exxon. The advertisements that Exxon ran in major newspapers raising doubt about climate change were contradicted by the scientific work we had done and continue to do. Exxon was publicly promoting views that its own scientists knew were wrong, and we knew that because we were the major group working on this. This was immoral and has greatly set back efforts to address climate change."

146.    The deception contained in the aforementioned advertorials—along with many others—was explained in a letter from a Senior Scientist at the Office of U.S. Global Change Research Program to ExxonMobil's then-CEO Lee Raymond, detailing several ways in which an August 10, 2000 ExxonMobil advertorial in the *Washington Post* titled "Political cart before a scientific horse" was deceptive. That letter criticized characterizing a draft report of the *U.S. National Assessment of the Potential Consequences of Climate Variability and Change* as a "political document" when the "report was prepared by a panel of experts having no political connections and had been very carefully reviewed by technical experts to ensure objectivity."

147.    A common tactic in ExxonMobil's campaign of deception has been to falsely characterize scientific evidence as political.

148.   The aforementioned letter criticizing the characterization of scientific evidence as political described several other tactics ExxonMobil commonly used when communicating publicly about climate change in the conduct of selling oil and gas, including but not limited to: (1) advocating for doing more research to understand the problem of climate change while also arguing that it would be too expensive to deal with the problem; (2) using recommendations for more research as a substitute for taking affirmative steps on climate change when the scientific consensus recommended pursuing both simultaneously; (3) mischaracterizing scientific conclusions by changing the scientific basis of the conclusion (e.g., arguing that climate models cannot accurately make *predictions* when climate models are intended to make *projections* not predictions); (4) portraying two sides of a debate as evenly balanced when one side has the great weight of authority; and (5) claiming that the science failed to meet a benchmark that it did not intend or need to meet in order to be credible. The letter indicated that there were also other ways in which ExxonMobil's advertorials and other forms of disinformation were deceptive.

149.   ExxonMobil's advertising has also deceptively promoted ExxonMobil products and practices as environmentally beneficial.

150.   Despite the overwhelming evidence that fossil fuels contribute to climate change, ExxonMobil has engaged in "greenwashing" by claiming that certain of its products reduce carbon dioxide emissions and are environmentally sound.

151.   ExxonMobil has used greenwashing as a deceptive means of corporate promotion and advertising since the 1970s, but ExxonMobil increased its use of greenwashing after it discontinued its purchase of *New York Times* advertorials.

31

152.     ExxonMobil has engaged in greenwashing while failing to disclose that the development, production, refining and use of its fossil fuel products contributes to climate change.

153.     Upon information and belief, misleading advertising by ExxonMobil that portrays ExxonMobil products as environmentally sound has intentionally reached Connecticut consumers through print, television, radio and online platforms including social media.

154.     ExxonMobil's greenwashing advertisements include, but are not limited to, the following marketing campaigns: "Protect Tomorrow. Today;" "Energy Solutions;" "Energy Lives Here;" "That's Unexpected Energy;" and "The Future of Energy."

155.     An example of such a greenwashing advertisement—titled "Growing Fuel"—is a 30 second commercial that aired frequently on television and social media and can be easily found online. In it, a narrator claims that ExxonMobil is "farming" to grow "algae for biofuels that could one day power planes, propel ships, and fuel trucks and cut their greenhouse gas emissions in half." The narration is accompanied by images of crops growing in a field, green pools, green spheres representing young algae, and the Earth.

156.     ExxonMobil has made similar claims and used similar language regarding the use of algae as an example of its innovation in the development of alternative fuels in other advertising—including but not limited to an advertorial in the electronic edition of *The New York Times* titled, "The Future of Energy? It May Come From Where You Least Expect: How scientists are tapping algae and plant waste to fuel a sustainable energy future" and a marketing video on YouTube titled, "School of ExxonMobil: Algae Biofuel."

157.     As part of these greenwashed advertisements, ExxonMobil claims that it is "working to decrease our overall carbon footprint."

158.    At the same time that ExxonMobil is attempting to convince consumers to purchase its products with greenwashed advertising, ExxonMobil is simultaneously devoting resources to expanding exploration of potential new oil and gas reserves, which if used, will do irreparable harm to the climate. ExxonMobil has announced expansion in fossil fuel production at sites off Guyana and in Argentina, and it has publicly indicated plans for new oil and gas projects in the United States. ExxonMobil has further, upon information and belief, indicated interest in opportunities for drilling in the Arctic National Wildlife Refuge.

159.    The publication of greenwashed advertisements deceives reasonable consumers into believing that purchasing ExxonMobil products is a responsible choice because ExxonMobil is addressing climate change by investing in alternative energy sources.

160.    While ExxonMobil was airing "Growing Fuel" and similar greenwashed advertisements, the vast majority of ExxonMobil's research and development continued to be spent on finding, refining, and producing oil and gas that will eventually enter the market, be burned, and contribute to climate change. This practice continues today.

161.    Online, ExxonMobil claims that its goal is to be able to produce 10,000 barrels of algae biofuel per day by 2025.

162.    Even if ExxonMobil met its goal and produced 10,000 barrels a day of algae biofuel in 2025, that would be approximately 0.2 percent of its current refinery capacity.

163.    ExxonMobil spends less than one percent of its annual revenue on alternative energy research. As a consequence, ExxonMobil provides no more than nominal resources to alternative energy research.

164.    ExxonMobil's advertising that emphasizes its purported commitment to developing low carbon fuels does not mention that the low carbon fuels would—even in a best-

case scenario—only be a small fraction of ExxonMobil product, and many of the alternative fuels ExxonMobil is pursuing are many years away from being usable.

165. ExxonMobil also engages in greenwashing by advertising that certain of its fossil-fuel-based products can help consumers reduce greenhouse gas emissions and improve fuel economy.

166. Advertisements claiming that certain ExxonMobil products are environmentally sound have falsely given reasonable consumers the impression that purchasing ExxonMobil's products is an environmentally sound decision and that ExxonMobil is supportive of ambitious action to address climate change.

167. Through advertisements over the past four decades—and continuing today—ExxonMobil has deprived Connecticut consumers of accurate information about their purchasing decisions. Initially these tactics mostly focused on disinformation about climate science, whereas more recent advertising has sought to falsely induce purchases and brand affinity by portraying ExxonMobil as a company working on a solution to climate change through selling "green" products. These tactics have had a material effect on Connecticut consumers.

## VI.   THE REALITY OF CLIMATE CHANGE IN CONNECTICUT

168. The pre-industrial concentration of carbon dioxide in the atmosphere was approximately 280 parts per million ("ppm"). In 2020, the concentration exceeded 415 ppm.

169. Average global air temperature has risen approximately 1 degree Celsius above its pre-industrial level.

170. In 2018, the IPCC concluded that the Earth will experience 1.5 degrees Celsius warming between 2030 and 2052 if the current pace of greenhouse gas emissions continues.

171.    The increase in temperature and $CO_2$ in the atmosphere is attributable to human activity, including the burning of fossil fuels.

172.    Credible scientific evidence indicates—especially considering recent extreme weather events—that the catastrophic effects of climate change are occurring sooner than anticipated.

173.    Climate change has negatively impacted, is negatively impacting, and will continue to negatively impact Connecticut's people, lands, waters, coastline, infrastructure, fish and wildlife, natural resources, critical ecosystems, and other assets owned by or held in the public trust by the state of Connecticut and/or its municipalities.

174.    Climate change has caused, is causing, and will cause sea level rise, flooding, drought, an increase in extreme temperatures, a decrease in air quality, an increase in severe storms, contamination of drinking water, and an increase in certain disease-transmitting species.

175.    As a result of the negative impacts on Connecticut's environment, climate change has caused, is causing, and will cause an increase in illness, infectious disease and death.

176.    As a result of the negative impacts on Connecticut's environment, climate change has caused, is causing, and will cause serious damage to existing infrastructure, including but not limited to coastal and inland development, roadways, railways, dams, water and sewer systems, and other utilities.

177.    As a result of the negative impacts on Connecticut's environment, climate change has caused, is causing, and will cause serious detrimental economic impacts on the State of Connecticut, its people, businesses and municipalities, including but not limited to heat-related productivity losses, increased energy cost and consumption, and agriculture, tourism, and recreation losses.

178.     Even if the Earth continues at its current rate of warming, the State of Connecticut would have to expend at billions of dollars to adapt to the consequences of global warming.

179.     ExxonMobil's stated plans to continue exploring for new fossil fuel reserves and not to plan for a reduction in fossil fuel consumption for the next forty years will result in more greenhouse gases being emitted into the atmosphere and will cause more severe health, economic and environmental consequences to the State of Connecticut.

180.     ExxonMobil's business practices over at least the last thirty years have prevented or helped to slow the transition to cleaner alternative fuels through a campaign of deception and misleading consumers about the science of climate change, despite ExxonMobil's knowledge of the consequences associated with continuing to use its products.

181.     The State of Connecticut, its people, and its municipalities will have to expend billions of dollars to adapt and implement resilience measures to partially combat the ongoing negative effects of climate change.

## COUNT ONE

### *ExxonMobil's Campaign of Deception Violated Conn. Gen. Stat. § 42-110b.*

1-181.   Paragraphs 1 through 181 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 181 of this First Count as if fully set forth herein.

182.     At all times relevant to this Complaint, ExxonMobil was engaged in the conduct of trade or commerce by selling oil and gasoline through retailers and/or branded wholesalers located in Connecticut.

183.     By engaging in the acts and practices alleged herein, ExxonMobil made or caused to be made to Connecticut consumers, directly or indirectly, explicitly or by implication,

representations which are material and false or likely to mislead consumers when reasonably interpreted, including, but not limited to, the following:

    a.    that ExxonMobil was uncertain that climate change was real, occurring or would occur in the future;

    b.    that ExxonMobil was uncertain that human activity, including the combustion of fossil fuels, contributed to climate change;

    c.    that there was time to wait before taking action;

    d.    that there was a balanced debate amongst scientists about whether climate change was occurring, its relationship to human activity, and whether its effects would be positive or negative;

    e.    that ExxonMobil's research supported the assertions in (a) – (d).

184.    By engaging in acts and practices alleged herein, ExxonMobil made deceptive omissions and/or asserted deceptive half-truths about scientific facts and the scientific consensus regarding climate change in order to mislead Connecticut consumers about its knowledge regarding climate change and the industry, including, but not limited to, the following:

    a.    that scientists employed by ExxonMobil knew that human activity, including the combustion of fossil fuels, contributed to climate change;

    b.    that climate change has potentially catastrophic effects;

    c.    that use of ExxonMobil products contributes to climate change;

    d.    that ExxonMobil decided to emphasize the uncertainty as part of its disinformation campaign as a way to continue to profit off the sale of oil and gasoline;

    e.    that ExxonMobil knew that reduction of fossil fuel combustion was the primary realistic course of action to address climate change; and

    f.    that there was scientific consensus, including from ExxonMobil's own scientists, that the combustion of fossil fuels was contributing to climate change and that the effects could be devastating.

185.    The advertorials and disinformation in the Defendant's campaign of deception constituted a sophisticated public relations campaign for the purpose of increasing its sales and profits.

186.    The acts and practices alleged herein, when interpreted reasonably, were and are likely to affect Connecticut consumers' decisions or conduct.

187.    Through the conduct alleged herein, ExxonMobil achieved revenues, profits, and gains which it otherwise would not have.

188.    ExxonMobil violated Conn. Gen. Stat. § 42-110b by making false and/or misleading statements about its business practices and their environmental impact that were and are likely to deceive Connecticut consumers.

## COUNT TWO

### *ExxonMobil's Conduct in Count One was Willful.*

1-188.  Paragraphs 1 through 188 of the First Count are hereby repeated and realleged as Paragraphs 1 through 188 of this Second Count as if fully set forth herein.

189.    ExxonMobil engaged in the acts and practices alleged herein when it knew or should have known that its conduct was deceptive, in violation of Conn. Gen. Stat. § 42-110b (a), and, therefore, is liable for civil penalties of up to $5,000 per willful violation pursuant to Conn. Gen. Stat. § 42-110o (b).

## COUNT THREE

### *ExxonMobil's Campaign of Deception Constitutes*
### *Unfair Trade Practices in Violation of Conn. Gen. Stat. § 42-110b.*

1-188.  Paragraphs 1 through 188 of the First Count are hereby repeated and realleged as Paragraphs 1 through 188 of this Third Count as if fully set forth herein.

189.     ExxonMobil's unfair acts and practices were in contravention of Connecticut's public policy, including but not limited to the policy set forth in General Statutes § 22a-1, which states that "human activity must be guided by and in harmony with the system of relationships among the elements of nature. . . . [T]he policy of the state of Connecticut is to conserve, improve and protect its natural resources and environment and to control air, land, and water pollution in order to enhance the health, safety and welfare of the people of the state." The statute also provides that the state has a "responsibility as trustee of the environment for the present and future generations."

190.     ExxonMobil's unfair acts and practices were in contravention of Connecticut's public policy promoting truth in advertising.

191.     ExxonMobil's unfair acts and practices—including, but not limited to, the following—were immoral, unethical, oppressive and/or unscrupulous:

    a.     deceiving Connecticut consumers about the catastrophic health, safety, economic, and environmental effects of burning fossil fuels; and

    b.     undermining and delaying the creation of alternative technologies, driven by informed consumer choice, which could have avoided the most devastating effects of climate change.

192.     ExxonMobil's unfair acts and practices have directly and proximately caused substantial injury to consumers within the State of Connecticut.

193.     The substantial injury caused to consumers by ExxonMobil's unfair acts and practices is not outweighed by any countervailing benefits, but rather resulted in the stifling of an open marketplace for renewable energy, thereby leaving consumers unable to reasonably avoid the detrimental consequences of fossil fuel combustion.

194.     ExxonMobil's false and/or misleading statements about its business practices and their environmental impact constitute an unfair trade practice in violation of Conn. Gen. Stat. § 42-110b.

## COUNT FOUR

### *ExxonMobil's Conduct in Count Three was Willful.*

1-194.   Paragraphs 1 through 194 of the Third Count are hereby repeated and realleged as Paragraphs 1 through 194 of this Fourth Count as if fully set forth herein.

195.     ExxonMobil engaged in the acts and practices alleged herein when it knew or should have known that its conduct was unfair, in violation of Conn. Gen. Stat. § 42-110b (a), and, therefore, is liable for civil penalties of up to $5,000 per willful violation pursuant to Conn. Gen. Stat. § 42-110o (b).

## COUNT FIVE

### *ExxonMobil's Deceptive Greenwashing Campaigns Violated Conn. Gen. Stat. § 42-110b.*

1-181.   Paragraphs 1 through 181 of the Complaint are hereby repeated and realleged as Paragraphs 1 through 181 of this Fifth Count as if fully set forth herein.

182.     At all times relevant to this Complaint, ExxonMobil was engaged in the conduct of trade or commerce by selling oil and gasoline through retailers and/or branded wholesalers located in Connecticut.

183.     ExxonMobil has engaged in deceptive greenwashing campaigns to portray the company as environmentally conscious as part of the company's marketing strategy to sell oil and gasoline to Connecticut consumers.

184.     As part of these "greenwashing" campaigns, ExxonMobil has engaged in deceptive conduct, including but not limited to, the following:

a.      made false and/or misleading statements regarding ExxonMobil's activities and their effect on the climate and/or the environment;

b.      failed to disclose that the continued use of fossil fuels will have a negative impact on the climate;

c.      created an impression that the company is expending far more resources toward developing sustainable energy solutions than it actually is;

d.      failed to disclose that the amount of resources ExxonMobil is devoting to research and development of "green" technologies, including but not limited to algae production, is far exceeded by the amount of resources it is expending on exploration, extraction and refinement of oil;

e.      created a false impression that ExxonMobil is meaningfully addressing climate change through development of alternative energy resources;

f.      used words and imagery to give the appearance that ExxonMobil products are not environmentally harmful; and

g.      asserted half-truths about its products and practices and their environmental impact.

185.    ExxonMobil's "greenwashing" advertisements were and are a sophisticated public relations campaign for the purpose of increasing its sales and profits.

186.    The acts and practices alleged herein, when interpreted reasonably, were and are likely to affect Connecticut consumers' decisions or conduct.

187.    Through the conduct alleged herein, ExxonMobil achieved revenues, profits, and gains which it otherwise would not have.

188.    ExxonMobil violated Conn. Gen. Stat. § 42-110b by conducting false and misleading Greenwashing Campaigns likely to deceive Connecticut consumers.

## COUNT SIX

### *ExxonMobil's Conduct in Count Five was Willful.*

1-188.  Paragraphs 1 through 188 of the Fifth Count are hereby repeated and realleged as Paragraphs 1 through 188 of this Sixth Count as if fully set forth herein.

41

189.    ExxonMobil engaged in the acts and practices alleged herein when it knew or should have known that its conduct was deceptive, in violation of Conn. Gen. Stat. § 42-110b (a), and, therefore, is liable for civil penalties of up to $5,000 per willful violation pursuant to Conn. Gen. Stat. § 42-110o (b).

## COUNT SEVEN

### *ExxonMobil's Deceptive Greenwashing Campaigns Constitute Unfair Trade Practices in Violation of Conn. Gen. Stat. § 42-110b.*

1-188.    Paragraphs 1 through 188 of the Fifth Count are hereby repeated and realleged as Paragraphs 1 through 188 of this Seventh Count as if fully set forth herein.

189.    ExxonMobil's unfair acts and practices were in contravention of Connecticut's public policy, including but not limited to the policy set forth in General Statutes § 22a-1, which states that "human activity must be guided by and in harmony with the system of relationships among the elements of nature. . . . [T]he policy of the state of Connecticut is to conserve, improve and protect its natural resources and environment and to control air, land, and water pollution in order to enhance the health, safety and welfare of the people of the state." The statute also provides that the state has a "responsibility as trustee of the environment for the present and future generations."

190.    ExxonMobil's unfair greenwashing acts and practices were in contravention of Connecticut's public policy promoting truth in advertising.

191.    ExxonMobil's unfair greenwashing acts and practices—including, but not limited to, the following—were immoral, unethical, oppressive and/or unscrupulous:

   a.    deceiving Connecticut consumers about the catastrophic health, safety, economic, and environmental effects of burning fossil fuels; and

42

b.    undermining and delaying the creation of alternative technologies, driven by informed consumer choice, which could have avoided the most devastating effects of climate change.

192.    ExxonMobil's unfair acts and practices have directly and proximately caused substantial injury to consumers within the State of Connecticut.

193.    The substantial injury caused to consumers by ExxonMobil's unfair acts and practices is not outweighed by any countervailing benefits, but rather resulted in the stifling of an open marketplace for renewable energy thereby leaving consumers unable to reasonably avoid the detrimental consequences of fossil fuel combustion.

194.    ExxonMobil's false and misleading Greenwashing Campaigns constitute unfair trade practices in violation of Conn. Gen. Stat. § 42-110b.

## COUNT EIGHT

### *ExxonMobil's Conduct in Count Seven was Willful.*

1-194.    Paragraphs 1 through 194 of the Seventh Count are hereby repeated and realleged as Paragraphs 1 through 194 of this Eighth Count as if fully set forth herein.

195.    ExxonMobil engaged in the acts and practices alleged herein when it knew or should have known that its conduct was unfair, in violation of Conn. Gen. Stat. § 42-110b (a), and, therefore, is liable for civil penalties of up to $5,000 per willful violation pursuant to Conn. Gen. Stat. § 42-110o (b).

## VII.    PRAYER FOR RELIEF

WHEREFORE, the State of Connecticut requests the following relief:

1.      A finding that by the acts alleged herein, ExxonMobil engaged in unfair and deceptive acts and practices in the course of engaging in trade or commerce within the State of Connecticut in violation of the Connecticut Unfair Trade Practices Act;

2.      An injunction pursuant to Conn. Gen. Stat. § 42-110m enjoining ExxonMobil from engaging in any acts that violate the Connecticut Unfair Trade Practices Act, including, but not limited to, the deceptive acts and practices alleged herein;

3.      Equitable relief pursuant to Conn. Gen. Stat. § 42-110m for past, present and future deceptive acts and practices that will require future climate change mitigation, adaptation, and resiliency;

4.      An order pursuant to Conn. Gen. Stat. § 42-110m directing ExxonMobil to pay a civil penalty for $5,000 for each and every willful violation of the Connecticut Unfair Trade Practices Act;

5.      An order pursuant to Conn. Gen. Stat. § 42-110m directing ExxonMobil to pay restitution to the State for all expenditures attributable to ExxonMobil that the State has made and will have to make to combat the effects of climate change;

6.      An order pursuant to Conn. Gen. Stat. § 42-100m directing ExxonMobil to disgorge all revenues, profits, and gains achieved in whole or in part through the unfair acts or practices complained of herein;

7.      An order that ExxonMobil disclose all research and studies in its possession, including such research and studies previously conducted directly or indirectly by it, its

respective agents, affiliates, servants, officers, directors, employees, and all persons acting in concert with them, that relates to the issue of climate change;

8.    An order that ExxonMobil fund a corrective education campaign to remedy the harm inflicted by decades of disinformation, to be administered and controlled by the State or such other independent third party as the Court may deem appropriate;

9.    An order pursuant to Conn. Gen. Stat. § 42-100m directing ExxonMobil to pay reasonable attorney's fees to the State of Connecticut;

10.   Costs of suit; and

11.   Such other relief as this Court deems just and equitable.

PLAINTIFF
STATE OF CONNECTICUT

By: _____
WILLIAM M. TONG
Juris No. 440323
Attorney General
MATTHEW I. LEVINE
Juris No. 414845
DANIEL M. SALTON
Juris No. 437042
JONATHAN E. HARDING
Juris No. 434270
Assistant Attorneys General
BENJAMIN W. CHENEY
Juris No. 440801
Special Assistant Attorney General
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
Tel: (860) 808-5280
Fax: (860) 808-5386
matthew.levine@ct.gov
daniel.salton@ct.gov
jonathan.harding@ct.gov
benjamin.cheney@ct.gov

45

DOCKET NO:                                          RETURN DATE: October 13, 2020

STATE OF CONNECTICUT                  :            SUPERIOR COURT
                                                   :
V.                                                 :            J.D. OF HARTFORD
                                                   :            AT HARTFORD
EXXON MOBIL CORPORATION               :
                                                   :            SEPTEMBER 14, 2020

## STATEMENT OF AMOUNT IN DEMAND

The Plaintiff states that the amount in demand is greater than Fifteen Thousand Dollars

($15,000), exclusive of interest and costs.

PLAINTIFF
STATE OF CONNECTICUT

By:

WILLIAM M. TONG
Juris No. 440323
Attorney General
MATTHEW I. LEVINE
Juris No. 414845
DANIEL M. SALTON
Juris No. 437042
JONATHAN E. HARDING
Juris No. 434270
Assistant Attorneys General
BENJAMIN W. CHENEY
Juris No. 440801
Special Assistant Attorney General
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
Tel: (860) 808-5280
Fax: (860) 808-5386
matthew.levine@ct.gov
daniel.salton@ct.gov
jonathan.harding@ct.gov
benjamin.cheney@ct.gov

46

STATE OF CONNECTICUT }
                          } SS:  HARTFORD,            SEPTEMBER 14, 2020
COUNTY OF HARTFORD  }

    Then and by virtue hereof, on the 14th day of September, 2020, I made due and legal service on the within named Defendant, **EXXON MOBIL CORPORATION,** I left a verified true and attested copy of the within original **Writ, Summons, Complaint, and Statement of Amount in Demand,** with and in the hands of Deneen L. Seifel, duly authorized to accept for  Corporation Service Company, Agent For Service for said Defendant, at Updike, Kelly & Spellacy, P.C., 100 Pearl Street, in the City of Hartford.

    The within is the original, **Writ, Summons, Complaint, and Statement of Amount in Demand,** with my doings hereon endorsed.

FEES:                                     ATTEST:

Pages         $ 47.00
Endorsements   1.60
Service          40.00                  ALEX J. RODRIGUEZ
Travel           1.15                  STATE MARSHAL
                                       HARTFORD COUNTY

Total         $ 89.75

ORDER   427017

DOCKET NO: HHDCV206132568S

SUPERIOR COURT

STATE OF CONNECTICUT
   V.
EXXON MOBIL CORPORATION

JUDICIAL DISTRICT OF HARTFORD
   AT HARTFORD

10/5/2020

ORDER

ORDER REGARDING:
09/16/2020 101.00 PRESIDING JUDGE REFERRAL TO COMPLEX LITIGATION DOCKET

The foregoing, having been considered by the Court, is hereby:

ORDER:

At the request of the Civil Presiding Judge, the above case is designated as a complex litigation case and it is hereby ordered transferred to the Complex Litigation Docket in the Judicial District of Hartford pursuant to C.G.S. §51-347b(a), the court having determined that such a transfer is required for the efficient operations of the courts and to insure the prompt and proper administration of justice.

Judicial Notice (JDNO) was sent regarding this order.

427017
_____

Judge: JAMES WILSON ABRAMS

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

# APPEARANCE

JD-CL-12 Rev. 1-12
P.B. §§ 3-1 thru 3-6, 3-8, 10-13, 25A-2

STATE OF CONNECTICUT
**SUPERIOR COURT**
*www.jud.ct.gov*

**Instructions —** *See Back/Page 2*

### Notice To Self-Represented Parties

*A self-represented party is a person who represents himself or herself. If you are a self-represented party and you filed an appearance before and you have since changed your address, you must let the court and all attorneys and self-represented parties of record know that you have changed your address by checking the box below:*

☐ I am filing this appearance to let the court and all attorneys and self-represented parties of record know that I have changed my address. My new address is below.

| Return date |
|---|
| **Oct-13-2020** |

| Docket number |
|---|
| **HHD-CV-20-6132568-S** |

**Name of case** *(Full name of Plaintiff vs. Full name of Defendant)*

### STATE OF CONNECTICUT v. EXXON MOBIL CORPORATION

| ☒ Judicial District | ☐ Housing Session | ☐ Small Claims | ☐ Geographic Area number | Address of Court *(Number, street, town and zip code)* |
|---|---|---|---|---|
| | | | | **95 WASHINGTON STREET HARTFORD, CT 06106** |

Scheduled Court date *(Criminal/Motor Vehicle Matters)*

## Please Enter the Appearance of

| Name of self-represented party *(See "Notice to Self-Represented Parties" at top)*, or name of official, firm, professional corporation, or individual attorney | Juris number of attorney or firm |
|---|---|
| **MATTHEW I LEVINE** | **414845** |

| **Mailing Address** *(Number, street) (Notice to attorneys and law firms - The address to which papers will be mailed from the court is the one registered or affiliated with your juris number. That address cannot be changed in this form.)* | Post office box | Telephone number *(Area code first)* |
|---|---|---|
| **AG-ENVIRONMENT 165 CAPITOL AVE 5TH FLR** | | **860-808-5250** |

| City/town | State | Zip code | Fax number *(Area code first)* | E-mail address |
|---|---|---|---|---|
| **HARTFORD** | **CT** | **06106** | **860-808-5386** | **matthew.levine@ct.gov** |

in the case named above for: *("x" one of the following parties; if this is a Family Matters case, also indicate the scope of your appearance)*

☒ The Plaintiff *(includes the person suing another person).*
☐ All Plaintiffs.
☐ The following Plaintiff(s) only: _____
☐ The Defendant *(includes the person being sued or charged with a crime).*
☐ The Defendant for the purpose of the bail hearing only *(in criminal and motor vehicle cases only).*
☐ All Defendants.
☐ The following Defendant(s) only: _____
☐ Other *(Specify):* _____
☐ This is a Family Matters case and my appearance is for: *("x" one or both)*
    ☐ matters in the Family Division of the Superior Court      ☐ Title IV-D Child Support matters

*Note: If other counsel or a self-represented party has already filed an appearance for the party or parties "x'd" above, put an "x" in box 1 or 2 below:*

1. ☐ This appearance is in place of the appearance of the following attorney, firm or self-represented party on file *(P.B. Sec. 3-8):* _____
2. ☒ This appearance is in addition to an appearance already on file.          *(Name and Juris Number)*

**I agree to accept papers (service) electronically in this case under Practice Book Section 10-13**   ☒ Yes   ☐ No

| Signed *(Individual attorney or self-represented party)* | Name of person signing at left *(Print or type)* | Date signed |
|---|---|---|
| ▶ 414845 | **MATTHEW I LEVINE** | **Sep 14 2020** |

## Certification

I certify that a copy of this document was mailed or delivered electronically or non-electronically on *(date)* **Sep 14 2020** to all attorneys and self-represented parties of record and that written consent for electronic delivery was received from all attorneys and self-represented parties receiving electronic delivery.

| Name and address of each party and attorney that copy was mailed or delivered to* | For Court Use Only |
|---|---|
| **BENJAMIN CHENEY - AG-ENVIRONMENT/165 CAPITOL AVE 5TH FLR/HARTFORD, CT 06106** **EXXON MOBIL CORPORATION (No Appearance) - Corporation Service Company, 100 Pearl Street, 17th Floor, Hartford, CT 06103** | |

| Signed *(Signature of filer)* | Print or type name of person signing | Date signed | Telephone number |
|---|---|---|---|
| ▶ 414845 | **MATTHEW I LEVINE** | **Sep 14 2020** | **860-808-5250** |

*If necessary, attach an additional sheet or sheets with the name of each party and the address which the copy was mailed or delivered to.

# APPEARANCE

JD-CL-12 Rev. 1-12
P.B. §§ 3-1 thru 3-6, 3-8, 10-13, 25A-2

STATE OF CONNECTICUT
**SUPERIOR COURT**
*www.jud.ct.gov*

**Instructions —** *See Back/Page 2*

### *Notice To Self-Represented Parties*
*A self-represented party is a person who represents himself or herself. If you are a self-represented party and you filed an appearance before and you have since changed your address, you must let the court and all attorneys and self-represented parties of record know that you have changed your address by checking the box below:*

☐ *I am filing this appearance to let the court and all attorneys and self-represented parties of record know that I have changed my address. My new address is below.*

| Return date |
|---|
| **Oct-13-2020** |
| Docket number |
| **HHD-CV-20-6132568-S** |

**Name of case** *(Full name of Plaintiff vs. Full name of Defendant)*

### STATE OF CONNECTICUT  v. EXXON MOBIL CORPORATION

| ☒ Judicial District | ☐ Housing Session | ☐ Small Claims | ☐ Geographic Area number | Address of Court *(Number, street, town and zip code)* |
|---|---|---|---|---|
| | | | | **95 WASHINGTON STREET HARTFORD, CT 06106** |

Scheduled Court date *(Criminal/Motor Vehicle Matters)*

## Please Enter the Appearance of

| Name of self-represented party *(See "Notice to Self-Represented Parties" at top)*, or name of official, firm, professional corporation, or individual attorney | Juris number of attorney or firm |
|---|---|
| **JONATHAN EDWARD HARDING** | **434270** |

| **Mailing Address** *(Number, street) (Notice to attorneys and law firms - The address to which papers will be mailed from the court is the one registered or affiliated with your juris number. That address cannot be changed in this form.)* | Post office box | Telephone number *(Area code first)* |
|---|---|---|
| **AG-ENVIRONMENT 165 CAPITOL AVE 5TH FLR** | | **860-808-5250** |

| City/town | State | Zip code | Fax number *(Area code first)* | E-mail address |
|---|---|---|---|---|
| **HARTFORD** | **CT** | **06106** | **860-808-5386** | **Jonathan.Harding@ct.gov** |

in the case named above for: *("x" one of the following parties; if this is a Family Matters case, also indicate the scope of your appearance)*

☒ The Plaintiff *(includes the person suing another person).*
☐ All Plaintiffs.
☐ The following Plaintiff(s) only: _____
☐ The Defendant *(includes the person being sued or charged with a crime).*
☐ The Defendant for the purpose of the bail hearing only *(in criminal and motor vehicle cases only).*
☐ All Defendants.
☐ The following Defendant(s) only: _____
☐ Other *(Specify):* _____
☐ This is a Family Matters case and my appearance is for: *("x" one or both)*
   ☐ matters in the Family Division of the Superior Court   ☐ Title IV-D Child Support matters

*Note: If other counsel or a self-represented party has already filed an appearance for the party or parties "x'd" above, put an "x" in box 1 or 2 below:*

1. ☐ This appearance is in place of the appearance of the following attorney, firm or self-represented party on file *(P.B. Sec. 3-8):* _____

2. ☒ This appearance is in addition to an appearance already on file. *(Name and Juris Number)*

| **I agree to accept papers (service) electronically in this case under Practice Book Section 10-13** | ☒ **Yes** | ☐ **No** |
|---|---|---|

| Signed *(Individual attorney or self-represented party)* | Name of person signing at left *(Print or type)* | Date signed |
|---|---|---|
| ▶ **434270** | **JONATHAN EDWARD HARDING** | **Sep 14 2020** |

## Certification

I certify that a copy of this document was mailed or delivered electronically or non-electronically on *(date)* **Sep 14 2020**   to all attorneys and self-represented parties of record and that written consent for electronic delivery was received from all attorneys and self-represented parties receiving electronic delivery.

Name and address of each party and attorney that copy was mailed or delivered to*

| | For Court Use Only |
|---|---|
| **MATTHEW LEVINE - AG-ENVIRONMENT/165 CAPITOL AVE 5TH FLR/HARTFORD, CT 06106**<br>**BENJAMIN CHENEY - AG-ENVIRONMENT/165 CAPITOL AVE 5TH FLR/HARTFORD, CT 06106** | |

| Signed *(Signature of filer)* | Print or type name of person signing | Date signed | Telephone number |
|---|---|---|---|
| ▶ **434270** | **JONATHAN EDWARD HARDING** | **Sep 14 2020** | **860-808-5250** |

*If necessary, attach an additional sheet or sheets with the name of each party and the address which the copy was mailed or delivered to.

**Continuation of JDCL12 Appearance Form for HHD-CV-20-6132568-S**

**Submitted By JONATHAN EDWARD HARDING (434270)**

**Certification of Service (Continued from JDCL12)**

**Name and Address at which service was made:**

EXXON MOBIL CORPORATION (No Appearance) - Corporation Service Company, 100 Pearl Street, Hartford, CT 06103

**\*\*\*\*\* End of Certification of Service \*\*\*\*\***

# APPEARANCE

JD-CL-12 Rev. 1-12
P.B. §§ 3-1 thru 3-6, 3-8, 10-13, 25A-2

### STATE OF CONNECTICUT
## SUPERIOR COURT
*www.jud.ct.gov*

**Instructions — *See Back/Page 2***

### Notice To Self-Represented Parties
*A self-represented party is a person who represents himself or herself. If you are a self-represented party and you filed an appearance before and you have since changed your address, you must let the court and all attorneys and self-represented parties of record know that you have changed your address by checking the box below:*

☐ I am filing this appearance to let the court and all attorneys and self-represented parties of record know that I have changed my address. My new address is below.

| Return date |
| --- |
| **Oct-13-2020** |
| Docket number |
| **HHD-CV-20-6132568-S** |

**Name of case** *(Full name of Plaintiff vs. Full name of Defendant)*

### STATE OF CONNECTICUT  v. EXXON MOBIL CORPORATION

| ☒ Judicial District | ☐ Housing Session | ☐ Small Claims | ☐ Geographic Area number | Address of Court *(Number, street, town and zip code)* |
| --- | --- | --- | --- | --- |
| | | | | **95 WASHINGTON STREET HARTFORD, CT 06106** |

Scheduled Court date *(Criminal/Motor Vehicle Matters)*

## Please Enter the Appearance of

| Name of self-represented party *(See "Notice to Self-Represented Parties" at top)*, or name of official, firm, professional corporation or individual attorney | Juris number of attorney or firm |
| --- | --- |
| **DANIEL MATTHEW SALTON** | **437042** |

| **Mailing Address** *(Number, street) (Notice to attorneys and law firms - The address to which papers will be mailed from the court is the one registered or affiliated with your juris number. That address cannot be changed in this form.)* | Post office box | Telephone number *(Area code first)* |
| --- | --- | --- |
| **AG-ENVIRONMENT 165 CAPITOL AVE 5TH FLR** | | **860-808-5250** |

| City/town | State | Zip code | Fax number *(Area code first)* | E-mail address |
| --- | --- | --- | --- | --- |
| **HARTFORD** | **CT** | **06106** | **860-808-5386** | **Daniel.Salton@ct.gov** |

in the case named above for: *("x" one of the following parties; if this is a Family Matters case, also indicate the scope of your appearance)*

- ☒ The Plaintiff *(includes the person suing another person).*
- ☐ All Plaintiffs.
- ☐ The following Plaintiff(s) only: _____
- ☐ The Defendant *(includes the person being sued or charged with a crime).*
- ☐ The Defendant for the purpose of the bail hearing only *(in criminal and motor vehicle cases only).*
- ☐ All Defendants.
- ☐ The following Defendant(s) only: _____
- ☐ Other *(Specify):* _____
- ☐ This is a Family Matters case and my appearance is for: *("x" one or both)*
  - ☐ matters in the Family Division of the Superior Court   ☐ Title IV-D Child Support matters

*Note: If other counsel or a self-represented party has already filed an appearance for the party or parties "x'd" above, put an "x" in box 1 or 2 below:*

1. ☐ This appearance is in place of the appearance of the following attorney, firm or self-represented party on file *(P.B. Sec. 3-8):* _____  *(Name and Juris Number)*

2. ☒ This appearance is in addition to an appearance already on file.

| **I agree to accept papers (service) electronically in this case under Practice Book Section 10-13** | ☒ Yes | ☐ No |
| --- | --- | --- |

| Signed *(Individual attorney or self-represented party)* | Name of person signing at left *(Print or type)* | Date signed |
| --- | --- | --- |
| ▶ **437042** | **DANIEL MATTHEW SALTON** | **Sep 14 2020** |

## Certification

I certify that a copy of this document was mailed or delivered electronically or non-electronically on *(date)* **Sep 14 2020** to all attorneys and self-represented parties of record and that written consent for electronic delivery was received from all attorneys and self-represented parties receiving electronic delivery.

| Name and address of each party and attorney that copy was mailed or delivered to* | For Court Use Only |
| --- | --- |
| **MATTHEW LEVINE - AG-ENVIRONMENT/165 CAPITOL AVE 5TH FLR/HARTFORD, CT 06106**<br>**JONATHAN HARDING - AG-ENVIRONMENT/165 CAPITOL AVE 5TH FLR/HARTFORD, CT 06106** | |

| Signed *(Signature of filer)* | Print or type name of person signing | Date signed | Telephone number |
| --- | --- | --- | --- |
| ▶ **437042** | **DANIEL MATTHEW SALTON** | **Sep 14 2020** | **860-808-5250** |

*If necessary, attach an additional sheet or sheets with the name of each party and the address which the copy was mailed or delivered to.

**Continuation of JDCL12 Appearance Form for HHD-CV-20-6132568-S**

**Submitted By DANIEL MATTHEW SALTON (437042)**

**Certification of Service (Continued from JDCL12)**

**Name and Address at which service was made:**

BENJAMIN CHENEY - AG-ENVIRONMENT/165 CAPITOL AVE 5TH FLR/HARTFORD, CT 06106

EXXON MOBIL CORPORATION (No Appearance) - Corporation Service Company, 100 Pearl Street, Hartford, CT 06103

**\*\*\*\*\* End of Certification of Service \*\*\*\*\***

# EXHIBIT 13

DOCKET NO: X08-HHD-CV20-6132568-S

| | |
|---|---|
| STATE OF CONNECTICUT, by its Attorney General, William M. Tong, | SUPERIOR COURT |
| | COMPLEX LITIGATION DOCKET |
| Plaintiff, | JUDICIAL DISTRICT OF HARTFORD |
| v. | OCTOBER 14, 2020 |
| EXXON MOBIL CORPORATION, | |
| Defendant. | |

## <u>FILING OF NOTICE OF REMOVAL OF ACTION</u>

Defendant Exxon Mobil Corporation ("ExxonMobil") hereby files a copy of the Notice

of Removal (annexed hereto) filed October 14, 2020, in the United States District Court for the

District of Connecticut, as required by 28 U.S.C. § 1446(d).

Dated: October 14, 2020                    Respectfully submitted,

EXXON MOBIL CORPORATION,


By its attorneys,                          PAUL, WEISS, RIFKIND,
                                           WHARTON & GARRISON LLP
Patrick J. Conlon*
patrick.j.conlon@exxonmobil.com            Theodore V. Wells, Jr.*
22777 Springwoods Village Parkway          Daniel J. Toal*
Spring, TX 77389                           twells@paulweiss.com
Tel:  (832) 624-6336                       dtoal@paulweiss.com
                                           1285 Avenue of the Americas
WIGGIN & DANA LLP                          New York, NY 10019-6064
                                           Tel:  (212) 373-3000
*/s/ Kevin M. Smith*                       Fax:  (212) 757-3990
Kevin M. Smith
Tadhg Dooley                               Justin Anderson*
ksmith@wiggin.com                          janderson@paulweiss.com
tdooley@wiggin.com                         2001 K Street, NW
One Century Tower                          Washington, DC 20006-1047
265 Church Street                          Tel:  (202) 223-7300
New Haven, CT 06510-7001                   Fax:  (202) 223-7420
Tel: (203) 498-4400
Fax: (203) 782-2889                        *Pro hac vice* forthcoming

Robert M. Langer
rlanger@wiggin.com
20 Church Street
Hartford, CT 06103-1250
Tel: (860) 297-3700
Fax: (860) 297-3799

## CERTIFICATE OF SERVICE

I hereby certify that, on this 14th day of October 2020, a copy of the foregoing Filing of

Notice of Removal of Action was served by electronic mail to the following counsel of record:

WILLIAM M. TONG
MATTHEW I. LEVINE
DANIEL M. SALTON
JONATHAN E. HARDING
BENJAMIN W. CHENEY
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
Tel: (860) 808-5280
Fax: (860) 808-5386
matthew.levine@ct.gov
daniel.salton@ct.gov
jonathan.harding@ct.gov
benjamin.cheney@ct.gov

/s/  Kevin M. Smith
Kevin M. Smith