# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STATE OF CONNECTICUT, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:20-cv-1555 (JCH) |
| | : | |
| v. | : | |
| | : | |
| EXXON MOBIL CORPORATION, | : | |
| Defendant. | : | JUNE 2, 2021 |
| | : | |
| | : | |

## RULING ON MOTION TO REMAND (DOC. NO. 36)

### I.    INTRODUCTION

Plaintiff, the State of Connecticut, has moved for an order remanding the case to
the Superior Court of Connecticut and awarding costs and attorneys' fees.  See Pl.'s.
Mot. to Remand to Superior Court and for Costs and Fees ("Pl.'s Mot.") (Doc. No. 36).
Defendant, Exxon Mobil Corporation ("ExxonMobil") opposes this Motion.  See Br. of
Def. in Opp'n to Pl.'s Mot. to Remand ("Def.'s Opp'n") (Doc. No. 37).  The court heard
argument in connection with the Motion on May 21, 2021.  See Min. Entry (Doc. No.
51).

For the reasons stated below, the court grants the Motion to Remand and denies
Connecticut's request for costs and fees.

### II.    BACKGROUND

#### A.    Allegations in the Complaint

ExxonMobil is a "multinational energy and chemicals company" incorporated in
New Jersey, with its principal place of business in Texas.  Ex. 12, Notice of Removal

("Compl.") (Doc. 1-2 at 34-78) ¶ 47.[1]  ExxonMobil manufactures, transports, and sells a variety of fossil fuels, such as crude oil, natural gas, and petroleum products.  Id. ¶¶ 53-54.  ExxonMobil has sold substantial quantities of fossil fuels in Connecticut, including through gas stations.  Id. ¶¶ 59-60.

At least as early as 1957, ExxonMobil has been aware of research indicating that the combustion of fossil fuels causes dangerous changes to the Earth's climate.  Id. ¶¶ 63-95.  This research includes materials created by Exxon's own employees warning that emissions attributable to fossil fuels "would cause climate variations including a mean temperature increase."  Id. ¶¶ 64, 68-70.

In an effort to resist potential decreases in its revenue that might result from widespread acceptance of the conclusion ExxonMobil itself understood--the causal connection between the combustion of fossil fuels and climate change--ExxonMobil published statements casting doubt on this connection.  Id. ¶¶ 96-167.  These statements took various forms, including advertisements, interviews, and research papers.  Id. ¶¶ 100-03.  For example, between 1972 and 2001, ExxonMobil published advertisements in the New York Times, a newspaper circulated to tens of thousands of Connecticut residents, nearly every week.  Id. ¶¶ 137-39.  One such advertisement, published in 1984, disparaged a scientific theory linking fossils fuels to melting polar ice caps and rising sea levels as "[l]ies they tell our children" and a "myth of the 1960s and 1970s."  Id. ¶ 144(a).  Another, published in 1997, warned readers that efforts to

---

[1] The Complaint uses the label "ExxonMobil" to refer to both Exxon Mobil Corporation and its predecessor entities.  Compl. ¶¶ 50-51.

respond to the threat of climate change were based on "speculation" and not on "science." Id. ¶ 144(h).

    B.    <u>Procedural Background</u>

    Connecticut, through its Office of the Attorney General, filed its Complaint in the Superior Court of Connecticut on September 24, 2020. <u>See</u> Compl. The Complaint asserts eight claims under the Connecticut Unfair Trade Practices Act ("CUTPA"). <u>Id.</u> at 38-43.[2]

    Count One alleges that ExxonMobil made false and/or misleading statements likely to deceive Connecticut consumers, in order to increase its profits, in violation of section 42-110b of the Connecticut General Statutes. <u>Id.</u> at 36-38. Count Three alleges that ExxonMobil's statements, by "stifling [ ] an open marketplace for renewable energy, [and] thereby leaving consumers unable to reasonably avoid the detrimental consequences of fossil fuel combustion", contravened Connecticut's public policy and constituted an unfair trade practice, also in violation of section 42-110b. <u>Id.</u> at 38-40. Counts Five and Seven assert that a subset of the statements that ExxonMobil made, which Connecticut labels as "greenwashing", <u>i.e.</u>, "deceptive [ ] campaigns to portray the company as environmentally conscious", constituted deceptive (Count Five) and unfair (Count Seven) practices, again in violation of section 42-110b. <u>Id.</u> at 40-43. Counts Two, Four, Six, and Eight allege that ExxonMobil's conduct was willful, triggering penalties under section 42-110o. <u>Id.</u> at 38, 40-43. Connecticut seeks damages,

_____

[2] The Complaint repeats certain paragraph numbers. The court cites to page numbers in the Complaint when necessary to avoid confusion.

disgorgement of revenues and profits, and multiple forms of injunctive relief, including an order requiring ExxonMobil to "fund a corrective education campaign to remedy the harm inflicted by decades of disinformation." Id. at 44-45.

On October 14, 2020, ExxonMobil filed its Notice of Removal. See Notice of Removal. In addition to listing several grounds for removal, the Notice of Removal asserts that, "[w]hile purportedly brought under state law and in the name of consumer protection, this lawsuit . . . is the latest product of a multi-year plan . . . to change federal climate and energy policy." Id. at 1-2.

Connecticut filed its Motion to Remand on December 2, 2020.[3] See Pl.'s Mot. ExxonMobil filed its Opposition on January 18, 2021. See Def.'s Opp'n. Connecticut filed a Reply on February 8, 2021. See Pl.'s Reply in Supp. of Mot. to Remand ("Pl.'s Reply") (Doc. No. 38). In addition, the parties have filed Notices of Additional Authority, in which they bring to the court's attention decisions by other district courts granting motions to remand in cases involving overlapping issues, as well as a recent decision by the Second Circuit concerning preemption of state nuisance claims pertaining to climate change. See Notices (Docs. Nos. 39, 41, 42, 46, 47).

## III.   STANDARD OF REVIEW

The federal removal statute permits removal of any "civil action [that] includes . . . a claim arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1441(c). Defendants bear the burden of proving that removal is proper. O'Donnell v.

---

[3] ExxonMobil filed a Motion to Dismiss for Lack of Personal Jurisdiction on November 13, 2020. See Mot. to Dismiss (Doc. No. 35). This Ruling does not address that Motion.

AXA Equitable Life Ins. Co., 887 F.3d 124, 128 (2d Cir. 2018) (citation omitted); see

Syngenta Crop Prot., Inc. v. Henson, 537 U.S. 28, 32 (2002) ("The right of removal is

entirely a creature of statute and a suit commenced in state court must remain there

until cause is shown for its transfer under some act of Congress." (citation and internal

quotation marks omitted)).

## IV.   DISCUSSION

### A.   The Well-Pleaded Complaint Rule

ExxonMobil argues that removal of this case is proper, because "federal common

law necessarily and exclusively governs claims for interstate and international pollution."

Def.'s Opp'n at 16-17.  Underlying ExxonMobil's primary arguments for removal is an

insistence that Connecticut's claims in this case, though labeled as claims for deceptive

and unfair practices under CUTPA, are not all that they seem.  In effect, ExxonMobil

asks the court to view Connecticut's claims as more akin to nuisance claims that seek to

regulate emissions of pollutants through common-law tort liability rules.

This request for the court to look past Connecticut's characterization of its own

Complaint is in tension with Supreme Court precedents concerning removal.  Section

1441(a) of title 28 authorizes removal of a "civil action brought in a State court of which

the district courts of the United States have original jurisdiction."  28 U.S.C. § 1441(a).

The Supreme Court has described this provision as limiting removal to "state-court

actions that originally could have been filed in federal court."  Caterpillar Inc. v. Williams,

482 U.S. 386, 392 (1987).  Thus, according to the Court, in the" [a]bsen[ce] [of] diversity

[jurisdiction] . . . federal jurisdiction exists only when a federal question is presented on

the face of the plaintiff's properly pleaded complaint." <u>Id.</u>  This rule is known as the "well-pleaded complaint rule." <u>Id.</u>

Two aspects of the well-pleaded complaint rule have significant implications for this case.  First, it is beyond dispute that the well-pleaded complaint rule can prevent removal of cases that involve dispositive questions of federal law.  As the Supreme Court has explained, "it is [ ] settled law that a case may <u>not</u> be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated by the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." <u>Id.</u> at 393 (citation omitted). Thus, unless a defendant can show that a recognized exception to the well-pleaded complaint rule applies, a defendant's argument that a case involves an issue of federal law--even a dispositive issue of federal law--is not sufficient to remove a case under section 1441(a).

Second, it also well settled that "[t]he well-pleaded complaint] rule makes the plaintiff the master of the claim." <u>Id.</u> at 392.  This principle is no mere abstraction: the Supreme Court has expressly observed that a plaintiff "may avoid federal jurisdiction by exclusive reliance on state law." <u>Id.</u>  In other words, section 1441(a) afford plaintiffs a degree of strategic control over whether a case will be litigated in state or federal court. Such strategic considerations do not amount to nefarious gamesmanship; they are a direct and recognized result of the text of section 1441(a), as interpreted by the Supreme Court.

With these principles in mind, the court briefly comments on the nature of Connecticut's claims, before discussing the recognized exceptions to the well-pleaded

complaint rule, which are also referred to as corollaries to the rule.  Connecticut's
Complaint asserts claims for deceptive and unfair practices under CUTPA.  See Compl.
at 36-43.  The claims are asserted pursuant to section 42-110b of the Connecticut
General Statutes, and they comprise distinct elements.  A deceptive practice claim
requires a plaintiff to allege (1) "a representation, omission, or other practice likely to
mislead consumers"; (2) that is interpreted "reasonably under the circumstances" by a
consumer"; (3) and that is material, i.e., "likely to affect consumer decisions or conduct."
Langan v. Johnson & Johnson Consumer Cos., Inc., 95 F. Supp. 3d 284, 288 (D. Conn.
2015) (quoting Smithfield Assocs., LLC v. Tolland Bank, 86 Conn. App. 14, 28 (2004)).
With regard to unfair practice claims, Connecticut courts have adopted the "cigarette
rule" articulated by the Federal Trade Commission ("FTC").  Ulbrich v. Groth, 310 Conn.
375, 409 (2013) (citation omitted).  Under this approach, a plaintiff must allege that a
practice (1) "offends public policy as it has been established by statutes, the common
law, or otherwise"; (2)" is immoral, unethical, oppressive, or unscrupulous: (3) or
"causes substantial injury to consumers."  Id.  As the Connecticut Supreme Court has
explained, "[a] practice may be unfair because of the degree to which it meets one of
the[se] criteria or because to a lesser extent it meets all three."  Id. (citation omitted).

These causes of action regulate the manner by which business interact with
consumers.  Consistent with the nature of these claims, Connecticut's claims seek
redress for the allegedly deceptive and unfair manner by which ExxonMobil interacted
with Connecticut consumers.  See supra at 2-3.  In short, Connecticut alleges that
ExxonMobil lied to Connecticut consumers, and that these lies affected the behavior of
those consumers.

The fact that the alleged lies were <u>about</u> the impacts of fossil fuels on the Earth's climate does not empower the court to rewrite the Complaint and substitute other claims for Connecticut's CUTPA claims.[4]  Nor does the possibility that Connecticut might have considered including other claims, but declined to do so, permit the court to rewrite the Complaint to add such claims.  The court is aware that other states have asserted common-law nuisance and trespass claims against ExxonMobil and other producers of fossil fuels.  <u>See, e.g.</u>, <u>City of New York v. Chevron</u>, 993 F.3d 81, 88 (2d Cir. 2021).  But Connecticut has not asserted such claims in this case.  Unless one of the recognized exceptions discussed below applies, 'the plaintiff [is] the master of the claim."  <u>See</u> <u>Caterpillar Inc.</u>, 482 U.S. at 392.

### 1.    Federal Common Law and Complete Preemption

Under the "'complete pre-emption' doctrine," the "pre-emptive force of a [federal] statute" can be "so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'"  <u>Caterpillar Inc.</u>, 482 U.S. at 393 (quoting <u>Metro. Life Ins. Co. v. Taylor</u>, 481 U.S. 58, 65 (1987)).  In other words, "[o]nce an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law."  <u>Id.</u> (citing

---

[4] During oral argument, the parties raised the broad language of Connecticut's fifth request for of relief: "An order pursuant to Conn. Gen. Stat. § 42-110m directing ExxonMobil to pay restitution to the State for all expenditures attributable to ExxonMobil that the State has made and will have to make to combat the effects of climate change." <u>See</u> Compl. at 44.  The court construes this request for relief as seeking restitution only for expenditures attributable to ExxonMobil's allegedly deceptive and unfair practices in marketing its products, as alleged in the Complaint.  Plainly, the court cannot award relief corresponding with conduct that goes beyond the claims in the Complaint.

Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal., 463 U.S. 1, 24 (1983)).

ExxonMobil's argument "that federal common law necessarily and exclusively governs claims for interstate and international pollution", Def.'s Opp'n at 17, parallels the complete preemption doctrine.  See Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 11 (2003) ("Because [sections] 85 and 86 provide the exclusive cause of action for such claims, there is, in short, no such thing as a state-law claim of usury against a national bank.").  However, perhaps recognizing that the Supreme Court has only applied complete preemption to claims arising under federal statutes, and that the Second Circuit has indicated that the only case in which it ever determined that federal common law can give rise to complete preemption is no longer good law, ExxonMobil insists that its "invocation of federal common law . . . is not an argument for complete preemption." See Def.'s Opp'n at 17 n.21 (emphasis added).  Thus, ExxonMobil's argument raises the issue of whether federal common law can convert state claims into federal claims in the same manner as complete preemption under federal statutes.

ExxonMobil's Opposition to the Motion to Remand cites scant authority in support of this proposition.[5]  See Def.'s Opp'n at 16-18.  In Sam L. Majors Jewelers v. ABX, Inc., 117 F.3d 922 (5th Cir. 1997), the Fifth Circuit stated that, notwithstanding the well-pleaded complaint rule, removal is proper if a "cause of action arises under federal

---

[5] The two Supreme Court decisions cited by ExxonMobil are inapposite.  In City of Milwaukee v. Illinois, 451 U.S. 304 (1981), the Complaint had been filed in federal court, id. at 310, and removal was therefore not an issue.  In Standard Fire Insurance Co. v. Knowles, 568 U.S. 588 (2013), the Court addressed whether a plaintiff can evade the scope of the Class Action Fairness Act of 2005 by stipulating that the plaintiff "will not seek damages that exceed $5 million in total."  Id. at 590.

common law principles." Id. at 924.  However, the Fifth Circuit failed to identify any authority for that proposition.  See id.  Instead, the Fifth Circuit relied on decisions recognizing that federal question jurisdiction exists when a complaint filed in federal court asserts causes of action under federal common law.  See id. at 926 (citing Illinois v. City of Milwaukee, 406 U.S. 91, 100 (1972)) (other citations omitted).

Left undiscussed in Sam. L Majors Jewelers was the proposition, critical to ExxonMobil's argument in the current case, that a court may look past a complaint's labeling of a claim as arising under state law, despite the Supreme Court's declaration that the well-pleaded complaint rule "makes the plaintiff the master of the claim."  See Caterpillar Inc., 482 U.S. at 392.  This power of federal courts to "convert" a claim pleaded under state law into a federal claim is the essence of the complete preemption exception to the well-pleaded complaint rule.  See Metro. Life Ins. Co., 481 U.S. at 65 (observing that "extraordinary preemptive power" is required to "convert  [ ] an ordinary state common law complaint into one stating a federal claim for the purposes of the well-pleaded complaint rule").  In other words, the complete preemption doctrine permits courts to look past a plaintiff's labeling of a claim only in limited circumstances; it is a narrow exception to the general rule that the plaintiff--and not the defendant or the court--is "the master of the claim."  See Caterpillar Inc., 482 U.S. at 392.

The second case relied on by ExxonMobil, Associated X-Ray Corp. v. Federal Express Corp., No. 3:93-CV-2209 (AVC), 1994 WL 897156 (D. Conn. July 22, 1994), observed that, "[w]hen federal law preempts state law, the court may allow removal . . . even though the complaint appears to allege state law claims," and that district courts have "original jurisdiction over civil actions arising under federal common law."  Id. at *3.

10

However, as in <u>Sam L. Majors Jewelers</u>, the court did not cite any decisions holding that federal courts may disregard plaintiffs' characterizations of their claims in cases involving federal common law.  <u>See</u> <u>id.</u>

In a world without the well-pleaded complaint rule, ExxonMobil's position would be straightforward: federal courts should have jurisdiction over important issues of federal law.  The problem for ExxonMobil is that the well-pleaded complaint rule does in fact exist.  Through this rule, the Supreme Court has given substantial weight to the principle that "the plaintiff [is] the master of the claim."  <u>Caterpillar Inc.</u>, 482 U.S. at 392. Again, it is beyond dispute that the well-pleaded complaint rule can prevent removal in cases that involve dispositive issues of federal law.  <u>Id.</u> at 393.  In such cases, given the availability of a petition for a writ of certiorari from a state court of last resort, a defendant's ability to have a federal defense reviewed by a federal court is narrowed, but it is not extinguished.  28 U.S.C. § 1257(a).  The complete preemption doctrine bypasses this arrangement, but only when the "pre-emptive force of a [federal] statute . . . [is] 'extraordinary.'"  <u>Caterpillar Inc.</u>, 482 U.S. at 393.  A different system would be constitutionally permissible, but this court must respect and enforce "the federal-state balance approved by Congress."  <u>See</u> <u>Gunn v. Minton</u>, 568 U.S. 251, 258 (2013).

Although the Supreme Court has not expressly addressed whether a defendant may remove a case on the ground that purported state claims actually arise under federal common law, the Supreme Court's articulation of the complete preemption standard suggests that the Court views congressional intent, in relation to the text of a specific federal statute, as an essential prerequisite for overcoming the principle that a plaintiff is the master of a complaint.  In <u>Metropolitan Life Insurance Co.</u> and <u>Caterpillar</u>

11

Inc., the Supreme Court justified permitting courts to look past plaintiffs'

characterizations of claims on the ground that specific federal statutes evidenced clear

congressional intent to impose "extraordinary preemptive power." Metro. Life Ins. Co.,

481 U.S. at 65; Caterpillar Inc., 482 U.S. at 393. More recently, in Beneficial National

Bank v. Anderson, 539 U.S. 1 (2003), the Supreme Court provided the following

formulation:

> [A] state claim may be removed to federal court in only two circumstances--when
> Congress expressly so provides, such as in the Price-Anderson Act, or when a
> federal statute wholly displaces the state-law cause of action through complete
> pre-emption. When the federal statute completely pre-empts the state-law cause
> of action, a claim which comes within the scope of that cause of action, even if
> pleaded in terms of state law, is in reality based on federal law.

Id. at 8 (emphasis added) (internal citation omitted).

The Supreme Court's analysis of the particular claims at issue in Beneficial

National Bank is also instructive for the current dispute. In that case, the defendant

sought removal of state usury claims. Id. at 9. The Supreme Court examined whether

either of two sections of the National Bank Act justified removal of the state usury

claims. Id. The first provision at issue, section 85 of the National Bank Act, caps the

rates of interest that banks with national operations may charge. See 12 U.S.C. § 85.

The Supreme Court observed that this provision "unquestionably pre-empts any

common-law or [state] statutory rule that would treat [ ] rates [below the statutory limit]

as usurious." Beneficial Nat'l Bank, 539 U.S. at 9. However, because section 85 would

merely "provide the petitioners with a complete federal defense," section 85 alone

"would not justify removal." Id. (citations omitted).

12

Section 86 of the National Bank Act goes beyond capping interest rates. This provision establishes a private cause of action on the part of any person who pays "a rate of interest greater than is allowed by section 85." 12 U.S.C. § 86. The Supreme Court held that sections 85 and 86 together permit removal because they evidenced congressional intent to "supersede both the substantive and remedial provisions of state usury laws." Beneficial Nat'l Bank, 539 U.S. at 9-11. As a result, "there is, in short, no such thing a state-law claim of usury against a national bank." Id. at 11.

The Second Circuit, for its part, once recognized federal common law as a basis for removal under the complete preemption doctrine, but the Second Circuit later reconsidered this principle after the Supreme Court's decision in Metropolitan Life Insurance Co. In Nordlicht v. New York Telephone Co., 799 F.2d 859 (2d Cir. 1986), the Second Circuit held that removal of state-law fraud claims challenging a pricing scheme for phone calls was appropriate, because such claims "necessarily ar[o]se under federal common law." Id. at 862.

However, twelve years later, in Marcus v. AT&T Corp., 138 F.3d 46 (2d Cir. 1998), the Second Circuit rejected an argument that federal common law permitted removal of state-law claims relating to telecommunications, noting that the Supreme Court's decision in Metropolitan Life Insurance Co. "sharply circumscribed the availability of removal based on complete preemption." Id. at 54. The Second Circuit concluded:

> Thus, after Metropolitan Life, it is clear that the complete preemption doctrine applies only where Congress has clearly manifested an intent to disallow state law claims in a particular field.

Given the narrow scope of the complete preemption doctrine after <u>Metropolitan Life</u>, absent some express statement or other clear manifestation from Congress that it intends the complete preemption doctrine to apply, we believe that federal common law does not completely preempt state law claims in the area of interstate telecommunications.

<u>Id.</u>

Shortly thereafter, in <u>Fax Telecommunications Inc. v. AT&T</u>, 138 F.3d 479 (2d Cir. 1998), the Second Circuit again rejected an argument that federal common law enabled removal of state claims.  <u>Id.</u> at 486-87.  Moreover, the Second Circuit provided the following description of its holding in <u>Marcus</u>:

In <u>Marcus</u>, we reconsidered <u>Nordlicht</u> in light of the Supreme Court's opinion in <u>Metropolitan Life</u>, which limited the availability of complete preemption removal to "the very narrow range of cases where 'Congress has clearly manifested an intent' to make specific action within a particular area removable."

<u>Id.</u> at 486 (quoting <u>Marcus</u>, 138 F.3d at 54).  In this way, the Second Circuit made clear that its only decision squarely recognizing federal common law as a basis for removal no longer is good law.[6]  Further, the Second Circuit gave a clear indication that courts should apply complete preemption analysis to arguments for removal relating to federal common law.

_____

[6] In <u>Republic of Philippines v. Marcos</u>, 806 F.3d 344 (2d Cir. 1986), the Second Circuit stated that it was "probably" possible for "federal common law in the area of foreign affairs [to be] so 'powerful', or important as to displace a purely state cause of action of constructive trust."  <u>Id.</u> at 354.  However, acknowledging that it might be "wrong on this point", the Second Circuit ultimately rested its decision in that case on its determination that plaintiff's state-law claim "raises, as a necessary element," an issue of federal law. <u>i.e.</u>, what has come to be known as <u>Grable</u> jurisdiction.  <u>See id.</u>  The Second Circuit's discussion of federal common law as a basis for removal in <u>Republic of Philippines</u> was thus dicta.  <u>See</u> <u>Baraket v. Holder</u>, 632 F.3d 56, 59 (2d Cir. 2011) ("[I]t is not substantive discussion of a question or lack thereof that distinguishes holding from dictum, but rather whether resolution of the question is necessary for the decision of the case.").  Given the Second Circuit's reconsideration of <u>Nordlicht</u>, this court finds the dicta in <u>Republic of Philippines</u> concerning federal common law to be unpersuasive.

The parties have not identified, and the court has also been unable to find, any decision by the Second Circuit after <u>Nordlicht</u> holding that federal common law can provide a basis for removal.

Here, by arguing that "federal common law necessarily and exclusively governs" Connecticut's claims, Def.'s Opp'n at 17, ExxonMobil asks the court to conclude that there is no such thing as a CUTPA deceptive or unfair practice claim targeting the marketing interactions between a seller of fossil fuels and Connecticut consumers. ExxonMobil argues that "interstate and international pollution" is an area of law that is so saturated with federal interests and regulation that Connecticut's claims are therefore also "federal in nature." See Def.'s Opp'n at 17.  However, for the purposes of removal, there is a material difference between a state claim that a federal preemption defense "unquestionably" defeats and a state claim that has been replaced by a federal cause of action with extraordinary preemptive force: only the latter suffices for removal.[7]  See Beneficial Nat'l Bank, 539 U.S. at 9-11.  The Supreme Court has directed courts to scrutinize congressional intent and statutory text to distinguish between these two situations.  See id. at 9 ("Only if Congress intended [section] 86 to provide the exclusive cause of action for usury claims against national banks would the statute be comparable

---

[7] Indeed, the Second Circuit recently commented on the consequences of this distinction for other lawsuits that have been filed by states against producers of fossil fuels.  See City of New York, 993 F.3d at 94.  In that case, the Second Circuit, which possessed diversity jurisdiction, held that certain state nuisance and trespass claims are preempted by federal common law.  Id. at 90-94.  After articulating this decision, the Second Circuit "pause[d] [ ] to reconcile [its] conclusion with the parade of recent opinions holding that state-law claims for public nuisance brought against fossil fuel producers do not arise under federal law."  Id. at 93 (brackets, citations, and quotation marks omitted).

The Second Circuit observed that, "[t]he single issue before each of those federal courts was thus whether the defendants' anticipated defense could singlehandedly create federal-question jurisdiction under [section] 1331 in light of the well-pleaded complaint rule."  Id. at 94 (citing Caterpillar Inc., 482 U.S. at 398).  While the Second Circuit only mentioned these cases in passing, its description of these cases as concerning the effect of an "anticipated federal defense" suggests that the Second Circuit would not view the complete preemption doctrine as applicable in a similar case.  As explained above in this Ruling, the Supreme Court has held that a mere "complete federal defense", as contrasted with complete preemption, does "not justify removal."  Beneficial Nat'l Bank, 539 U.S. at 9 (citations omitted).  The court also notes that the Second Circuit's decision did not address state consumer protection claims.

to the provisions we construed in the <u>Avco</u> and <u>Metropolitan Life</u> cases.").  Federal common law provides no criteria by which a court can discern whether a federal cause of action carries the "extraordinary", <u>Caterpillar</u>, 482 U.S. at 393, degree of preemption needed for removal.

The strongest argument for altering this framework in the context of federal common law is the principle that defendants should be able to receive prompt review of dispositive issues of federal law, but the Supreme Court has made quite clear that the well-pleaded complaint rule can frustrate this principle.  <u>Caterpillar Inc.</u>, 482 U.S. at 393 ("[I]t is [ ] settled law that a case may <u>not</u> be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated by the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue.").  Thus, although the Supreme Court's decisions pertaining to the well-pleaded complaint rule have not squarely addressed federal common law, the approach it has crafted in cases involving federal statutes is inconsistent with removal of purported state claims merely on the ground that federal common law has displaced such claims.  Therefore, the court concludes that ExxonMobil has not shown that federal common law justifies removal of this case.

        2.   <u>Grable</u> Jurisdiction

ExxonMobil also argues that the doctrine recognized by the Supreme Court in <u>Grable & Sons Metals Products, Inc. v. Darue Engineering & Manufacturing</u>, 545 U.S.

308 (2005), justifies removal of this case.  Under the so-called <u>Grable</u> doctrine,[8]

removal is proper if a federal issue is "embedded" within a state law claim.  <u>See</u> <u>id.</u> at

314.  The embedded federal issue must be "(1) necessarily raised, (2) actually disputed,

(3) substantial, and (4) capable of resolution in federal court without disrupting the

federal-state balance approved by Congress."  <u>Gunn</u>, 568 U.S. at 258 (citing <u>Grable</u>,

545 U.S. at 313-14).  All four of these elements must be met in order to establish federal

jurisdiction.  <u>Id.</u>

ExxonMobil's primary arguments for <u>Grable</u> jurisdiction concern the potential

impact of Connecticut's claims on federal policymaking.  <u>See</u> Def.'s Opp'n at 18-20.

According to ExxonMobil, Connecticut's claims amount to an "attempt to countermand

federal energy and environmental policy."  <u>Id.</u> at 18.  ExxonMobil argues that the relief

sought by Connecticut would disrupt the "careful balance between energy production

and environmental protection" that "Congress has already struck."  <u>Id.</u> at 19.  In addition,

ExxonMobil contends that the Complaint's allegations necessarily imply that the federal

government was among the victims of ExxonMobil's alleged deception.  <u>Id.</u> at 19.

Whether a state claim relates to issues of national concern may demonstrate that

an embedded federal issue is "substantial", <u>i.e.</u>, the third element for <u>Grable</u> jurisdiction,

but such an argument does not address the first <u>Grable</u> element, that is, whether a state

claim "necessarily raise[s]" an issue of federal law.  <u>See</u> <u>Grable</u>, 545 U.S. at 314.  In

<u>Grable</u>, the respondent purchased real property that the IRS had seized from the

---

[8] The Second Circuit has also referred to this doctrine as "the substantial federal question exception to the well-pleaded complaint rule."  <u>New York v. Shinnecock Indian Nation</u>, 686 F.3d 133, 141 (2d Cir. 2012).

17

petitioner in satisfaction of a federal tax delinquency. Id. at 310.  Five years after the purchase, the petitioner contested ownership of the property through a state quiet title action.  Id.  The basis for the petitioner's state quiet title claim was an allegation that "the IRS had failed to notify [the petitioner] of its seizure of the property in the exact manner required by [section] 6335(a)" of title 26 of the U.S. Code.  Id. at 311.  Under the applicable state law, the petitioner was required to "specify the facts establishing the superiority of [its] claim."  Id. at 314 (citation and internal quotation marks omitted).

The Supreme Court held that the petitioner's state quiet title claim necessarily raised a federal issue, because "[w]hether [the petitioner] was given notice within the meaning of the federal statute is thus an essential element of its quiet title claim."  Id. at 315.  The Supreme Court also justified its holding on the ground that "[t]he meaning of the federal tax provision is an important issue of federal law that sensibly belongs in a federal court."  Id. at 315.  However, it only progressed to this second segment of its analysis after concluding that the federal issue was necessarily raised by the petitioner's state claim.  See id. at 314-15.  As explained above, federal jurisdiction only exists under the Grable doctrine if "all four . . . requirements are met."  Gunn, 568 U.S. at 258.

The requirement that a state claim "necessarily raise" an issue of federal law is underscored by the Second Circuit's decision in New York v. Shinnecock Indian Nation, 686 F.3d 133 (2d Cir. 2012).  That case involved a dispute between the State of New York and the Shinnecock Indian Nation over the development of a casino.  686 F.3d at 135-36.  The district court conducted a bench trial and issued a permanent injunction prohibiting construction of the casino, unless the Shinnecock Indian Nation complied with state and local laws.  Id. at 135.  As the Second Circuit observed, whether "federal

18

Indian law [ ] preclude[d] the application of state and local law to the Tribe's activities
. . . was essentially the only issue in dispute at trial."  Id. at 139.

Nevertheless, the Second Circuit concluded that New York's claim did not
necessarily raise a federal issue, and that the district court therefore lacked jurisdiction
over the claim.  Id. at 140-41.  As the court explained, "if the Shinnecock were to have
established that their construction of the casino complied with state and local law, the
court could have resolved the case without reaching the federal issues."  Id. at 140.

Here, Connecticut's Complaint asserts claims for defective and unfair acts and
practices under CUTPA.  Compl. at 38-43.  The only argument ExxonMobil makes that
pertains to the first element of Grable jurisdiction, i.e., the requirement that a state claim
"necessarily raise" an issue of federal law, is that CUTPA looks to the Federal Trade
Commission's definition of unfair or deceptive acts for guidance.  See Def.'s Opp'n at
20.  Section 42-110b(b) codifies "the intent of the [Connecticut] legislature that in
construing" CUTPA, "the commissioner and the courts of this state shall be guided by
interpretations given by the Federal Trade Commission and the federal courts to
Section 5(a)(1) of the Federal Trade Commission Act."  Conn. Gen. Stat. § 42-110b(b).
Section 42-110b(c) authorizes the Commissioner of Connecticut's Department of
Consumer Protection to issue regulations implementing CUTPA but requires that "[s]uch
regulations shall not be inconsistent with the rules, regulations and decisions of the
Federal Trade Commission and the federal courts in interpreting the provisions of the
Federal Trade Commission Act."  Conn. Gen. Stat. § 42-110b(c).

With respect to section 42-110b(b), to "be guided by interpretations" is not the
same as being bound by them.  See Conn. Gen. Stat. § 42-110b(b).  As the Connecticut

Appellate Court has explained, "[a]lthough the guidance provided by federal law will often be enlightening, federal law is not a straightjacket. . . . In other words, federal law sets a floor for Connecticut law, but not a ceiling."  Johnson Elec. Co., Inc. v. Salce Contracting Assocs., Inc., 72 Conn. App. 342, 352 (2002).  Further, although Connecticut courts have adopted the framework of analysis embodied by the federal "cigarette rule", this rule requires courts to look to public policy, as announced in Connecticut statutes and common law.  See Ulbrich, 310 Conn. at 409; see also Artie's Auto Body, Inc. v. Hartford Fire Ins. Co., 317 Conn. 602, 623-27 (2015) (referring to a Connecticut statute and regulatory scheme to determine whether plaintiffs could prevail on their unfair practice claim).  Thus, CUTPA claims do not necessarily raise federal issues by operation of this provision, because a court reviewing a CUTPA claim is not required to apply federal law.  Rather, a court refers to federal law for guidance in applying Connecticut law.  As for section 42-110b(c), it is not helpful for ExxonMobil because the Complaint does not allege that ExxonMobil violated a regulation issued by the Commissioner of the Department of Consumer Protection.  See Compl. at 36-42. Therefore, Connecticut's claims do not necessarily raise a federal issue.

Further, even assuming for the sake of argument that, on account of either of these provisions, Connecticut's CUTPA claims necessarily raise a federal issue, it is not the federal issue on which ExxonMobil focuses.  ExxonMobil makes absolutely no argument that "interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act," Conn. Gen. Stat. § 42-110b(b), are actually disputed or substantial.  See Def.'s Opp'n at 20.  In other words, with respect to any federal issue involving the FTCA, ExxonMobil has not satisfied the

remaining elements of Grable jurisdiction, i.e., that an issue is substantial, actually disputed, and capable of resolution without disrupting the federal-state balance approved by Congress.  Therefore, ExxonMobil has failed to show that this issue can support federal jurisdiction under the Grable doctrine.

The majority of the remainder of ExxonMobil's arguments in support of Grable jurisdiction are different forms of its argument that Connecticut's claims relate to issues of national concern.  See Def.'s Opp'n at 20-23.  For example, ExxonMobil argues that Connecticut "seeks to impose one state's energy policy on the rest of the country."  Id. at 21.  ExxonMobil also contends that, because the U.S. Army Corps of Engineers has exercised its delegated authority to regulate . . . issues of sea level rise", Connecticut's claims "ask this court to second-guess the efficacy of the Corps' programs."  Id. Although ExxonMobil seeks to fit these arguments into the first element of Grable jurisdiction, see Def.'s Opp'n at 18-22, arguments of this nature address whether an issue is substantial but not whether an issue is necessarily raised.  See Grable, 545 U.S. at 314.[9]

Finally, ExxonMobil briefly contends that Connecticut's claims necessarily raise federal issues because they implicate ExxonMobil's free speech rights under the First Amendment.  See Def.'s Opp'n at 22.  However, the cases on which ExxonMobil relies address the constitutional limits on defamation and libel claims.  See Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 52 (1988); Phila. Newspapers, Inc. v. Hepps, 475 U.S. 767,

---

[9] ExxonMobil also repeats its argument concerning federal common law and the well-pleaded complaint rule.  See Def.'s Opp'n at 21-22.  The court has already addressed why this argument does not justify removal.  See supra at 8-16

774-75 (1986); N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964). ExxonMobil

fails to cite any authority for the proposition that these limits apply to consumer

protection claims, nor for the proposition that these limits would apply to such claims in

a manner that would embed any First Amendment issues within state law claims--as

opposed to providing ExxonMobil with a federal defense.  Further, ExxonMobil does not

address the "subordinate position in the scale of First Amendment values" that the

Supreme Court and the Second Circuit have assigned to commercial speech.  See

Vugo, Inc. v. City of New York, 931 F.3d 42, 49 (2d Cir. 2019) (quoting Bd. of Trs. of

State Univ. of N.Y. v. Fox, 492 U.S. 469, 477 (1989)).  Therefore, the court concludes

that ExxonMobil has not shown that Connecticut's claims necessarily raise First

Amendment issues for the purposes of the Grable doctrine.

     Accordingly, for all of the above reasons, the court concludes that ExxonMobil

has failed to show that the Grable doctrine justifies removal.[10]

------------------------------------

     [10] During oral argument, counsel for ExxonMobil repeatedly emphasized the "artful pleading doctrine."  The court notes that the phrase "artful pleading doctrine" is absent from both ExxonMobil's 58-page Notice of Removal and 56-page Opposition to the Motion to Remand.  See Notice of Removal; Def.'s Opp'n.  The phrases "artful pleading" and "artfully pleaded" each appear once on the first page of the Opposition to the Motion to Remand, but without any citation to a specific court decision. See Def.'s Opp'n at 1.

     The Supreme Court once appeared to use the term "artful pleading doctrine" as a synonym for complete preemption.  See Rivet v. Regions Bank of Louisiana, 522 U.S. 470, 475 (1998) ("The artful pleading doctrine allows removal where federal law completely preempts a plaintiff's state-law claim.").  However, the Supreme Court also appeared to describe this doctrine as the "principle that 'a plaintiff may not defeat removal by omitting to plead necessary federal questions.'"  Id. (emphasis added).

     In Marcus v. AT&T Corp., the Second Circuit analyzed complete preemption and the artful pleading doctrine separately.  See 138 F.3d at 53-56.  With respect to artful pleading, the Second Circuit concluded that a breach of contract claim was removable, because it was based on a "tariff [ ] filed with the FCC pursuant to the FCA", and, therefore, "the breach of warranty claim necessarily raise[d] a substantial federal question."  Id. at 56.  The Marcus decision predated the Supreme Court's decision in Grable, which, as discussed above, clarified when a state law claim is removable on account of an embedded issue of federal law.  See Grable, 545 U.S. at 314.  Subsequently, in Sullivan v. American

22

B.    <u>Federal Officer Removal Statute</u>

ExxonMobil next argues for removal on the basis of the federal officer removal statute.  Section 1442(a)(1) authorizes removal of cases involving claims against "any officer (or any person acting under that officer) of the United States or of any agency thereof."  28 U.S.C. § 1442(a)(1).  In contrast to "the general removal statute[, which] must be strictly construed, both [section] 1442 and especially its 'acting under' provision must be read broadly."  <u>Agyin v. Razman</u>, 986 F.3d 168, 175 (2d Cir. 2021) (citations omitted).  Private parties that seek removal on the basis of section 1442 must show that (1) "they are person[s] within the meaning of statute who act[ed] under [a federal officer", (2) "they performed the actions for which they are being sued under color of [federal] office", and (3) "they [ ] raise a colorable federal defense."  <u>Isaacson v. Dow Chem. Co.</u>, 517 F.3d 129, 135 (2d Cir. 2008) (citation and quotation marks omitted).

The paradigmatic example of a private party that may avail itself of the federal officer removal statute is "a private company acting pursuant to a contract with the federal government."  <u>See Agyin</u>, 986 F.3d at 175.  ExxonMobil argues that it fits this description perfectly, given that it has supplied the federal government with fossil fuels for decades.  <u>See</u> Def.'s Opp'n at 24-30.  As ExxonMobil details in its Opposition,

---

<u>Airlines, Inc.</u>, 424 F.3d 267 (2d Cir. 2005), which was decided three months after <u>Grable</u>, the Second Circuit noted that "[t]he precise scope of the artful-pleading doctrine is not entirely clear" and acknowledged only that the doctrine "has been relied upon to support federal-court jurisdiction . . . where a plaintiff's state-law contract claims were construed as asserting rights arising only under federal tariffs." <u>Id.</u> at 272 n.4 (citing <u>Marcus</u>, 138 F.3d at 55-56).

This court understands the artful pleading doctrine as coextensive with <u>Grable</u>, <u>i.e.</u>, the artful pleading doctrine prevents a plaintiff from avoiding <u>Grable</u> jurisdiction by omitting, from the plaintiff's statement of a state-law claim, an essential element of the claim that necessarily raises a federal issue that is substantial, actually disputed, and capable of resolution without disrupting the federal-state balance approved by Congress.  <u>Compare</u> <u>Marcus</u>, 138 F.3d at 55-56, <u>and</u> <u>Grable</u>, 545 U.S. at 314.

23

through various arrangements for the production of fossil fuels, the federal government has at times exercised a significant degree of control and direction over ExxonMobil's operations.  See id.

However, ExxonMobil must show not merely that it has acted under a federal agency or officer but also that it "performed the actions for which [it] is being sued 'under color of [federal] office."  Isaacson, 517 F.3d at 135 (emphasis added) (citation omitted).  The Second Circuit has observed "[t]he hurdle erected by this requirement is quite low": a defendant need not show that a plaintiff's claims are "for the very acts" the defendant performed under color of federal office.  See id. at 137.  Further, a court must "credit [a defendant's] theory of the case" when analyzing this prong of the federal officer removal test.  See id.

Nevertheless, under this "causation requirement . . . non-governmental corporate defendants . . . must demonstrate that the acts for which they are being sued . . . occurred because of what they were asked to do by the Government."  Id.  Thus, although the strength of the connection between acts performed by a defendant under color of federal office and the acts for which the defendant is sued may be "quite low", the nature of this connection must be causal.  See id.; see also Cnty. Bd. of Arlington Cnty., Va. V. Express Scripts Pharmacy, No. 20-1031, 2021 WL 1726106, *9 (4th Cir. May 3, 2021) (holding that causal connection was sufficient for removal, where pharmacy defendants "were legally bound to follow [the Department of Defense]'s formulary when administering" a mail-order pharmacy program "and had no discretion to deviate from the DOD contract's requirements").

Here, ExxonMobil provides no explanation as to how the allegedly deceptive statements that form the basis of Connecticut's consumer protection claims have any causal connection to the production of fossil fuels for or under the direction of the federal government. See Def.'s Opp'n at 30-31. Thus, although Connecticut's allegations that ExxonMobil misrepresented the dangers of fossil fuels for the Earth's climate relate to ExxonMobil's production of fossil fuels, ExxonMobil has not shown why the alleged misrepresentations "occurred because of what [it] was asked to do by the Government." See Isaacson, 517 F.3d at 137. Nowhere does ExxonMobil allege that its contracts with the government required it to publish the advertisements and other misrepresentations alleged by Connecticut. ExxonMobil does not assert, or even suggest, that the federal government directed ExxonMobil to make these allegedly deceptive statements. See Notice of Removal ¶¶ 71-108. As a result, the court's obligation to credit ExxonMobil's theory of the case, see Isaacson, 517 F.3d at 137, does not benefit ExxonMobil with respect to this requirement.

Therefore, even assuming that ExxonMobil can satisfy the first and third prongs of the federal officer removal test, ExxonMobil has failed to satisfy the causation requirement. The court concludes that ExxonMobil has not shown that the federal officer removal statute applies to Connecticut's claims.

C.     Outer Continental Shelf Lands Act

Next, ExxonMobil argues that the court possesses jurisdiction on account of the Outer Continental Shelf Lands Act ("OCSLA"). See Def.'s Opp'n at 23-25. Section 1349(b)(1) of title 43 of the U.S. Code provides that

the district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals, or (B) the cancellation, suspension, or termination of a lease or permit under this subchapter.

43 U.S.C. § 1349(b)(1).  The parties have not brought to the court's attention any decisions by the Second Circuit or the Supreme Court discussing the limits of this jurisdictional grant, and the court has not identified any such authority.  Instead the parties both cite to decisions of the Fifth Circuit, which appears to have more familiarity with the OCSLA than other Courts of Appeals.  In construing the meaning of section 1349(b), the Fifth Circuit has concluded that "the term 'operation' contemplate[s] the doing of some physical act on the [Outer Continental Shelf]."  EP Operating Ltd. P'ship v. Placid Oil Co., 26 F.3d 563, 567 (5th Cir. 1994).  For example, in Barker v. Hercules Offshore, Inc., 713 F.3d 208 (5th Cir. 2013), the Fifth Circuit concluded that OCSLA jurisdiction existed because a workplace accident occurred on a "jack-up rig attached to the Outer Continental Shelf."  Id. at 213.

ExxonMobil's argument on this issue fails because the claims Connecticut has chosen to bring in this case seek redress for deceptive and unfair practices relating to ExxonMobil's interactions with consumers in Connecticut--not for harms that might result from the manufacture or use of fossil fuels, let alone from ExxonMobil's operations on the Outer Continental Shelf.[11]  See Compl. at 36-43.  As explained above,

---

[11] ExxonMobil submitted voluminous exhibits that suggest Connecticut may have been motivated to bring the current suit as part of a broader strategy among multiple states' attorneys general to seek redress for harms directly caused by climate change.  See Exs. 1-8, Notice of Removal (Doc. No. 1-1 at 1-95; Doc. No. 1-2 at 1-3); Exs. 1-5, Def.'s Opp'n (Docs. Nos. 37-2, 37-3, 37-4, 37-5, 37-6).  Even assuming that ExxonMobil is correct about Connecticut's motivations, this does not change the fact that

see supra at 6-8, although the Complaint details the harms caused by combustion of fossil fuels in order to explain why ExxonMobil's statements violate CUTPA, these are not the harms that underlie Connecticut's claims in this case.

Therefore, the court concludes that ExxonMobil has failed to show that OCSLA justifies removal of this case.[12]

D.      Federal Enclave Jurisdiction

ExxonMobil also contends that the court possesses jurisdiction on the ground that some of the injuries alleged by Connecticut must have occurred on federal enclaves.  See Def.'s Opp'n at 34-36.  Section 8 of Article I of the U.S. Constitution authorizes Congress "[t]o exercise exclusive Legislation in all Cases whatsoever . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-yards, and other needful Buildings."  U.S. Const. art. I, § 8.  Although "the issue is not entirely settled," some courts have construed this provision as "establish[ing] federal subject matter jurisdiction over tort claims occurring on federal enclaves, and have allowed such claims to proceed even when applying state law."  Jograj v. Enter. Servs., LLC, 270 F. Supp. 3d 10, 16 (D.D.C. 2017) (citing Akin v. Ashland Chem. Co. 156 F.3d 1030, 1034 (10th

---

Connecticut has chosen, in this case, to bring claims seeking redress for deceptive and unfair practices relating to the manner by which ExxonMobil has interacted with consumers in Connecticut.

[12] Although OCSLA jurisdiction is not a familiar issue within the Second Circuit, the court notes that other district courts have rejected similar arguments to those raised by ExxonMobil in this case.  See, e.g., Minnesota v. Am. Petroleum Inst., No. 20-CV-1636 (JRT/HB), 2021 WL 1215656, at *10-11 (D. Minn. Mar. 31, 2021) (concluding that OCSLA jurisdiction was not present, because "the State's claims are rooted not in the Defendants' fossil fuel production, but in its alleged misinformation campaign").

Cir. 1998), and <u>Federico v. Lincoln Military Hous.</u>, 901 F. Supp. 2d 654, 656 (E.D. Va. 2012)).

ExxonMobil argues that federal jurisdiction is present in the current case because "climate change harms . . . [n]ecessarily impact [ ] . . . multiple federal enclaves within Connecticut, including military installations . . . national parks . . . and federal prisons." <u>See</u> Def.'s Opp'n at 35.  ExxonMobil also argues that, "by targeting ExxonMobil's oil and gas operations and their alleged impacts, this action necessarily sweeps in those operations that occur on military bases and other federal enclaves."  <u>See</u> <u>id.</u> at 36.

ExxonMobil's argument is premised on its characterization of Connecticut's claims as targeting pollution.  However, as the court has already explained, Connecticut's claims seek redress for the manner by which ExxonMobil has interacted with consumers in Connecticut, not the impacts of climate change.  <u>See</u> <u>supra</u> at 6-8. Further, given that national parks, federal prisons, and military installations are located throughout the country, ExxonMobil's interpretation of federal enclave jurisdiction would appear to give rise to federal jurisdiction in any case involving injuries that occur throughout a state, no matter how minor the injuries occurring on federal enclaves are in relation to the claims at issue.  ExxonMobil cites no authority in support of what would amount to a sweeping change to the balance between the jurisdiction of state and federal courts.

Therefore, the court concludes that ExxonMobil has failed to show that removal is proper on account of federal enclave jurisdiction.[13]

E.    Diversity Jurisdiction

Finally, ExxonMobil argues that the court possesses diversity jurisdiction because Connecticut is not the real party in interest.  See Def.'s Opp'n at 37-39. Section 1332(a)(1) of title 28 vests district courts with "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."  28 U.S.C. § 1332(a)(1).  "There is no question that a State is not a 'citizen' for purposes of [ ] diversity jurisdiction."  Moor v. Alameda Cty., 411 U.S. 693, 717 (1973).  However, "courts must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy."  Purdue Pharma L.P. v. Kentucky, 704 F.3d 208, 218 (2d Cir. 2013) (citation and internal quotation marks omitted).

Courts have developed two competing approaches for determining whether a state is a real party in interest: the "claim-by-claim approach" and the "whole-complaint" approach.  Id. at 218-19.  Courts applying the former approach analyze whether a state is the real party in interest "with respect to each type of relief sought," while courts applying the latter approach "look[ ] at the lawsuit as a whole."  See id.  Although the Second Circuit has not definitively adopted the whole-complaint approach, it has

_____

[13] As with ExxonMobil's arguments in connection with the OCSLA, although authority on the applicability of federal enclaves jurisdiction is sparse, the court notes that other district courts have rejected similar arguments to those raised by ExxonMobil in this case.  See, e.g., Minnesota, 2021 WL 1215656, at *11 ("While the various injuries alleged in the complaint may be felt on federal enclaves as much as they are felt anywhere, the Court requires a more substantive and explicit relationship between the actual claims alleged and a specific federal enclave to exercise jurisdiction.").

strongly suggested that it prefers this approach.  See id. at 219 ("[W]e note that the

'claim-by claim' approach has been roundly criticized, and the 'whole-complaint'

approach has emerged as the majority rule.").  Accordingly, the court will apply the

whole-complaint rule in this case.  See In re Standard & Poor's Rating Agency Litig., 23

F. Supp. 3d 378, 402 (S.D.N.Y. 2014) ("[A]lthough the Second Circuit did not formally

reach the question in Purdue Pharma, it is difficult to view that decision as anything but

a thumb firmly on the whole-complaint side of the scale.").

 In Connecticut v. Moody's Corp., No. 3:10-CV-546 (JBA), 2011 WL 63905 (D.

Conn. Jan. 2011), the court held that Connecticut was the real party in interest in a suit

alleging widespread violations of CUTPA by credit ratings agencies, because it "has a

statutory interest under CUTPA 'to protect the public from unfair practices in the conduct

of any trade or commerce.'"  Id. at *3 (quoting Eder Bros., Inc. v. Wine Merchants of

Conn., Inc., 275 Conn. 363, 380 (2005)).  The court also noted that Connecticut did not

seek "restitution [ ] on behalf of specific individuals", but instead sought a restitution

order, pursuant to section 42-110m of the Connecticut General Statutes, "without

specifying beneficiaries of that restitution, which the State argues may be ordered paid

to the Connecticut Department of Consumer Protection[ ] . . . to fund positions and other

related expenses for the enforcement of Department of Consumer Protection licensing

and registration laws."  Id.

 Reviewing the Complaint as a whole, the court concludes that Connecticut is

suing to protect a quasi-sovereign interest and is therefore a real party in interest.

Connecticut seeks redress not simply for the deception allegedly caused by each of

ExxonMobil's statements but rather for a decades-long campaign of alleged

disinformation that resulted in "the stifling of an open marketplace for renewable energy."  <u>See</u> Compl. at 39, ¶ 193.  Further, as in <u>Moody's Corp.</u>, Connecticut seeks a restitution order under CUTPA that would fund efforts to respond to ExxonMobil's allegedly deceptive and unfair practices generally, rather than providing compensation to specific individuals.  <u>See id.</u> at 78 (seeking "[a]n order that ExxonMobil fund a corrective education campaign to remedy the harm inflicted by decades of disinformation, to be administered and controlled by the State or such other independent third party as the Court may deem appropriate"); <u>Moody's Corp.</u>, 2011 WL 63905, at *3.

Therefore, the court concludes that Connecticut is a real party in interest, and that the court does not possess diversity jurisdiction.

F.    <u>Fees and Costs</u>

The plaintiffs seek costs and attorneys' fees pursuant to section 1447(c) of title 28 the U.S. Code, which provides that "[a]n order remanding the case may require payment of just costs and any actual expenses, incurred as a result of the removal."  28 U.S.C. § 1447(c).  "Absent unusual circumstances, courts may award attorney's fees under [section] 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal."  <u>Martin v. Franklin Capital Corp.</u>, 546 U.S. 132, 141 (2005).  The Supreme Court has instructed that, "[i]n applying this rule, district courts retain discretion to consider whether unusual circumstances warrant a departure from the rule in a given case."  <u>Id.</u>  Here, Connecticut argues that an award of costs and fees is warranted because ExxonMobil's arguments for removal have been "roundly rejected by district and circuit courts across the country."  <u>See</u> Pl.'s Mem. at 28.

31

As the court has noted throughout this Ruling, however, several of the issues raised by ExxonMobil are novel within the Second Circuit.  Further, although it is true that multiple district courts have rejected similar arguments for removal, those courts are located in different circuits, and many relevant portions of their rulings were not subject to appellate review until very recently.  See BP P.L.C. v. Mayor & City Council of Baltimore, No. 19-1189, slip. op. at 6 (U.S. May 17, 2021) (holding that section 1447(d) of title 28 of the U.S. Code "permits appellate review of [a] district court's remand order-- without any further qualification").  Given these circumstances, the court concludes, albeit with some reservation, that ExxonMobil did not lack an objectively reasonable basis for removal.  Connecticut's request for costs and fees is denied.

## V.   CONCLUSION

For the reasons discussed above, the court grants Connecticut's Motion to Remand (Doc. No. 36) and denies Connecticut's request for costs and fees.  The Clerk is directed to remand the case to the Superior Court of Connecticut.

**SO ORDERED.**

Dated this 2nd day of June 2021, at New Haven, Connecticut.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge